# 25-861

## United States Court of Appeals
### *for the*
## Second Circuit

NUNZIO CALCE, SHAYA GREENFIELD, RAYMOND PEZZOLI, SECOND AMENDMENT FOUNDATION, FIREARMS POLICY COALITION, INC., ALLEN CHAN, AMANDA KENNEDY,

*Plaintiffs-Appellants,*

– v. –

JESSICA TISCH, in her official capacity as Commissioner of the New York City Police Department, CITY OF NEW YORK,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, No. 1:21-cv-08208-ER (Edgardo Ramos, District Judge)

## JOINT APPENDIX
## Volume II

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

## Volume I

District Court Docket, *Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)............................................................................... A-1

Amended Complaint, Doc. 5 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Dec. 22, 2021) ................................................. A-11

Answer to Amended Complaint, Doc. 15 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Apr. 22, 2022)............................. A-23

Pls.' Motion for Summary Judgement, Doc. 25 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024)............. A-31

Pls.' Rule 56.1 Statement, Doc. 27 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024)........................................ A-33

Declaration of Nunzio Calce, Doc. 28 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) ................................... A-40

Declaration of Allen Chan, Doc. 29 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) ................................... A-44

Declaration of Shaya Greenfield, Doc. 30 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) ............................. A-47

Declaration of Amanda Kennedy, Doc. 31 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) ...................... A-49

Declaration of Raymond Pezzoli, Doc. 32 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) ............................. A-52

Declaration of Adam Kraut, Doc. 33 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) ................................... A-55

Declaration of Brandon Combs, Doc. 34 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) ............................. A-57

Declaration of David. D. Jensen, Esq., Doc. 35 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024)............. A-60

Ex. 1 to Declaration of David. D. Jensen, Esq., Doc. 35-1 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) .......................................................................... A-63

Ex. 2 to Declaration of David. D. Jensen, Esq., Doc. 35-2 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) .......................................................................... A-92

Ex. 3 to Declaration of David. D. Jensen, Esq., Doc. 35-3 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) .......................................................................... A-112

Ex. 4 to Declaration of David. D. Jensen, Esq., Doc. 35-4 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) .......................................................................... A-129

Ex. 5 to Declaration of David. D. Jensen, Esq., Doc. 35-5 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) .......................................................................... A-143

Ex. 6 to Declaration of David. D. Jensen, Esq., Doc. 35-6 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) .......................................................................... A-201

Ex. 7 to Declaration of David. D. Jensen, Esq., Doc. 35-7 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) .......................................................................... A-225

Ex. 8 to Declaration of David. D. Jensen, Esq., Doc. 35-8 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 1, 2024) .......................................................................... A-249

Cross Motion for Summary Judgement, Doc. 38 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Apr. 26, 2024) ......... A-250

Defs.' Rule 56.1 Statement, Doc. 39 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Apr. 26, 2024) ............................... A-252

## Volume II

Defs.' Counter Statement, Doc. 40 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Apr. 26, 2024) .................................... A-260

Declaration of Artur Edward Sadowski, Doc. 41 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Apr. 26, 2024) ......... A-281

Ex. 1 to Declaration of Artur Edward Sadowski, Doc. 41-1 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Apr. 26, 2024) ........................................................................ A-287

Declaration of Samantha Schonfeld, Doc. 42 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Apr. 26, 2024) ................... A-289

Ex. 2 to Declaration of Samantha Schonfeld, Doc. 42-2 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Apr. 26, 2024) ........................................................................ A-291

Pls.' Counter Statement, Doc. 50 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (June 6, 2024).................................... A-485

Notice of Constitutional Question, Doc. 51 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (June 12, 2024) ................. A-495

Opinion & Order, Doc. 57 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 24, 2025)............................................. A-497

Clerk's Judgement, Doc. 58 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 24, 2025)............................................. A-517

Notice of Appeal, Doc. 59 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Apr. 8, 2025) ................................................ A-518

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

NUNZIO CALCE, ALLEN CHAN, SHAYA
GREENFIELD, AMANDA KENNEDY, RAYMOND                    21-CV-8208(ER)
PEZZOLI; SECOND AMENDMENT FOUNDATION;
and FIREARMS POLICY COALITION,

                                        Plaintiffs,

                  -against-

CITY OF NEW YORK, and DERMOT SHEA, in his
official capacity as Commissioner of the New York City
Police Department,

                                        Defendants.

------------------------------------------------------------------------ x

## **DEFENDANTS' RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants the City of New York, and Dermot Shea,[1] in his official capacity as

Commissioner of the New York City Police Department (collectively "Defendants"), by their

attorney the Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, submit

this counter statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District

Court for the Southern District of New York, responding to Plaintiffs' Statement of Material Facts

As To Which There Is No Genuine Issue To Be Tried ("Plaintiffs' Statement").

---

[1] Plaintiffs originally named then-NYPD Commissioner Dermot Shea as a defendant in his official capacity as Commissioner of the New York City Police Department. Edward A. Caban replaced Keechant Sewell (who replaced Dermot Shea) as Commissioner of the New York City Police Department on July 17, 2023. Pursuant to Federal Rule of Civil Procedure 25(d), the successor of a public officer is automatically substituted as a party when the originally named public officer "ceases to hold office while the action is pending."

**PARAGRAPH # 1:**

Defendant City of New York is a municipal corporation incorporated under the laws of the State of New York. [Amended Complaint (Doc. No. 5) ¶ 13; Answer (Doc. No. 15) ¶ 13].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 1:**

Defendants do not dispute the assertions set forth in paragraph "1" of Plaintiffs' Statement.

**PARAGRAPH # 2:**

The New York City Police Department (or "NYPD") is an agency of the Defendant City that is not amenable to suit in its own name. [Amended Complaint (Doc. No. 5) ¶ 14; Answer (Doc. No. 15) ¶ 14].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 2:**

Defendants do not dispute the assertions set forth in paragraph "2" of Plaintiffs' Statement.

**PARAGRAPH # 3:**

Dermot Shea, who was named as an official capacity Defendant at the time of filing, was previously the Commissioner of the New York City Police Department. [Amended Complaint (Doc. No. 5) ¶ 15; Answer (Doc. No. 15) ¶ 15].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 3:**

Defendants do not dispute the assertions set forth in paragraph "3" of Plaintiffs' Statement.

**PARAGRAPH # 4:**

Defendant Edward A. Caban is the current Commissioner of the New York City Police Department, named in his official capacity. [Amended Complaint (Doc. No. 5) ¶ 15; Answer (Doc. No. 15) ¶ 15; *see also* https://www.nyc.gov/site/nypd/about/leadership/commissioner.page (last visited Mar. 1, 2024)].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 4:**

Defendants do not dispute the assertions set forth in paragraph "4" of Plaintiffs' Statement.

**PARAGRAPH # 5:**

Plaintiff Nunzio Calce is a 50 year old married man who lives in Bronx, New York. [Declaration of Nunzio Calce ("Calce Dec.") ¶ 2].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 5:**

Defendants do not dispute the assertions set forth in paragraph "5" of Plaintiffs' Statement.

**PARAGRAPH # 6:**

Plaintiff Nunzio Calce would like to purchase, possess and carry a stun gun or a taser in the City of New York, but he refrains from doing so because he fears that NYPD officers will arrest or otherwise prosecute him if he does so. [Calce Dec. ¶¶ 3, 9].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 6:**

Defendants do not dispute the assertions set forth in paragraph "6" of Plaintiffs' Statement.

**PARAGRAPH # 7:**

On September 7, 2021, Plaintiff Nunzio Calce contacted his local NYPD precinct (49th) to ask whether stun guns and tasers are legal. In response, someone named "Officer Ju" told him that both stun guns and tasers are illegal in all of New York City. [Calce Dec. ¶ 7].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 7:**

Defendants do not dispute the assertions set forth in the first sentence of paragraph "7" of Plaintiffs' Statement. Plaintiffs do not cite to any admissible evidence to support the assertions set forth in the second sentence of paragraph "7" of Plaintiffs' Statement as the document cited therein constitutes hearsay for which no exception applies, and thus, no response is required and

Defendants reserve their right to move to strike these statements.  See FRCP 56(c)(2); Local Civil Rule 56.1(d).

### PARAGRAPH # 8:

Since Plaintiff Nunzio Calce spoke with his local NYPD precinct, nothing has happened that would change his understanding that NYPD officers will enforce the prohibitions against stun guns and tasers. [Calce Dec. ¶ 8].

### DEFENDANTS' RESPONSE TO PARAGRAPH # 8:

Defendants do not dispute the assertions set forth in paragraph "8" of Plaintiffs' Statement.

### PARAGRAPH # 9:

Plaintiff Nunzio Calce has never been convicted of a felony or confined to a mental institution. To the best of his knowledge, he is legally eligible to purchase and possess firearms under New York law and federal law. [Calce Dec. ¶ 10].

### DEFENDANTS' RESPONSE TO PARAGRAPH # 9:

Defendants do not dispute the assertions set forth in paragraph "9" of Plaintiffs' Statement.

### PARAGRAPH # 10:

Plaintiff Allen Chan is a 32 year old man who lives in the Flushing neighborhood of Queens, New York. [Declaration of Allen Chan ("Chan Dec.") ¶ 2].

### DEFENDANTS' RESPONSE TO PARAGRAPH # 10:

Defendants do not dispute the assertions set forth in paragraph "10" of Plaintiffs' Statement.

**PARAGRAPH # 11:**

Plaintiff Allen Chan would like to purchase, possess and carry a stun gun or a taser in the City of New York, but he refrains from doing so because he fears that NYPD officers will arrest or otherwise prosecute him if he does so. [Chan Dec. ¶¶ 3, 9].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 11:**

Defendants do not dispute the assertions set forth in paragraph "11" of Plaintiffs' Statement.

**PARAGRAPH # 12:**

On several days in September and October of 2021, Plaintiff Allen Chan attempted to contact his local NYPD precinct (109th) to ask whether stun guns and tasers are legal. On October 28, 2021, Mr. Chan was able to speak with someone who answered the number for the Detectives Squad, and that person told him that stun guns and tasers are illegal in New York City, but that the person was not sure whether they are illegal under New York State law. [Chan Dec. ¶ 7].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 12:**

Defendants do not dispute the assertions set forth in the first sentence of paragraph "12" of Plaintiffs' Statement. Plaintiffs do not cite to any admissible evidence to support the assertions set forth in the second sentence of paragraph "12" of Plaintiffs' Statement as the document cited therein constitutes hearsay for which no exception applies, and thus, no response is required and Defendants reserve their right to move to strike these statements. See FRCP 56(c)(2); Local Civil Rule 56.1(d).

**PARAGRAPH # 13:**

Since Plaintiff Allen Chan spoke with his local NYPD precinct, nothing has happened that would change his understanding that NYPD officers will enforce the prohibitions against stun guns and tasers. [Chan Dec. ¶ 8].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 13:**

Defendants do not dispute the assertions set forth in paragraph "13" of Plaintiffs' Statement.

**PARAGRAPH # 14:**

Plaintiff Allen Chan has never been convicted of a felony or confined to a mental institution. To the best of his knowledge, he is legally eligible to purchase and possess firearms under New York law and federal law. [Chan Dec. ¶ 10].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 14:**

Defendants do not dispute the assertions set forth in paragraph "14" of Plaintiffs' Statement.

**PARAGRAPH # 15:**

Plaintiff Shaya Greenfield is a 31 year old man who lives in the Richmond Hill neighborhood of Queens, New York. [Declaration of Shaya Greenfield ("Greenfield Dec.") ¶ 2].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 15:**

Defendants do not dispute the assertions set forth in paragraph "15" of Plaintiffs' Statement.

**PARAGRAPH # 16:**

Plaintiff Shaya Greenfield would like to purchase, possess and carry a stun gun or a taser in the City of New York, but he refrains from doing so because he fears that NYPD officers will arrest or otherwise prosecute him if he does so. [Greenfield Dec. ¶¶ 3, 9]

**DEFENDANTS' RESPONSE TO PARAGRAPH # 16:**

Defendants do not dispute the assertions set forth in paragraph "16" of Plaintiffs' Statement.

**PARAGRAPH # 17:**

On several days in September 2021, Plaintiff Shaya Greenfield attempted to contact his local NYPD precinct (102nd) to ask whether stun guns and tasers are legal, but he was not able to reach anyone by telephone. On September 27, 2021, Mr. Greenfield called the number for the precinct's Detective Squad and spoke with an individual who told him it was illegal to have a taser in New York City. [Greenfield Dec. ¶ 7].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 17:**

Defendants do not dispute the assertions set forth in the first sentence of  paragraph "17" of Plaintiffs' Statement. Plaintiffs do not cite to any admissible evidence to support the assertions set forth in the second sentence of paragraph "17" of Plaintiffs' Statement as the document cited therein constitutes hearsay for which no exception applies, and thus, no response is required and Defendants reserve their right to move to strike these statements.  See FRCP 56(c)(2); Local Civil Rule 56.1(d).

**PARAGRAPH # 18:**

Since Plaintiff Shaya Greenfield spoke with his local NYPD precinct, nothing has happened that would change his understanding that NYPD officers will enforce the prohibitions against stun guns and tasers. [Greenfield Dec. ¶ 8].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 18:**

Defendants do not dispute the assertions set forth in paragraph "18" of Plaintiffs' Statement.

**PARAGRAPH # 19:**

Plaintiff Shaya Greenfield has never been convicted of a felony or confined to a mental institution. To the best of his knowledge, he is legally eligible to purchase and possess firearms under New York law and federal law.[Greenfield Dec. ¶ 10].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 19:**

Defendants do not dispute the assertions set forth in paragraph "19" of Plaintiffs' Statement.

**PARAGRAPH # 20:**

Plaintiff Ray Pezzoli is a 48 year old man who lives in Staten Island, New York. [Declaration of Raymond Pezzoli ("Pezzoli Dec.") ¶ 2].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 20:**

Defendants do not dispute the assertions set forth in paragraph "20" of Plaintiffs' Statement.

**PARAGRAPH # 21:**

Plaintiff Ray Pezzoli would like to purchase, possess and carry a stun gun or a taser in the City of New York, but he refrains from doing so because he fears that NYPD officers will arrest or otherwise prosecute him if he does so. [Pezzoli Dec. ¶¶ 3, 9]

**DEFENDANTS' RESPONSE TO PARAGRAPH # 21:**

Defendants do not dispute the assertions set forth in paragraph "21" of Plaintiffs' Statement.

**PARAGRAPH # 22:**

On August 10, 2021, Plaintiff Ray Pezzoli called his local NYPD precinct (120th) in Staten Island and spoke with someone named "Detective Cayenne," who he understood was a member of the Detective Squad. Mr. Pezzoli asked if it was legal to have a stun gun in New York City, and Detective Cayenne told him it was not legal. [Pezzoli Dec. ¶ 7].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 22:**

Defendants do not dispute the assertions set forth in the first sentence of paragraph "22" of Plaintiffs' Statement. Plaintiffs do not cite to any admissible evidence to support the assertions set forth in the second sentence of paragraph "22" of Plaintiffs' Statement as the document cited therein constitutes hearsay for which no exception applies, and thus, no response is required and Defendants reserve their right to move to strike these statements. See FRCP 56(c)(2); Local Civil Rule 56.1(d).

**PARAGRAPH # 23:**

Since Plaintiff Ray Pezzoli spoke with his local NYPD precinct, nothing has happened that would change his understanding that NYPD officers will enforce the prohibitions against stun guns and tasers. [Pezzoli Dec. ¶ 8].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 23:**

Defendants do not dispute the assertions set forth in paragraph "23" of Plaintiffs' Statement.

**PARAGRAPH # 24:**

Plaintiff Ray Pezzoli has never been convicted of a felony or confined to a mental institution. To the best of his knowledge, he is legally eligible to purchase and possess firearms under New York law and federal law. [Pezzoli Dec. ¶ 10].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 24:**

Defendants do not dispute the assertions set forth in paragraph "24" of Plaintiffs' Statement.

**PARAGRAPH # 25:**

Plaintiff Amanda Kennedy is a 45 year old woman who currently lives in Bristol, Connecticut. [Declaration of Amanda Kennedy ("Kennedy Dec.") ¶ 2].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 25:**

Defendants do not dispute the assertions set forth in paragraph "25" of Plaintiffs' Statement.

**PARAGRAPH # 26:**

Previously, Plaintiff Amanda Kennedy lived in Brooklyn, New York. [Kennedy Dec. ¶ 2].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 26:**

Defendants do not dispute the assertions set forth in paragraph "26" of Plaintiffs' Statement.

**PARAGRAPH # 27:**

Plaintiff Amanda Kennedy continues to be in the City of New York on a regular basis, for both social reasons and for work. Both her agent and her recording studio are located in New York City. [Kennedy Dec. ¶ 10].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 27:**

Defendants dispute the assertions set forth in paragraph "27" of Plaintiffs' Statement only to the extent that Plaintiffs' characterization of Plaintiff Amanda Kennedy's visits to the City of New York as occurring on a "regular basis" is subjective and not supported by the evidence cited by Plaintiffs. This dispute does not result in a genuine material factual issue to be tried.

**PARAGRAPH # 28:**

Plaintiff Amanda Kennedy would like to purchase, possess and carry a stun gun or a taser in the City of New York, but she refrains from doing so because she fears that NYPD officers will arrest or otherwise prosecute her if she does so. [Kennedy Dec. ¶¶ 9, 15].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 28:**

Defendants do not dispute the assertions set forth in paragraph "28" of Plaintiffs' Statement.

**PARAGRAPH # 29:**

When Plaintiff Amanda Kennedy lived in Brooklyn, she had a stun gun that she had purchased when she previously lived in California. On November 16, 2021, while driving her car in Brooklyn, Ms. Kennedy was involved in an incident in which a woman (on foot) became angry and hit her in the face, as well as hitting her car and causing a dent, and tried to pull the door of

her car open. Ms. Kennedy had her stun gun with her, and she showed it to the woman to deter her from further attacking. [Kennedy Dec. ¶ 3].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 29:**

Defendants do not dispute the assertions set forth in paragraph "29" of Plaintiffs' Statement.

**PARAGRAPH # 30:**

NYPD officers responded to the incident, and when they learned that Plaintiff Amanda Kennedy had a stun gun, they seized the stun gun and charged her with possessing a stun gun in violation of N.Y.C. Admin. Code § 10-135. [Kennedy Dec. ¶¶ 4-5 & ex.].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 30:**

Defendants do not dispute the assertions set forth in paragraph "30" of Plaintiffs' Statement.

**PARAGRAPH # 31:**

On November 16, 2021, a NYPD officer issued Plaintiff Amanda Kennedy a "Criminal Court Appearance Ticket" that charged her with possessing a stun gun in violation of N.Y.C. Admin. Code § 10-135. [Kennedy Dec. ¶¶ 4-5 & ex.].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 31:**

Defendants do not dispute the assertions set forth in paragraph "31" of Plaintiffs' Statement.

**PARAGRAPH # 32:**

Plaintiff Amanda Kennedy retained counsel in order to contest the charge. [Kennedy Dec. ¶ 6].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 32:**

Defendants do not dispute the assertions set forth in paragraph "32" of Plaintiffs' Statement.

**PARAGRAPH # 33:**

On December 6, 2021, the New York and Kings County Criminal Court resolve the pending charge against Plaintiff Amanda Kennedy by means of an adjournment in contemplation of dismissal. [Kennedy Dec. ¶ 7].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 33:**

Defendants do not dispute the assertions set forth in paragraph "33" of Plaintiffs' Statement.

**PARAGRAPH # 34:**

Nothing has happened since then (i.e., when NYPD officers charged her with unlawfully possessing a stun gun) that would change Plaintiff Amanda Kennedy's understanding that NYPD officers will enforce the prohibitions against stun guns and tasers. [Kennedy Dec. ¶ 14].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 34:**

Defendants do not dispute the assertions set forth in paragraph "34" of Plaintiffs' Statement.

**PARAGRAPH # 35:**

Plaintiff Amanda Kennedy has never been convicted of a felony or confined to a mental institution. To the best of her knowledge, she is legally eligible to purchase and possess firearms under New York law and federal law. [Kennedy Dec. ¶ 16].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 35:**

Defendants do not dispute the assertions set forth in paragraph "35" of Plaintiffs' Statement.

**PARAGRAPH # 36:**

During the year 2023, according to information posted by Defendant City on its "OpenData" website, NYPD officers arrested 2,229 individuals for violating subpart (1) of Penal Law §265.01.[Declaration of David D. Jensen, Esq. ("Jensen Dec.") ¶ 3 & ex. 1].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 36:**

Defendants do not dispute the assertions set forth in paragraph "36" of Plaintiffs' Statement.

**PARAGRAPH # 37:**

During the year 2022, according to information posted by Defendant City on its "OpenData" website, NYPD officers arrested 1,552 individuals for violating subpart (1) of Penal Law §265.01. [Jensen Dec. ¶ 4 & ex. 2].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 37:**

Defendants do not dispute the assertions set forth in paragraph "37" of Plaintiffs' Statement.

**PARAGRAPH # 38:**

During the year 2021, according to information posted by Defendant City on its "OpenData" website, NYPD officers arrested 1,307 individuals for violating subpart (1) of Penal Law §265.01. [Jensen Dec. ¶ 5 & ex. 3].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 38:**

Defendants do not dispute the assertions set forth in paragraph "38" of Plaintiffs' Statement.

**PARAGRAPH # 39:**

Defendants do not maintain records from which they can determine how many of the arrests for violating subpart (1) of Penal Law § 265.01 concerned stun guns or tasers, visà-vis other items that this subpart prohibits. [Jensen Dec. ¶ 6 & ex. 4 at Interrogatory ¶ 2].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 39:**

Defendants dispute the allegations set forth in paragraph "39" of Plaintiffs' Statement as Plaintiffs mischaracterize Defendants' interrogatory response. Defendants' interrogatory response states that "the NYPD does not **readily** maintain any records concerning the specific provisions of the Administrative Code with which a defendant is charged." (emphasis added). See Jensen Dec. ¶ 6 & ex. 4 at Interrogatory ¶ 2. This dispute does not result in a genuine factual issue to be tried because Defendants do not readily have at their disposal records illustrating the number of arrests made pursuant to Penal Law § 265.01 specifically for the possession or use of stun guns and tasers.

**PARAGRAPH # 40:**

Defendants do not maintain records from which they can readily determine how many people they charged with violating New York City Administrative Code §10-135. [Jensen Dec. ¶ 6 & ex. 4 at Interrogatory ¶ 1].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 40:**

Defendants dispute the allegations set forth in paragraph "40" of Plaintiffs' Statement as Plaintiffs mischaracterize Defendants' interrogatory response. Defendants' interrogatory response

states that the "NYPD does not keep records in the form requested by Plaintiff[s]" and that such request would require employees of the NYPD to "look up individual arrest reports to determine if an arrestee was charged with a violation of Administrative Code § 10-135 from January 2017 to the present." See Jensen Dec. ¶ 6 & ex. 4 at Interrogatory ¶ 1. This dispute does not result in a genuine factual issue to be tried because Defendants do not readily have at their disposal records illustrating the number of arrests made pursuant to Administrative Code § 10-135 specifically for the possession or use of stun guns and tasers.

**PARAGRAPH # 41:**

The NYPD Police Student Guide identifies the "electronic dart gun" and "electronic stun gun" as being among the weapons for which "[n]o intent is required, so that the mere possession of [them] is a crime." [Jensen Dec. ¶ 7 & ex. 5 at p. 8].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 41:**

Defendants do not dispute the assertions set forth in paragraph "41" of Plaintiffs' Statement.

**PARAGRAPH # 42:**

The NYPD Police Student Guide includes both stun guns and tasers in a separate section that lists and includes pictures of weapons that Article 265 of the Penal Law prohibits. [Jensen Dec. ¶ 7 & ex. 5 at pp. 42-43].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 42:**

Defendants do not dispute the assertions set forth in paragraph "42" of Plaintiffs' Statement.

**PARAGRAPH # 43:**

In discovery, Defendants identified no evidence that could support the conclusion that stun guns are not in common use by law-abiding people for lawful purposes. [Jensen Dec. ¶ 6 & ex. 4 at Interrogatory ¶¶ 9, 11 & Request ¶¶ 5, 14].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 43:**

Defendants dispute the assertions set forth in paragraph "43" of Plaintiffs' Statement as they consist of legal arguments rather than material facts as required by Local Civil Rule 56.1(a), and thus, no response is required and Defendants reserve their right to move to strike this statement. See FRCP 56(c)(2); Local Civil Rule 56.1(a), (d). Defendants further dispute the assertions set forth in paragraph "43" of Plaintiffs' Statement as they fail to comply with the requirements of Local Rule 56.1 and are not followed by a citation to admissible evidence. This dispute does not result in a genuine factual issue to be tried.

**PARAGRAPH # 44:**

Plaintiff Second Amendment Foundation ("SAF") is a non-profit member organization incorporated under the laws of the State of Washington with its principal place of business in Bellevue, Washington. [Declaration of Adam Kraut ("Kraut Dec.") ¶ 2].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 44:**

Defendants do not dispute the assertions set forth in paragraph "44" of Plaintiffs' Statement.

**PARAGRAPH # 45:**

Plaintiff SAF has over 720,000 supporters nationwide, including in the City and State of New York. [Kraut Dec. ¶ 3].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 45:**

Defendants do not dispute the assertions set forth in paragraph "45" of Plaintiffs' Statement.

 **PARAGRAPH # 46:**

SAF's core purposes include promoting both the exercise of the right to keep and bear arms, as well as education, research, publishing, and legal action focusing on the constitutional right to privately own and possess firearms. SAF publishes three periodicals (The New Gun Week, Women and Guns, and The Gottlieb-Tartaro Report) and also publishes the academic publication Journal of Firearms and Public Policy. SAF promotes research and education on the consequences of abridging the right to keep and bear arms and on the historical grounding and importance of the right to keep and bear arms as one of the core civil rights of United States citizens. [Kraut Dec. ¶ 5].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 46:**

Defendants do not dispute the assertions set forth in paragraph "46" of Plaintiffs' Statement.

**PARAGRAPH # 47:**

Plaintiffs Nunzio Calce, Allen Chan, Shaya Greenfield, Ray Pezzoli and Amanda Kennedy are all members of Plaintiff  SAF. [Calce Dec. ¶ 11; Chan Dec. ¶ 11; Greenfield Dec. ¶ 11; Kennedy Dec. ¶ 17; Kraut Dec.¶ 4; Pezzoli Dec. ¶ 11].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 47:**

Defendants do not dispute the assertions set forth in paragraph "47" of Plaintiffs' Statement.

**PARAGRAPH # 48:**

Employees of SAF have spent a significant amount of time responding to requests from both members and supporters and the general public as a result of New York City's enforcement of the State and City laws prohibiting stun guns and tasers. SAF also spends time and money incidental to this litigation. All of these expenditures of time and money come at the expense of other priorities that SAF would otherwise pursue. [Kraut Dec. ¶ 8]

**DEFENDANTS' RESPONSE TO PARAGRAPH # 48:**

Defendants dispute the assertions set forth in the first sentence of paragraph "48" of Plaintiffs' Statement only to the extent that Plaintiffs' characterization of SAF spending a "significant amount of time" is subjective and not supported by the evidence cited by Plaintiffs. This dispute does not result in a genuine material factual issue to be tried. Defendants further dispute the assertions set forth in the third sentence of paragraph "48" of Plaintiffs' Statement. These assertions constitute speculative and conclusory opinions rather than material facts as required by Local Civil Rule 56.1(a), and thus, no response is required and Defendants reserve their right to move to strike this statement. <u>See</u> FRCP 56(c)(2); Local Civil Rule 56.1 (a), (d). Specifically, it is entirely speculative that SAF would pursue other priorities if it were not for the expenditures relating to this instant litigation.

**PARAGRAPH # 49:**

Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a nonprofit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada. [Declaration of Brandon Combs ("Combs Dec.") ¶ 2]

**DEFENDANTS' RESPONSE TO PARAGRAPH # 49:**

Defendants do not dispute the assertions set forth in paragraph "49" of Plaintiffs' Statement.

**PARAGRAPH # 50:**

FPC has members in both the City and State of New York. [Combs Dec. ¶ 7]

**DEFENDANTS' RESPONSE TO PARAGRAPH # 50:**

Defendants do not dispute the assertions set forth in paragraph "50" of Plaintiffs' Statement.

**PARAGRAPH # 51:**

FPC's mission is to defend and promote the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advance individual liberty, and restore freedom. FPC serves its members and the public through legislative and regulatory advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. [Combs Dec. ¶¶ 3, 6].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 51:**

Defendants do not dispute the assertions set forth in paragraph "51" of Plaintiffs' Statement.

**PARAGRAPH # 52:**

Plaintiffs Nunzio Calce, Allen Chan, Shaya Greenfield, Ray Pezzoli and Amanda Kennedy are all members of Plaintiff FPC [Calce Dec. ¶ 11; Chan Dec. ¶ 11; Combs Dec. ¶ 7; Greenfield Dec. ¶ 11; Kennedy Dec. ¶ 17; Pezzoli Dec. ¶ 11].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 52:**

Defendants do not dispute the assertions set forth in paragraph "52" of Plaintiffs' Statement.

**PARAGRAPH # 53:**

Members have contacted Plaintiff FPC to ask questions related to the legal status of stun guns and tasers in New York City, and in response, representatives of FPC have spent time, money and other resources answering questions and providing advice. Furthermore, members of both FPC may face criminal charges or other adverse action in the future on account of the allegation that they violated N.Y. Penal Law §265.01(1) and/or Administrative Code §10-135, and FPC may in that instance provide individuals with support in the form of advice and referrals to counsel. [Combs Dec. ¶ 7, 9, 11, 13].

**DEFENDANTS' RESPONSE TO PARAGRAPH # 53:**

Defendants dispute the assertions set forth in the second sentence of paragraph "53" of Plaintiffs' Statement as these assertions constitute speculative and conclusory opinions rather than material facts as required by Local Civil Rule 56.1(a), and thus, no response is required and Defendants reserve their right to move to strike this statement. See FRCP 56(c)(2); Local Civil Rule 56.1 (a), (d). Specifically, it is entirely speculative that any of the named Plaintiffs would violate Penal Law § 265.01(1) and/or Administrative Code §10-135 in the future or that they would be charged criminally for violating these sections of law.

**PARAGRAPH # 54:**

Plaintiff FPC assisted Plaintiff Amanda Kennedy in paying for the cost of hiring counsel to defend against her charge of possessing a stun gun in violation of N.Y.C. Administrative Code §10-135. [Combs Dec. ¶ 12; Kennedy Dec. ¶ 6]

**DEFENDANTS' RESPONSE TO PARAGRAPH # 54:**

Defendants do not dispute the assertions set forth in paragraph "54" of Plaintiffs'

Statement.

Dated:    New York, New York
          April 26, 2024

                          HON. SYLVIA O. HINDS-RADIX
                          Corporation Counsel
                            of the City of New York
                          *Attorney for Defendants*
                          100 Church Street
                          New York, New York 10007
                          (212) 356-2183


                   By:    /s/ *Samantha Schonfeld*
                          ————————————————————
                          Samantha Schonfeld
                          Assistant Corporation Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

NUNZIO CALCE, ALLEN CHAN; SHAYA
GREENFIELD; AMANDA KENNEDY; RAYMOND
PEZZOLI; SECOND AMENDMENT FOUNDATION; and
FIREARM POLICY COALITION, INC.,

                                       Plaintiffs,

                   -against-

CITY OF NEW YORK; and DERMOT SHEA, in his official
capacity as Commissioner of the New York City Police
Department,[1]

                                   Defendants.

------------------------------------------------------------------------X

**DECLARATION OF
ARTUR EDWARD
SADOWSKI**

21-CV-08208 (ER)

      **ARTUR EDWARD SADOWSKI**, declares under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct:

      1.     I am an Axon Taser Master Instructor and a Training Coordinator at the New York City Police Department ("NYPD"). I have been employed by the NYPD since January 2005 and have served as a Stun Device Curriculum Developer since 2017. My responsibilities include writing and editing lesson plans on stun devices and conducting instructor development for the proper use of stun devices. I have been the primary author of the lesson plans used by the NYPD for stun devices since 2020.

      2.     The statements made in this declaration are based on my personal knowledge, review of records maintained by the NYPD and the City of New York, communications with NYPD staff, and upon statements made by employees, officers, and agents of the City of New York.

[1] Edward Caban is current the Commissioner of the NYPD.

3.      I submit this declaration in opposition to plaintiffs' motion for summary judgment and in support of defendants' cross-motion for summary judgment. More specifically, this declaration will address how electronic dart guns and electronic stun guns operate, the extensive trainings conducted by the NYPD on the use of these devices, and the dangerousness of these weapons.

**Electronic Stun Guns and Electronic Dart Guns (aka Tasers)**

4.      An electronic stun gun is defined as "any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, render unconscious or paralyze a person by passing a high voltage electrical shock to such person." See Exhibit A. Stun guns require direct contact between the device and an individual.

5.      An electronic dart gun is defined as "any device designed primarily as a weapon" the purpose of which is to stun, knock out or paralyze a person "by passing an electrical current to such person by means of a dart or projectile." See Exhibit A. Electronic dart guns, or "Tasers" as they are commonly known, can be utilized as direct contact devices or as ranged weapons.[2]

6.      An electronic dart gun incapacitates individuals by transmitting pulses of electric current. It fires two small darts, connected to the gun with wires. The electric shock disrupts the body's motor nervous system which results in temporary incapacitation.

7.      When properly used, Tasers are considered to be "less lethal options" to firearms, which is why they are an effective tool for law enforcement. However, there are

_____

[2] Taser is a brand name of an electronic stun/dart gun. All Tasers are electronic dart/stun guns, but technically not all electronic dart/stun guns are Tasers. It is used in this report in the colloquial sense unless referring specifically to NYPD stun guns/devices, all of which are the brand "Taser."

portions of the population that are more susceptible to a serious injury when Tasers are used against them such as those individuals who are already medically compromised due to, for example, heart disease, asthma, or other pulmonary conditions, and people suffering from excited delirium, profound agitation, severe exhaustion, drug or alcohol intoxication, or chronic drug abuse. The use of a stun device on any of these vulnerable groups can result in serious injury, including death.

8.      A majority of injuries incurred by Tasers are not from the device itself, but are generally related to secondary causes. For example, the device may cause painful muscle contractions that lead to a loss of balance, and that loss of balance may lead to a fall-related injury (such as a head hitting a hard surface). Injuries more likely to be caused by the Taser device itself are muscle strains and soreness, and temporary soft tissue damage at probe or electrode impact sites. Though the occurrence of deaths in incidents where stun devices are used is rare, they do occur.

9.      Moreover, additional safety concerns arise when civilians purchase stun devices on the internet or in their local New York City convenience store where they are sometimes offered for sale. The NYPD ensures that the tasers used by officers are only purchased from reputable companies. This guarantees a certain level of product testing and quality-control.  Stun devices sold over the internet or in a corner store may not have the same level of product safety requirements which could lead to more misuse, serious injuries and even fatalities. Additionally, an individual using a Taser recreationally or during a crime may be unaware of manufacturer guidelines for proper product use, or purposefully ignore them, thus creating a greater risk to public safety.

**Required Trainings within the NYPD**

10.     To lessen the occurrence of unnecessary injury, NYPD officers are required to participate in extensive trainings on the use of stun devices. The NYPD requires officers to be recertified in these devices annually.

11.     During these trainings, officers are instructed on production specifications of the physical weapon itself as well as overall safety parameters. Namely, officers are trained on how to properly operate these devices including how to load and unload the device, proper probe placement, team tactics, and how to determine what is considered to be a "preferred target area."   Officers are taught to aim below the bottom of the chest cavity to keep the probe further from the heart (as well as further from throat and face for frontal deployments). Additionally, officers are encouraged to keep the total number of cumulative discharges (five second cycles), at less than three.

12.     Officers are further trained to quickly recognize high risk populations (see paragraph 7 above) to determine whether use of a taser would have a particularly adverse effect in a certain situation. Such high risk populations include medically compromised individuals and people suffering from certain emotional disorders such as excited delirium, profound agitation, severe exhaustion, drug or alcohol intoxication, and chronic drug use.

13.     Once these extensive trainings are completed, officers must pass a written test and a practical test. During the practical test, an officer must: (1) deploy a total of 2 cartridges (X26P) or (4 Cartridges (Taser 7 – 2 stand off and 2 close quarters)) into preferred areas of a target, (2) demonstrate safe handling during loading and unloading of the device, (3) demonstrate proper finger positioning, aiming, and deploying at preferred target areas, and (4) perform a proper de-escalation warning arc (showing the arcing of electrical current at the front

of the Taser in the hopes that an individual will comply with commands to avoid the Taser being used), and (5) utilize the arc switch to re-energize deployed probes (Taser 7).

14.     It is imperative that officers receive training on these complex devices to lessen the occurrence of serious injuries and fatalities. To that end, concerns regarding improper use of stun devices is only magnified when these weapons are put into the hands of untrained individuals.  Individuals without such proper training may not understand where to aim the device to avoid fatal occurrences or the need to limit repeated discharges. Accordingly, left in untrained hands, the device may not be used as intended or may be used in a cruel or torturous manner.

Dated:     New York, New York
           April 26, 2024

                                        _____
                                        **ARTUR EDWARD SADOWSKI**

.

# EXHIBIT A



# POLICE STUDENT GUIDE
## Law



- **Rifle** - any weapon designed or redesigned and intended to be fired from the shoulder, using a fixed metallic cartridge to fire a single projectile through a rifled bore for each single pull of the trigger.

- **Semiautomatic** - any repeating rifle, shotgun or pistol (regardless of barrel or overall length), which utilizes a portion of the energy of a firing cartridge or shell to extract the fired cartridge, case, or spent shell, and chamber the next round and which requires a separate pull of the trigger to fire each cartridge or shell.

- **Shotgun** - any weapon designed or redesigned and intended to be fired from the shoulder, using a fixed shotgun shell that fires through a smooth bore a number of ball-shot or a single projectile for each pull of the trigger.

- **Electronic Dart Gun** - any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out, or paralyze a person by passing an electrical shock to such person by means of a dart or projectile.

- **Electronic Stun Gun** - any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, render unconscious, or paralyze a person by passing a high voltage electrical shock to such person.

- **Metal Knuckle Knife** - a weapon that, when closed, cannot function as a set of metal knuckles, nor as a knife and when open, can function as both.

- **Pilum Ballistic Knife** - any knife that has a blade that can be projected from the handle by a button, lever, spring, or other device.

- **Switchblade Knife** - any knife which opens automatically by hand pressure that is applied to a button, spring or other device in the knife handle.

- **Kung Fu Star** - a disc-like object with sharpened points on the circumference thereof, and is designed for use primarily as a weapon to be thrown.

- **Cane Sword** - a cane or swagger stick having concealed within it a blade that may be used as a sword or stiletto.

- **Chuka Stick** - any device designed primarily as a weapon, consisting of

A-288

NYC000006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NUNZIO CALCE; ALLEN CHAN; SHAYA
GREENFIELD; RAYMOND PEZZOLI; SECOND
AMENDMENT FOUNDATION; FIREARM
POLICY COALITION,

          Plaintiffs,

   -against-

THE CITY OF NEW YORK, and DERMOT SHEA,
in his official capacity as Commissioner of the New
York City Police Department,

          Defendants.

**<u>DECLARATION OF SAMANTHA
SCHONFELD</u>**

21-CV-8208 (ER)

   **SAMANTHA SCHONFELD**, declares pursuant to 28 U.S.C. § 1746, under

penalty of perjury, that the following is true and correct:

   1.  I am an Assistant Corporation Counsel in the office of the Honorable

Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, attorney for Defendants

the City of New York ("City") and Dermot Shea in his official capacity as the Commissioner of

the New York City Police Department ("NYPD").[1]  As such, I am familiar with the facts stated

below and submit this declaration to place on the record the relevant documents in support of the

Defendants' cross-motion for summary judgment and in opposition to Plaintiffs' motion for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

   2.  Attached as Exhibit "A" is a true and correct copy of Plaintiffs' Amended

Complaint, dated December 22, 2021.

---

[1] Plaintiffs originally named then-NYPD Commissioner Dermot Shea as a defendant in his official
capacity as Commissioner of the New York City Police Department.  Edward A. Caban replaced
Keechant Sewell (who replaced Dermot Shea) as Commissioner of the New York City Police Department
on July 17, 2023.  Pursuant to Federal Rule of Civil Procedure 25(d), the successor of a public officer is
automatically substituted as a party when the originally named public officer "ceases to hold office while
the action is pending."

3.      Attached as Exhibit "B" is a true and correct copy of the Expert Report of Robert Spitzer, dated January 3, 2024.

4.      Attached as Exhibit "C" is a true and correct copy of New York State Penal Law Section § 265.01.

5.      Attached as Exhibit "D" is a true and correct copy of New York City Administrative Code Section § 10-135.

Dated:      New York, New York
            April 26, 2024

                                        /s/ Samantha Schonfeld
                                        Samantha Schonfeld
                                        Assistant Corporation Counsel

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NUNZIO CALCE; ALLEN CHAN; SHAYA GREENFIELD; AMANDA KENNEDY; RAYMOND PEZZOLI; SECOND AMENDMENT FOUNDATION; and FIREARMS POLICY COALITION, INC., <br><br>                 Plaintiffs, <br><br>        v. <br><br> CITY OF NEW YORK, and DERMOT SHEA, in his official capacity as Commissioner of the New York City Police Department, <br><br>                 Defendants. | 1:21-cv-08208 (ER) |

# EXPERT REPORT OF ROBERT SPITZER

January 3, 2024

I have been asked to render an opinion by the City of New York Law Department about the history of, and historical legal analogs to, restrictions pertaining to stun guns and tasers.

This Report is based on my own personal knowledge, research, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this Report.

## PROFESSIONAL QUALIFICATIONS

I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an adjunct professor at the College of William and Mary School of Law. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia. A copy of my complete curriculum vitae is attached as Exhibit A.

I am the author of 16 books on American politics subjects, including six on gun policy. I have been studying and writing about gun policy for nearly forty years. My first publication on the subject appeared in 1985. In addition to six books, I've written over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The ninth edition of the book was published in August 2023 by Routledge Publishers. My two most recent books on gun policy, *Guns across America* (Oxford University Press in 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in the national and international media on gun-related matters. For over twenty years, I have been a member of the National Rifle Association and of the Brady

Campaign to Prevent Gun Violence.

I have provided written testimony as an expert witness in the following cases (in addition to this case): *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.); *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No.: 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu* , No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951(D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum,* No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141, (S.D. Ill.); *Mitchell, et al. v. Atkins, et al*., 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et al*., 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, 22-cv-10989 (S.D.N.Y.)*; Rocky Mountain Gun Owners, et. al. v. The Town of Superior*, 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, Case No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-

192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, 23-cv-05364 (W.D. Wash.); *RMGO/Mosgrove v. Polis*; *Koppel v. Bonta*, 8:23-cv-00813 (C.D. Cal.); *Calce v. City of New York*, Case 1:21-cv-08208-ER (S.D.N.Y.).

I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069 (2012).

I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

## I.   INTRODUCTION

Stun guns and tasers are modern weapons that were designed or adapted for individual use as small, hand-held devices primarily by and for law enforcement and possible military applications. When these devices entered society and began to circulate, they were subject to

various types of regulation, from outright bans pertaining to civilians, to permissible civilian ownership subject to a system of permitting. The purpose of this Report is to examine the development and regulation of these "conducted energy devices" (CEDs; also called "conducted electrical weapons," or CEWs) in the light of historic government regulation of other weapons also considered dangerous, but less lethal than firearms, including fighting knives, various types of clubs, and toy guns. All follow a remarkably similar sequence of events culminating in a variety of public policy regulations.

## II.   THE HISTORY OF STUN GUNS AND TASERS

Stun guns are devices that use an electrical shock to disable or incapacitate another person. Early, experimental versions of such devices date back to the 1930s, and "have their roots not in policing or riot control but in farming and torture."[1] Such early devices were cumbersome but were adapted for use in riot control in the 1950s and 1960s in the U.S. where police first used them against civil rights protestors in Southern states.[2] During this period stun guns were "primarily used by law enforcement agencies"[3] that required the device to be in direct contact with the person subject to the electrical charge. Stun gun technology continued to advance, yielding a new generation of devices that were smaller, lighter weight, and safer for the holder of the device to operate. U.S. Army researchers were also interested in "less-lethal weapons" like stun guns.[4]

Tasers were developed by engineer Jack Cover. Working in the 1960s and 1970s, he developed what he hoped would be a non-lethal or less-than-lethal weapon to be used on airlines

---

[1] Neil Davison, *'Non-Lethal' Weapons* (NY: Palgrave Macmillan, 2009), 21. An inventor was granted a patent for the first electric cattle prod in 1890:
https://patentimages.storage.googleapis.com/1f/a0/2a/08403a18699549/US427549.pdf
[2] Davison, *'Non-Lethal' Weapons*, 21.
[3] "A Brief History of Stun Guns: How They Became Popular Self-Defense Tools," TBO-TECH, March 1, 2023, https://www.tbotech.com/history-of-stun-guns.htm
[4] Davison, *'Non-Lethal' Weapons*, 22.

and by law enforcement that fired electrically charged darts attached to wires from a distance of about 20 feet. The darts delivered a 50,000 volt (high-voltage, low-amperage) charge. Cover developed the first taser prototype in 1970, which he patented in 1974 and began selling in 1974-1975, giving it the acronym-based name "TASER."[5] After initial skepticism on the part of law enforcement that stretched through the 1980s, police forces came to accept the taser; today over 90% of law enforcement agencies are equipped with them. Initial sales of the weapon were unregulated and thus included civilian acquisition, and some were used in crimes. Among the earliest such reported taser crimes were a gas station robbery in Miami, and the torture of a couple during a robbery in Blue Bell, Pa.[6] (Police are not required to keep systematic records on taser and other CEW use.[7]) This, plus the fact that early tasers used gunpowder to fire the darts, prompted the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) to classify it as a firearm, which opened the door to federal regulation. States also stepped in to impose their own restrictions.

From the 1970s through the early 2000s, at least seven states, including New York State, enacted laws that barred civilian possession of stun guns and tasers.[8] In addition, nearly 40

---

[5] TASER is an acronym for "Tom Swift and His Electric Rifle," after a favorite literary character of Cover's who, in a story published in 1911, invented a gun that shot bolts of electricity. Robert Bowling, "History of the TASER: How It Became an Essential Police Tool," OFFICER.com, November 9 2023, https://www.officer.com/tactical/less-lethal/article/21251746/history-of-the-taser-how-it-became-an-essential-police-tool. About 2000 tasers were sold in 1975 to civilians, security guards, and a few police officers, but that year sales were stopped temporarily while the Consumer Product Safety Commission investigated the device. After declaring it not lethal, sales resumed. Davison, *'Non-Lethal' Weapons*, 22-23.

[6] Bowling, "History of the TASER."

[7] Johanna Wald and Lisa H. Thurau, *Catch and Stun: The Use and Abuse of Conducted Electrical Weapons (CEWs) on Children and Youth,* Strategies for Youth, January 2022, 10, 16-17, https://strategiesforyouth.org/sitefiles/wp-content/uploads/2022/01/SFY_Catch-and-Stun_fnl-rev_web.pdf

[8] Act of June 13, 1988, ch. 275, § 134-16, 1988 Haw. Sess. Laws 510, 516; Act of July 10, 1986, ch. 212, 1986 Mass. Acts 456; Act effective July 1, 1976, No. 106, § 1, 1976 Mich. Pub. Acts 225, 225; Act of Nov. 12, 1985, ch. 360, 1985 N.J. Laws 1488; NY CLS Penal § 265.01, 1976;

localities in 15 states (aside from the seven states just mentioned) enacted similar restrictions (including cities, towns, and counties). At least 17 states and nearly 130 localities (cities, towns, counties) imposed carry bans. A handful of other localities allowed for stun gun and taser carrying with a permit.[9] As this data shows, local governments have been especially active in enacting restrictions on stun guns and tasers.

In the 1990s researchers replaced the gunpowder propellant with compressed air, which removed it from the ATF's "firearm" category.[10] This spurred manufacturers to launch aggressive campaigns to sell tasers to the general public as personal self-defense weapons.[11] Tasers are now capable of firing their darts, wired to the releasing device, to a distance of over 30 feet, although their optimal range is closer to 20 feet.[12]

Stun guns and tasers were developed to provide law enforcement with a non-lethal, or far less lethal alternative to the use of firearms.[13] Yet controversy surrounding the consequences of taser use has persisted since their initial availability.[14] For example, critics have noted that, from 2010 to 2021, at least 513 individuals have died in the U.S. as the result of being fired upon with tasers by police.[15] From 2000 through 2020, tasers were the third leading cause of death among

---

Act effective Nov. 1, 1990, ch. 264, 1990 N.Y. Laws 761; Act of June 27, 1985, ch. 310, 1985 R.I. Pub. Laws 701; Laws of 1981, ch. 348, 1981 Wis. Sess. Laws 1456.

[9] Eugene Volokh, "Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Defend Arms and Defend Life," *Stanford Law Review* 62(December 2009): 244-55.

[10] Bowling, "History of the TASER."

[11] Davison, *'Non-Lethal' Weapons*, 60.

[12] https://www.britannica.com/topic/TASER; Eugene Nielsen, "Taser International X26," *Law and Order,* October 2004, 118-24; Davison, *'Non-Lethal' Weapons*, 96.

[13] John Yang, "Police face new scrutiny for use of Tasers after deadly incidents," *PBS News Hour,* July 17, 2023, https://www.pbs.org/newshour/show/police-face-new-scrutiny-for-use-of-tasers-after-deadly-incidents

[14] "A Brief History of Stun Guns"; Ata Soleimanirahbar and Byron K Lee, "The TASER safety controversy," *Expert Review of Medical Devices* 8:6 (2011): 661-663, DOI: 10.1586/erd.11.53

[15] Jo Ciavaglia, Josh Salman, and Katie Wedell, "Lethal force? Tasers are meant to save lives, yet hundreds die after their use by police," *USA Today,* April 26, 2021, https://www.usatoday.com/in-

fatalities resulting from civilian-police encounters.[16] As one scientist has noted, "'A Taser, while intended to be nonlethal, can still incur serious effects, which in some cases, can be life-threatening.'"[17]

In addition, they continue to have criminal appeal. According to a 2012 account, stun guns and tasers "have gained popularity among robbers who use the devices to intimidate victims into cooperation."[18] The same investigation noted that "[s]tun gun-armed robberies have occurred everywhere from Bellingham [Washington] to Rockville, Md., in the past couple of years. . . ." For criminals, these weapons are reportedly appealing because they are less lethal and less expensive than firearms, are readily available, are less likely to be mistaken for firearms by police in a perpetrator-police encounter, and in most places do not result in sentence enhancement if used in crimes (unlike guns). This is further complicated by the fact that "a stun gun is a deadly weapon if used by an untrained professional, improperly, or against a vulnerable victim. . . ."[19]

Other analysis has emphasized the importance of training protocols for proper use of such weapons, continued research into the physiological effects of taser and stun gun use, and greater oversight of their use.[20] With respect to standards for using tasers, in 2005 the Police Executive

depth/news/investigations/2021/04/23/police-use-tasers-ends-hundreds-deaths-like-daunte-wright/7221153002/. Taser-related deaths date to the 1980s. Davison, *'Non-Lethal' Weapons*, 35, 97.

[16] "Fatal Encounters," https://fatalencounters.org/our-visualizations/

[17] Kelly Burch, "10 ways Tasers and stun guns can damage your body and brain, from twisted testicles to temporary memory loss," *Business Insider*, April 10, 2023, https://www.businessinsider.com/how-taser-stun-gun-affect-brain-body-2023-4

[18] Paris Achen, "Use of stun guns to commit crimes more prevalent," *The Columbian*, July 11, 2012, https://www.columbian.com/news/2012/jul/11/use-of-stun-guns-to-commit-crimes-more-prevalent-l/

[19] Achen, "Use of stun guns to commit crimes more prevalent."

[20] Neil Davison and Nick Lewer, "Bradford Non-Lethal Weapons Research Project," Research Report No. 8, Centre for Conflict Resolution, Department of Peace Studies, University of Bradford, March 2006, https://ipcan.org/wp-content/uploads/2017/06/Research-Report-of-the-University-of-Bradford-on-Non-Lethal-Weapons-mars-2006.pdf

Research Forum and the International Association of Chiefs of Police both issued policy recommendations that tasers and other conducted energy devices (CEDs) "be used against only those who are actively resisting, that they not be used against minors or the elderly except in emergency situations, and that each deployment be closely supervised."[21] Police training experts have warned that police may at times be "too trigger-happy with stun guns," using them too frequently or in circumstances when taser use is not called for.[22] Even though most police now carry tasers, some within the law enforcement community have registered doubts about taser use and efficacy.[23] A related concern is that the operator can administer repetitive painful shocks to the victim once the darts are fired. Such torture-like repetitive shocking increases the likelihood of a fatal outcome by 50-75%.[24] All of these concerns and uncertainties are magnified when tasers are possessed for civilian use. Police are at least subject to supervision and training, though training standards vary. Civilians are not. Training is important to avoid abuse or misuse of stun guns and tasers. As the New York Civil Liberties Union reported, the likelihood of greater harm or danger with such weapons' use occurs when excessive numbers or long shocks are administered, when particularly vulnerable parts of the body are hit, including the chest, neck, and genitals,[25] and when used against children.[26]

---

[21] Michael D. White and Justin Ready, "Examining fatal and nonfatal incidents involving the TASER," *Criminology and Public Policy* 8(November 2009): 868, https://cvpcs.asu.edu/sites/default/files/content/projects/Taser%20Media%20CPP.pdf

[22] German Lopez, "It's not just guns. Police often use Tasers all wrong, too." *Vox*, April 15, 2015, https://www.vox.com/2015/4/15/8420305/tasers-stun-guns-police

[23] Christopher Mele and Johnny Diaz, "Tasers: Are These Police Tools Effective and Are They Dangerous?" *New York Times,* April 14, 2021, https://www.nytimes.com/article/police-tasers.html

[24] White and Ready, "Examining fatal and nonfatal incidents involving the TASER," 875.

[25] Corey Stoughton, et al., *Taking Tasers Seriously: The Need for Better Regulation of Stun Guns in New York*, New York Civil Liberties Union, 17, https://www.nyclu.org/sites/default/files/publications/nyclu_TaserFinal.pdf

[26] Wald and Thurau, *Catch and Stun,* 16.

Obviously, stun gun and taser technologies are relatively new. Yet an examination of weapons regulation in American history reveals that less lethal weapons—i.e., weapons other than firearms—were subject to significant, widespread, and varied regulation in addition to firearms. Historical weapons regulations extended to fighting knives and other bladed weapons, clubs, and toy guns. Historical regulations of these weapons followed a regulatory pattern remarkably similar to that of stun guns and tasers.

## III.  HISTORICAL RESTRICTIONS ON BOWIE KNIVES AND SIMILAR LONG-BLADED KNIVES

Note at the outset that knives and blunt objects like clubs (discussed in the next section) are not firearms. They are, however, weapons, and "arms" as that term is used in the debate over gun policy and the Second Amendment.[27] And while knives and clubs are certainly deadly, they are less deadly (partly because they require more concerted intent, intimacy, and force by the user) than firearms.[28] In that respect, they pose a direct analog to stun guns and tasers.

The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons.[29] In the 1830s, at least six states enacted laws barring the carrying of

---

[27] *D.C. v. Heller,* 554 U.S. 570, 582 (2008); Eric Ruben, "The Gun Rights Movement and 'Arms' Under the Second Amendment," Brennan Center for Justice, June 2021, file:///C:/Users/Bob/Downloads/Ruben_final.pdf; Stephen P. Halbrook, "What the Framers Intended: A Linguistic Analysis of the Right to 'Bear Arms,'" *Law and Contemporary Problems* 49(Winter 1986): 158, https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=3830&context=lcp

[28] Joshua Harms and Madison Bush, "A Comparative Analysis of Knife and Firearm Homicides in the United States," *Journal of Interpersonal Violence* 37(October 2022): 19-20, https://pubmed.ncbi.nlm.nih.gov/36148686/; Philip J. Cook and Kristin A. Goss, *The Gun Debate,* 2nd ed.(NY: Oxford University Press, 2020), 37-42.

[29] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 582, and in Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 53–54.

Bowie knives by name.[30]  From then to the start of the twentieth century, every state plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives:  a total of at least 42 states (including the District of Columbia) barred or restricted Bowie knives by name, including laws punishing concealed carry, any carry, enhanced criminal penalties, taxes on sale or ownership, barring them from named groups, and anti-brandishing laws. Another 8 states enacted laws barring the category or type of knife embodied by the Bowie knife but without mentioning them by name (see Exhibit B) totaling 49 states plus the District of Columbia.[31]

The Bowie knife is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim Bowie, who reputedly killed one man and wounded another using the "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[32]

The "Bowie knife" rapidly became known beginning in the 1830s for the distinctive type of long-bladed and usually single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named. While Bowie knives initially "came in a variety of forms—with or without guards, with differently shaped blades," they eventually became more standardized as "a

---

[30]  A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law.

[31]  Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states.  See Exhibit C.

[32]  "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77). David Kopel says, erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River in 1827." Rezin Bowie had just developed the distinctive knife his brother used in the fight, so it could not have been "traditional." David Kopel, "Bowie knife statutes 1837-1899," *The Volokh Conspiracy*, November 20, 2022, https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

large knife with a cross guard and a blade with a clipped point."[33]  The distinctive features of the Bowie knife are revealed in Robert Abels' book, *Bowie Knives*, which includes pictures of nearly one hundred such knives made between 1835 and 1890.[34] The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo in 1836), and the knife's distinctive features, encouraged its proliferation,[35] referred to by one historian as "the craze for the knives."[36]

### A.  BOWIE KNIVES AND CRIME

As was true of other knives with long, thin blades,[37] they were widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate.[38]  Indeed, such knives were known as "fighting knives"[39] that were "intended for [interpersonal] combat."[40] In the early nineteenth century "guns and knives accounted for a growing share of the known weapons that whites used to kill whites."[41] In 1834, for example, a grand jury in Jasper County, Georgia deplored

> the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult

---

[33] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/.

[34] Robert Abels, *Bowie Knives* (NY: Abels, 1979).

[35] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39–63.

[36] Davis, *Three Roads to the Alamo*, 583.

[37] Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

[38] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485; Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques* (Boulder, CO: Paladin Press, 2010), 35-44.

[39] Randall Roth, *American Homicide* (Cambridge, MA: Harvard University Press, 2009), 218.

[40] Flayderman, *The Bowie Knife*, 59.

[41] Roth, *American Homicide*, 218.

others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[42]

Homicide rates increased in the South in the early nineteenth century, as did laws restricting concealed weapons carrying.  Dueling also persisted during this time, even as the practice was widely deplored by religious and other groups, in newspapers, by anti-dueling societies and political leaders.[43]

Bowie knife writer Norm Flayderman provides abundant and prolific evidence of the spread and early criminal use of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper and other accounts, and providing references to literally hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in fights, duels, brawls and other criminal activities.[44]  Flayderman concludes that, as early as 1836, "most of the American public was well aware of the Bowie knife."[45]  (Very much like the allure of contemporary assault weapons to some,[46] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[47])  All this contributed to widespread enactment of laws prohibiting dueling in the

---

[42] Quoted in Roth, *American Homicide*, 218–19.
[43] Baugh, *Rendezvous at the Alamo*, 51.
[44] Flayderman, *The Bowie Knife*, 25–64; 495–502.
[45] Flayderman, *The Bowie Knife*, 43.
[46] Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,* March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.
[47] Flayderman, *The Bowie Knife*, 46.

states.[48]  In 1839, Congress passed a measure barring dueling in the District of Columbia.[49]  Both

pistols and knives were prominently used in such affairs.[50]

At least three state court cases dealt in some manner with fighting knives like the Bowie

knife.  In the 1840 case of *Aymette v. State*[51] the Supreme Court of Tennessee upheld the conviction

of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of

1837–1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-knife, or Arkansas

toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or

Arkansas toothpick, under his clothes, or keep the same concealed about his person such person

shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less

than two hundred dollars, and shall be imprisoned in the county jail not less than three months and

not more than six months."[52]  In its decision, the court concluded that the prohibition against

wearing the named weapons was well justified in that they "are usually employed in private broils,

and which are efficient only in the hands of the robber and the assassin."[53]  The court continued,

"The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to

the peace and safety of the citizens. . . ."[54]  Further, the court added that the state law existed "to

preserve the public peace, and protect our citizens from the terror which a wanton and unusual

---

[48] A search for the word "duel" in the Duke Center for Firearms Law database of old gun laws yields 42 results.  See https://firearmslaw.duke.edu/repository/search-the-repository/.
[49] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.
[50] Roth, *American Homicide*, 180–83, 210–17.
[51] Cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008).
[52] *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).
[53] *Aymette v. State,* 156.
[54] *Aymette v. State,* 157.

exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms. . . ."[55]

Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law violation and challenge. In the case of *Haynes v. Tennessee* (1844),[56] Stephen Haynes was indicted for carrying a concealed Bowie knife. He was convicted of wearing a knife that resembled a Bowie knife but appealed his conviction on the grounds that he was actually carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade. (At the trial, witnesses disagreed as to the proper name for the knife in question.) He also argued that the state law, in listing various types of knives including those "similar" to Bowie knives, was "too indefinite" and could therefore lead to "absurd consequences" that "must follow its enforcement. . . ."[57] On appeal, the court upheld his conviction and commended the Tennessee state legislature's enactment: "The design of the statute was to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil disposed persons but too often ended in assassination."[58] The court continued: "The design, meaning, and intent was to guard against the destruction of human life, by prohibiting the wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill. . . ."[59] The court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or any other weapon in form, shape or size, resembling them."[60] Noting the similarity among knives and the possibility of an unjust outcome where, say, a person might be

---

[55] *Aymette v. State,* 157.
[56] *Haynes v. Tennessee,* 24 Tenn. 120 (1844).
[57] *Haynes v. Tennessee,* 122.
[58] *Haynes v. Tennessee,* 122.
[59] *Haynes v. Tennessee,* 123.
[60] *Haynes v. Tennessee,* 122.

convicted of carrying a mere pocket knife, the court posed this question: "what is to protect against conviction, when the words of the statute cover the charge, and its true spirit and meaning does not?" Their answer: "the judge and jury who try the case."[61] As the author of a book on Bowie knives noted, "the fact that the term 'bowie knife' had never been precisely defined did not help his [Haynes's] case."[62]

A third state court case relevant to the legal status of Bowie knives is *Cockrum v. State of Texas*, 1859.[63] The *Cockrum* case involved John Cockrum, who was charged with the murder of his brother-in-law, William Self, with a Bowie knife.[64] Under Texas law, "a homicide, which would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall be deemed murder and punished as such. . . ."[65] The court upheld the added penalty provision of the law relating to use of a Bowie knife, despite the court's very expansive interpretation of the right to bear arms, but reversed and remanded the man's conviction because of an error related to statutory changes and jury instructions. It described the Bowie knife as "an exceeding destructive

---

[61] *Haynes v. Tennessee,* 123.

[62] Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques*, 43.

[63] *Cockrum v. State,* 24 Tex. 394 (1859), https://constitution.org/1-Constitution/2ll/2ndcourt/state/177st.htm. David Kopel says that a fourth case, *Nunn v. State*, 1 Ga. 243 (1846), is a "major state supreme court case[s] involving Bowie knives." "The legal history of bans on firearms and Bowie knives before 1900," *The Volokh Conspiracy,* November 20, 2022, https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-and-bowie-knives-before-1900/. But *Nunn* involved a man who was prosecuted for carrying a pistol (openly, not concealed), not a knife. A state law criminalized concealed carry of various named weapons, including pistols and Bowie knives, whereas a different provision allowed for open carrying of named weapons, including Bowie knives, but failed to include pistols on that list. Noting the "great vagueness" in the statute's wording, the court reversed the man's conviction and wrote that there was a constitutional right to open carry "for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State." By contrast, the court upheld the constitutionality of the concealed carry restrictions and noted that those restrictions were enacted "to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*." 246; italics in original.

[64] https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-0001/UHP-0254.html

[65] *Cockrum v. State,* 394.

weapon," an "instrument of almost certain death," and "the most deadly of all weapons in common use."[66] Further, the court said: "He who carries such a weapon. . .makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon."[67]

All of these cases underscore courts' recognition of the dangerous nature and nefarious use of Bowie knives not only by their characterizations of them, but by the fact that they are treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons including pistols and various named clubs.[68]

For example, 15 states banned all carrying of Bowie knives (by banning both concealed carry and open carry), while others imposed taxes on individuals' acquisition or possession of them. Georgia sought to stamp out Bowie knife circulation (as well as that of other named weapons) in

---

[66] *Cockrum v. State*, 403–04. Kopel says, incorrectly, that "Bowie knives. . . were regulated the same as a butcher's knife." According to the Duke Center for Firearms Law Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/search-the-repository/) six states had laws that restricted butcher knives by name, whereas 42 states restricted Bowie knives by name. See Exhibits B and D. Kopel, "Bowie knife statutes 1837-1899."

[67] *Cockrum v. State,* 403.

[68] Among the notorious incidents attached to the Bowie knife was its use by two of the conspirators in the Lincoln assassination in 1865. The plan was to assassinate President Lincoln, Vice President Andrew Johnson, and Secretary of State William Seward. The man assigned to attack Seward, Lewis Powell, entered the Seward home armed with a pistol and a Bowie knife. When one of Seward's sons tried to stop him, Powell tried to shoot him, but his gun misfired, so he used it as a club against the son. When he encountered another son, Powell slashed him with his Bowie knife, the weapon he then used to attack Seward who, thanks to a neck collar, survived. David Morgan, "Lincoln assassination: The other murder attempt," *CBS News,* May 10, 2015, https://www.cbsnews.com/news/lincoln-assassination-the-other-murder-attempt/; https://www.history.com/topics/american-civil-war/william-seward. John Wilkes Booth also carried what was later identified as a Bowie knife which he used to slash the man who accompanied Lincoln to the theater and who tried to stop Booth after he shot the president. Booth slashed the man in the arm with his knife to make his escape. https://lincolnconspirators.com/2018/12/31/cloak-and-daggers-cutting-through-the-confusion-of-the-assassination-knives/

an 1837 law: "it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons . . . Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c."[69]  The desirability and utility of concealed-carry restrictions was precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence.

States were imaginative and persistent in their effort to suppress fighting knives and other weapons. For example, an 1881 Arkansas law combined no-carry provisions (whether concealed or openly) applying to "any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knuck[le]s, razor, or any pistol of any kind whatever" with another provision in the same law that made it a misdemeanor to "sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person" the aforementioned weapons, including "any kind of cartridge."[70] Even though the law allowed persons to have the weapons on their own premises, it begs the question of how, exactly, a person could legally obtain such weapons in the first place if they weren't already owned within a family before the 1881 law was enacted.

States relied on a variety of regulatory techniques to suppress Bowie knife carrying: 29 states enacted laws to bar their concealed carry; 15 states barred their carry whether concealed or openly;

---

[69] 1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, § 1.
[70] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § §1-3. The law also made exceptions for military weapons, for officers, and legal transport for people on a journey, a common exception in such laws.

7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives (see Exhibits B and D). In addition, these laws would often expressly exempt from restriction common pocket knives.[71]

### B. Difficulties in Prohibiting Knife Possession

The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further question: given the universal agreement that these knives were dangerous, why not simply ban their possession outright? The answer is two-fold. First, America was a developing nation-state in the nineteenth century. The federal and state governments did not yet possess the maturity, powers, tools, or resources to implement any measure as sweeping as a knife ban, especially since knives are technologically very simple to produce, and metal-working was a common and ordinary part of everyday life. After all, the front-line administrative entity on which we today rely for law enforcement, the police, barely existed in the way we think of policing today in most places in most of nineteenth century (up to this time policing fell to a haphazard mix of the watch system, constables, militias, and vigilantes). Modern police forces only came in to being in a handful of large cities before the Civil War, and did not reach maturity until the early twentieth century.[72]

---

[71] E.g., 1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117; 1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1; 1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1; John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835; 1821 Tenn. Pub. Acts 15-16, An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, ch. 13.

[72] Chris McNab, *Deadly Force* (Oxford, Great Britain: Osprey Publishing, 2009), 13-24; William R. Kelly and Daniel P. Mears, *The Reinvention of Policing* (Lanham, MD: Rowman & Littlefield, 2023), 54-58. Boston created a police force in 1838, New York City created a

Second, the chief (though not only) remedy enacted by the states to address the problem of knife fighting was both more focused and feasible: to bar the carrying of knives, along with the other two categories of weapons that also threatened public safety, clubs and pistols. The fact that all three types of weapons—knives, clubs, and pistols—were consistently treated together is conclusive evidence that all were considered so dangerous and inimical to public safety that they were subject to anti-carry and other restrictive laws and bundled together in legislative enactments.

## IV.    HISTORICAL RESTRICTIONS ON CLUBS AND OTHER BLUNT WEAPONS

Among the most widely and ubiquitously regulated harmful implements in U.S. history were various types of clubs and other blunt weapons (see Exhibit C). Most were anti-carry laws, which also generally encompassed pistols and specific types of knives, although some of the laws extended prohibitions to these weapons' manufacture, possession, sale, or use in crime.[73]   As Exhibit C shows, at least five distinct types of clubs and blunt objects were regulated in the United States.   Notably, every state in the nation had laws restricting one or more types of clubs. According to a detailed reference book on the subject of these blunt instruments by Robert Escobar, they were considered "objectionable objects, once feared but now forgotten."[74]   Escobar provides what he calls "a family history" of these blunt weapons, but adding that "[i]t's a disreputable family to say the least, black sheep even within the study of weaponry."[75]   They have been described as

standing police force in 1845, followed by Chicago in 1851, Philadelphia in 1854, and Baltimore in 1857 (23). Jill Lepore, "The Invention of the Police," *The New Yorker,* July 13, 2020, https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police. Both McNab and Lepore emphasize the role of slavery and slave suppression as key to the development of policing. Had there been no slavery in the U.S., however, policing would have been no less necessary.

[73] E.g. see 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.

[74] Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Columbus, OH: Gatekeeper Press, 2018), 1.

[75] Escobar, *Saps, Blackjacks and Slungshots*, 2.

"wicked, cowardly, 'Soaked in blood and cured in whiskey.'"[76]  Those who carried them (excluding police) "were called vicious, devils and lurking highwaymen."[77]  These club-type blunt objects compose a family of objects used for striking others, and while they vary in name and construction, the categories are "somewhat fluid."[78]

Among the five types of clubs regulated in U.S. laws, 15 states barred bludgeon carrying.  A bludgeon is a short stick with a thickened or weighted end used as a weapon.[79]  The earliest state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s and 1800s, and 4 in the early 1900s (as with each of these chronological categories, the state law total exceeds the total number of states because some states enacted the same or similar laws in multiple centuries).

A billy (sometimes spelled billie) club is a heavy, hand-held rigid club,[80] usually made of wood, plastic, or metal,[81] that is traditionally carried by police, often called a nightstick or baton.[82]  Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police armed with batons,"[83] a synonym for a billy club.  As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry.  At least 16 states had anti-billy club laws, totaling 46 laws; the earliest

---

[76] Escobar, *Saps, Blackjacks and Slungshots,* 2.
[77] Escobar, *Saps, Blackjacks and Slungshots,* 2.
[78] Escobar, *Saps, Blackjacks and Slungshots,* 1.
[79] https://www.merriam-webster.com/dictionary/bludgeon.
[80] Some versions were made to have some flexibility to increase their striking power. See Escobar, *Saps, Blackjacks and Slungshots*, 118-19.
[81] https://www.merriam-webster.com/dictionary/billy%20club. Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. *Saps, Blackjacks and Slungshots*, 118. One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c." "Local Intelligence," *Delaware Republican*, June 15, 1857, https://bit.ly/3V9nVO7.
[82] Escobar, *Saps, Blackjacks and Slungshots,* 2, 69-70, 105, 113-30.
[83] Escobar, *Saps, Blackjacks and Slungshots*, 105.

law appears to have been enacted in Kansas in 1862,[84] followed by a New York law in 1866.[85] Fourteen states enacted such laws in the 1800s; 11 states did so in the early 1900s.

At least 14 states barred the carrying of "clubs" more generically, without specifying the type. The oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s.

Anti-slungshot laws were enacted by 43 states, with 71 laws enacted in the 1800s and 12 in the 1900s. A slungshot (or slung shot), also referred to as "a type of blackjack,"[86] is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s (the first "known use" of slungshot was 1842[87]). By one account, "[s]lungshots were widely used by criminals and street gang members in the 19th Century. They had the advantages of being easy to make and conceal, silent, and very effective, particularly against an unsuspecting opponent. This gave them a dubious reputation, similar to that of switchblade knives in the 1950s, and they were outlawed in most jurisdictions. Their use as a criminal weapon continued at least up until the early 1920s."[88] Escobar concurs that slungshots and blackjacks "were a regular part of criminal weaponry. . .and gangsters could be

---

[84] C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources, 1862.

[85] Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources, 1866.

[86] Escobar, *Saps, Blackjacks and Slungshots*, 228.

[87] See https://www.merriam-webster.com/dictionary/slungshot Escobar agrees with this rough date. See *Saps, Blackjacks and Slungshots*, 67.

[88] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

merciless in their use."[89]

In a criminal case considered the most famous of those involving lawyer Abraham Lincoln, the future president defended a man charged with murdering another using a slungshot. In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's acquittal.[90]

These technologically very simple weapons were viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their development and their spreading use by criminals and as fighting implements. These devices were developed and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging prohibitions. The earliest anti-slungshot law was enacted in 1850; 43 states legislated against them in the 1800s (including the District of Columbia), and 11 states in the early 1900s (note this incorporates multiple laws enacted in more than one century by a few states).

Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well. Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-shaped fabric (although the weight could also be something dense and heavy, like a lock in the end of a sock),[91] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag. (Alternately, they could be made heavier by adding water to the sand.) The first anti-sandbag law was 1866, with 10 states enacting such laws—7 in

---

[89] Escobar, *Saps, Blackjacks and Slungshots*, 86.

[90] Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim with a slung shot at night because of the full moon. Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon. Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac,* May 4, 2022, https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

[91] https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/; Escobar, *Saps, Blackjacks and Slungshots*, 20-22. Escobar dates the earliest reference to sandbags as weapons to the 1600s (22).

the 1800s and 7 in the early 1900s. Only 4 states did not have any prohibitions in any of these categories of clubs and similar striking weapons, but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons.  One state, New Hampshire, may not have enacted such a law during this time but did at some point.[92]

## V.    TOY GUNS

A final historical analog to modern stun guns and tasers is found in historic restrictions on toy guns. Dating to the nineteenth century, toy guns encompassed a variety of usually realistic-looking weapons that lacked the firepower and deadliness of traditional firearms, but that nevertheless were dangerous and posed a risk to society.

The earliest such toy guns included cap guns, which were developed at the close of the Civil War (1861-1865) by shotgun manufacturers seeking a new device to manufacture and sell after the war ended.[93] Early cap guns "used some form of mild explosive to create a popping sound and puff of smoke when the toy's trigger was pulled."[94] The first BB guns were developed in 1886, as were so-called "penny guns," inexpensive, non-functional copies of real guns.[95] By one account, gun companies developed toy pistols, at first made from iron, "in order to stay in business" after

---

[92] Up to 2010, New Hampshire had this law on the books: "159:16 Carrying or Selling Weapons. Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state."  In 2010, the law was amended when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives.  Compare N.H. Rev. Stat. § 159:16 with 2010 New Hampshire Laws Ch. 67 (H.B. 1665). In 1923, New Hampshire enacted an extensive licensing system for handgun carrying: 1923 N.H. Laws 138.
[93] Matt Bean, "A toy gun, a real crime," *CNN.com*, January 8, 2003, http://www.cnn.com/2003/LAW/01/08/ctv.toy.guns/;
[94] "Vintage Cap Guns," Collectors Weekly, https://www.collectorsweekly.com/toys/cap-guns
[95] Tom Gaylord, "The rise of the BB gun," *Pyramid*, August 17, 2015, https://www.pyramydair.com/blog/2015/08/the-rise-of-the-bb-gun-part-1/

Civil War demobilization.[96] Other early toy guns subject to restriction included air guns[97] and spring guns.[98]

As early as 1875, the *New York Times* opined about the dangerous spread of toy guns. The article was prompted by a court case where the father of a 13-year old boy who lost an eye to a toy gun discharged by another boy sued the family of the boy who fired the toy gun for damages. The judge in the case dismissed the suit, prompting the *Times* writer to say that a "father who buys deadly weapons for his children, instead of any of the hundreds of harmless toys that are always on sale, should be responsible legally as well as morally for any consequences that may ensue."[99] An article appearing in the *Baltimore Sun* in 1881 reported on a 13-year old boy who accidentally shot himself in the hand with a projectile from a toy pistol, leading the boy to develop a fatal lockjaw (tetanus) infection.[100]

In the late 1800s and early 1900s, in reaction to increased circulation of toy guns and growing reports of injuries and deaths resulting from them, states and localities moved to restrict toy guns, including their sale, manufacture, discharge, or carry. Researcher Catie Carberry identified at least seven states that enacted toy gun restrictions just in the 1880s in a 2019 article.[101]

---

[96] "Vintage Cap Guns."

[97] The Daisy air rifle first appeared in 1888. Marc Fisher, "Bang: The troubled legacy of toy guns," *Washington Post,* December 22, 2014,
https://www.washingtonpost.com/lifestyle/style/bang-the-troubled-legacy-of-toy-guns/2014/12/22/96494ea8-86f8-11e4-9534-f79a23c40e6c_story.html

[98] 1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.

[99] "Toy Pistols," *New York Times*, April 20, 1875,
https://timesmachine.nytimes.com/timesmachine/1875/04/20/82030097.pdf?pdf_redirect=true&ip=0

[100] "More Lockjaw Cases," *The Baltimore Sun*, July 25, 1881,
https://baltimoresun.newspapers.com/image/372401406/?terms=%22Toy%2BPistols%2Band%2BConcealed%2BWeapons

[101] Catie Carberry, "The Origin of Toy Guns in America," Duke Center for Firearms Law, July 18, 2019, https://firearmslaw.duke.edu/2019/07/the-origin-of-toy-guns-in-america/

My research has identified at least 19 states that enacted anti-toy gun laws just in the 1880s. From the 1880s through the early 1900s, a total of at least 31 states enacted anti-toy gun laws.[102] The majority of these laws made it a crime to sell, give, or otherwise pass to minors toy guns and other dangerous weapons or items, like fireworks and firecrackers, sometimes with parental exceptions. However, a considerable number of laws restricted toy guns and like items regardless of the age of the person, such as this 1882 Vermont law:

> A person who has in his possession a toy pistol for the explosion of percussion caps or blank cartridges, with intent to sell or give away the same, or sells or gives away, or offers to sell or give away the same, shall be fined not more than ten nor less than five dollars; and shall be liable for all damages resulting from such selling or giving away, to be recovered in an action on the case.[103]

Other anti-toy gun laws that restricted access to them by anyone, regardless of age, included measures enacted by Baltimore, Md. (1881), Wisconsin (1882), Maine (1883), Utah (1884), Indiana (1885), and Arkansas (1909).[104] Concerns about toy guns persisted well into the twentieth century. For example, in the 1930s organizations of mothers held bonfire burnings of toy guns that resembled gangster weapons. In 1955, New York City banned black, blue and silver toy guns.[105]

## CONCLUSION

All of the weapons discussed in this Report—tasers and stun guns, fighting knives, clubs and similar striking implements, and toy guns—follow a nearly identical regulatory pattern. First,

---

[102] Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-results/?_sf_s=toy
[103] Barber, Orion M. The Vermont Statutes, 1894: Including the Public Acts of 1894, with the Declaration of Independence, the Articles of Confederation, and the Constitutions of the United States, and the State of Vermont Page 918, Image 935 (1895) available at The Making of Modern Law: Primary Sources. 1882.
[104] Carberry, "The Origin of Toy Guns in America."
[105] Fisher, "Bang."

a new weapon or weapons technology is invented or developed; second, it might be patented;[106] third, it was usually developed for military or law enforcement use (though not in the case of toy guns); fourth, at some point the weapon spreads to civil society; and fifth, if it becomes associated with criminality or poses a public health or safety problem, calls for regulation ensue.[107] What is also significant about the weapons and dangerous devices examined here is that they are all dangerous, but also less lethal than firearms. Thus, these historical weapons restrictions are remarkably analogous to contemporary restrictions on stun guns and tasers.

As discussed in this Report, stun guns and tasers were developed for use by law enforcement as an alternative to firearms. Reports of misuse of such devices by police, who receive training in their use, suggest that adverse or unjustified use and results would only be greater in civilian hands, as these devices pose a greater hazard when used by people who are untrained in their use and consequences (training is not required for civilians in places where they are legal for them to own). Stun guns and tasers have been identified as used by criminals to intimidate and even torture victims. In short, the history of these devices, when considered in the light of historical non-firearm regulations in American history as discussed here, militates in favor of current legal restrictions in New York.

The first purpose of any government is to protect the lives, health, and safety of its people.[108] The many laws examined in this Report arise from this central fact of governance. This

---

[106] Stun guns and tasers were patented: https://patents.google.com/patent/US20060067026A1/en; https://patents.google.com/patent/US6636412B2/en; https://patents.justia.com/assignee/taser-international-inc. The knives and clubs discussed here were not patented, but historically other weapons and weapons technologies were.

[107] Robert J. Spitzer, "Understanding Gun Law History After *Bruen*: Moving Forward by Looking Back," *Fordham Urban Law Journal* 51(October 2023): 60, 70-71.

[108] "The primary purpose of government is to maintain order and stability so that people can live safely, productively, and happily." "Government," Annenberg Classroom, https://www.annenbergclassroom.org/glossary_term/government/

purpose was no less a prime concern of American government early in its history than it was and is today.

/s/   *Robert Spitzer*

Robert Spitzer

**EXHIBIT A**

1

# EXHIBIT A

November 2023

## Curriculum Vitae

## Robert J. Spitzer

## Distinguished Service Professor, Emeritus
## SUNY Cortland

Address:      5333 Center St.
              Williamsburg, VA  23188
              (607) 423-1781
              Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
              https://sites.google.com/site/robertspitzercortland/


Education:    A.B. (Political Science), summa cum laude, SUNY College at Fredonia, 1975.
              M.A. Cornell University, 1978.
              Ph.D. Cornell University, 1980.


Positions Held:

        Adjunct Professor, College of William and Mary School of Law, Spring 2023-present.
        Affiliated Scholar, Government Department, College of William and Mary, 2023-present.
        Department Chair, SUNY Cortland, 2008-2020.
        Interim Department Chair, SUNY Cortland, 2004-2005.
        Distinguished Service Professor, SUNY Cortland, 1997-2021.
        Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-
                1990, 1992-2017.
        Professor, SUNY Cortland, 1989 to 1997.
        Continuing Appointment, SUNY Cortland, 1986.
        Associate Professor, SUNY Cortland, 1984 to 1989.
        Department Chair, SUNY Cortland, 1983 to 1989.
        Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985,
                1986, 1988.
        Copy Editor, Administrative Science Quarterly, 1982 to 1983.
        Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
        Assistant Professor, SUNY Cortland, 1979 to 1984.
        Instructor, Cornell University, 1979.

2

Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

Honors:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.

Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.

Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.

Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.

Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.

Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.

SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.

Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."

Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.

Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.

Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.

Who's Who in the World, 1996.

Dictionary of International Biography, 1995.

Who's Who in the East, 1995-96; 1997-98

Ex officio member, Cortland County Bicentennial Committee, 1987-89.

Chair, SUNY Cortland Bicentennial Committee, 1987-89.

Phi Eta Sigma, SUNY Cortland, 1994.

Phi Kappa Phi, SUNY Cortland, 1990.

Men of Achievement (1986)

Contemporary Authors, vol. 112 (1985) and subsequent updates.

3

International Authors and Writers Who's Who, 1985-present.
International Who's Who in Education, Winter 1985-86.
Herbert H. Lehman Graduate Fellowship, 1975-79.
Who's Who Among Students in American Universities and Colleges, 1974-75.
Phi Beta Kappa Club, SUNY College at Fredonia, 1975.
Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.


Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.


Publications and Papers:

BOOKS:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

4

Editor, <u>The Bicentennial of the U.S. Constitution:  Commemoration and Renewal</u> (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert Spitzer.

<u>President and Congress:  Executive Hegemony at the Crossroads of American Government</u> (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, <u>Media and Public Policy</u> (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

<u>The Politics of Gun Control</u> (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021; 9th ed. 2024). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, <u>Politics and Constitutionalism: The Louis Fisher Connection</u>, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

<u>The Right to Bear Arms: Rights and Liberties Under the Law</u> (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

<u>Essentials of American Politics</u>, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

5

<u>The Presidency and the Constitution: Cases and Controversies</u>, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

<u>Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning</u> (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

<u>We the People: Essentials Edition</u>, co-authored with Benjamin Ginsberg, Theodore Lowi, Margaret Weir, Caroline Tolbert, Andrea Campbell (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021; 14th ed. 2023).

<u>Gun Control: A Documentary and Reference Guide</u> (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

<u>The Gun Debate: An Encyclopedia of Gun Rights and Gun Control</u>, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

<u>Guns across America: Reconciling Gun Rules and Rights</u> (New York: Oxford University Press, 2015; revised paperback ed. 2017); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

<u>The Gun Dilemma: How History Is Against Expanded Gun Rights</u> (New York: Oxford University Press, 2023). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, <u>Series on American Constitutionalism</u>, SUNY Press, 1996-present. Books include:
    Daniel Hoffman, <u>Our Elusive Constitution,</u> (1997)
    Martin Sheffer, <u>God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment</u>, (1999)
    Daniel Levin, <u>Representing Popular Sovereignty: The Constitution in American Political Culture</u>, (1999)

6

Robert Spitzer, ed., <u>Politics and Constitutionalism</u>, (2000)
Laura Langer, <u>Judicial Review in State Supreme Courts</u> (2002)
Ian Brodie, <u>Friends of the Court</u> (2002)
Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination</u>
    <u>Law and Policy</u> (2002)
Artemus Ward, <u>Deciding to Leave: The Politics of Retirement from the United</u>
<u>States Supreme Court</u> (2003)
James T. McHugh, <u>Ex Uno Plura: State Constitutions and Their Political Cultures</u>
(2003)
Stephen Newman, ed., <u>Constitutional Politics in Canada and the United States</u>
(2004).
Stephen Kershnar, <u>Justice for the Past</u> (2004).
Timothy R. Johnson, <u>Oral Arguments and Decision Making on the U.S. Supreme</u>
<u>Court</u> (2004).
Christopher P. Banks, David B. Cohen, and John C. Green, eds., <u>The Final</u>
<u>Arbiter: The Consequences of Bush v. Gore for Law and Politics</u> (2005)
Kenneth D. Ward and Cecilia R. Castillo, eds., <u>The Judiciary and American</u>
<u>Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and</u>
<u>Contemporary Constitutional Theory</u> (2005).
G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-</u>
<u>first Century: The Politics of State Constitutional Reform</u> (2006).
Frank P. Grad and Robert F. Williams, <u>State Constitutions for the Twenty-first</u>
<u>Century: Drafting State Constitutions, Revisions, and Amendments</u> (2006).
G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-</u>
<u>first Century: The Agenda of State Constitutional Reform</u>, 3 vols. (2006).
Cary Federman, <u>The Body and the State: Habeas Corpus and American</u>
<u>Jurisprudence</u> (2006).
Christopher S. Kelley, ed., <u>Executing the Constitution: Putting the President Back</u>
<u>into the Constitution</u> (2006).
David Fagelson, <u>Justice as Integrity: Tolerance and the Moral Momentum of Law</u>
(2006).
Christopher Shortell, <u>Rights, Remedies, and the Impact of State Sovereign</u>
<u>Immunity</u> (2008).
Robert Blomquist, <u>The Quotable Judge Posner</u> (2010).
Kirk A. Randazzo, <u>Defenders of Liberty or Champions of Security?</u> (2010).
Pamela Corley, <u>Concurring Opinion Writing on the U.S. Supreme Court</u> (2010).
Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law</u>
<u>and Policy</u> (2nd ed. 2010).
Julia R. Azari, et al., eds., <u>The Presidential Leadership Dilemma</u> (2013).
Stephen A. Simon, <u>Universal Rights and the Constitution</u> (2014).
Kirk A. Randazzo and Richard W. Waterman, <u>Checking the Courts</u> (2014).
Anthony Maniscalco, <u>Public Spaces, Marketplaces, and the Constitution</u> (2015).
Goirgi Areshidze et al., eds., <u>Constitutionalism, Executive Power, and the Spirit</u>
7

of Moderation (2016).
Peter J. Galie, et al., eds., New York's Broken Constitution (2016).
Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).
Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).
Clyde H. Ray, John Marshall's Constitutionalism (2019).
Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).
Robert M. Howard, et al., Power, Constraint, and Policy Change: Courts and Education Finance Reform (2021).
Mark C. Dillon, The First Chief Justice (2022).

Book Series Editor, Presidential Briefing Books, Routledge, 2015-present.
Mary Stuckey, Political Rhetoric (2015)
Michael A. Genovese, Presidential Leadership in an Age of Change (2015)
Christopher Fettweis, Making Foreign Policy Decisions (2016)
Nancy Maveety, Picking Judges (2016)
Richard S. Conley, Presidential Relations with Congress (2017)
Andrew L. Stigler, Governing the Military (2019)
Graham G. Dodds, The Unitary Presidency (2020)


Member, Board of Editors for the Encyclopedia of Guns in American Society, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, Issues: Understanding Controversy and Society, ABC-CLIO, 2011-2016.


BOOK CHAPTERS:

"Third Parties in New York," in Governing New York State (formerly New York State Today), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in Social Regulatory Policy: Recent Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in Inventing the American Presidency: Early Decisions and Critical Precedents, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

8

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar, closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, <u>American Government: Freedom and Power</u> (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in <u>Encyclopedia of the American Legislative System</u>, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in <u>The Presidency and the Persian Gulf War</u>, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in <u>The Presidency Reconsidered</u>, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in <u>Understanding the Presidency</u>, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the <u>Encyclopedia of the American Presidency</u>, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the <u>Encyclopedia of the United States Congress</u>, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in <u>The Constitution and the Conduct of American Foreign Policy</u>, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in <u>The Executive Office of the President</u>, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the <u>Oxford Historical Guide to American Government</u> (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in <u>Liberty Under Law</u>, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

"Multi-Party Politics in New York," in <u>Multi-Party Politics and American Democracy</u>, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, <u>We the People</u> (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in <u>Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in <u>The Encyclopedia of American Third Parties</u>, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in <u>Prayers in the Precincts</u>, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in <u>The Clinton Scandal and the Future of American Politics</u>, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in <u>Politics and Constitutionalism</u>, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the <u>Encyclopedia of American Political History</u>, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in <u>The Constitution and Its Amendments</u>, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in <u>The Second Amendment in Law and History</u>, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

10

"Veto Power" in The Oxford Companion To United States History ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in The Presidency and the Law: The Clinton Legacy, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in Honor and Loyalty: Inside the Politics of the Bush White House, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the Encyclopedia of Guns in American Society, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; 2nd ed. 2011; 3rd ed. 2023): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the Encyclopedia of the American Presidency, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for The Encyclopedia of New York State, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," Transformed By Crisis: The Presidency of George W. Bush and American Politics, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in Debating the Presidency, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in Thinking About the Presidency, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Executing the Constitution, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in Social Issues in America: An Encyclopedia, 8 vols.,

11

ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," The Presidency and the Challenge of Democracy, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," Encyclopedia of American Civil Liberties, 4 vols., ed. By Paul Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," Gun Violence: Opposing Viewpoints, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," Presidential Power in America, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," Encyclopedia of American Government and Civics ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," Encyclopedia of Political Communication ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in Leadership at the Crossroads, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in Encyclopedia of Issues in U.S. Public Policy, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in Winning the Presidency 2008, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in Debating Reform: Conflicting Perspectives on How to Fix the American Political System, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" You Asked: 20 Questions About America, U.S. Department of State, 2010.

12

"Liberals and the Presidency," <u>Contending Approaches to the American Presidency</u>, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" <u>The American Presidency in the 21st Century</u>, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in <u>Governing America</u>, ed. By Paul Quirk and William Cunion (New York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," <u>Encyclopedia of Applied Ethics</u>, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" <u>Winning the Presidency 2012</u>, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." <u>American Government</u>. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" <u>A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump</u>

13

Presidency: Executive Power and Democratic Governance, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," The 2020 Presidential Election: Key Issues and Regional Dynamics, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," Developments in American Politics 9, Gillian Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," The Conversation on Guns, James A. Densley, ed. (Baltimore: Johns Hopkins University Press, 2023).

"To Brandish or Not to Brandish: The Consequences of Gun Display," New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, 2024).


ARTICLES:

"Jamestown:  Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69.  Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun

14

Control, April/May, 1987; <u>Gun Control</u>, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and <u>The Informed Argument</u>, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," <u>America</u>, June 15, 1985.

"The Item Veto Reconsidered," <u>Presidential Studies Quarterly</u> 15(Summer, 1985): 611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" <u>Policy Studies Journal</u>, 15 (June 1987), 675-89. Reprinted in <u>Public Policy Theories, Models, and Concepts</u>, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of the <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," <u>Policy Studies Journal</u>, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," <u>PS:  Political Science and Politics</u>, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," <u>PS:  Political Science and Politics</u>, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," <u>Oklahoma City University Law Review</u>, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," <u>Congress and the Presidency</u>, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," <u>Pace Law Review</u>, 15, 1 (Fall 1994), 111-39.

15

"Can 3.5 Million Americans Be Wrong?" <u>The Spectator</u>, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," <u>Political Science Quarterly</u>, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," <u>Presidential Studies Quarterly</u>, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," <u>PS: Political Science and Politics</u>, 32 (September 1999).

"The Gun Dispute," <u>American Educator</u>, 23 (Summer 1999): 10-15.  Reprinted in <u>Annual Editions: Criminal Justice</u> (Dushkin/McGraw-Hill, 2000); and in <u>Criminology</u> (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," <u>Congress Monthly</u>, September/October 2000.

"Lost and Found: Researching the Second Amendment," <u>Chicago-Kent Law Review</u> 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, <u>Silveira v. Lockyer</u> (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Presidential Studies Quarterly</u> 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson C*ase," <u>St. John's Law Review</u> 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," <u>Focus on Law Studies</u> 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," <u>Fordham Law Review</u> 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," <u>PS: Political Science and Politics</u> 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, <u>The PRG Report</u> 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, <u>American Literary History</u> 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, <u>Injury Prevention</u> 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," <u>Albany Government Law Review</u> 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," <u>Presidential Studies Quarterly</u> 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," <u>Gonzaga Law Review</u> 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," <u>Government, Law and Policy Journal</u> 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," <u>Presidential Studies Quarterly</u> 42(September 2012): 637-55.

"Gun Laws," <u>New York State Bar Association Journal</u> 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," <u>Presidents and Executive Politics Report</u> 35(Fall 2012).

"Writing the Gun Debate," <u>Los Angeles Review of Books</u>, February 10, 2013.

"A Historical Look at Gun Control in America," <u>WCNY Magazine</u>, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," <u>PS: Political Science and Politics</u> 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," <u>The Islamic Monthly</u>, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," <u>White House Studies</u> 12(October 2013): 125-46.

"A Look at the 2014 Elections," <u>WNCY Magazine</u>, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," <u>Albany Law Review</u>, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," <u>Social Science Docket</u>, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," <u>The Critique</u> (July/August 2016).

17

"Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" Items: Insights from the Social Sciences, Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.

"Understanding Gun Law History After Bruen: Moving Forward by Looking Back," Fordham Urban Law Journal 51 (2023): 57-115.


OP-ED ARTICLES:

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," Rochester Times Union, September 14, 1987.

"The Great Gun Fallacy," Syracuse Post-Standard, March 30, 1989.

"Four Cases on Right to Bear Arms," Syracuse Post-Standard, April 22, 1989.

"Don't Start Line-Item Veto," Syracuse Post-Standard, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," Syracuse Post-Standard, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," Los Angeles Times, February 19, 1996.

18

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" <u>Christian Science Monitor</u>, September 19, 1997.

"Assault Weapons Ban," <u>Christian Science Monitor</u>, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," <u>Syracuse Post-Standard</u>, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," <u>Syracuse Post-Standard</u>, April 20, 1999.

"The Gun Saga in Congress," <u>Intellectual Capital</u>, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" <u>Intellectual Capital</u>, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," <u>Intellectual Capital</u> 5(February 10-17, 2000).

"Gun Control After Columbine," <u>Intellectual Capital</u> 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," <u>The Catholic Review</u>, March 30, 2000.

"Why Would Anyone Want the Job Now?" <u>Chicago Tribune</u>, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," <u>Syracuse Post-Standard</u>, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," <u>Syracuse Post-Standard</u>, June 12, 2001.

"Exposure Erodes Clout of NRA," <u>Columbus Dispatch</u>, April 24, 2003.

"Hazing Scandals," <u>Syracuse Post-Standard</u>, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 18, 2004.

"NRA Loses Its Political Firepower," <u>Los Angeles Times</u>, April 12, 2004. Also in the <u>Deseret News</u>.

"A 'Tortured' Interpretation of the President's Vast Powers," <u>Syracuse Post-Standard</u>,

19

June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us),
20

January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post
([www.huffingtonpost.com](www.huffingtonpost.com)), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post
([www.huffingtonpost.com](www.huffingtonpost.com)), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post
([www.huffingtonpost.com](www.huffingtonpost.com)), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post
([www.huffingtonpost.com](www.huffingtonpost.com)), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* ([www.huffingtonpost.com](www.huffingtonpost.com)),
posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5,
2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January
16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington
Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

21

A-340

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

22

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

23

A-342

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

24

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard*, April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News*, August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard*, August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times*, October 3, 2017.

"An American Standoff," *New York Daily News*, October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post*, February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation*, February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News*, March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard*, March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post*, May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com*, September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times*, November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard*, December 30, 2018.

25

A-344

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

26

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-Standard,* November 4, 2022.

"What our past tells us about young people and guns," *The Hill,* March 28, 2023.

"Stand-Your-Ground, the Castle Doctrine, and Public Safety," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 3, 2023.

"For Most of U.S. History We've Had Both Gun Rights and Gun Regulations," *TIME.com,* June 6, 2023.

"Is domestic abuse really protected by the Second Amendment?" *The Hill,* July 14, 2023.

"America's Original Gun Control," *The Atlantic Monthly,* August 12, 2023. 163

"The Unusual Thing About Hunter Biden's Indictment," *CNN.com*, September 15, 2023.


TESTIMONY, BRIEFS, AND REPORTS:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of Silveira v. Lockyer (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, amicus curiae brief in the case of Nordyke v. King, U.S. Court of Appeals,

29

Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety

30

Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.


PAPERS AND PRESENTATIONS (NOT INCLUDING THOSE GIVEN ON THE CORTLAND CAMPUS):

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

31

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the <u>Washington Post</u>, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in <u>The Politics of Gun Control</u>," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November

34

A-353

1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes: The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

36

A-355

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

37

A-356

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

38

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"College and Life: Really the Same," SUNY Cortland Commencement Address, May 14, 2017.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

39

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C.,

40

A-359

November 29-December 1, 2022.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., February 16, 2023.

"The Obama Presidency and Gun Policy," Paper Presented for Hofstra University's 13th Presidential Conference on The Barack Obama Presidency, Hempstead, NY, April 19-21, 2023.

"Gun Law History and Virginia," League of Women Voters, Williamsburg, Va., June 22, 2023.

"Gun Policy in the U.S.: Past, Present, Future," College of William and Mary, Williamsburg, Va., September 21, 2023.

"Historical Gun Laws Pertaining to Minors," 2023 Cooper-Walsh Colloquium, Conference on *Public Health, History, and the Future of Gun Regulation After Bruen,* Fordham University School of Law, New York City, NY, October 12-13, 2023.

"Presidential Impeachment: What It Is, How It Works, Why It Matters," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 19, 2023.


PANEL PARTICIPATION:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political

41

Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western
42

A-361

Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.

44

BOOK REVIEWS:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142:  An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers:  Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions:  Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

45

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective, Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies

Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives, Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).


SELECTED MEDIA APPEARANCES/QUOTATIONS:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN,

49

and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi"; "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.


PROFESSIONAL ASSOCIATIONS:

    Scholars Strategy Network.
    American Political Science Association.
    Center for the Study of the Presidency.
    Presidents and Executive Politics Section (formerly the Presidency Research Group),
        APSA; served on Governing Board of PRG, 1991 to 2003.
    New York Political Science Association.
    Pi Sigma Alpha.
    Phi Kappa Phi.


TEACHING AREAS:

    American Government:  courses taught include Law and Politics, Introduction to
        American Government, The Legislative Process, Political Parties and Social

Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Politics and Policy, Introduction to Public Policy, Gun Policy.  Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

TEACHING-RELATED AWARDS:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)

OTHER PROFESSIONAL ACTIVITIES

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science

51

Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science
Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair,
1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration,
American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st
Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics,
American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-
Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press,
University of Chicago Press, University of California Press, Princeton University Press, Cornell
University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan,
University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press,
HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of
Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge,
University of Alabama Press, American Political Science Review, PS, Comparative Politics,
American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political
Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science
Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative
Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal,
Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics
and Policy, and the National Science Foundation.


SELECTED COMMUNITY SERVICE

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present;
for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County,
2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).
Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's (N.Y.) Odyssey 2010
Project, 1996.

53

# EXHIBIT B

# EXHIBIT B

## BOWIE KNIFE LAWS BY TYPE#

| STATE | No Concealed Carry | No Carry | Greater Criminal Penalty | Tax/Punish for Sale | Tax Owner-ship | No Sale to Barred Groups* | No brandish |
|---|---|---|---|---|---|---|---|
| Alabama | 1839,1841 1876,1879 | | 1837 | 1837,1897 | 1837,1867 | 1876 | |
| Alaska | | | | | | | |
| Arizona | 1893,1901 | 1889 | | | | | |
| Arkansas | 1875 | 1881 | 1871 | 1881 | | | |
| California | 1896 | | | | | 1896 | 1855,1858 |
| Colorado | 1862,1877 | 1881 | | | | | |
| Connecticut | | | | | | | |
| Delaware | | | | | | | |
| District of Columbia | 1871 | | | | | | |
| Florida | | | | 1838a | | | |
| Georgia | 1837***,1873 | | | 1837*** | | 1860 | |
| Hawaii | | 1852,1913 | | | | | |
| Idaho | 1909 | 1879 | | | | | |
| Illinois | 1876,1881 1883 | | | | | 1881 | |
| Indiana | | 1859 | | | | | |
| Iowa | 1882,1887 1900 | | | | | | |
| Kansas | 1862,1863 1887 | | | | | 1883 | |
| Kentucky | | | | | | 1859 | |
| Louisiana | 1855 | 1870 | | | | | |
| Maine | | | | | | | |
| Maryland | 1872,1884 1886,1890 | | | | | | |
| Massachusetts | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Michigan | 1891 | | | | | | |
| Minnesota | 1884 | | | | | | |
| Mississippi | 1878,1896^ | | 1837,1838 | | 1841** | | 1840 |
| Missouri | 1871,1883 1890,1897 | 1917,1923 | | | | | |
| Montana | 1864 | | 1879 | | | | |
| Nebraska | 1890,1899 | 1872 | | | | | |
| Nevada | | | 1873 | | | | |
| New Hampshire | | | | | | | |
| New Jersey | 1895 | | | | | | |
| New Mexico | 1859,1887 | | | | | | |
| New York | | 1885 | | | | | |
| North Carolina | 1879 | | | | 1856,1858 | 1846b | |
| North Dakota | | | | | | | |
| Ohio | 1859,1880 | | | | | | |
| Oklahoma | 1890,1903 | 1890,1891 | | | | | |
| Oregon | | | | | | | |
| Pennsylvania | 1897 | | | | | | |
| Rhode Island | 1893,1896 1908 | | | | | | |
| South Carolina | | | | | | 1923 | |
| South Dakota | | | | | | | |
| Tennessee | 1838,1863 1867 | 1869,1881 1893 | 1838,1856 | 1838,1867 | | 1856,1867 | |
| Texas | | 1871 | 1856 | | | 1897 | |
| Utah | | 1877 | | | | | |
| Vermont | | 1892 | | | | | |
| Virginia | 1838,1867, 1887 | | 1838 | | | | |
| Washington | | | | | | | 1854,1859 1869 |
| West Virginia | 1870 | 1882,1891 | | | | | |

| | | 1925 | | | | | |
|---|---|---|---|---|---|---|---|
| Wisconsin | 1883 | | | | | | |
| Wyoming | | | | | | | 1884 |
| TOTAL STATES | 29 | 17 | 8 | 5 | 3 | 10 | 4 |
| TOTAL LAWS | 58 | 23 | 10 | 7 | 5 | 11 | 7 |

Source:  https://firearmslaw.duke.edu/repository/search-the-repository/ unless otherwise noted.

*Barred groups included Native Americans/Indians, African Americans/Enslaved, minors.

#Table excludes laws that punish carry/use of "knives" or "sharp or dangerous weapons" but do not mention Bowie knives by name.

** 1841 Miss. Chap. 1, p. 52. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

^ 1896 Miss. L. chap. 104, pp. 109-10. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

***https://dlg.galileo.usg.edu/georgiabooks/pdfs/gb0439.pdf, pp. 210-211.

a  1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838). See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

b 1846 N.C. L. chap. 42. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

**EXHIBIT C**

1

EXHIBIT C

DANGEROUS WEAPONS RESTRICTIONS
(YEARS OF ENACTMENT)

| STATE[1] | BOWIE KNIVES | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/Dan gerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837,1839, 1841,1867, 1876,1877, 1879,1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896[†] | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1867,1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871,1875, 1881 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862,1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890[†] | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881[†] | | | 1797 | | | 1852 | |
| District of Columbia | 1858,1871, 1892 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835,[†]1838 ,1847,1868 ,1893[†] | | 1888 | | 1868, 1888 | | 1887 | |

---

[1] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Georgia | 1837,1860, 1873 | 1816 | | | 1860 | | 1837 | |
| Hawaii | 1852, 1913 | | | | 1852, 1913 | | 1913 | |
| Idaho | 1864[†]1875, 1879, 1909 | 1875 | | | 1879 | | 1909 | 1864 |
| Illinois | 1876, 1881 | 1845 | | | 1881, 1893 | | 1881 | |
| Indiana | 1859 | | | 1804, 1855, 1881, 1905 | 1875, 1905 | | 1820 | 1831 |
| Iowa | 1882,1887, 1900 | | 1882 | | 1882 | 1887, 1900 | 1882, 1887, 1897, 1929 | |
| Kansas | 1862,1863 1868,1883, 1887 | | 1862, 1887 | | 1883, 1887, 1899 | | 1901 | |
| Kentucky | 1859 | | | 1798 | 1859 | | 1812, 1813 | |
| Louisiana | 1870 | | | | | | 1813 | 1813, 1842, 1870 |
| Maine | 1840,1841, 1884[†] | | | 1786 | | | 1840 | 1841 |
| Maryland | 1872,1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874 1884, 1886 1890, 1927 | | 1886 | 1890 | 1872 | |
| Massachusetts | 1836[†] | | | 1750 | 1850, 1927 | | 1751 | |
| Michigan | 1891 | 1927, 1929 | 1887, 1891, 1927, 1929 | 1913 | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | |
| Minnesota | 1882 | | | | 1882, 1888 | 1888 | 1881 | 1882 |
| Mississippi | 1837,1838, 1878 | | | 1799, 1804 | 1878 | | 1838,1878 | |
| Missouri | 1871,1897, 1917, 1923 | | 1871, 1897, 1923 | 1818,1923 | 1883, 1888, 1897, 1917 | | 1873 | |
| Montana | 1864,1879, 1885 | 1887 | | | | | 1864, 1865 | 1888 |
| Nebraska | 1877,1890, 1899 | 1858 | 1872, 1890, 1899 | | 1890 | | 1881 | |

3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nevada | 1873 | 1872 | | | 1881 | | 1881, 1925 | |
| New Hampshire | | | | | | | | |
| New Jersey | 1871,1905[†] | 1799, 1877, 1927 | 1871, 1927 | | 1871, 1873, 1927 | 1871, 1927 | 1686 | |
| New Mexico | 1852[†]1853, 1859,1864 1887 | 1887 | | | 1853, 1859, 1869, 1887 | | 1852, 1853 | |
| New York | 1866,1885, 1911[†] | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1664 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1891 | |
| North Carolina | 1840,1856, 1858,1860, 1879 | | | | 1879 | | 1792, 1840 | |
| North Dakota | 1895,1915[†] | 1915 | 1915 | | 1895 | 1915 | 1895 | |
| Ohio | 1859,1880, 1890 | | | | | | 1859 | 1788, 1859, 1880 |
| Oklahoma | 1890,1891, 1903 | | 1890, 1891 | | 1890, 1891, 1903 | 1890 | 1890 | |
| Oregon | 1885[†] | | 1898, 1917 | | 1885, 1917 | 1917 | 1853 | |
| Pennsylvania | 1897 | | 1897 | | 1851 | | 1851 | |
| Rhode Island | 1893,1896, 1908 | | 1893, 1908 | | 1893, 1896 | | 1893 | |
| South Carolina | 1880, 1923 | | | | 1880 | | 1880 | |
| South Dakota | 1903[†] | | | | 1877, 1903 | | 1877 | |
| Tennessee | 1838,1856, 1863,1867, 1871,1881, 1893 | | | | 1879, 1882, 1893 | | 1821 | |
| Texas | 1856,1871, 1879,1897 | | | 1899 | 1871, 1879, 1889, 1897, 1899 | | 1870 | |

| State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Utah | 1877 | | | | | | 1877, 1888 | |
| Vermont | 1892,1895[†] | | | | 1895 | | 1895, 1897 | |
| Virginia | 1838,1887 | | | 1792 | 1887 | | 1794 | |
| Washington | 1854, 1859 1869 | | | | | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1870,1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883, 1896 | | | | 1883, 1888 | | 1858 | 1883 |
| Wyoming | 1884,1890 1899,1925 | 1876, 1893 | | | 1884, 1890, 1899 | | 1876 | |
| Total Laws | 136 | 25 | 44 | 17 | 79 | 21 | 66 | 24 |

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

[†] States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

**EXHIBIT D**

1

**EXHIBIT D**

**DANGEROUS WEAPONS LAWS**

**<u>ALABAMA</u>**

Harry Toulmin, A Digest of the Laws of the State of Alabama : Containing the
Statutes and Resolutions in Force at the End of the General Assembly in January,
1823. To which is Added an Appendix; Containing the Declaration of
Independence; the Constitution of the United States; the Act authorizing the People
of Alabama to form a Constitution and State Government; and the Constitution of
the State of Alabama Page 627, Image 655 (1823) available at The Making of
Modern Law: Primary Sources.  1805
Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting
Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave
shall keep or carry any gun, powder, shot, club, or other weapon whatsoever,
offensive or defensive, except the tools given him to work with, or that he is
ordered by his master, mistress, or overseer, to carry the said articles from one
place to another, but all and every gun , weapon, or ammunition, found in the
possession or custody of any slave, may be seized by any person, and upon due
proof made thereof, before any justice of the peace of the county or corporation
where such seizure shall be made, shall, by his order, be forfeited to the seizer, for
his own use; and moreover, every such offender shall have and receive, by order of
such justice, any number of lashes, not exceeding thirty-nine, on his bare back for
every such offense : Provided nevertheless, That any justice of the peace may
grant, in his proper county, permission in writing to any slave, on application of his
master or overseer, to carry and use a gun and ammunition within the limits of his
said master's or owner's plantation, for a term not exceeding one year, and
revocable at any time within such term, at the discretion of the said justice, and to
prevent the inconveniences arising from the meeting of slaves.

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama
in General Assembly convened, That if any person carrying any knife or weapon,
known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or
weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw
[sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife,

2

by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1

That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.

Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed

3

by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.
Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which

4

the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 883, Image 899 (1877) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873
Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles and slung-shots. – Any person who carries, concealed about his person, brass knuckles, slung-shot, or other weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty, nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for the county, for a term not exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The Making of Modern Law: Primary Sources.
§ 428. Any person who, not being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey, carries concealed about his person a bowie-knife or any other knife of like kind or description, or a pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama" with Such

5

Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.

[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.
That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.
That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## ARIZONA

Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is Prefixed the Constitution of the United States, the Mining Law of the United States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96, Image 102 (1871) available at The Making of Modern Law: Primary Sources, 1867.

6

An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution.

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.
If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.
It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.
§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.
§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other

7

kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.

§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.

§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).

Race and Slavery Based | Arkansas | 1835

§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and

receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82. 1837.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.
§ 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-five nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § §1-3.

§ 1. That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. Provided, that officers whose duties require them to make arrests or to keep and guard prisoners, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. Provided, further, that nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey or upon his own premises.

§ 2. Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as is used in the army or navy of the United States, in any manner except uncovered and in his hand, shall be deemed guilty of a misdemeanor.

§ 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

https://cite.case.law/ark/83/26/

1923 Ark. Acts 379, An Act to Regulate the Ownership of Pistols and Revolvers, No. 430.

Be It Enacted by the People of the State or Arkansas:

From and after the passage of this Act, it shall be unlawful for any person to own or have in his custody or possession any pistol or revolver, except as herein provided:

Section 1. Any person having in his possession or custody any pistol or revolver, shall within 60 days from the approval of this Act, present such firearm to the county clerk of the county, where he resides, and it shall be the duty of the said county clerk to enter upon a separate record provided for that purpose, the name, age, place of residence, and color of the party, together with the make, calibre and number of said pistol or revolver.


## CALIFORNIA

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of Independence, the Constitutions of the United States and of California, the Treaty of Queretaro, and the Naturalization Laws of the United States Page 663-664, Image 682-683 (1853) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | California | 1853
Compiled Laws of California, § 127.
If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the county jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .


Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864

An Act to Prohibit the Carrying of Concealed Weapons, § 1.

Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in

12

the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878
Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.
No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Fresno, § 8.
Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

13

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

Carrying Weapons | California | 1917

§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person

Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923

§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

14

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## **COLORADO**

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

15

Government of the United States, and the Rules and Order of Business Page 100, Image 101 (1877) available at The Making of Modern Law: Primary Sources. Offenses Affecting Streets and Public Property, § 9.

If any person or persons, within the corporate limits of Georgetown, shall be found carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or other deadly weapon, such person shall, on conviction thereof, be fined in a sum not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881)

No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon . . . .

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369, Image 370 (1886) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | Colorado | 1886

City of Denver, Slung Shot – Brass Knuckles, § 10.

Whenever there shall be found upon the person of anyone who is guilty of a breach of the peace, or of conduct calculated to provoke a breach of the peace, any slung shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of anyone while in the act of commission of the acts aforesaid, such person shall upon conviction be fined not less than twenty-five dollars nor more than three hundred dollars.

## CONNECTICUT

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources. Good Order and Decency § 192.

Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

17

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

1 William B. Webb The Laws of the Corporation of the of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.
It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: Provided, That the Police officers when on duty shall be exempt from such penalties and forfeitures.

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).
Carrying Weapons || 1871
Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

Washington D.C. 27 Stat. 116 (1892)
CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

18

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment

19

in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct  the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

## **FLORIDA**

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835.

An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

No. 24. An Act in addition to An Act, (approved January 30th, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly.

Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.

Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.

Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand juriors [sic] of their respective districts at each term of the court.
Passed 5th February 1838.—Approved 10th Feb. 1838.
https://www.google.com/books/edition/Acts_of_the_Legislative_Council_of_the_T/-LIwAQAAMAAJ?hl=en&gbpv=1&dq=%22vend+dirks,+pocket+pistols,+sword+canes,+or+bowie+knives%22&pg=PA36&printsec=frontcover

Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425.
Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.
Sentence Enhancement for Use of Weapon | Florida | 1868
Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]
Offences Against Public Peace, § 13.
Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.
Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the

22

public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## GEORGIA

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Georgia | 1816
Offences Against the Public Peace, (1816) § 19.
If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.
§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.
§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum

23

not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided, nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.

[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places

No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or

24

imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment of a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person.

## IDAHO

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit or other instrument or tool, with intent feloniously to crack and enter into any dwelling-house, store, shop, warehouse, or other building containing valuable property, or shall be found in the aforesaid buildings with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the Territorial prison for a term not less than one year nor more

25

than five years; and if any person shall have upon him or her any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894 Page 118-119, Image 119-120 (1894) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or other dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

## ILLINOIS

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139. If any person shall be found,, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, shall, on conviction, be deemed a vagrant, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874 Page 360, Image 368 (1874) available at The Making of Modern Law: Primary Sources. Disorderly Conduct: Disturbing the Peace, § 56.
Whoever, at a late and unusual hour of the night time, willfully and maliciously disturbs the peace and quiet of any neighborhood or family, by loud or unusual noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling, challenging to fight or fighting, or whoever shall carry concealed weapons, or in a threatening manner display any pistol, knife, slungshot, brass, steel or iron knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.
No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. [1881]

Deadly Weapons: Selling or Giving to Minor. § 54b.

Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Danville. Concealed Weapons. § 22.

Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.

Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

## INDIANA

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.

And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody

of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.
That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach,

29

locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

## IOWA

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.
No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that

30

A-411

this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

1913 Iowa Acts 307, ch. 297, § 2
§ 1. It shall be unlawful for any person, except as hereinafter provided, to go armed with and have concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sand bag, skull cracker, slung-shot, or other offensive and dangerous weapons or instruments concealed upon his person.


## **KANSAS**

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence
Page 149, Image 157 (1866) available at The Making of Modern Law: Primary
Sources, 1863.

Nuisances, § 10. Any person who shall in this city have or carry concealed or
partially concealed, upon his person, any pistol, bowie knife or other deadly
weapon, shall, on conviction, be fined not less than one nor more than ten dollars;
Provided, This section shall not apply to peace officers of the city or state. The
carrying of a weapon in a holster, exposed to full view, shall not be deemed a
concealed or partially concealed weapon under this section.

The General Statutes of the State of Kansas, to Which the Constitutions of the
United State of Kansas, Together with the Organic Act of the Territory of Kansas,
the Treaty Ceding the Territory of Louisiana to the United States, and the Act
Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868)
available at The Making of Modern Law: Primary Sources, 1868.

Crimes and Punishments, § 282. Any person who is not engaged in any legitimate
business, any person under the influence of intoxicating drink, and any person who
has ever borne arms against the government of the United States, who shall be
found within the limits of this state, carrying on his person a pistol, bowie-knife,
dirk or other deadly weapon, shall be subject to arrest upon the charge of
misdemeanor, and upon conviction shall be fined in a sum not exceeding one
hundred dollars, or by imprisonment in the county jail not exceeding three months,
or both, at the discretion of the court.

Revised Ordinances of the City of Salina, Together with the Act Governing Cities
of the Second Class: Also a Complete List of the Officers of Salina During its
Organization as a Town and City of the Second and Third Class Page 99, Image
100 (1879) available at The Making of Modern Law: Primary Sources. 1879
Ordinances of the City of Salina, An Ordinance Relating to the Carrying of Deadly
Weapons, § 1. That it shall be unlawful for any person to carry on or about his
person any pistol, bowie knife, dirk, or other deadly or dangerous weapon,
anywhere within the limits of the city of Salina, save and except as hereinafter
provided. § 2. This ordinance shall not apply to cases when any person carrying
any weapon above mentioned is engaged in the pursuit of any lawful business,
calling or employment and the circumstances in which such person is placed at the
time aforesaid, are such as to justify a prudent man in carrying such weapon, for
the defense of his person, property or family, nor to cases where any person shall
carry such weapon openly in his hands, for the purpose of sale, barter, or for
repairing the same, or for use in any lawful occupation requiring the use of the
same. § 3. Any person violating any of the provisions of this ordinance shall, upon

32

conviction thereof before the police court, be fined in any sum not less that twenty-five nor more than one hundred dollars.

1881 Kan. Sess. Laws 92, c. 37, § 24.
The Council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise, and cause to be arrested and imprisoned, fined or set to work, all vagrants, tramps, confidence men and persons found in said city without visible means of support or some legitimate business.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887
Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

Bruce L. Keenan, Book of Ordinances of the City of Wichita Published by Authority of a Resolution Adopted by the City Council April 24, 1899, under the Direction of Judiciary Committee and City Attorney, and Formally Authorized by

33

Ordinance No. 1680 Page 46, Image 70 (1900) available at The Making of Modern
Law: Primary Sources. 1899
Ordinances of the City of Wichita, Carrying Unconcealed Deadly Weapons, § 2.
Any person who shall in the city of Wichita carry unconcealed, any fire-arms,
slungshot, sheath or dirk knife, or any other weapon, which when used is likely to
produce death or great bodily harm, shall upon conviction, be fined not less than
one dollar nor more than twenty-five dollars. Using or Carrying Bean Snapper, § 3.
Any person who shall, in the city of Wichita, use or carry concealed or
unconcealed, any bean snapper or like articles shall upon conviction be fined in
any sum not less than one dollar nor more than twenty-five dollars. Carrying
Concealed Deadly Weapons, § 4. Any person who shall in the city of Wichita,
carry concealed about his person any fire-arm, slung shot, sheath or dirk knife,
brass knuckles, or any weapon, which when used is likely to produce death or great
bodily harm, shall upon conviction, be fined in any sum not exceeding one hundred
dollars.

## KENTUCKY

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry
any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive
but all and every gun, weapon and ammunition found in the possession or custody
of any negro, mulatto or Indian may be seized by any person and upon due proof
thereof made before any justice of the peace of the county where such seizure shall
be shall by his order, be forfeited to the seizor for his own use, and moreover every
such offender shall have and receive by order of such justice any number of lashes
not exceeding thirty nine on his or her back, well laid for every such offense.

1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One
the Several Acts in Relation to the Town of Harrodsburg, § 23.
If any person, other than the parent or guardian, shall sell, give or loan, any pistol,
dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly
weapon, which is carried concealed, to any minor, or slave, or free negro, he shall
be fined fifty dollars.

## LOUISIANA

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going
Armed in Public Places in an Unneccessary Manner, § 1.
Carrying Weapons | Louisiana | 1813

34

Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842).
Carrying Weapons | Louisiana | 1842
[A]ny person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him, that do not appear in full open view, any person so offending, shall, on conviction thereof, before an justice of the peace, be subject to pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .

Louisiana 1855 law 1855 La. L. Chap. 120, Sec. 115, p. 148
Sec. 115, Be it further enacted, &c., That whoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution by indictment or presentnient, and on conviction for the first offence shall be fined not less than two hundred and fifty dollars nor more than five hundred dollars, or imprisonment for one month; and for the second offence not less than five hundred dollars nor more than one thousand dollars, or imprisonment in the parish prison at the discretion of the court, not to exceed three months, and that it shall be the duty of the Judges of the District Courts in this State to charge the Grand Jury, specially as to this section.
https://babel.hathitrust.org/cgi/pt?id=osu.32437123281277&view=1up&seq=300&q1=Bowie

1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . . , § 73.
Subject(s): Sensitive Places and Times
[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed

guilty of a misdemeanor; and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . . .

La. Const. of 1879, art. III.
Post-Civil War State Constitutions | Louisiana | 1879
A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.

## MAINE

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.), Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the Massachusetts Assembly: That from & after the publication of this act, if any persons, to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty, or more, shall be unlawfully, routously, rioutously or tumultuously assembled, any Justice of the Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation [asking them to disperse, and if they do not disperse within one hour, the officer is] ... empowered, to require the aid of a sufficient number of persons in arms ... and if any such person or persons [assembled illegally] shall be killed or wounded, by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be indemnified, and held guiltless.

1821 Me. Laws 285, ch. 76, § 1.
Be it enacted by the Senate, and House of Representatives, in Legislature assembled, That it shall be within the power, and be the duty of every Justice of the Peace within this county, to punish by fine not exceeding five dollars, all assaults and batteries that are not of a high and aggravated nature, and to examine into all homicides, murders, treasons, and felonies done and committed in this county, and commit to prison all persons guilty, or suspected to be guilty of manslaughter, murder, treason or other capital offence; and to cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State, or such others as may utter any menaces or threatening speeches; and upon view of such Justice, confession of the delinquent or other legal conviction of any such offence, shall require of the offender to fund sureties to appear and answer for his offence,

36

at the Supreme Judicial Court, or Circuit Court of Common Pleas, next to be held within or for the same county at the discretion of the Justice, and as the nature or circumstances of the case may require;

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 709, Image 725 (1847) available at The Making of Modern Law: Primary Sources.
Justices of the Peace, § 16.
Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

1841 Me. Laws 709, ch. 169, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having resonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.
Prevention of Crimes, § 10.
Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

## MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The

Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1809 If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.
Carrying Weapons | Maryland | 1872
It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Maryland | 1874
Election Districts–Fences. § 99.
It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local

38

Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Maryland | 1886
Concealed Weapons, § 30.
Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,)

concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Maryland | 1890
Ordinances of Baltimore, § 742A.
Every person in said city of Baltimore not being a conservator of the peace, entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen knives excepted.) concealed upon or about his person; and every person who shall carry or wear such weapons openly, with the intent or purpose of injuring any person, shall, upon a conviction thereof, be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the general law of this State as if this act had not been passed.

## MASSACHUSETTS

1 Records of the Governor and Company of the Massachusetts Bay in New England 211-12 (Nathanial B. Shurtleff ed., 1853). 1637.
Whereas the opinions & revelations of Mr. Wheeleright & Mrs. Hutchinson have seduced & led into dangerous errors many of the people heare in Newe England, insomuch as there is just cause of suspition that they, as others in Germany, in former times, may, upon some revelation, make some suddaine irruption vpon those that differ from them in judgment, for prevention whereof it is ordered, that all those whose names are vnderwritten shall (vpon warning given or left at their dwelling houses) before the 30th day of this month of November, deliver in at Mr. Canes house, at Boston, all such guns, pistols, swords, powder, shot, & match as

40

they shalbee owners of, or have in their custody, vpon paine of ten pound for ev'y default to bee made therof ; which armes are to bee kept by Mr. Cane till this Court shall take further order therein. Also, it is ordered, vpon like penulty of x', that no man who is to render his armes by this order shall buy or borrow any guns, swords, pistols, powder, shot, or match, vntill this Court shall take further order therein. . . . The like order is taken for other townes, changing the names of those who shall deliver their armes, & keepe them. . . . It was ordered, that if any that are to bee disarmed acknowledg their siun in subscribing the seditions -libell, or do not

justify it, but acknowledg it evill to two magistrates, they shalbee thereby freed from delivering in their armes according to the former order./
file:///C:/Users/Bob/Downloads/ocm3522063_vol1.pdf

1749-51 Mass. Acts 339, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 12. 1751
"Whereas the Provision already made by Law has been found insufficient to prevent Routs, Riots, and tumultuous Assemblies, and the evil Consequences thereof :     Wherefore,
Be it enacted by the Lieutenant Governour Council and House of Representatives, That from and after the Publication of this Act, if any Persons to the Number of Twelve or more, being Arm'd with Clubs or other Weapons, or if any Number of Persons consisting of Fifty or upwards, whether armed or not, shall be unlawfully riotously or tumultuously assembled; any Justice of the Peace, Field-Officer or Captain of the Militia, Sheriff of the County or Under-Sheriff, or any Constable of the Town, shall among the Rioters, or as near to them as he can safely come, command Silence while Proclamation is making, and shall openly make Proclamation in these or the like Words,
Our Sovereign Lord the KING, chargeth and commandeth all Persons, being assembled, immediately to disperse themselves, and peaceably to depart to their Habitations, or to their lawful Business, upon the Pains contained in the Act of this Province made in the twenty-fourth Year of His Majesty King GEORGE the Second, for preventing and suppressing of Riots, Routs, and unlawful Assemblies. GOD save the King.
And if such Persons so unlawfully assembled, shall after Proclamation made, not disperse themselves within one Hour, it shall be lawful for every such Officer or Officers and for such other Persons as he or they shall command to be assisting, to seize such Persons, and carry them before a Justice of Peace: And if such Person shall be killed or hurt by Reason of their resisting the Persons so dispersing or seizing them, the said Officer or Officers and their Assistants shall be indemnified and held guiltless…"
The following links to a version of this law that is contemporaneous with the original session law, but seems to have been published separately as a notice: An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, 1750. https://firearmslaw.duke.edu/wp-content/uploads/2020/03/1749-51-Mass.-Acts-339.pdf

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1, 2.

All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ; § 2 That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources.
Of Proceedings to Prevent the Commission of Crimes, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 10.
Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff , constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.
Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

Third Annual Report of the Park Commissioners of the City of Lynn for the year
ending December 20, 1891, at 23, Ordinances. 1891

The Board of Park Commissioners of the City of Lynn, by virtue of its authority to
make rules for the use and government of the Public Parks of said City, and for
breaches of such rules to affix penalties, hereby ordains that within the limits of
Lynn Woods, Meadow Park and Oceanside, except with the prior consent of the
Board, it is forbidden: . . .

3. To throw stones or other missiles; to discharge or carry firearms, except by
members of the police force in the discharge of their duties; to discharge or carry
fire – crackers, torpedoes or fireworks; to make fires; to have any intoxicating
beverages; to sell, to offer or expose for sale any goods or wares; to post or display
signs, placards, flags or advertising devices; to solicit subscriptions or
contributions; to play games of chance, or have possession of instruments of
gambling; to utter profane, threatening, abusive or indecent language, or to do any
obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow,
or otherwise annoy other visitors.

Rules and Regulations Governing the Public Parks within the City of Lowell, at 58
(1903)

The Board of Park Commissioners of the City of Lowell, by virtue of its authority
to make rules and regulations for the use and government of the Public Parks and
Commons of said City, and to fix penalties for breaches of rules and regulations,
hereby ordains that, within such Public Parks and Commons, except by and with
the consent of the Board: . . .

3. It is forbidden to throw stones, balls or other missiles; to discharge or carry
firearms, fire crackers, torpedoes or fire-works; to make fires; to have any
intoxicating beverages; to sell, offer or expose for sale any goods or wares; to post
or display signs, placards, flags or advertising devices; to solicit subscriptions or
contributions, to play games of chance, or to have possession of instruments of
gambling; to utter profane, threatening, abusive or indecent language, or to commit
any obscene or indecent act; to solicit the acquaintance of, or to follow, or in any
way annoy visitors to said Parks and Commons.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch.
326, § 5 (amending §10)

Carrying Weapons | Massachusetts | 1927

Whoever, except as provided by law, carries on his person, or carries on his person
or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or
possesses a machine gun as defined in section one hundred and twenty-one of
chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk

44

knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when
arrested upon a warrant for an alleged crime or when arrested while committing a
crime or a breach or disturbance of the public peace, is armed with, or has on his
person, or has on his person or under his control in a vehicle, a billy or dangerous
weapon other than those herein mentioned, shall be punished by imprisonment for
not less than six months nor more than two and a half years in a jail . . .

## MICHIGAN

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed
Weapons, And To Provide Punishment Therefore, § 1.
It shall be unlawful for any person, except officers of the peace and night-watches
legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air
gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot,
razor or other offensive and dangerous weapon or instrument concealed upon his
person.

1891 Mich. Pub. Acts 409, Police Department, pt 15:. . . . And all persons who
shall carry concealed on or about their persons, any pistol, revolver, bowie knife,
dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or
who shall lay in wait , lurk or be concealed, with intent to do injury to any person
or property, who shall threaten to beat or kill another or injure him in his person or
property . . . shall be deemed a disorderly person, and upon conviction thereof may
be punished by a fine not exceeding one hundred dollars and the costs of
prosecution, and in imposition of any such fine and costs the court may make a
further sentence that in default of payment, such offender be imprisoned in the city
prison. . .

1913 Mich. Pub. Acts 452, An Act Defining the Crime of Felonious Assault and
Prescribing Punishment Therefor, § 1.
Whoever shall assault another with a gun, revolver, pistol, knife, iron bar, club,
brass knuckles or other dangerous weapon, but without intending to commit the
crime of murder, and without intending to inflict great bodily harm less than the
crime of murder, shall be deemed guilty of a felonious assault, and upon conviction
shall be punished by imprisonment in the State Prison for a term not exceeding
three years or by imprisonment in the county jail for a term not exceeding one
year, in the discretion of the court.

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling,
Purchasing, Possessing and Carrying of Certain Firearms, § 3.

Dangerous or Unusual Weapons | Michigan | 1927

It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1929

It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources.
Concealed Weapons – License, § 1.

It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about

their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1888
Making, Selling, etc., Dangerous Weapons, §§ 333-334.
§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons . . . .
§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## MISSISSIPPI

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

47

A-428

1837 Miss. Law 289-90, An Act To Prevent The Evil Practice Of Dueling In This State And For Other Purposes, § 5.

That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Laws of the State of Mississippi ; embracing all Acts of a Public Nature from January Session, 1824, to January Session 1838, Inclusive Page 736, Image 738 (Jackson, 1838) available at The Making of Modern Law: Primary Sources, 1838. An Act to Prevent the Evil Practice of Dueling in this State, and for other Purposes, § 5. Be it further enacted, That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town, or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any persons shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Volney Erskine Howard, The Statutes of the State of Mississippi of a Public and General Nature, with the Constitutions of the United States and of this State: And an Appendix Containing Acts of Congress Affecting Land Titles, Naturalization, &c, and a Manual for Clerks, Sheriffs and Justices of the Peace Page 676, Image 688 (1840) available at The Making of Modern Law: Primary Sources. 1840 Crimes, Misdemeanors and Criminal Prosecution, § 55. If any person having or carrying any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon, shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in the circuit or criminal court of the proper county, shall be fined in a sum not exceeding five hundred dollars, and be imprisoned not exceeding three months.

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.

That any person not being threatened with or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

## MISSOURI

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.
Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Missouri | 1871
Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.
§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife,

dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.

§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure"

§ 1274.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515 (1897) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Missouri | 1897

Concealed Weapons – Carrying of, § 7.

Any person who shall in this city wear under his clothes or carry concealed upon or about his person, or be found having upon or about his person concealed, any pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass

50

or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Sensitive Places and Times | Missouri | 1923
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person

51

or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## MONTANA

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.
If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.
If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.
Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy

sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.
If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

## **NEBRASKA**

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon with intent to assault any person, every such person, on conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb; Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1890
Ordinances of Omaha, Concealed Weapons, § 10.

53

It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34, Image 34 (1899) available at The Making of Modern Law: Primary Sources. Carrying Weapons | Nebraska | 1899
Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1.
It shall be unlawful for any person to carry upon his person any concealed pistol, revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge or their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2. Any such weapon or weapons, duly adjudged by the Police Judge of said city to have been worn or carried by any person in violation of the first section of this ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so adjudged.

## NEVADA

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36.

§ 35. If any person shall by previous appointment or agreement, fight a duel with a rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous weapon, and in doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guiltily of murder in the first degree and upon conviction thereof shall be punished accordingly.

§ 36. Any person who shall engage in a duel with any deadly weapon although no homicide ensue or shall challenge another to fight such duel, or shall send or deliver any verbal or written message reporting or intending to be such challenge, although no duel ensue, shall be punished by imprisonment in the State prison not less than two nor more than ten years, and shall be incapable of voting or holding any office of trust or profit under the laws of this State.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources.

Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Nevada | 1881

An Act to prohibit the carrying of concealed weapons by minors. § 1.

Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment.

## **NEW HAMPSHIRE**

New Hampshire - Acts and Laws June 1701:

That every justice of the peace within this province, may cause to be stayed and arrested all affrayers, rioters, disturbers or breakers of the peace, or any other that shall go armed offensively, to put his Majesty's subjects in fear by threatening speeches; and upon view of such justice, confession of the Party, or legal proof of any such offence, the justice may commit him to prison, until he the offender find such sureties as is required for his good behavior, and cause his arms or weapons to be taken away, and apprized and answered to his Majesty, as forfeited: And may further punish the breach of the peace, in any person that shall smite or strike another by fine to the King, not exceeding twenty shillings, or require bond for their good behavior, and to pay all just costs; as also may make out hue and cry

after run-away-servants, thieves, and other criminals. https://heinonline-org.proxy.wm.edu/HOL/Page?handle=hein.ssl/ssnh0240&id=1&collection=ssl&index=ssl/ssnh

New Hampshire Public Carry Prohibition (1708)*
And every justice of the peace within this province, may cause to be stayed and arrested, all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches : And upon view of such justice, confession of the offender, or legal proof of any such offence, the justice may commit the offender to prison, until he or she find such sureties for the peace and good behaviour, as is required, according to the aggravations of the offence ; and cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use. And may also punish the breach of the peace in any person, who shall smite, or strike another, by fine to the King, not exceeding twenty shillings; and require bond with sureties for the peace, till the next court of general sessions of the peace, or may bind the offender over to answer for said offence at said court, as the nature and circumstances of the offence may require.
*The original law is dated this way: "PASS'D 11 TH OF WM. 3" King William III ruled from 1689-1702, so the 11th year of his reign would be 1699. See:
https://heinonline-org.proxy.wm.edu/HOL/Page?collection=ssl&handle=hein.ssl/ssnh0244&id=68&men_tab=srchresults

New Hampshire - Acts and Laws, 1743, 9-10:*
That if twelve persons or more, being armed with clubs, or other weapons; or that if fifty persons or more, whether armed or not, shall be unlawfully, riotously, tumultuously or routerously assembled, any of the officers aforesaid, shall make a proclamation, in manner and form aforesaid; and if such persons so unlawfully assembled, shall not thereupon immediately disperse themselves, according to said proclamation, each of them, and every one who shall wilfully hinder any such officer (who shall be known, or shall openly declare himself to be such) making the said proclamation, shall forfeit and pay a fine not exceeding the sum of five hundred pounds, at the discretion of the said superior court, (which only shall have cognizance of the offense,) considering the aggravations attending the same, and shall be whipt thirty stripes on the naked back at the publick whipping-post, and suffer twelve months imprisonment, and once every three months, during said twelve months, receive the same number of stripes aforesaid.
https://heinonline-org.proxy.wm.edu/HOL/Print?collection=ssl&handle=hein.ssl/ssnh0244&id=10

56

file:///C:/Users/Bob/Downloads/i-1.pdf

*This law was "made and passed in the Seventeenth Year of His present Majesty's Reign," which would calculate in the reign of King George II (1727-1760) as the year 1743.

1923 N.H. Laws 138

SECTION 1. Pistol or revolver, as used in this act shall be construed as meaning any firearm with a barrel less than twelve inches in length.

SECT. 2. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall in addition to the punishment provided for the crime, be punished by imprisonment for not more than five years.

SECT. 3. No unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another shall own or have in his possession or under his control a pistol or revolver, except as hereinafter provided. Violations of this section shall be punished by imprisonment for not more than two years and upon conviction the pistol or revolver shall be confiscated and destroyed.

SECT. 4. No person shall carry a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment not exceeding one year or by both fine and imprisonment.

SECT. 5. The provisions of the preceding sections shall not apply to marshals, sheriffs, policemen, or other duly appointed peace and other law enforcement officers, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps of the United States, nor to the national guard when on duty, nor to organizations by law authorized to purchase or receive such weapons, nor to duly authorized military or civil organizations when parading, or the members thereof when at or going to or from their customary places of assembly.

SECT. 6. The selectmen of towns or the mayor or chief of police of cities may, upon application of any person issue a license to such person to carry a loaded pistol or revolver in this state, for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury' to his person or property or for any other proper purpose, and that he is a suitable person to be licensed. The license shall be in duplicate and shall bear the name, address, description, and signature of the licensee. The original thereof shall be delivered to the licensee, the duplicate shall be preserved by the selectmen of towns and the chief of police of the cities wherein issued for a period of one year.

57

SECT. 7. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of twenty-one years any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars or be imprisoned not more than three months, or both. This section shall not apply to fathers, mothers, guardians, administrators, or executors who give to their children, wards, or heirs to an estate, a revolver.

SECT. 8. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who is an unnaturalized foreign-born person or has been convicted of a felony against the person  property of another, except upon delivery of a written permit to purchase, signed by the selectmen of the town or the mayor or chief of police of the city. Before a delivery be made the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward to the chief of police of the city or selectmen of the town one copy thereof and shall retain the other copy for one year. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than one year, or by both such fine and imprisonment.

SECT. 9. Whoever, without being licensed as hereinafter provided, sells, advertises, or exposes for sale, or has in his possession with intent to sell, pistols or revolvers, shall be punished by imprisonment for not more than two years.

SECT. 10. The selectmen of towns and the chief of police of cities may grant licenses, the form of which shall be prescribed by the secretary of state, effective for not more than one year from date of issue, permitting the licensee to sell at retail pistols and revolvers subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered (a) to a purchaser not personally known to the seller or who does not present clear evidence of his identity; nor (b) to an unnaturalized foreign-born person or a person who has been convicted of a felony and has no permit as required by section 8 of this act.

A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the secretary of state and shall be signed by the purchaser and by the person effecting the sale, and shall include the date of sale, the caliber, make,

model, and manufacturer's number of the weapon, the name, address, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded to the selectmen of the town or the chief of police of the city and the other copy retained for one year.

SECT. 11. If any person in purchasing or. otherwise securing delivery of a pistol or revolver shall give false information or offer false evidence of his identity he shall be punished by imprisonment punished, for not more than two years.

SECT. 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed, altered, removed, or obliterated, shall be presumptive evidence that such possessor has changed, altered, removed or obliterated the same. Violations of this section shall be punished by a fine of not more than two hundred dollars or by imprisonment for not more
than one year, or both.

SECT. 13. All licenses heretofore issued within the state permitting the carrying of pistols or revolvers upon the person shall expire at midnight of July 31, 1923.

SECT. 14. This act shall not apply to antique pistols or revolvers incapable of use as such.

SECT. 15. All acts and parts of acts inconsistent herewith are hereby repealed, and this act shall take effect upon its passage.

## **NEW JERSEY**

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686)

An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed

upon proof thereof before any justice of the peace to the common jail, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1799
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2.
And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument

or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons, Registration and Taxation | New Jersey | 1873
An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the
Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page
304, Image 350 (1877) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.
And whereas, diverse ill-disposed persons are frequently apprehended, having
upon them implements for house-breaking, or offensive weapons, or are found in
or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-
houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as
places of public resort or assemblage), with intent to commit theft, misdemeanors
or other offences; and although their evil purposes are thereby manifested, the
power of the justices of the peace to demand of them sureties for their good
behavior hath not been of sufficient effect to prevent them from carrying their evil
purposes into execution; if any person shall be apprehended, having upon him or
her any picklock, key, crow, jack, bit or other implement with an intent to break
and enter into any building: or shall have upon him or her any pistol, hanger,
cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or
shall be found in or near any dwelling house, warehouse, stable, barn, coach-house,
smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to
any house, or in any place of public resort or assemblage for business, worship,
amusement, or other lawful purposes with intent to steal any goods or chattels, then
he or she shall be deemed and adjudged a disorderly person.

An Ordinance Concerning Firearms and Other Deadly Weapons, PLAINFIELD,
N.J., GEN. ORDINANCES §§ 1-2 (1902 Daily Press) (approved April 9, 1895).
An Ordinance Concerning Firearms and Other Deadly Weapons
The Inhabitants of the City of Plainfield, by their Common Council, do enact as
follows:
    Section 1. That no person shall fire or discharge any gun, fowling piece or
firearms within the limits of the City of Plainfield, under a penalty of a fine not
exceeding twenty dollars for every such offence; PROVIDED, however, that this
section shall not apply to the use of such weapons at any military exercise or
review, or target practice duly authorized by the military authority of this State, or
by the Common Council, or the Mayor, or in the lawful defence of the person,
family or property of any citizen; and PROVIDED further that this section shall
not apply to the discharge of blank cartridges or charges of powder on the fourth
day of July.
    Sec 2. That no person shall carry within the limits of the City of Plainfield
concealed upon or about his person, any pistol, dirk, butcher or bowie knife,
stilletto, dagger, sword, or spear in a cane, brass or metal knuckles, razor, slug

63

shot, or other deadly weapon, under a penalty of a fine not exceeding twenty dollars for each and every offence; PROVIDED that this section shall not apply to officers of the law or persons who are threatened with bodily harm."

An Ordinance Concerning Firearms and Other Deadly Weapons, PLAINFIELD, N.J., GEN. ORDINANCES §§ 1-2 (1902 Daily Press) (approved April 9, 1895). The Charter and General Ordinances of the City of Plainfield, New Jersey: In Force May 9th, 1902 (Plainfield, NJ: The Daily Press Print, 1902), 125-126. An Ordinance Concerning Firearms and Other Deadly Weapons, §§ 1-2. Approved April 9, 1895.

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both;. . . .


## NEW MEXICO

1852 N.M. Laws 67, An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, § 1.

That each and every person is prohibited from carrying short arms such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.

That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

1859 N.M. Laws 94, § 1-2.

§ 1. That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called, under the penalities and punishment which shall hereinafter be described. § 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceeding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause.


1864-1865 N.M. Laws 406-08, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, ch. 61, § 25, 1864.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called, under the penalties and punishment which shall hereinafter be described.

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887).
Brandishing, Carrying Weapons, Dangerous or Unusual Weapons, Firing Weapons, Transportation | New Mexico | 1887
§ 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. . . .

**NEW YORK**

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894) available at The Making of Modern Law: Primary Sources.

Race and Slavery Based | New York | 1664

Laws of the Colony of New York. And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1866

An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.

Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New York | 1881
Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.
Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.

67

Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900
Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pisol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under ht age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1911
Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons

Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913

§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

Dangerous or Unusual Weapons | New York | 1931

A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

## NORTH CAROLINA

Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)
Item, it is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's justices, or other of the King's Ministers doing their office with force and arms, nor bring no force in affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs and other ministers in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and boroughholders, constables and wardens of the peace within their wards shall have power to execute this etc. [in original] And that the Justices assigned, at thier coming down into the country , shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources, 1840.
Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation

Has Ceased to Exist Page 75, Image 75 (1847) available at The Making of Modern Law: Primary Sources, 1846.

Crimes and Punishments, 1846 – 7- Ch. 42. It shall not be lawful for any person or persons to sell or barter and deliver, to any slave, or slaves, any gun cotton, fire arms, swords, dirks or other side arms, unless those articles be for the owner or employer, and by the written order of the owner or employer of such slave or slaves, under the penalty of one hundred dollars for each offence, to be recovered, by warrant, before any Justice of the Peace, and applied, one half to the use of the party suing for the same, and the other half to the wardens of the poor of the county; and, moreover, may be indicted in the County or Superior Courts of Law; and the defendant, on conviction, shall be fined or imprisoned at the discretion of the Court; the fine, however, not to exceed fifty dollars, or the imprisonment three months.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4, 1856.

On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents; on dirks and swordcanes, sixty five cents: Provided, however, That of said arms, only such shall be taxable, as at some time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15, 1858.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, § 1, 1860.

That chapter 107, section 66, of the Revised Code be amended to read as follows:
If any free negro shall wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot, he shall be guilty of a misdemeanor, and upon conviction fined not less than fifty dollars.

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor.
If any one, except when on his own premises, shall carry concealed about his person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of a misdemeanor, and be fined or imprisoned at the discretion of the court. And if anyone not being on his own lands, shall have about his person any such deadly weapon, such possession shall be prima facie evidence of the concealment thereof. . .

## **NORTH DAKOTA**

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13.
§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.
§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries

72

concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or
has the same in his custody, possession or control, shall be guilty of a felony. . . .

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6.
Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house,
shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal
abuse, force, or violence, or shall be so armed with any dangerous weapon or
weapons as clearly to indicate a violent intention, he, she or they so offending,
upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and
personal, to this territory, out of which the party injured shall be recompensed as
aforesaid, and the offender shall also be committed to any gaol [jail] in the territory
for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed
Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person,
such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be
deemed guilty of a misdemeanor, and on conviction of the first offense shall be
fined not exceeding two hundred dollars, or imprisoned in the county jail not more
than thirty days; and for the second offense, not exceeding five hundred dollars, or
imprisoned in the county jail not more than three months, or both, at the discretion
of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General
Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme
Court Page 452, Image 464 (1860) available at The Making of Modern Law:
Primary Sources.
Carrying Weapons | Ohio | 1859
An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.
§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall
carry a weapon or weapons, concealed on or about his person, such as a pistol,
bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a
misdemeanor, and on conviction of the first offense shall be fined not exceeding
two hundred dollars, or imprisoned in the county jail not more than thirty days; and
for the second offense, not exceeding five hundred dollars, or imprisoned in the
county jail not more than three months, or both, at the discretion of the court. Sec.

73

§ 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1880
Offences Against Public Peace, § 6892.
Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars, or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

## OKLAHOMA

1890 Okla. Laws 495, art. 47
Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.
§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.
§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of

74

intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.


1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19.

§ 18. Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind is guilty of a misdemeanor.

§ 19. Every person who carries upon his person, whether concealed or not or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.


General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image 33 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1890
Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.
To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor, slung shot, sand bag, or a knife with a blade over three inches long, with a spring handle, as a weapon.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Oklahoma | 1891

Concealed Weapons, §§ 1, 2, 4-10.

§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.

It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

## **OREGON**

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.

§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.

It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oregon | 1898
An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.
It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.
Carrying Weapons | Oregon | 1917
§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.
Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.
§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7

78

of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law. Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

## PENNSYLVANIA

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.
That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an imprisonment at hard labor for a term not less than 6 months nor more than one year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Pennsylvania | 1897
An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.
No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

## RHODE ISLAND

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1.

No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his persons . . . [additional fine provided if intoxicated while concealed carrying].

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.

Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893

§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.

§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.

§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Rhode Island | 1896

Offences Against Public Policy, §§ 23, 24, 26.

§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge

80

of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.

§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated . . . .

§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.

1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws
Carrying Weapons | Rhode Island | 1908
§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

## SOUTH CAROLINA

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)
§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.

§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

Act of Feb. 20, 1901, ch. 435, §1, 1901 S.C. Acts 748
Sec. 1. Be it enacted by the General Assembly of the State of South Carolina: That from and after the first day of July 1902 it shall be unlawful for any one to carry about the person whether concealed or not any pistol less than 20 inches long and 3 pounds in weight. And it shall be unlawful for any person, firm or corporation to manufacture, sell or offer for sale, or transport for sale or use into this State, any pistol of less length and weight. Any violation of this Section shall be punished by a fine of not more than one hundred dollars, or imprisonment for not more than thirty days and in case of a violation by a firm or corporation it shall forfeit the sum of one hundred dollars to and for the use of the school fund of the County wherein the violation takes place to be recovered as other fines and forfeitures: Provided, this Act shall not apply to peace officers in the actual discharge of their duties, or to persons while on their own premises.

1923 S.C. Acts 221
If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## **SOUTH DAKOTA**

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471.
§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

## TENNESSEE

Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801

An Act for the Restraint of Idle and Disorderly Persons § 6. Be it enacted, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law.

1821 Tenn. Pub. Acts 15-16, An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, ch. 13.

Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and Permanent Nature, from the Commencement of the Government to the Present time: With References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page 100, Image 105 (1836) available at The Making of Modern Law: Primary Sources. 1821

An Act of 1821, § 1. Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence, which may be recovered by warrant before any justice of the peace, in the name of the county for its use, in which the offence may have been committed; and it shall be the duty of a justice to issue a warrant on the application, on oath, of any person applying; and it shall be the duty of every judge, justice of the peace, sheriff, coroner, and constable within this state, to see that this act shall have its full effect: Provided, that nothing herein contained shall affect any person that may be on a journey to any place out of his county or state.

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.

That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.
That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.
That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this state, for a period of time not less than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of
Memphis, Together with the Acts of the Legislature Relating to the City, with an
Appendix Page 190, Image 191 (1863) available at The Making of Modern Law:
Primary Sources.

Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.

It shall not be lawful for any person or persons to carry concealed about his or their
persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person
so offending, shall upon conviction thereof before the Recorder, be fined not less
than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of
Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature
Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The
Making of Modern Law: Primary Sources.

Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747,
4753, 4757.

§ 4746. Any person who carries under his clothes or concealed about his person, a
bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape
or size, is guilty of a misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the
purpose of selling, giving away or otherwise disposing of any knife or weapon
mentioned in the preceding section.

§ 4753. No person shall ride or go armed to the terror of the people, or privately
carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of
any person.

§ 4757. No person shall either publicly or privately carry a dirk, sword-cane,
Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of
a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of
Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature
Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The
Making of Modern Law: Primary Sources.

Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk,
Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for
hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be
fined not less than twenty-five dollars, and imprisoned in the county jail at the
discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.

§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources. 1869 Elections.

§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.

§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, § 738.

Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

## TEXAS

A Digest of the General Statute Laws of the State of Texas: to Which Are Subjoined the Repealed Laws of the Republic and State of Texas (Austin, Texas: Williamson S. Oldham & George W. White, comp., 1859)

Texas, Chapter 3, Act of August 28, 1856

Art. 493. If any person shall assault another with intent to murder, he shall be punished by confinement in the Penitentiary, not less than two years, nor more than seven years. If the assault be made with a bowie-knife, or dagger, the punishment shall be doubled. Page 520

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=538&q1=bowie%20knife

Art. 610. If any person be killed with a *bowie knife* or *dagger*, under circumstances which would otherwise render the homicide a case of manslaughter, the killing shall nevertheless be deemed murder, and punished accordingly. [emphasis in original] Page 534

88

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=552
&q1=bowie%20knife

1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly
Weapons.
§ 1. Be it enacted by the Legislature of the State of Texas, That any person
carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk,
dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other
kind of knife manufactured or sold for the purposes of offense or defense, unless
he had reasonable grounds for fearing an unlawful attack on his person, and that
such ground of attack shall be immediate and pressing; or unless having or
carrying the same on or about his person for the lawful defense of the State, as a
militiaman in actual service, or as a peace officer or policeman, shall be guilty of a
misdemeanor, and on conviction thereof shall, for the first offense, be punished by
fine of not less then than twenty-five nor more than one hundred dollars, and shall
forfeit to the county the weapon or weapons so found on or about his person; and
for every subsequent offense may, in addition to such fine and forfeiture, be
imprisoned in the county jail for a term not exceeding sixty days; and in every case
of fine under this section the fined imposed and collected shall go into the treasury
of the county in which they may have been imposed; provided, that this section
shall not be so contrued as to prohibit any person from keeping or bearing arms on
his or her own premises, or at his or her own place of business, nor to prohibit
sheriffs or other revenue officers, and other civil officers, from keeping or bearing
arms while engaged in the discharge of their official duties, nor to prohibit persons
traveling in the State from keeping or carrying arms with their baggage; provided
further, that members of the Legislature shall not be included under the term "civil
officers" as used in this act.
§ 2. Any person charged under the first section of this act, who may offer to prove,
by way of defense, that he was in danger of an attack on his person, or unlawful
interference with his property, shall be required to show that such danger was
immediate and pressing, and was of such a nature as to alarm a person of ordinary
courage; and that the weapon so carried was borne openly and not concealed
beneath the clothing; and if it shall appear that this danger had its origin in a
difficulty first commenced by the accused, it shall not be considered as a legal
defense.

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).
Art. 163.
If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or
other dangerous weapon, concealed or unconcealed, on any day of election , during

89

the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code.

1879 Tex. Crim. Stat. tit. IX, Ch. 4 (Penal Code)

Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

Art. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, not to a revenue or other civil officer engaged in the discharge of official duty, not to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.

Art. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

Art. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

Art. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail to refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars.

Art. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.

That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.
Brandishing | Texas | 1899
Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.
If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

## UTAH

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14.
Any person who shall carry any slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah).
§ 182: Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be

91

construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.[1]

## **VERMONT**

Laws of Vermont, Public Acts, No. 85.—An Act Against Carrying Concealed Weapons, Ch. 85, p. 95. 1892.

Section 1. A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.

Sec. 2. A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.

Approved November 19, 1892.

https://www.google.com/books/edition/Acts_and_Laws_Passed_by_the_Legislatur e/DXFOAQAAIAAJ?hl=en&gbpv=1&dq=Vermont+%22while+a+member+of+an d+in+attendance+upon+any+school,%22++%22any+firearms,+dirk+knife,+bowie +knife,+dagger+or+other+dangerous+or+deadly+weapon%22%C2%A0&pg=PA9 5&printsec=frontcover

Ordinances of the City of Barre, Vermont

Carrying Weapons, Firing Weapons | Vermont | 1895

CHAPTER 16, § 18.

No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.

CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any

---

[1] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

weapon concealed on his person without permission of the mayor or chief of police in writing.[2]

---

[2] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

93

## VIRGINIA

1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays.

Be it enacted by the General Assembly, that no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.

Race and Slavery Based | Virginia | 1792

[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.

§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

94

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76; 1838.

Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

1847 Va. Laws 127, c. 14, § 16.

If any person shall go armed with any offensive or dangerous weapon without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided.

Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources, 1867.

Ordinances of The Town of Lexington, VA, Of Concealed Weapons and Cigarettes, § 1. If any person carrying about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars; and any of such weapons mentioned shall be forfeited to the town. Nothing in this section shall apply to any officer of the town, county or state while in the discharge of his duty.

The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Virginia | 1887

Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished. Forfeiture and Sale of Weapons. If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty nor more than one hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any

95

weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

## **WASHINGTON**

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1854
Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1859
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year and be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days[.]

96

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956, Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in any sum not exceeding twenty-five dollars. Justices of the peace shall have exclusive original jurisdiction of all offenses arising under the last two preceding sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms, fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334, Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All persons (except police officers and other persons whose duty it is to execute process or warrants or make arrests) who shall carry upon his person any concealed weapon consisting of a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or

any instrument by the use of which injury could be inflicted upon the person or property of any other person.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1896
Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1.
If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1897
Carrying Concealed Weapons, § 7084.
If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars nor more than one hundred dollars, or imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court: Provided, That this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests.

## WEST VIRGINIA

1870 W. Va. Code 692, Of Offenses against the Peace, ch. 148, § 7.
If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informers shall have one half of such fine.

1870 W. Va. Code 703, For Preventing the Commission of Crimes, ch. 153, § 8.
If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal.

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.

99

Carrying Weapons | West Virginia | 1891

If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925

§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

100

## WISCONSIN

1858 Wis. Rev. Stat. 985, Of Proceedings to Prevent the Commission of Crime, ch. 175, § 18.

If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1872 Wis. Sess. Laws 17, ch. 7, § 1, An Act to prohibit and prevent the carrying of concealed weapons.

SECTION 1. If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by imprisonment in the state prison for a term of not more than two years, or by imprisonment in the county jail of the proper county not more than twelve months, or by fine not exceeding five hundred dollars, together with the costs of prosecution, or by both said fine and costs and either of said imprisonments; and he may also be required to find sureties for keeping the peace and against the further violation of this act for a term not exceeding two years: provided, that so going armed shall not be deemed a violation of this act whenever it shall be made to appear that such person had reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, or to any person under his immediate care or custody, or entitled to his protection or assistance, or if it be made to appear that his possession of such weapon was for a temporary purpose, and with harmless intent.

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.

To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

101

Charter and Ordinances of the City of Superior; Also Harbor Act, Municipal Court Act, Rules of the Common Council and Board of Education Page 390, Image 481 (1896) available at The Making of Modern Law: Primary Sources. 1896 Ordinances of the City of Superior, Carrying Concealed Weapons, § 18. It shall be unlawful for any person, other than a policeman or other officer authorized to maintain the peace or to serve process, to carry or wear any pistol, sling-shot, knuckles, bowie knife, dirk, dagger or any other dangerous weapon within the limits of the City of Superior, and any person convicted of a violation of this section shall be punished by a fine of not less than ten (10) dollars nor more than one hundred (100) dollars.

## **WYOMING**

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.
Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.
If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Wyoming | 1893
Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.
It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding section shall be fined not exceeding one hundred dollars, or imprisoned in the city

102

jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NUNZIO CALCE; ALLEN CHAN; SHAYA
GREENFIELD; AMANDA KENNEDY;
RAYMOND PEZZOLI; SECOND AMENDMENT
FOUNDATION; and FIREARMS POLICY
COALITION, INC.,

No. 1:21-cv-08208-ER

                              Plaintiffs,

     -against-

CITY OF NEW YORK; and EDWARD A.
CABAN, in his official capacity as Commissioner
of the New York City Police Department,

                              Defendants.

---

## PLAINTIFFS' RESPONSE TO
## <u>DEFENDANTS' LOCAL RULE 56.1 STATEMENT</u>

     Plaintiffs, pursuant to Rule 56(c) and Local Civil Rule 56.1, respond to Defendants'

Local Rule 56.1 Statement as follows:

1.    Plaintiff Nunzio Calce lives in Bronx, New York and would like to buy and possess a
stun gun and taser to protect himself and his family both at home and in public. <u>See</u>
Declaration of Nunzio Calce, dated February 29, 2024, ¶¶ 2, 3.

     <u>RESPONSE:</u>  Not disputed.

2.    Plaintiff Allen Chan lives in Flushing, New York and would like to buy and possess a
stun gun and taser to protect himself both at home and in public. <u>See</u> Declaration of Allen
Chan, dated February 27, 2024, ¶¶ 2, 3.

     <u>RESPONSE:</u>  Not disputed.

3.    Plaintiff Shaya Greenfield lives in Richmond Hill, Queens and would like to buy and
possess a stun gun and taser to protect himself both at home and in public. See Declaration of Shaya Greenfield, dated February 29, 2024, ¶¶ 2, 3.
[Amended Complaint (Doc. No. 5) ¶ 13; Answer (Doc. No. 15) ¶ 13]

     <u>RESPONSE:</u>  Not disputed.

4.  Plaintiff Raymond Pezzoli lives in Staten Island, New York and would like to buy and possess a stun gun and taser to protect himself both at home and in public. See Declaration of Raymond Pezzoli, dated February 29, 2024, ¶¶ 2, 3.

    RESPONSE:  Not disputed.

5.  Plaintiff Amanda Kennedy lives in Bristol, Connecticut but previously resided in Brooklyn, New York. See Declaration of Amanda Kennedy, dated February 29, 2024 ("Kennedy Dec.") ¶ 2.

    RESPONSE:  Not disputed.

6.  On November 16, 2021, Plaintiff Kennedy was charged with possessing a stun gun in violation of New York City Administrative Code § 10-135. See Kennedy Dec., ¶¶ 3-4.

    RESPONSE:  Not disputed.

7.  On December 6, 2021, the Kings County Criminal Court issued Plaintiff Kennedy an adjournment in contemplation of dismissal. See Kennedy Dec., ¶ 7.

    RESPONSE:  Not disputed.

8.  Plaintiff Second Amendment Foundation ("SAF") is a not-for-profit corporation that is organized under the laws of the State of Washington with its principal place of business located in Bellevue, Washington. See Declaration of Adam Kraut, dated March 1, 2024, ¶ 2.

    RESPONSE:  Not disputed.

9.  Plaintiff Firearms Policy Coalition, Inc. is a nonprofit membership organization that is organized under the laws of the State of Delaware with its principal place of business located in Clark County, Nevada. See Declaration of Brandon Combs, dated March 1, 2024, ¶ 2.

    RESPONSE:  Not disputed.

10. Defendant, City of New York, is a municipal corporation incorporated under the laws of the State of New York. See Defendants' Answer (Doc. No. 15), ¶ 13.

    RESPONSE:  Not disputed.

11. Defendant Dermot Shea, who is being sued in his official capacity, was the Commissioner of the New York City Police Department ("NYPD") at the time that this action was filed in 2021. See Defendants' Answer (Doc. No. 15), ¶ 15.

    RESPONSE:  Not disputed.

12. Edward Caban is the current Commissioner of the NYPD. See https://www.nyc.gov/site/nypd/about/leadership/commissioner.page

   RESPONSE: Not disputed.

**Challenged Provisions of Law**

13. In this action, Plaintiffs challenge the constitutionality of New York State Penal Law ("Penal Law") Section 265.01 and New York City Administrative Code ("Administrative Code") Section 10-135. See Plaintiffs' Statement of Undisputed Facts, ¶¶ 39, 40.

   RESPONSE: Not disputed.

14. Penal Law § 265.01 was adopted in 1974. See Declaration of Samantha Schonfeld, dated April 26, 2024 ("Schonfeld Dec."), Ex. C.

   RESPONSE: Plaintiffs do not dispute that the legislature adopted Penal Law § 265.01 in 1974, but note that the 1974 enactment did not address electronic dart guns or electronic stun guns.

15. Penal Law § 265.01 prohibits the possession of any electronic dart gun or electronic stun gun and provides as follows:

   Section 265.01—Criminal Possession of a weapon in the fourth degree

   A person is guilty of criminal possession of a weapon in the fourth degree when:

   (1) He or she possesses any firearm, electric dart gun, electric stun gun, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slingshot, shirken, or "Kung Fu star"…

   Criminal possession of a weapon in the fourth degree is a Class A misdemeanor.

   See Schonfeld Dec., Ex. C.

   RESPONSE: Not disputed.

16. Administrative Code § 10-135 prohibits the possession and sale of electronic stun guns and provides as follows:

   § 10-135 Prohibition on sale and possession of electronic stun guns

   a. As used in this section, "electronic stun gun" shall mean any device designed primarily as a weapon, the purpose of which is to stun, render unconscious or paralyze a person by passing an electronic shock to such person, but shall not include an "electronic dart gun" as such term is defined in § 265.00 of the penal law.

    b.  it shall be unlawful for any person to sell or offer for sale or to have in his or her possession within the jurisdiction of the city any electronic stun gun.

    c.  Violation of this section shall be a Class A misdemeanor…

See Schonfeld Dec., Ex. D.

<u>RESPONSE:</u>  Not disputed.

17.    Administrative Code § 10-135 was adopted in 1985. See Schonfeld Dec., Ex. D.

<u>RESPONSE:</u>  Not disputed.

## Stun Guns and Tasers

18.    An electronic stun gun is defined as "any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, render unconscious or paralyze a person by passing a high voltage electrical shock to such person." See Penal Law § 265.00 15(c); Declaration of Artur Edward Sadowksi, dated April 26, 2024 ("Sadowski Dec."), ¶ 4.

<u>RESPONSE:</u>  Not disputed.

19.    Stun guns require direct contact between the device and an individual. See Sadowski Dec., ¶ 4.

<u>RESPONSE:</u>  Not disputed.

20.    An electronic dart gun or "Taser" as it is commonly referred, is defined as "any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical current to such person by means of a dart or projectile." See Penal Law § 265.00 15(a); Sadowski Dec., ¶ 5.

<u>RESPONSE:</u>  Not disputed.

21.    Tasers incapacitate individuals by transmitting pulses of electric current. See Sadowski Dec., ¶ 6.

<u>RESPONSE:</u>  Not disputed.

22.    Tasers fire two small darts that are connected to the device with wires. See Sadowski Dec., ¶ 6.

<u>RESPONSE:</u>  Not disputed.

23.     Tasers were first developed in the 1960s and 1970s to be used by law enforcement as a less-lethal option to firearms. See Schonfeld Dec., Ex. B at 5-6.

        RESPONSE:  Disputed, but admitted that tasers were first patent application for a taser device was filed in 1970 and that one use of tasers was in law enforcement. According to US Patent 3,803,463, the original intended use was "for the self-protection of the private citizen, as well as an important element in the armamentarium of the armed forces and law enforcement agencies."

24.     Between 1970 and the early 2000s, seven states, including New York, enacted laws banning civilian possession of stun guns and tasers. See Schonfeld Dec., Ex. B at 6.

        RESPONSE:  Not disputed.

25.     Approximately 40 localities within 15 states enacted similar restrictions on the banning of civilian possession of stun guns and tasers. See Schonfeld Dec., Ex. B at 6-7.

        RESPONSE:  Not disputed.

26.     Approximately 17 states and "nearly 130 localities" imposed carry bans on stun guns and tasers. See Schonfeld Dec., Ex. B at 7.

        RESPONSE:  Denied, but admitted that, according to the law review article cited in the proffered expert report: (1) two states (Connecticut and Oklahoma) adopted bans on carrying stun guns and tasers either openly or concealed; (2) one state (Illinois) adopted a ban on carrying either openly or concealed, unless one holds a license; (3) within these three states, four localities in Illinois and 14 localities in Oklahoma banned carry either openly or concealed; and (4) outside of these three states, 14 localities adopted laws that banned carry either openly or concealed. *See* Eugene Volokh, *Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life*, 62 STAN.L.REV. 199, 247-49 (2009). The other laws referenced in the article restricted concealed carry, and more specifically: (1) two states (Delaware and Maryland) adopted laws that prohibit or appear to prohibit concealed carry and one state (Wisconsin) may have done so; and (2) nine states (Louisiana, Maine, Michigan, Missouri, Nebraska, North Carolina, Ohio, South Carolina and Utah) adopted laws that prohibit or appear to prohibit concealed carry unless one holds a license, and one state (Washington) may have done so. *See id.* at 249-54.

27.     Sometime in the 1990s, tasers were removed from the United States Bureau of Alcohol, Tobacco, Firearms and Explosives "firearm" category. See Schonfeld Dec., Ex. B at 7.

        RESPONSE:  Denied, but admitted that the Bureau of Alcohol, Tobacco, Firearms and Explosives determined that tasers were firearms in 1976 (ATF Ruling 76-6) and that in 1990 tasers were released that used compressed air instead of gas, with the result that they no longer met the definition of firearm.

28. Improper use of stun guns and tasers can result in serious injury, including death. See Sadowski Dec., ¶ 7.

   RESPONSE:  Not disputed.

29. Tasers and stun guns have been "used by criminals to intimidate and even torture victims." See Schonfeld Dec., Ex. B at 27.

   RESPONSE:  Disputed. The cited page of the proffered expert witness report does not contain any source or citation for this conclusion. It is not disputed that all weapons are capable of being used by criminals.

30. Between 2010 and 2021, "at least 513 individuals died in the U.S. as the result of being fired upon with tasers by police." See Schonfeld Dec., Ex. B at 7.

   RESPONSE:  Denied, but admitted that the USA Today article cited in the expert report states: "Since 2010, there have been at least 513 cases in which subjects died soon after police used Tasers on them, according to fatalencounters.org."

31. From 2000 through 2020 "tasers were the third leading cause of death among fatalities resulting from civilian-police encounters." See Schonfeld Dec., Ex. B at 7-8.

   RESPONSE:  Not disputed.

**Historical Regulations on Non-Firearm Weapons**

   **A. Bowie Knives**

32. In the 1800s, 29 states enacted laws banning the concealed carrying of Bowie knives. See Schonfeld Dec., Ex. B at 18.

   RESPONSE:  Plaintiffs object that this statement relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 25 n.6 (2022) ("The job of judges is not to resolve historical questions in the abstract; it is to resolve legal questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (*quoting* W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & HIST. REV. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis. Furthermore, the cited laws speak for themselves and are their own best evidence as to what they did and did not permit and Plaintiffs deny to the extent that the statement misconstrues the laws. Subject to those objections, denied. The following states (and the District of Columbia) adopted laws that prohibited the concealed carry of Bowie knives during the 1800s in the dates indicated: Alabama (1839); the District of Columbia (1871); Georgia (1837); Louisiana (1855); Maryland (1886); Michigan (1891); Mississippi (1878); Missouri (1883); North Carolina (1879); Ohio (1859); Rhode Island (1893); Tennessee (1838); Virginia (1838); and West Virginia (1870). In addition, five territories

adopted laws that prohibited concealed carry in the dates indicated: Arizona (1893); Colorado (1862); Montana (1864); and New Mexico (1853). The balance of the laws cited in the proffered expert witness report are municipal laws, not state laws. *See* pages 104, 118-19, 121-24, 137-38, 144-45, 154, 170, 192-93 of Doc. No. 42-2.[1]

33.  Fifteen states barred both open and concealed carry of Bowie knives. See Schonfeld Dec., Ex. B at 18.

    <u>RESPONSE:</u>  Subject to the same objections as Statement 32, Plaintiffs deny.  Only three of the state laws the State identified banned both open and concealed carry of Bowie knives: Arkansas (1875); Texas (1871); West Virginia (1882). In addition, three territories adopted laws that prohibited both open and concealed carry: Arizona (1889), Hawaii (1852) and Oklahoma (1890). Such laws are not "state laws" as the State asserts, and *Bruen* discounted territorial laws because they were frequently short lived, rarely tested in court, and irrelevant to most of the country at the time they were in force. *Bruen*, 597 U.S. at 67-68.

    Two of the cited laws (from Colorado in 1881 and Indiana in 1859) prohibited concealment, not carry in any manner. *See* Doc. No. 42-2 pp. 107, 120. One of the cited laws (from New York in 1885) prohibited the carry or possession of a "dirk or dangerous knife" only where there was "intent to use [it] against another." *See id.* at 158. The Vermont law from 1892 similarly applied only where there was proof someone carried a weapon "with the intent or avowed purpose of injuring a fellow man," or alternatively, while at a school. *See id.* at 183. And finally, Louisiana's 1870 law applied only on election day, while Tennessee's 1869 law prohibited carrying Bowie knives, guns and other weapons only in specific areas—elections, fairs, race courses and other public assemblies. *See id.* at 126-27, 178. The balance of the cited laws are municipal laws, not state laws. *See id.* at 84-86, 117, 142, 144, 158-59, 179, 182-83.

34.  Seven states created enhanced criminal penalties for individuals who used Bowie knives to commit criminal offenses. See Schonfeld Dec., Ex. B at 19.

    <u>RESPONSE:</u>  Subject to the objections above, admitted in part. The seven laws the State's expert cites also enhance criminal penalties for those carrying a pistol or a rifle, among other weapons. They do not single out Bowie knives. *See* Schonfeld Dec., Ex. D at 9, 11, 22, 27, 39, 63, 80.

35.  Four states "enacted penalties for brandishing Bowie knives." See Schonfeld Dec., Ex. B at 19.

    <u>RESPONSE:</u>  Subject to the objections above, denied, these penalties were enacted for brandishing weapons in a "rude" or "threatening" manner. *See* Schonfeld Dec., Ex. D at

---

[1] Both in this response and in the briefing submitted herewith, Plaintiffs refer to the actual page numbers of the .pdf document filed as No. 42-2 on the ECF docket for the convenience of the Court. Plaintiffs do not intend the references to concede that the historical record is complete, nor to suggest that the question presented here—a complete prohibition on a nonlethal weapon—requires a detailed analysis of the historical record.

12, 27, 48, 50. These laws prohibit the crime of affray and do not ban the weapons in question.

### B. Clubs and Other Blunt Weapons

36.  Every state in the United States had laws "restricting one or more types of clubs." See Schonfeld Dec., Ex. B at 20.

RESPONSE:  Subject to the objections above, denied. The State's expert's descriptions are far too general to satisfy the careful review which *Bruen* requires. The State's expert admits that "[m]ost were anti-carry laws". *See* Schonfeld Dec., Ex. B at 20. As examples, Spitzer cites two 20th century laws, 1917 Cal. Sess. Laws 221-225 and 1923 Cal. Stat. 695. Not only do these laws come far too late to be relevant to the *Bruen* analysis, but California's 1917 ban on billy clubs has been declared to be in violation of the Second Amendment. *See Fouts v. Bonta*, 2024 WL 751001 (S.D. Cal. Feb. 23, 2024).

37.  Fifteen states prohibited bludgeon carrying. See Schonfeld Dec., Ex. B at 21.

RESPONSE:  Subject to the objections above, denied. Two states adopted laws that prohibited the concealed carry of Bowie knives in the 1800s: Michigan (1887) and Rhode Island (1893). *See* Doc. No. 42-2 at pp. 136, 170-71. In addition, two states adopted laws that banned the carry of bludgeons and other weapons either open or concealed in the dates indicated: Oklahoma (1890) and West Virginia (1882). *See id.* at 165-66, 190.

Otherwise, ten states and territories adopted laws in the 1800s that prohibited carrying bludgeons and other weapons "*with intent to assault another.*" These were not general prohibitions on carrying bludgeons. *See id.* at 102, 106, 114, 116-17, 117-18, 128-29, 144, 151, 193. Maryland adopted two laws (in 1874 and 1886) that restricted the carry of bludgeons and other weapons, but these laws applied only on election day in two counties. *See id.* at 129.

38.  Sixteen states created anti-billy club laws. See Schonfeld Dec., Ex. B at 22.

RESPONSE:  Subject to the objections above, denied. The description of the laws as "anti-billy club laws" without specifying what they prohibited is insufficiently descriptive to even permit a response and it lumps together laws that are not "relevantly similar" even to one another. *See Bruen*, 597 U.S. at 29. Two of the cited state laws merely prohibited the concealed carry of billy clubs and other weapons on the dates indicated: Michigan (1887) and Rhode Island (1893). *See* Doc. No. 42-2 pp. 136, 170-71. Furthermore, two other states adopted laws that prohibit the open or concealed carry of billy clubs and other weapons on the dates indicated: Oklahoma (1890) and West Virginia (1882). *See id.* at 165-66, 190. Furthermore, Maryland adopted laws that prohibited concealed carry of billy clubs in two counties in 1872 and 1886, and the 1874 and 1886 Maryland election day carry prohibition (no. 37 above) also applied to billy clubs. *See* Doc. No. 42-2 pp. 129-30. Aside from that, the remainder of the "anti-billy club" laws (from before the twentieth century) are municipal laws that, by and large, prohibited the *concealed* carry of various weapons, including billy clubs.

39.     Forty-three states enacted anti-slungshot laws. See Schonfeld Dec., Ex. B at 22.

RESPONSE:   Subject to the objections above, denied. The description of the laws as "anti-slungshot laws" without specifying what they prohibited is insufficiently descriptive to even permit a response and it lumps together laws that are not "relevantly similar" even to one another. *See Bruen*, 597 U.S. at 29.  Only four states completely banned slungshots. *See Teter v. Lopez*, 76 F.4th 938 (August 7, 2023) at 951. The balance of the cited laws are municipal laws, not state laws; the State's expert has been previously criticized for conflating state and municipal laws. *See Fouts v. Bonta*, 2024 WL 751001 (S.D. Cal. Feb. 23, 2024) at *10 ("It makes it difficult to properly perform the *Bruen* analysis when the State's expert who has studied gun regulations for thirty years is imprecise in his language, and when the State's briefing employs a mischaracterization. After all, the subject of the regulatory 'what and when' is the central historical tradition inquiry under *Bruen*. More importantly, it is the government's central burden to show a national tradition of regulation by reference to state laws and court decisions in effect during the most important historical time period.").

40.     In the 1800s and early 1900s, 10 states enacted anti-sandbag laws. See Schonfeld Dec., Ex. B at 23-24.

RESPONSE:   Subject to the objections above, denied. The description of the laws as "anti-sandbag laws" without specifying what they prohibited is insufficiently descriptive to even permit a response and it lumps together laws that are not "relevantly similar" even to one another. *See Bruen*, 597 U.S. at 29. The only states that banned sandbags were California (1923) (*see* Schonfeld Dec., Ex. D at 14); Michigan (1927, 1929) (*see id.* at 46); New York (1913, 1931) (*see id.* at 69); and Oregon (1917) (*see id.* at 78). All of these bans come from the 20th century, and as a result are irrelevant to the *Bruen* analysis. *See Bruen*, 597 U.S. at 66 n. 28.

### C. Toy Guns

41.     In the 1880s, at least 19 states enacted anti-toy gun laws. See Schonfeld Dec., Ex. B at 26.

RESPONSE:   Subject to the objections above, denied. The description of the laws as "anti-toy gun laws" without specifying what they prohibited is insufficiently descriptive to even permit a response and it lumps together laws that are not "relevantly similar" even to one another. *See Bruen*, 597 U.S. at 29. Vermont adopted a law that prohibited the sale of (or possession with intent to sell) "a toy pistol for the explosion of percussion caps or blank cartridges." *See* Doc. No. 42-2 p. 26 & n.103. Otherwise, Defendants have not provided copies of these alleged laws, and the only citations in the proffered expert report are to the URL of a searchable database and an article identified as: Carberry, "The Origin of Toy Guns in America". *See id.* at 26 & nn.102, 104.

42.     Between the 1800s and early 1900s, 31 states enacted anti-toy gun laws. See Schonfeld Dec., Ex. B at 26.

RESPONSE:   Subject to the objections above, denied. The description of the laws as "anti-toy-gun laws" without specifying what they prohibited is insufficiently descriptive to even

permit a response and it lumps together laws that are not "relevantly similar" even to one another. *See Bruen*, 597 U.S. at 29. Vermont adopted a law that prohibited the sale of (or possession with intent to sell) "a toy pistol for the explosion of percussion caps or blank cartridges." *See* Doc. No. 42-2 p. 26 & n.103. Otherwise, Defendants have not provided copies of these alleged laws, and the only citations in the proffered expert report are to the URL of a searchable database and an article identified as: Carberry, "The Origin of Toy Guns in America". *See id.* at 26 & nn.102, 104.

43.    In 1995, New York City "banned black, blue and silver toy guns." See Schonfeld Dec., Ex. B at 26.

RESPONSE:  Not disputed.

Dated: New York, New York
       June 6, 2024

                                        DAVID JENSEN PLLC

                                        By: _____
                                            David D. Jensen, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NUNZIO CALCE; ALLEN CHAN; SHAYA
GREENFIELD; AMANDA KENNEDY;
RAYMOND PEZZOLI; SECOND AMENDMENT       No. 21-cv-8208 (ER)
FOUNDATION; and FIREARMS POLICY
COALITION, INC.,

                                    Plaintiffs,

           -against-

CITY OF NEW YORK; and EDWARD A.
CABAN, in his official capacity as Commissioner
of the New York City Police Department,

                                    Defendants.

---

## NOTICE OF CONSTITUTIONAL QUESTION

To:     Office of the Attorney General
        Division of Appeals & Opinions
        28 Liberty Street
        New York, New York 10005

**PLEASE TAKE NOTICE**, pursuant to Rule 5.1(a)(1) of the Federal Rules of Civil

Procedure, that Plaintiffs have filed an Amended Complaint and a motion for summary judgment

that draw into question the constitutionality of the prohibition on "electronic stun guns" and

"electronic dart guns" set forth in § 265.01(1) of the Penal Law under the Second and Fourteenth

Amendments to the United States Constitution.

**PLEASE TAKE FURTHER NOTICE**, pursuant to Rule 5.1(a)(2) of the Federal Rules

of Civil Procedure, that copies of both said papers are appended hereto.

Dated: Beacon, New York
     May 2, 2024

              DAVID JENSEN PLLC

          By: _____
              David D. Jensen, Esq.
              David Jensen PLLC
              33 Henry Street
              Beacon, New York 12508-3006
              Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on May 2, 2024 he sent a copy of the foregoing Notice of

Constitutional Question, and the appended Amended Complaint and Plaintiffs' moving papers in

support of summary judgment, to the Office of the New York State Attorney General by

depositing a true copy of the aforesaid documents in a postpaid properly addressed envelope at a

post office or official depository under the exclusive care and custody of the United States Postal

Service for delivery by certified mail to the following address:

        Office of the Attorney General
        Division of Appeals & Opinions
        28 Liberty Street
        New York, New York 10005

same being the address provide by the Office of the Attorney General for delivery of notices of

constitutional questions.

              _____
              David D. Jensen, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NUNZIO CALCE, ALLEN CHAN,
SHAYA GREENFIELD, AMANDA
KENNEDY, RAYMOND PEZZOLI,
SECOND AMENDMENT
FOUNDATION, *and* FIREARMS
POLICY COALITION, INC.,

                   Plaintiffs,

      – *against* –

THE CITY OF NEW YORK *and* JESSICA
TISCH, *in her official capacity as the
Commissioner of the New York City Police
Department*,

                 Defendants.

**OPINION & ORDER**

21 Civ. 8208 (ER)

---

RAMOS, D.J.:

      Nunzio Calce, Allen Chan, Shaya Greenfield, Amanda Kennedy, Raymond

Pezzoli, the Second Amendment Foundation, and the Firearms Policy Coalition, Inc.

(collectively, "Plaintiffs") bring this § 1983 action against the City of New York (the

"City") and Jessica Tisch,[1] in her official capacity as Commissioner of the New York City

Police Department (the "NYPD Commissioner," and collectively, "Defendants"), for

enforcing a New York State law which prohibits private citizens from possessing stun

guns and tasers, and a New York City law which prohibits private citizens from

possessing and selling stun guns.

---

[1] Plaintiffs originally named Dermot Shea as a defendant in his official capacity as Commissioner of the
New York City Police Department. *See* Doc. 1. Pursuant to Federal Rule of Civil Procedure 25(d), "when
a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending[,]
[t]he officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). Jessica Tisch was
appointed NYPD Commissioner effective November 25, 2024, and she currently serves in that role. *See
Mayor Adams Appoints Jessica Tisch as NYPD Commissioner*, https://www.nyc.gov/office-of-the-
mayor/news/847-24/mayor-adams-appoints-jessica-tisch-nypd-commissioner#/0 (last visited Mar. 23,
2025). Therefore, Tisch is automatically substituted as party to this case.

Before the Court are Plaintiffs' motion for summary judgment and Defendants' cross-motion for summary judgment.  For the following reasons, Plaintiffs' motion for summary judgment is DENIED, and Defendants' cross-motion for summary judgment is GRANTED.

## I.    BACKGROUND

### A.  Factual Background[2]

#### 1.  The Parties

Plaintiffs Calce, Chan, Greenfield, and Pezzoli are New York City residents. Doc. 50 ¶¶ 1–4.  Plaintiff Kennedy lives in Bristol, Connecticut, however her agent and recording studio are located in New York City, so she visits New York "on a regular basis," for both social and work-related reasons.  Doc. 40 at 10–11.

The Second Amendment Foundation ("SAF") and Firearms Policy Coalition, Inc. ("FPC") are nonprofit organizations.  Id. at 17, 19.  Each have members in New York State and City, including all the individual plaintiffs.  Id. at 18, 20.  SAF, which has over 720,000 supporters nationwide, "promot[es] both the exercise of the right to keep and bear arms, as well as education, research, publishing, and legal action focusing on the constitutional right to privately own and possess firearms."  Id. at 18.[3]  Plaintiffs allege that SAF has spent a "significant" amount of time responding to requests from its members and supporters, as well as from the general public, resulting from "New York City's enforcement of the State and City laws prohibiting stun guns and tasers."  Id. at 19.

"FPC's mission is to defend and promote . . . the fundamental, individual Second Amendment right to keep and bear arms[,] advance individual liberty, and restore

---

[2] The following facts are taken from the parties' Local Rule 56.1 Statements, and the parties' responses thereto, Docs. 40 (Defendants' Response to Plaintiffs' SOF), 50 (Plaintiffs' Response to Defendants' SOF). The facts recited here are undisputed unless otherwise noted.

[3] "SAF publishes three periodicals (The New Gun Week, Women and Guns, and The Gottlieb-Tartaro Report) and also publishes the academic publication Journal of Firearms and Public Policy.  SAF promotes research and education on the consequences of abridging the right to keep and bear arms and on the historical grounding and importance of the right to keep and bear arms as one of the core civil rights of United States citizens."  Doc. 40 at 18.

freedom." *Id.* at 20.  FPC additionally conducts "legislative and regulatory advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs." *Id.*  Representatives from FPC have "spent time, money and other resources answering questions and providing advice" concerning the "legal status of stun guns and tasers in New York City." *Id.* at 21.

Calce, Chan, Greenfield, Pezzoli, and Kennedy each "would like to purchase, possess and carry a stun gun or a taser in the City of New York." *Id.* at 3, 5, 7, 9, 11. Calce, Chan, Greenfield, and Pezzoli specifically desire a stun gun and taser to protect themselves both at home and in public.  Doc. 50 ¶ 1–4.[4]  None of the individual plaintiffs have ever been convicted of a felony nor confined to a mental institution, and to the best of their knowledge, they are each legally eligible to purchase and possess firearms under New York law and federal law.  Doc. 40 at 4, 6, 8, 10, 13.

However, each of them has refrained from purchasing, possessing, or carrying a stun gun or taser in New York City, out of fear that they will be arrested or otherwise prosecuted by NYPD officers for doing so.  *Id.* at 3, 5, 7, 9, 11.  All of them have an "understanding that NYPD officers will enforce the prohibitions against stun guns and tasers." *Id.* at 4, 6, 8, 9, 13.  On November 16, 2021, when she lived in Brooklyn, Kennedy was charged by the NYPD with possession of a stun gun, in violation of New York City Administrative Code § 10-135.  *Id.* at 12–13.  The charge resulted from an incident in which Kennedy brandished her stun gun to deter a woman who had hit her in the face from further attacking her.  *Id.* at 11–12.  FPC assisted Kennedy in paying for counsel to defend against the charge, *id.* at 21, which was ultimately resolved through an adjournment in contemplation of dismissal, which the Kings County Criminal Court issued on December 6, 2021.  Doc. 50 ¶ 7.

---

[4] Neither of the 56.1 statements discusses a specific purpose behind Kennedy's desire to purchase the weapons.

Defendant City of New York is a municipal corporation incorporated under the laws of the State of New York. *Id.* ¶ 10. The current NYPD Commissioner is Jessica Tisch.

### 2.  *Stun Guns and Tasers*

An electronic stun gun is defined as "any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, render unconscious or paralyze a person by passing a high voltage electrical shock to such person." Doc. 50 ¶ 18 (quoting N.Y. Penal Law § 265.00(15-c)). Stun guns "require direct contact between the device and an individual." *Id.* ¶ 19.

An electronic dart gun, commonly referred to as a "taser," is defined as "any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical current to such person by means of a dart or projectile." *Id.* ¶ 20 (quoting N.Y. Penal Law § 265.00(15-a)). Tasers "incapacitate individuals by transmitting pulses of electric current" by "fir[ing] two small darts that are connected to the device with wires." *Id.* ¶ 21–22.

 "Improper use of stun guns and tasers can result in serious injury, including death." *Id.* ¶ 28. From 2000 through 2020, "tasers were the third leading cause of death among fatalities resulting from civilian-police encounters." *Id.* ¶ 31. Defendants' expert report cites to a USA Today article which provides that "[s]ince 2010, there have been at least 513 cases in which subjects died soon after police used Tasers on them, according to fatalencounters.org." *Id.* ¶ 30. Moreover, according to Defendants, both stun guns and tasers have been "used by criminals to intimidate and even torture victims." *Id.* ¶ 29.

"Between 1970 and the early 2000s, seven states, including New York, enacted laws banning civilian possession of stun guns and tasers." *Id.* ¶ 24. "Approximately 40 localities within 15 states enacted similar restrictions[.]" *Id.* ¶ 25.

3.  *New York State and New York City Provisions*

New York Penal Law § 265.01, adopted in 1974 by the State of New York,[5]

provides that "[a] person is guilty of criminal possession of a weapon in the fourth

degree," a Class A misdemeanor, when:

> (1) He or she possesses any firearm, **electronic dart gun**, **electronic stun gun**, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slingshot, shuriken, or throwing star[.]

N.Y. Penal Law § 265.01 (emphasis added); *see also* Doc. 50 ¶ 14–15.

New York City Administrative Code § 10-135, adopted in 1985 by the City of

New York, "prohibits the possession and sale of electronic stun guns," a Class A

misdemeanor, providing:

> a. As used in this section, "electronic stun gun" shall mean any device designed primarily as a weapon, the purpose of which is to stun, render unconscious or paralyze a person by passing an electronic shock to such person, but shall not include an "electronic dart gun" as such term is defined in § 265.00 of the penal law.
>
> b. It shall be unlawful for any person to sell or offer for sale or to have in his or her possession within the jurisdiction of the city any **electronic stun gun**.

New York City, N.Y., Code § 10-135 (emphasis added); *see also* Doc. 50 ¶ 16–17.[6]

The NYPD Police Student Guide[7] identifies the "electronic dart gun" and

"electronic stun gun" as being among the weapons for which "[n]o intent is required, so

that the mere possession of [them] is a crime."  Doc. 40 at 16 (emphasis in original); *see*

*also* Doc. 35-5 at 8.

According to public information that the City provides online, the NYPD arrested

1,307 individuals in 2021, 1,552 in 2022, and 2,229 in 2023, for violating N.Y. Penal

---

[5] Plaintiffs state that the 1974 enactment of N.Y. Penal Law § 265.01 "did not address electronic dart guns or electronic stun guns," although it does now.  Doc. 40 ¶ 14.

[6] There is no City regulation of tasers being challenged in the instant case.  *See* Doc. 50 at ¶¶ 13–17.

[7] Defendants produced this document in response to Plaintiffs' discovery request for "[a]ll training materials that pertain to or address Stun Guns and/or Tasers, which have been used at any point from January 1, 2017 to present."  Doc. 35-5 ¶ 7; *see* Doc. 35-4 at 9.

Law § 265.01(1). Doc. 40 at 14. However, Defendants explain that they "do not readily have at their disposal records illustrating the number of arrests made pursuant to [N.Y.] Penal Law § 265.01 specifically for the possession or use of stun guns and tasers." *Id.* at 15. As for N.Y.C. Admin. Code § 10-135, Defendants explain that NYPD employees would have to "look up individual arrest reports to determine if an arrestee was charged with a violation of Administrative Code § 10-135" on the dates Plaintiffs requested, and in any event, Defendants "do not readily have at their disposal records illustrating the number of arrests made pursuant to Administrative Code § 10-135 specifically for the possession or use of stun guns and tasers."[8] *Id.* at 16.

### 4. *Historical Regulations on Non-Firearm Weapons*

Between the 1800s and 1900s, many states and jurisdictions enacted laws which regulated, to various extents, the carry, sale, and/or possession of Bowie knives, bludgeons, billy clubs, slungshots, sandbags, and/or toy guns—items which Defendants liken to stun guns and tasers as "non-firearm weapons." *See* Doc. 50 ¶¶ 32–43.

### B. Procedural History

Plaintiffs filed their initial complaint on October 5, 2021, and an amended complaint on December 22, 2021. Docs. 1, 5 (First Amended Complaint, "FAC"). Plaintiffs allege that N.Y. Penal Law § 265.01(1) and N.Y.C. Admin. Code § 10-135 are unconstitutional, and Defendants therefore deprived them of their right to bear arms under color of state law, in violation of 42 U.S.C. § 1983, by enforcing those laws. Doc. 5 ¶¶ 50, i–ii. Plaintiffs seek (1) a declaratory judgment that § 265.01(1) and § 10-135 are facially unconstitutional, or alternatively, unconstitutional as applied; (2) a preliminary and/or permanent injunction restraining Defendants from enforcing § 265.01(1) and § 10-

---

[8] It is unclear why Defendants mention tasers in this response, given that N.Y.C. Admin. Code § 10-135 states it does "not include an 'electronic dart gun' as such term is defined in § 265.00 of the penal law." *See* Doc. 50 ¶ 16.

135; (3) attorney's fees and costs; and (4) any other relief the Court deems just and equitable. *Id.* ¶¶ i–v. Defendants answered the FAC on April 22, 2022. Doc. 15.

Following discovery, Plaintiffs moved for summary judgment on March 1, 2024. Doc. 25. Defendants filed an opposition and cross-motion for summary judgment on April 26, 2024. Doc. 38.

On June 12, 2024, Plaintiffs filed a notice of constitutional question, pursuant to Federal Rule of Civil Procedure 5.1(a)(2), noting that the FAC and motion for summary judgment "draw into question the constitutionality of the prohibition on 'electronic stun guns' and 'electronic dart guns' set forth in § 265.01(1) of the Penal Law under the Second and Fourteenth Amendments to the United States Constitution."[9] Doc. 51.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

---

[9] Federal Rule of Civil Procedure 5.1 provides, "[a] party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly: (1) file a notice of constitutional question stating the question and identifying the paper that raises it, if: . . . (B) a state statute is questioned and the parties do not include the state, one of its agencies, or one of its officers or employees in an official capacity." Fed. R. Civ. P. 5.1(a)(1)(B). In their Memorandum of Law in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, filed on April 26, 2025, Defendants had noted that Plaintiffs "fail[ed] to comport with the requirements" of Rule 5.1. Doc. 43 at 6 n.2.

judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or speculation. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); *see also Ridinger v. Dow Jones & Co.*, 651 F.3d 309, 317 (2d Cir. 2011). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

The same legal standard applies when analyzing cross-motions for summary judgment. *See Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (quoting *Aviall, Inc. v. Ryder System, Inc.*, 913 F. Supp. 826, 828 (S.D.N.Y. 1996)). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Board of Education*, 667 F.2d 305, 314 (2d Cir. 1981)). The Court is not required to grant summary judgment in favor of either moving party. *See id.* (citing *Heublein Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

## III.   DISCUSSION

The question before the Court is whether there is any genuine dispute of material fact as to the constitutionality of N.Y. Penal Law § 265.01 and N.Y.C. Admin. Code § 10-135 under the Second Amendment.

## A.  Applicable Law

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment is not limited to the "right to bear arms in a state militia," but rather includes the "individual right to possess and carry weapons in case of confrontation."  554 U.S. 570, 592, 620 (2008).  In *McDonald v. Chicago*, the Supreme Court held for the first time that the Second Amendment's protections apply fully to the states through the Due Process Clause of the Fourteenth Amendment.  561 U.S. 742 (2010).  In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court recognized *Heller* and *McDonald* as protecting the right of an "ordinary, law-abiding citizen to possess a handgun in the home for self-defense," and it held that individuals also have a "right to carry a handgun for self-defense *outside* the home."  597 U.S. 1, 10 (2022) (emphasis added).

However, the "the right secured by the Second Amendment is not unlimited," and it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller*, 554 U.S. at 626.  The Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."  *Id.* at 625.  Put differently, the Supreme Court has stated it is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"  *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627).  Consistent with that principle, in holding that a ban on the possession of handguns was unconstitutional, the *Heller* Court emphasized "that the American people have considered the handgun to be the quintessential self-defense weapon."  *Id.* at 629.

After *Heller* and *McDonald*, but before *Bruen*, the Second Circuit, "as well as every other regional circuit," applied the following two-step framework for analyzing Second Amended challenges:

> At step one, [courts] asked whether a challenged law burdened conduct that fell within the scope of the Second Amendment based on its text and history. If so, [they] proceeded to step two, assessing whether the challenged law burdened the core of the Second Amendment, defined by *Heller* as self-defense in the home. If the burden was *de minimis*, the law was subject to intermediate scrutiny; if the burden was substantial and affected the core of the right, the law was subject to strict scrutiny.

*Antonyuk v. James*, 120 F.4th 941, 963 (2d Cir. 2024) (internal citations omitted) (collecting pre-*Bruen* cases from every circuit court except the Eighth). In *Bruen*, the Supreme Court rejected Step 2 of that framework and "set out a new 'test rooted in the Second Amendment's text, as informed by history.'" *Id.* at 964 (quoting *Bruen*, 597 U.S. a 19). *Bruen* established a new standard for applying the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 24 (citation omitted). Accordingly, therefore, in analyzing a challenge to a law on Second Amendment grounds, a court has to analyze whether "the Second Amendment's plain text covers an individual's conduct," and if it does, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Antonyuk*, 120 F.4th at 964. As to Step 1—the "plain text" inquiry—the *Bruen* Court reiterated its statement from *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582). "By that same logic," as to Step 2—the examination of "the Nation's historical tradition of firearm regulation"—"the Second Amendment permits more than just those regulations identical to ones that could be

found in 1791." *United States v. Rahimi*, 602 U.S. 680, 689, 691–92 (2024). That is, for the government to "justify its regulation" by showing that it is "'relevantly similar' to laws that our tradition is understood to permit," it need only point to a "historical analogue," not a "historical twin." *Id.* at 691, 701 (quoting *Bruen*, 597 U.S. at 30).

**B. Analysis**

"[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). In this context, "in common use at the time" refers to "weapons in use *today*," not at the time of ratification. *Maloney v. Singas*, 106 F. Supp. 3d 300, 310 (E.D.N.Y. 2015).

*1. Burden of Proof for "Common Use" Analysis*

The parties agree that the two-step Second Amendment test is a burden-shifting framework, whereby after Step 1, the burden shifts to the government to establish that its regulation accords with this Nation's history and tradition. *See Bruen*, 597 U.S. at 24 (emphasis added) (after Step 1, "[t]he government must *then* justify its regulation" at Step 2). However, the parties dispute whether the "common use" analysis takes place during Step 1 or Step 2 of the Second Amendment framework, and therefore, which party carries the burden to prove it.

Plaintiffs assert that "the question of commonality is relevant to the *historical* prong," Step 2, and is thus the government's burden, since the "'historical tradition of prohibiting the carrying of dangerous and unusual weapons' was the Court's whole justification in the first place for interpreting the Second Amendment as protecting arms 'in common use.'" Doc. 49 at 4; Doc. 26 at 10 (quoting *Heller*, 554 U.S. at 627). Plaintiffs explain that Step 1 focuses "solely on the 'plain text' of the Second Amendment," and argue that stun guns and tasers "plainly qualify" as arms, and thus Step 1 is "quickly and conclusively" satisfied. Docs. 26 at 9, 49 at 3, 4. Defendants, on the other hand, argue that the textual analysis at Step 1 itself involves a determination of

whether "the weapon at issue is 'in common use' today" for lawful purposes, as the court must find that stun guns and tasers are within the *scope* of the Second Amendment's protections before turning to the question of whether the government's regulation is nonetheless valid based on the Nation's history and tradition. Therefore, Defendants argue, Plaintiffs' bear the initial burden of showing that stun guns and tasers are in "common use." Doc. 43 at 8.

This Court follows the weight of authority in determining that the "common use" analysis is part of Step 1. *See United States v. Berger*, 715 F. Supp. 3d 676, 681–82 (E.D. Pa. 2024) ("Following Bruen, most federal courts considering Second Amendment challenges address the common-use issue at step one of the analysis.") (collecting cases); *see, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 254–55 (2d Cir. 2015), *cert. denied Shew v. Malloy*, 579 U.S. 917 (2016); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023); *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023), *reversed and remanded on other grounds*, 602 U.S. 680 (2024). *Heller* framed the "common use" analysis as part of the determination of what "sorts of weapons" are protected by the Second Amendment. *Heller*, 554 U.S. at 627; *see also id.* at 625 (emphasis added) (stating it "accords with the historical understanding of the *scope of the right*" to bear arms to say that the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes"); *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring) (emphasis added) (internal citation omitted) ("*Heller* . . . recognized a few categories of traditional exceptions to the right. For example, *Heller* indicated that: . . . the Second Amendment *attaches* only to weapons 'in common use[.]'"). Therefore, "[b]ecause determining which 'arms' the amendment covers is a textual matter," the "common use" analysis is to be conducted at Step 1, in assessing whether the regulated conduct is presumptively protected by the Constitution. *United States v. Lane*, 689 F. Supp. 3d 232, 252 at n.22 (E.D. Va. 2023). Plaintiffs' contrary, narrower interpretation of the textual analysis—that Step 1 is "quickly and conclusively"

satisfied because stun guns and tasers "plainly qualify" as arms, Docs. 49 at 3, 4; 26 at 9—is "far too facile and would essentially eliminate the step-one analysis whenever a regulation has the slightest connection to guns." *Mills v. New York City, New York*, No. 23 Civ. 7460 (JSR), 2024 WL 4979387, at *8, *9 (S.D.N.Y. Dec. 4, 2024) (granting motion to dismiss claim that various New York City firearm licensing regulations violated the Second Amendment, based in part on plaintiffs' failure, at step one of the Second Amendment analysis, to "show that the challenged regulations are foreclosed by the text of the Second Amendment"). Indeed, in *Bruen* itself, *at the outset of its textual analysis*, the Supreme Court established that the handguns at issue were not disputed to be "in common use" for self-defense, and only then turned to Step 2, the assessment of the Nation's historical tradition of firearm regulation. *See Bruen*, 597 U.S. at 32–34.

While the Second Circuit has not squarely discussed which party bears the burden to establish whether an arm is in "common use," it has, like the Supreme Court in *Bruen*, treated the "common use" assessment as core to the "initial" question, at Step 1, of whether the "challenged legislation impinges upon conduct protected by the Second Amendment."[10] *Cuomo*, 804 F.3d at 254–55 (considering under the "First Step: Whether

---

[10] The *Cuomo* court does note that, based on *Heller*'s statement that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," it follows that "the State bears the initial burden of rebutting" the "presumption in favor of Second Amendment protection." *Cuomo*, 804 F.3d at 257 n.73. It would seem to follow that this "burden of rebutting" is triggered *after* the "First Step: Whether the Second Amendment Applies," *id.* at 254, given the Second Amendment only "extends" to a given case, *id.*, if the first step is satisfied. On the other hand, at least one court seems to have interpreted *Cuomo* to mean that the government's burden is triggered *during* Step 1, albeit still in response to a plaintiff's presentation of prima facie evidence that the Second Amendment protects the conduct and weapon at hand. *See Avitabile v. Beach*, 368 F. Supp. 3d 404, 411, 412, 421 (N.D.N.Y. 2019) (finding stun guns and tasers were in "common use" where plaintiff did his best to "develop[] the 'common use' issue in discovery" through data, the State stipulated to the limited factual record developed by plaintiff, and the State offered "no meaningful contrary evidentiary showing"; and finding N.Y. Penal Law § 265.01 unconstitutional as applied to stun guns and tasers). Another court, adopting a third approach, seems to have interpreted the "presumption in favor of Second Amendment protection" as attaching *before* Step 1, with the government bearing the "initial burden of rebutting" that presumption by affirmatively "disprov[ing]" either "common use" or "typical possession by law-abiding citizens" at Step 1, that is, without the plaintiff necessarily presenting any evidence first. *Maloney v. Singas*, 351 F. Supp. 3d 322, 233, 234 (E.D.N.Y. 2018) (concluding that the government needs to affirmatively "show that, at a minimum, [the arms at issue] are not typically possessed by law-abiding citizens for lawful purposes" in order to "exempt

the Second Amendment Applies," that "[t]he Second Amendment protects only 'the sorts of weapons' that are (1) 'in common use' and (2) 'typically possessed by law-abiding citizens for lawful purposes.'").[11]  And, following *Bruen*, courts within the Second Circuit have continued to analyze "common use" at Step 1—and generally as plaintiffs' burden.  *See, e.g.*, *Grant v. Lamont*, No. 22 Civ. 1223 (JBA), 2023 WL 5533522, at *4 (D. Conn. Aug. 28, 2023) ("Under *Heller* and *Bruen*, Plaintiffs 'bear the burden of producing evidence that the specific firearms they seek to use and possess are in common use for self-defense, that the people possessing them are typically law-abiding citizens, and that the purposes for which the firearms are typically possessed are lawful ones.' . . . 'If Plaintiffs establish each of those elements, the burden shifts to Defendants to justify their regulation based on *Bruen*'s requirements for establishing relevant similarity to history and tradition.'"); *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 55 (N.D.N.Y. 2024) ("*Bruen*'s first step . . . requires a textual analysis, determining whether the challenger is part of 'the people' whom the Second Amendment protects, whether the weapon at issue is 'in common use' today for self-defense, and whether the proposed course of conduct

---

the challenged law from Second Amendment coverage").  However, *Maloney*'s statement that "nunchakus constitute a 'bearable arm' and so the rebuttable presumption that nunchakus are protected by the Second Amendment applies," *id.* at 234, is, like Plaintiffs' proposed approach, far too sweeping and "inconsistent with *Bruen* itself."  *See Mills*, 2024 WL 4979387, at *8.  In any event, here, Plaintiffs argue that "common use" is not in Step 1 whatsoever but in Step 2.  The *Cuomo* court is clear that "common use" is assessed at Step 1; therefore, the Court determines it is Plaintiffs' burden to establish it.

[11] Although *Bruen* dispensed with the second step of the analysis applied in *Cuomo*, "means-end scrutiny," the first part of the analysis in *Cuomo* remains consistent with *Bruen*.  *See Bruen*, 597 U.S. at 19 ("Step one of the predominant framework is broadly consistent with *Heller*, . . . [b]ut *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."); *see id.* at 18–19 (internal citations omitted) (explaining that in "means-end scrutiny," courts would "analyze 'how close the law [came] to the core of the Second Amendment right and the severity of the law's burden on that right.'  The Courts of Appeals [would] generally maintain 'that the core Second Amendment right is limited to self-defense *in the home*.'  If a 'core' Second Amendment right [was] burdened [by the challenged law], courts [would] apply 'strict scrutiny' and ask whether the Government [could] prove that the law [was] "narrowly tailored to achieve a compelling governmental interest.  Otherwise, they [would] apply intermediate scrutiny and consider whether the Government [could] show that the regulation [was] 'substantially related to the achievement of an important governmental interest.'"); *see also Frey v. Bruen*, 2022 WL 3996713, at *3 and n.2 (S.D.N.Y. Sept. 1, 2022) (explaining that *Bruen* rejected the *second step* of the previous two-step approach, which involved, in the *first step*, analyzing "whether the challenged legislation impinges upon conduct protected by the Second Amendment, or weapons in common use and typically possessed by law-abiding citizens for lawful purposes," and in the second step, determining the appropriate level of scrutiny).

falls within the Second Amendment."); *Vermont Federation of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 187 (D. Vt. 2024) ("[A]ccording to *Bruen*, a plaintiff must prove that the regulated weapons are in common use in order to qualify for presumptive protection under the Second Amendment.  Once a plaintiff has done that, the State may justify its regulation by demonstrating that the regulation 'is consistent with the Nation's historical tradition of firearm regulation.'"); *Lane v. Rocah*, No. 22 Civ. 10989 (KMK), 2024 WL 54237, at *8 (S.D.N.Y. Jan. 4, 2024) (emphasis in original) (finding Plaintiffs' proposed conduct was "*arguably* affected with a constitutional interest," because they desired to possess weapons "in common use," and "typically used for self defense and hunting," and deferring to a later stage in the case the assessment of "whether a law prohibiting that conduct turns out to be constitutional").

Other Circuit Courts have come to the same conclusion that whether a weapon is in "common use" is part of the "textual analysis" in Step 1.  For example, the Ninth Circuit expressly stated:

> *Bruen* step one involves a threshold inquiry.  In alignment with *Heller*, it requires a textual analysis, determining whether the challenger is "part of 'the people' whom the Second Amendment protects," whether the weapon at issue is 'in common use' today for self-defense," and whether the "proposed course of conduct" falls within the Second Amendment.

*Alaniz*, 69 F.4th at 1128.

In *United States v. Rahimi*, the Fifth Circuit similarly stated that the firearms at issue were "in common use" and thus "within the scope" of the Second Amendment, before finding that "*Bruen*'s first step [wa]s met, and the Second Amendment presumptively protect[ed] Rahimi's right to keep the weapons officers discovered in his home."  61 F.4th at 454.  The Fifth Circuit then found, at Step 2, that the Government failed to demonstrate that the restriction on the Second Amendment right imposed by 18 U.S.C. § 922(g)(8) "fits within our Nation's historical tradition of firearm regulation," thus concluding that the law was facially unconstitutional.  *Id.* at 460–61.  The Supreme

Court ultimately reversed the Fifth Circuit's finding that the statute was unconstitutional—holding that the Second Amendment in fact "*permits the disarmament* of individuals who pose a credible threat to the physical safety of others"—however its reversal was premised on its findings that the Fifth Circuit engaged in an overly demanding historical inquiry at Step 2, and incorrectly applied the Court's "precedents governing facial challenges." *Id.* at 693, 701 (emphasis added).[12] The Court did not, however, criticize the Fifth Circuit's analysis at Step 1, which included its finding that the handguns at issue were in "common use."

Therefore, Plaintiffs bear the burden to prove, at Step 1, that stun guns and tasers are in "common use."

   2.   *"Common Use" Analysis*

"[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. Therefore, Plaintiffs must show that stun guns and tasers are in "common use" today, and that they are "typically possessed by law-abiding citizens for lawful purposes." *Cuomo*, 804 F.3d at 255–56.

Whether an arm is in "common use" is "an objective and largely statistical inquiry." *Id.* at 256. "Since *Heller*, courts in this Circuit have require[d] substantial statistical evidence showing the popularity of a weapon before concluding that it is protected by the Second Amendment." *Jones v. Bermudez*, No. 15 Civ. 8527 (PKC) (BCM), 2019 WL 2493539, at *9 n.7 (S.D.N.Y. Feb. 14, 2019), *report and recommendation adopted sub nom. Jones v. Burmudez*, No. 15 Civ. 8527 (PKC) (BCM), 2019 WL 1416985 (S.D.N.Y. Mar. 29, 2019); *see also Berger*, 715 F. Supp. 3d at 691

---

[12] The Supreme Court explained: "The Fifth Circuit made two errors. First, like the dissent, it read *Bruen* to require a 'historical twin' rather than a 'historical analogue.' Second, it did not correctly apply our precedents governing facial challenges . . . Rather than consider the circumstances in which Section 922(g)(8) was most likely to be constitutional, the panel instead focused on hypothetical scenarios where Section 922(g)(8) might raise constitutional concerns. That error left the panel slaying a straw man." *Rahimi*, 602 U.S. at 701 (internal citations omitted).

(citation omitted) ("Every post-*Heller* case to grapple with whether a weapon is 'popular' enough to be considered 'in common use' has relied on statistical data of some form."). Courts have applied different statistical methodologies, such as evaluating the "raw" total number of a particular arm in the U.S., considering the "percentage and proportion" of ownership of that specific arm relative to total weapon ownership, and taking into account how many jurisdictions "allow or bar a particular weapon." *Berger*, 715 F. Supp. 3d at 691 (citation omitted). "[T]ypical possession," meanwhile, requires analyzing "both broad patterns of use and the subjective motives of gun owners." *Cuomo*, 804 F.3d at 256. "Looking solely at a weapon's association with crime . . . is insufficient. [The Court] must also consider more broadly whether the weapon is 'dangerous and unusual' in the hands of law-abiding civilians." *Id.* As to this "typical possession" analysis, the Second Circuit has recognized that "reliable empirical evidence of lawful possession for lawful purposes [i]s 'elusive,' beyond ownership statistics." *Id.* at 257.

Here, Plaintiffs have not provided any studies, reports, or data for the Court to conduct a "statistical inquiry" into whether stun guns and tasers are in common use. *Id.* at 256. Plaintiffs do not "even identify the most basic of statistics including, for example, the number of stun guns and/or tasers purchased in the United States for any given year." Doc. 43 at 11. Thus, Plaintiffs provide "no evidence whatsoever to support their claim that stun guns and tasers are in common use in the United States for self-defense, let alone in New York City." *Id.* at 10–11.

Plaintiffs' reliance on "findings and conclusions" from non-binding cases is of no moment. Doc. 49 at 7; *see People v. Yanna*, 297 Mich. App. 137, 144 (Ct. App. 2012) (citation omitted) ("Hundreds of thousands of Tasers and stun guns have been sold to private citizens, with many more in use by law enforcement officers."); *Avitabile*, 368 F. Supp. at 411 ("[B]ased on the limited data available, the parties agree there are at least 300,000 tasers and 4,478,330 stun guns owned by private citizens across the United States."); *O'Neil v. Neronha*, 594 F. Supp. 3d 463, 473 (D.R.I. 2022) ("Defendants agree

that millions of stun guns have been sold nationwide[.]").  Putting aside that the phrases "hundreds of thousands" and "millions" are indefinite, and that the figures in *Avitabile* were based on "limited data," Plaintiffs do not provide a legal basis for the Court to adopt those findings.[13]  Moreover, Plaintiffs do not even attempt to argue how these scant sources could inform whether stun guns and tasers are commonly used for lawful purposes.

Plaintiffs erroneously state that the Second Circuit in *Cuomo* found a pump-action rifle was in "common use," without any "evidence going to the issue."  Doc. 49 at 4.  The *Cuomo* court considered the constitutionality of two laws regulating weapons and large-capacity magazines:  a New York law, and a Connecticut law regulating "183 particular assault weapons," of which just one of the 183 weapons, the pump-action rifle, was a "non-semiautomatic firearm."  *Cuomo*, 804 F.3d at 250 and n.17.  The court initially found, based on various statistics offered by the plaintiff, that the assault weapons and large-capacity magazines being regulated by the laws at issue were "in common use."  *Id.* at 255.  Then, it analyzed whether the weapons were additionally "typically possessed by law-abiding citizens for lawful purposes"; after recognizing the difficulty of that analysis, the court opted to "*assume without deciding*" that the semiautomatic weapons were within the scope of the Second Amendment's protections.  *Id.* at 256, 257 n.73.  However, as to the pump-action rifle only, *i.e.* as to the "single non-semiautomatic firearm" covered by the Connecticut law, the court explicitly *decided*, as opposed to "*assum[ing] without deciding*," that the Second Amendment presumptively applied.  *Id.* at 257 n.73.  The court reasoned that, since the government "focused on semiautomatic weapons," it "failed to

---

[13] Plaintiffs suggest that the Court should rely on those findings by quoting a Ninth Circuit case, *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), *vacated on rehearing en banc*, which provided:  "[T]he historical research required under *Bruen* involves issues of so-called 'legislative facts'—those 'which have relevance to legal reasoning and the lawmaking process,' such as 'the formulation of a legal principle or ruling by a judge or court'—rather than adjudicative facts, which 'are simply the facts of the particular case.'"  Doc. 49 at 7 n.1 (quoting *Teter*, 76 F.4th at 946–47 (internal citation omitted)).  However, the quoted language is not in reference to a "common use" analysis, nor do Plaintiffs provide any explanation as to why it should apply thereto.

make any argument that this pump-action rifle [wa]s dangerous, unusual, or otherwise not within the ambit of Second Amendment protection," such that "the presumption that the Amendment applies" to it "remain[ed] unrebutted." *Id.*; *see Virginia v. Black*, 538 U.S. 343, 369 (2003) (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part) (quoting Black's Law Dictionary 1190 (6th ed. 1990)) (defining "prima facie evidence" as that which, "if unexplained or uncontradicted, is sufficient to sustain a judgment in favor of the issue which it supports"). Therefore, the *Cuomo* court's determination as to pump-action rifles was entirely separate from its "common use" analysis, and it nowhere suggested "common use" can be established without any statistical evidence whatsoever.

Plaintiffs also overstate the Supreme Court's holding in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), arguing that the case "erases any conceivable doubt concerning the weapons at issue." Doc. 49 at 3. In *Caetano*, the Court vacated a Massachusetts court's judgment upholding a ban on the possession of stun guns, but it did so specifically because "the explanation the Massachusetts court offered for upholding the law contradict[ed] th[e] Court's precedent." *Caetano*, 577 U.S. at 412. The Court explained that the Massachusetts court (1) improperly relied on the fact that stun guns "were not in common use at the time of the Second Amendment's enactment," and (2) it improperly concluded stun guns were "unusual" because they are "a thoroughly modern invention"—both in contradiction with the principles established in *Heller*. *Id.* at 411, 412 (quoting *Commonwealth v. Caetano*, 470 Mass. 774, 781 (2015), *judgment vacated sub nom. Caetano v. Massachusetts*, 577 U.S. 411 (2016)).[14] In other words, *Caetano* reiterated that the Second Amendment can extend to arms "that were not in existence at

---

[14] The Court additionally rejected the Massachusetts Court's third explanation for its holding that the Second Amendment did not protect stun guns: that the record did not "suggest that [stun guns] are readily adaptable to use in the military." *Caetano*, 470 Mass. at 781. The Court found this reasoning also contradicted *Heller*, as "*Heller* rejected the proposition 'that only those weapons useful in warfare are protected.'" *Caetano*, 577 U.S. at 412 (quoting *Heller*, 554 U.S. at 624–25).

the time of the founding." *Id.* at 312 (quoting *Heller*, 554 U.S. at 582); *see also Bruen*, 597 U.S. at 28 (same). The *Caetano* Court did not, however, conclusively determine, because it was not required to, that stun guns and tasers are in "common use."[15]

In sum, because Plaintiffs have failed to provide any evidence that stun guns and tasers are in "common use"; they have clearly not "set forth significant, probative evidence on which a reasonable fact-finder could decide in [their] favor." *Senno*, 812 F. Supp. 2d at 467–68. Therefore, no "reasonable jury could return a verdict" that stun guns and tasers are presumptively protected by the Second Amendment at Step 1 of the analysis, and the Court does not proceed to Step 2. *Id.* at 467; *see Cuomo*, 804 F.3d at 254 ("If the challenged restriction does not implicate conduct within the scope of the Second Amendment, our analysis ends and the legislation stands.").

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment is DENIED, and Defendants' cross-motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 25 and 38, and close the case.

It is SO ORDERED.

Dated:    March 24, 2025
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.

---

[15] The Court notes, however, that in concurrence, Justice Alito, joined by Justice Thomas, states: "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." *Caetano*, 577 U.S. at 420 (Alito, J. concurring). However, a concurrence is not binding precedent. *See Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (noting that a statement "contained in a concurrence" did not "constitute[] binding precedent").

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

NUNZIO CALCE, ALLEN CHAN, SHAYA
GREENFIELD, AMANDA KENNEDY, RAYMOND
PEZZOLI, SECOND AMENDMENT FOUNDATION, *and*
FIREARMS POLICY COALITION, INC.,

|  |  |
|---|---|
| Plaintiff, | 21 **CIVIL** 8208 (ER) |
| -against- | **JUDGMENT** |

THE CITY OF NEW YORK and JESSICA TISCH, *in her
official capacity as the Commissioner of the New York City
Police Department.*

Defendants.

------------------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion & Order dated March 24, 2025, Plaintiffs' motion for summary

judgment is DENIED, and Defendants' cross-motion for summary judgment is GRANTED.

Accordingly, the case is closed.

**Dated:**  New York, New York

March 24, 2025

**TAMMI M. HELLWIG**
**Clerk of Court**

BY:  _____

**Deputy Clerk**

A-517

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NUNZIO CALCE; ALLEN CHAN; SHAYA GREENFIELD; AMANDA KENNEDY; RAYMOND PEZZOLI; SECOND AMENDMENT FOUNDATION; and FIREARMS POLICY COALITION, INC., | No. 21-cv-8208 (ER) |
| Plaintiffs, | **NOTICE OF APPEAL** |
| -against- | |
| CITY OF NEW YORK; and EDWARD A. CABAN, in his official capacity as Commissioner of the New York City Police Department, | |
| Defendants. | |

Notice is hereby given that Plaintiffs NUNZIO CALCE; ALLEN CHAN; SHAYA GREENFIELD; AMANDA KENNEDY; RAYMOND PEZZOLI; SECOND AMENDMENT FOUNDATION; and FIREARMS POLICY COALITION, INC. hereby appeal to the United States Court of Appeals for the Second Circuit from the Opinion and Order (Doc. No. 57) and Judgment (Doc. No. 58) denying Plaintiffs' motion for summary judgment and granting Defendants' cross-motion for summary judgment, entered in this action on the 24th day of March, 2025. The appeal is from each and every aspect of that order and judgment.

Dated: New York, New York
        April 8, 2025

DAVID JENSEN PLLC

By: _____
    David D. Jensen, Esq.
    33 Henry Street
    Beacon, New York 12508
    david@djensenpllc.com