# 25-861

## United States Court of Appeals
### *for the*
## Second Circuit

NUNZIO CALCE, SHAYA GREENFIELD, RAYMOND PEZZOLI, SECOND AMENDMENT FOUNDATION, FIREARMS POLICY COALITION, INC., ALLEN CHAN, AMANDA KENNEDY,

*Plaintiffs-Appellants,*

— v. —

JESSICA TISCH, in her official capacity as Commissioner of the New York City Police Department, CITY OF NEW YORK,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, No. 1:21-cv-08208-ER (Edgardo Ramos, District Judge)

## BRIEF OF PLAINTIFFS-APPELLANTS

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs-Appellants*

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Firearms Policy Coalition, Inc., does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

Second Amendment Foundation does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

Dated: July 22, 2025

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson

*Attorney for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT...................................................i

TABLE OF AUTHORITIES.......................................................................iv

INTRODUCTION .......................................................................................1

JURISDICTIONAL STATEMENT ............................................................2

ISSUE PRESENTED ..................................................................................3

STATEMENT OF THE CASE ....................................................................3

   I.   The Electronic Arms Ban. ..................................................................3

   II.   Procedural History. ............................................................................5

STANDARD OF REVIEW..........................................................................8

SUMMARY OF ARGUMENT ....................................................................8

ARGUMENT .............................................................................................10

   I.   Electronic weapons are "arms" that are presumptively protected by the Second Amendment. ...............................................................11

      A. All bearable weapons are "arms" within the scope of the Second Amendment's plain text. ...........................................11

      B. The district court's contrary conclusion is untenable. .........15

        1. "Common use" is irrelevant to *Bruen*'s textual question...15

        2. The weight of authority does not support treating "common use" as a textual issue. ........................................20

        3. Narrowing the scope of "arms" at the outset makes no sense within the context of the Second Amendment. ........25

   II.   The Ban cannot be historically justified. ........................................28

      A. The Supreme Court has determined that history supports banning only "dangerous and unusual weapons."................35

      B. Electronic arms are far less "dangerous" than other common and protected bearable arms. ................................................37

      C. Electronic arms are not unusual but rather "in common use for lawful purposes." ..........................................................44

CONCLUSION ...................................................................... 47

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**(s)

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) ................................. 23, 24, 25, 30, 33

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters,*
    943 F.3d 568 (2d Cir. 2019) ............................................................. 8

*Avitabile v. Beach,*
    368 F. Supp. 3d 404 (N.D.N.Y. 2019) ........................................ 5, 46

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) .................................................... 37, 38

*Bianchi v. Brown,*
    111 F.4th 438 (4th Cir. 2024) .................................................... 37, 38

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) .................................... 13, 14, 15, 35, 36, 44, 45

*Crowell v. Kirkpatrick,*
    400 F. Appx. 592 (2d Cir. 2010) ............................................... 42, 43

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................... 1, 10, 12, 13, 14, 16, 17, 18, 19, 24,
                                  25, 27, 29, 31, 35, 36, 44, 45

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020) ...................................................................... 31

*Hanson v. District of Columbia,*
    120 F.4th 223 (D.C. Cir. 2024) ................................................. 14, 36

*Lara v. Comm'r Pa. State Police,*
    125 F.4th 428 (3d Cir. 2025) ............................................... 28, 29, 32

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ......................................................... 32

*New York State Rifle & Pistol Ass'n v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ................................................. 21, 22, 38

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ................. 7, 10, 11, 14, 16, 18, 19, 20, 22, 23, 24,
                             26, 28, 29, 30, 31, 32, 33, 34, 36

iv

*O'Neil v. Neronha,*
    594 F. Supp. 3d 463 (D.R.I. 2022).................................................46

*Penree ex rel. Penree v. City of Utica,*
    694 F. Appx. 30 (2d Cir. 2017)........................................................42

*People v. Yanna,*
    824 N.W.2d 241 (Mich. Ct. App. 2012)..........................................45

*Teter v. Lopez,*
    125 F.4th 1301 (9th Cir. 2025)........................................................37

*Teter v. Lopez,*
    76 F.4th 938 (9th Cir. 2023)...........................................................37

*United States v. Alaniz,*
    69 F.4th 1124 (9th Cir. 2023)...................................................21, 22

*United States v. Rahimi,*
    602 U.S. 680 (2024) ...................................21, 26, 28, 30, 32, 33, 34

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir. 2023)....................................................21, 22

*United States v. Rush,*
    No. 23-3256, 2025 WL 750313 (7th Cir. Mar. 10, 2025)...............32

*Worth v. Jacobson,*
    108 F.4th 677 (8th Cir. 2024)....................................................29, 32

*Zherka v. Bondi,*
    140 F.4th 68 (2d Cir. 2025) .................................................24, 26, 27

## Constitutional Provisions and Statutes

28 U.S.C.
    § 1291 .................................................................................................2
    § 1331 .................................................................................................2
    § 1343 .................................................................................................2

U.S. Const. amend. II.....................................................................10, 11

N.Y. Penal Law
    § 265.00(15-a) ...................................................................................4
    § 265.00(15-c)....................................................................................4
    § 265.01 ..............................................................................................4
    § 265.01(1)..........................................................................................4

v

§ 265.20(a)(1)(a) ................................................................. 4
§ 265.20(a)(1)(b) ................................................................ 4
§ 265.20(a)(3) .................................................................... 4

N.Y.C. Admin. Code
§ 10-135(a) ........................................................................ 4
§ 10-135(b) ........................................................................ 4
§ 10-135(c) ........................................................................ 4
§ 10-135(d) ........................................................................ 4

## Other Authorities

J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. __
(forthcoming 2025) ............................................................ 20, 23

AMNESTY INT'L, USA: "LESS THAN LETHAL"? THE USE OF STUN
WEAPONS IN US LAW ENFORCEMENT (2008) .................................... 41

William P. Bozeman et al., *Safety and Injury Profile of Conducted
Electrical Weapons Used by Law Enforcement Officers Against
Criminal Suspects*, 53 ANNALS EMERGENCY MED. 480 (2009) ....... 39

Tomora Clark, *One Painful Lesson: MPs Train with Tasers*,
U.S. ARMY (Mar. 11, 2014), https://perma.cc/5J6R-8R5K ............. 41

JORDAN B. COHEN & MATTHEW D. TROUT, CONG. RSCH. SERV., IF12841,
STUN GUNS, TASERS, AND OTHER CONDUCTED ENERGY DEVICES:
ISSUES FOR CONGRESS (2024) .......................................................... 47

Decl. of Michael A. Brave, *O'Neil v. Neronha*, 1:19-cv-612
(June 2, 2021), Doc. 39-4 ................................................................ 46

Alison R. Gardner et al*., Conducted Electrical Weapon (TASER) Use
Against Minors: A Shocking Analysis*, 28 PEDIATRIC EMERGENCY
CARE 873 (2012) ............................................................................. 39

*Illinois Cops Give Public Chance to Get Tasered for Free at Training
Event*, FOX 32 CHI. (Jan. 30, 2019),
https://perma.cc/YF6X-UT9K .......................................................... 42

Dana Kennedy, *Self-defense Tasers and stun guns surge in
popularity across NYC*, N.Y. POST (Feb. 27, 2021),
https://perma.cc/XUN8-M63Q ................................................... 46, 47

Mike La Putt, *TASER Training NV DPS Police Academy 87*
(YouTube, Dec. 15, 2019), http://bit.ly/46diKF7 ............................. 42

Joshua Magbanua, *Shocked and in Tears: Taser and Pepper Spray Training*, JOINT BASE LANGLEY-EUSTIS (Jan. 29, 2021), https://perma.cc/RVY6-LRMC ....................................................... 41

Steve Marantz, '*Stun Guns' Gain Popularity: More Than 300,000 Sold to Police and Private Citizens*, BOSTON GLOBE (May 22, 1985), *available at* https://perma.cc/3DYT-2AG7 .................................... 45

NOAH WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://perma.cc/PJE2-XLDN ............................................ 12

Gary J. Ordog et al., *Electronic Gun (Taser®) Injuries*, 16 ANNALS EMERGENCY MED. 73 (1987) ............................................................ 40

Redacted Decls., *O'Neil v. Neronha*, 1:19-cv-612 (Mar. 8, 2021), Doc. 30-4 ................................................................. 46

Jack Reinhard, *Local Police Discuss Taser Training*, FOX56 WOLF (Apr. 26, 2021), https://perma.cc/8LSR-8YDN ........................ 41, 42

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J.L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://perma.cc/75MP-MHFS ............................... 29

*The Pros and Cons of Stun Guns*, THE N.Y. TIMES: CONSUMER'S WORLD (Aug. 13, 1988), *available at* https://perma.cc/3LDG-AVYB................................................... 45, 46

*The truth about TASER*, AXON (2024), https://perma.cc/CM4E-CNR8 ...................................................... 43

Eugene Volokh, *Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life*, 62 STAN. L. REV. 199 (2009) ....................................... 1, 3, 38, 41, 45

vii

# INTRODUCTION

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court explained that, at the Founding and throughout our nation's history, the Second Amendment has been understood to protect the ownership and use of deadly weapons for self-defense. At the same time, the Court recognized that there have always been some who declined to use them for that purpose. "Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever—so much so that Quaker frontiersmen were forbidden to use arms to defend their families, even though in such circumstances, the temptation to seize a hunting rifle or knife in self-defense must sometimes have been almost overwhelming." *Id.* at 590 (cleaned up). Many people today have similar moral, religious, or even practical objections to lethal self-defense. *See, e.g.*, Eugene Volokh, *Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life*, 62 STAN. L. REV. 199, 207 & n.31 (2009) (noting that Mennonites, Pentecostalists, and the Dalai Lama have all "expressed the view that one ought not use deadly force even in self-defense, but self-defense using nondeadly force is permissible"). New York City, through its enforcement

1

of state and local restrictions on "electronic arms" like stun guns and tasers, perversely denies citizens the right to opt for a nonlethal alternative to handguns or other deadly weapons for use in self-defense.

This restriction flies in the face of the Second Amendment. The district court held that stun guns are not even "arms" within the meaning of the Second Amendment's plain text, and hence the Second Amendment was not even implicated, but that was an error. As weapons, they are indisputably within the meaning of the term "arms." And there is no historical justification for banning a weapon that is both common among law-abiding citizens looking to defend themselves and markedly *less* dangerous than other common instruments they could choose for that purpose. The decision below must be reversed.

## JURISDICTIONAL STATEMENT

The district court had original subject-matter jurisdiction over this Second Amendment action under 28 U.S.C. §§ 1331 and 1343. This Court has appellate jurisdiction to review the district court's order granting Defendants final judgment on all claims under 28 U.S.C. § 1291. The district court's judgment was entered on March 24, 2025, S.A. 21, and Plaintiffs timely filed a notice of appeal on April 8, 2025, J.A. 497.

## ISSUE PRESENTED

Whether the laws of the State of New York and the City of New York prohibiting private citizens from possessing or using electronic arms like stun guns and tasers are constitutional under the Second and Fourteenth Amendments.

## STATEMENT OF THE CASE

### I.  The Electronic Arms Ban.

So-called "electronic arms" like stun guns and tasers "work by producing electrical pulses that make the target's muscles spasm, and thus quickly but temporarily disable him. And unlike, say, a baton or a similar weapon, they generally stop the target with one blow, and can be used even by people who are weak or disabled." Volokh, *supra*, at 204. Some electronic arms, like stun guns are essentially close-quarters weapons, requiring the user to touch the target with the source of the electrical shock, while others, most famously the taser, fire barbed and electrified darts a short distance, permitting individual defense at a greater range. *Id.*

Despite the fact that these arms are dramatically less deadly than firearms and knives and therefore "merit being viewed as tantamount to generally non-deadly force, such as a punch or a shove," *id.* at 205, New

3

York State and New York City both ban possession of electronic arms like stun guns or tasers. Under state law, possession of an "electronic dart gun" (defined to cover electronic arms that fire a projectile) or "electronic stun gun" (defined to cover electronic arms that do not) is prohibited. N.Y. PENAL LAW §§ 265.00(15-a), (15-c), 265.01(1); *see also* J.A. 184–85 (illustrating these items). New York City also makes it a crime to possess an "electronic stun gun" (defined only to cover electronic arms that do not fire a projectile). N.Y.C. Admin. Code § 10-135(a), (b). Violation of these laws (collectively, the "Electronic Arms Ban") is a misdemeanor. N.Y. PENAL LAW § 265.01; N.Y.C. Admin. Code § 10-135(c).

The Electronic Arms Ban is subject to exceptions like those for police officers or members of the military, N.Y. PENAL LAW § 265.20(a)(1)(a), (b) (police officers and members of the military); N.Y.C. Admin. Code § 10-135(d) (police officers). But there is no exception that would permit ordinary, peaceable civilians in New York to possess or carry such an arm for self-defense, and individuals who have licenses to carry a handgun are barred from even possessing electronic arms in New York. *See* N.Y. PENAL LAW § 265.20(a)(3).

4

Finally, the New York State laws that make up part of the Electronic Arms Ban at issue in this case have previously been held unconstitutional and had their enforcement, by the state police, enjoined, in a decision that the State did not appeal. *See Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019). The City, however, is not bound by that decision, and it continues to train its police officers regarding the state law prohibition and to enforce the Electronic Arms Ban. *See* J.A. 49–50, 150, 270–75.

## II. Procedural History.

The Plaintiffs in this case are several individuals and two organizations. The Individual Plaintiffs desire to own and to carry an electronic arm in New York City for personal self-defense, but they refrain from doing so because of the Ban. J.A. 41, 45, 48, 50, 53. Indeed, one Individual Plaintiff, Amanda Kennedy, has previously used an electronic arm to ward of an attack by a pedestrian who struck her car and her face and tried to open her car door. J.A. 49–50. The mere sight of Kennedy's stun gun ended the attack, but when the police officers who responded to the attack learned she was carrying a stun gun, they charged *her* with possession, though the case was eventually resolved

through an adjournment in contemplation of dismissal. J.A. 50. The two organizations, Firearms Policy Coalition and Second Amendment Foundation are both nonprofit membership organizations that seek to advance and to defend the Second Amendment rights of their members. J.A. 55–59. Both count each of the Individual Plaintiffs as their members. J.A. 56, 58–59.

This coalition of Plaintiffs filed this suit on October 5, 2021, and amended the complaint on December 22, 2021, alleging that the Electronic Arms Ban violates the right to keep and bear arms protected by the Second and Fourteenth Amendments. Compl., Dist. Ct. Doc. 1 (Oct. 5, 2021); J.A. 11–22. The Defendants answered on April 22, 2022. J.A. 23–30. Following discovery, the parties cross-moved for summary judgment in March and April of 2024. J.A. 31–32; J.A. 250–51. On June 12, 2024, Plaintiffs filed a notice pursuant to Federal Rule of Civil Procedure 5.1, notifying the State of New York that this case challenges the constitutionality of New York's statutes banning electronic arms, but the State did not seek to intervene. J.A. 495–96.

On March 24, 2025, the district court granted summary judgment in favor of the City and denied Plaintiffs' motion. S.A. 1–21. Applying the

6

framework prescribed by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the district court held that Plaintiffs' challenge did not merit any Second Amendment scrutiny at all, because it did not implicate the Amendment's "plain text." S.A. 20. In reaching that conclusion, the district court determined that only arms "in common use" fall within the scope of the Amendment's textual protection of the right "to keep and bear arms." S.A. 12. Though the district court did not offer a textual justification for this decision, it claimed that it was "follow[ing] the weight of authority" in treating "common use" as a textual issue. *Id*. That analytical decision was ultimately dispositive, as it led the district court to place the burden on Plaintiffs to prove, as part of this threshold step, "that stun guns and tasers are in 'common use.' " S.A. 16. It concluded that Plaintiffs had failed to carry that burden, ignoring findings and conclusions regarding the commonality of these arms in other cases and faulting Plaintiffs for not "provid[ing] any studies, reports, or data for the Court to conduct a 'statistical inquiry' into whether stun guns and tasers are in common use." S.A. 17.

7

## STANDARD OF REVIEW

This Court reviews "a district court's grant of summary judgment *de novo* where the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 576–77 (2d Cir. 2019) (cleaned up).

## SUMMARY OF ARGUMENT

I. The district court erred in holding that the Electronic Arms Ban is immune from scrutiny under the Second Amendment because stun guns and tasers are not "arms" within the meaning of the Second Amendment's plain text. *Heller* makes clear that the textual scope of the Amendment is very broad. *All bearable weapons* are "arms" that are presumptively protected. The district court's contrary conclusion was based on its unsupportable decision to treat whether an arm is "in common use" as a requirement to fit within the meaning of the "plain text." That is unsupportable as a matter of interpretation—there is nothing in the Amendment's text that suggests such a limitation. And it is also unsupportable as a matter of precedent. Although the district court purported to ground its decision in *Bruen*, properly understood,

8

*Heller* and *Bruen* both reject the notion that the "common use" principle has anything to do with the Amendment's text.

II. Rather, "common use" is a product of the *historical* analysis required by *Bruen*. As *Heller* explained and *Bruen* reiterated, the only historical tradition that can support banning a type of arm is the history of restricting weapons that are both "dangerous and unusual." The "common use" test follows from that history because a weapon in common use is, by definition, not an "unusual weapon."

A. Here, however, the Court ultimately need not decide where "common use" factors into the analysis, because electronic arms are not dangerous and unusual weapons and therefore are protected by the Second Amendment. Indeed, electronic arms are much *less* dangerous than the handguns that the Supreme Court held were protected in *Heller* and *Bruen*. In fact, that is their entire reason for existing—to offer a nonlethal yet meaningful method of self-defense. Studies show that being shot with electronic arms does not cause even moderate injuries except in outlier cases, something that is self-evidently not true of firearms. The City will be unable, in light of those facts, to show that electronic arms are "dangerous."

9

B. In addition, electronic arms are common. In failing to find they were "in common use," the district court both placed the burden on the wrong party and blinded itself to the evidence demonstrating that fact. And regardless of who bears the burden, electronic arms are in common use for lawful purposes like self-defense.

## ARGUMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Amendment protects " 'the right of law-abiding, responsible citizens to use arms' for self-defense" (in addition to other lawful purposes) and "demands our unqualified deference." *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). For that reason, no important governmental interest can justify legislation that conflicts with the protections of the Second Amendment. Following the Supreme Court's decision in *Bruen*, the following standard governs cases challenging the constitutionality of laws under the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's

historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 24 (quotation marks omitted).

## I. Electronic weapons are "arms" that are presumptively protected by the Second Amendment.

### A. All bearable weapons are "arms" within the scope of the Second Amendment's plain text.

Applying *Bruen*'s framework here, the first question to be answered is whether the Second Amendment's plain text extends to cover the possession of electronic arms like stun guns and tasers, granting them presumptive protection. Because they are bearable weapons, the answer to that question is a straightforward yes.

*Bruen* repeatedly emphasized that the subject of this analysis is the Amendment's "plain text," 597 U.S. at 17, 24, 32–33, or "bare text," *id.* at 44 n.11. In other words, the focus is only upon the words of the Amendment, their historical meaning, and what they fairly imply. Distinctions that do not appear on the face of the text cannot be found at this stage of the analysis and must be derived later, if at all, through history. Again, the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The

11

question here, then, is what was understood by the term "arms" at the Founding. *Heller* has already answered this question.

"The 18th-century meaning is no different from the meaning today." *Heller*, 554 U.S. at 581. "The 1773 edition of Samuel Johnson's dictionary defined 'arms' as '[w]eapons of offence, or armour of defence.'" *Id*. (quoting *Arms*, 1 DICTIONARY OF THE ENGLISH LANGUAGE 106 (4th ed. 1773)). And "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id*. (quoting 1 A NEW AND COMPLETE LAW DICTIONARY (1771)). The Court also cited without quoting Webster's 1828 American Dictionary of the English Language, which gave as its first definition of arms "[w]eapons of offense, or armor for defense and protection of the body," and said that "[i]n law, *arms* are any thing which a man takes in his hand in anger, to strike or assault another." *Arms*, NOAH WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://perma.cc/PJE2-XLDN. Summarizing its findings, *Heller* wrote that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582. Stun

guns and tasers, as weapons, are plainly encompassed within the textual scope of "arms."

Indeed, consistent with this straightforward, and generally expansive definition of the term, the Supreme Court has itself *twice* explained that electronic arms like stun guns are "arms" within the meaning of the Amendment's plain text. In *Caetano v. Massachusetts*, in a brief per curiam opinion, the Supreme Court vacated a decision of Massachusetts's Supreme Judicial Court upholding a ban on stun guns, rejecting the Commonwealth's contrary arguments by explaining that "the Second Amendment 'extends … to … arms … that were not in existence at the time of the founding,'" 577 U.S. 411, 412 (2016) (quoting *Heller*, 554 U.S. at 582), that an arm is not "unusual because [it is] a thoroughly modern invention," 577 U.S. at 412 (citation and quotation marks omitted), and that stun guns' lack of utility to the military was irrelevant because "*Heller* rejected the proposition 'that only those weapons useful in warfare are protected,'" *id.* (quoting 554 U.S. at 624–25). Each of these objections presupposes that stun guns are "arms"— indeed, the opinion would be incomprehensible if they were not. Why

13

should it matter that the Second Amendment extends to cover modern arms, if the stun gun is not one?

Courts accordingly have recognized that *Caetano* establishes that "stun guns" are arms. *See Hanson v. District of Columbia*, 120 F.4th 223, 233 (D.C. Cir. 2024) ("[P]ossession of a stun gun is protected by the Second Amendment." (citing *Caetano*, 577 U.S. at 412)). Indeed, *Bruen* recognized as much. In explaining its mode of analysis, *Bruen* stated that, as a textual matter, the Second Amendment has a "historically fixed meaning" that nevertheless "applies to new circumstances[.]" 597 U.S. at 28. This means that while the definition of "arms" is the same as it was in the 1790s (weapons), the things that that definition encompasses today are different than the things that it encompassed at the Founding; the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.' " *Id*. (quoting *Heller*, 554 U.S. at 582) (brackets in *Bruen*). Therefore, the Court explained, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id*. And *Bruen* supported this statement with the following citation: "Cf. *Caetano*, 577 U.S. at 411–

14

12 (*per curiam*) (stun guns)." *Id*. (citation to *Caetano* cleaned up). In other words, *Bruen* expressly identified stun guns as a modern instrument that is "cover[ed]" by the Second Amendment's plain text. The district court's decision holding otherwise was, therefore, directly contrary to Supreme Court precedent.

### B. The district court's contrary conclusion is untenable.

The district court reached a different conclusion because it narrowed the scope of "arms" encompassed by the "plain text" of the Second Amendment to include only those weapons that can be shown (by the Plaintiffs) to be "in common use." S.A. 20. As a result, it held that the Electronic Arms Ban required *zero* constitutional scrutiny. That decision was wrong for several reasons.

### 1. "Common use" is irrelevant to *Bruen*'s textual question.

In addition to ignoring the key fact that *Caetano* and *Bruen* have already stated that "stun guns" are "arms" within the Second Amendment's plain text, the district court's narrow textual reading has no basis in the language of the Second Amendment itself, nor is it supported by the reasoning of *Heller* or *Bruen*. Beginning with the text, the Second Amendment's reference to "arms" is unqualified, and there is

nothing that suggests, textually, a "common use" limitation. The district court did not even try to explain how it could shoehorn "common use" into the plain text of the Amendment.

Rather, the district court claimed that its treatment of "common use" as a textual limitation followed from "*Heller* [which] framed the 'common use' analysis as part of the determination of what 'sorts of weapons' are protected by the Second Amendment." S.A. 12. *Heller* did in fact make "common use" relevant to the question of whether a given weapon is "protected by the Second Amendment," but that does not mean that it is a *textual* limitation on the right. Quite the opposite is true. Consider the statement on its face. If *Heller* made "what 'sorts of weapons' are protected by the Second Amendment" turn on "common use," then that *necessarily means* that "common use" is relevant to the *historical* inquiry, not the plain text. After all, *Bruen* made clear that whether an item is an "arm" merely means that it is entitled to "presumptive[] protect[ion]." 597 U.S. at 17. In the same way, *Heller* cautioned that the Second Amendment's broad text meant it "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. But before it can be said conclusively that an arm is protected by

16

the Second Amendment, *Heller* indicated that the government has the opportunity to demonstrate that it is a dangerous and unusual weapon and therefore subject to restriction under the historical tradition of regulation that provides limits on the plain-text scope of the right.

*Heller*'s structure makes this clear. As discussed above, in Part II of its opinion, when the Court announced it would "turn first to the meaning of the Second Amendment," *Heller* provided an extensive discussion of how the textual term "arm" was defined at the Founding to mean essentially any weapon. *See* 554 U.S. at 581–84. Through this whole discussion, the Court *never* mentioned a "common use" limitation on the term or the right. *See id.* That came later, in Part III of the opinion when it took up the project of delineating "the historical understanding of the scope of the right." *Id.* at 625. Then, the Court explained, "that the sorts of weapons protected,"—note, not *presumptively* protected, or *prima facie* protected, but protected, full stop—"were those in common use at the time." *Id.* at 627 (quotation marks omitted). In so doing, it explicitly stated that this conclusion "is fairly supported by *the historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 627 (emphasis added); *see also id.* at 625 ("[T]he Second Amendment does

17

not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with *the historical understanding of the scope of the right*, see Part. III, *infra*." (emphasis added)). It was in these, explicitly *historical*, passages, that *Heller* made "common use" relevant to the scope of the Second Amendment. The district court's reliance upon these same passages for its conclusion that *Heller* treated "common use" as somehow part of the Second Amendment's text was therefore an error. *See* S.A. 12 (quoting *Heller*, 554 U.S. at 625, 627).

If there could be any doubt that the district court misunderstood *Heller* in placing "common use" at the textual level, *Bruen* dispels them. In providing a summary of "*Heller*'s methodological approach to the Second Amendment," *Bruen*, 597 U.S. at 19, *Bruen* was explicit that *Heller* had

> relied on the historical understanding of the Amendment to demark the limits on the exercise of that right. … For example, we found it "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons" that the Second Amendment protects the possession and use of weapons that are "in common use at the time."

18

*Id.* at 21 (quoting *Heller*, 554 U.S. at 627). That discussion is incompatible with any reading of *Heller* that would place "common use" at the textual level.

To be sure, the district court purported to find support for its contrary position in *Bruen*, claiming that "in *Bruen* itself, *at the outset of its textual analysis*, the Supreme Court established that the handguns at issue were not disputed to be 'in common use' for self-defense, and only then turned to Step 2, the assessment of the Nation's historical tradition of firearm regulation." S.A. 13 (citing *Bruen*, 597 U.S. at 32–34). But the district court was wrong to read *Bruen* that way. The statements about common use made up the *entirety* of the Court's analysis of whether the handguns at issue in the case were protected arms as a matter of text and history, and they came before the Court began *either* its textual or its historical analysis of the terms "bear." Nor was the district court correct that, after it concluded this short discussion of common use, *Bruen* "turned to Step 2, the assessment of the Nation's historical tradition of firearm regulation." S.A. 13. Rather, *Bruen* immediately "turn[ed] to whether the plain text of the Second Amendment protects

19

[petitioners'] proposed course of conduct"—i.e., carrying arms in public. 597 U.S. at 32.

Importantly, after this early mention of "common use" in *Bruen*, the Supreme Court never returned, later in its opinion, to ask whether common handguns could be restricted consistent with history. That necessarily means that its conclusions were not "preliminary" ones based only on the text. Rather, consistent with *Heller*, *Bruen* treated the fact that the handguns the petitioners wanted to carry were in "common use" as dispositive of whether they were *protected* arms, not just "arms" within the meaning of the plain text that were *presumptively* protected. *Id.*; *see also* J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. __, 12–14 (forthcoming 2025).

## 2. The weight of authority does not support treating "common use" as a textual issue.

In addition to misunderstanding *Bruen*, the district court purported to ground its decision on the fact that it was "follow[ing] the weight of authority in determining that the 'common use' analysis is part of Step 1 [the threshold textual analysis]" and, therefore, that electronic arms are not "arms." S.A. 12. This was error for several reasons.

20

First, the "authority" that counts here is the Supreme Court's. And as just explained, that authority conclusively demonstrates that the plain text of the Second Amendment covers all "arms." A simple appeal to non-binding and unpersuasive decisions of other courts cannot overcome holdings of the Supreme Court.

Second, the authority the district court cited does not even support its conclusion. In addition to *Heller* and *Bruen* (which, as explained, refute the district court), the district court cited the Fifth Circuit's decision in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), which the Supreme Court reversed, *United States v. Rahimi*, 602 U.S. 680 (2024), the Ninth Circuit's decision in *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023), and this Court's pre-*Bruen* decision in *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015). But *Rahimi* dealt with the question of whether an individual subject to a domestic violence restraining order could be disarmed consistent with the Second Amendment, and *Alaniz* dealt with the question of whether the Second Amendment permits sentencing enhancements based on the possession of a firearm during the commission of a crime. In short, the question of "what types of weapons" the Second Amendment protects was

21

not raised by either case, and their discussion of "common use" is therefore dicta. Indeed, "discussion" is hardly the right word—given that the issue did not matter in either case, both courts dispensed with the issue in a single sentence. *See Rahimi*, 61 F.4th at 454; *Alaniz*, 69 F.4th at 1128. (*Alaniz* specifically cited for support the same passage of *Bruen* that the district court misread, as described above. 69 F.4th at 1128.) It is hard to understand how the district court could find either added much to the "weight of authority" on the issue.

More puzzling still is the district court's reliance on this Court's pre-*Bruen* caselaw, which it held "treated the 'common use' assessment as core to the 'initial' question, at Step 1, of whether the 'challenged legislation impinges upon conduct protected by the Second Amendment.'" S.A. 13 (quoting *Cuomo*, 804 F.3d at 254–55). But this draws a false equivalency between the old "step one" analysis and *Bruen*'s threshold textual analysis. In *Cuomo*, this Court's analysis proceeded in two parts, "First Step: Whether the Second Amendment Applies" and "Second Step: Level of Scrutiny." 804 F.3d at 254, 257. As *Bruen* explained, this was "one step too many" because *Heller* did not support the second, "interest balancing" step *at all*, though the Court noted that

22

"[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. It is clear, both from *Bruen* and *Cuomo*'s own description of its test, that the old "step one" analysis was not equivalent to the post-*Bruen* threshold textual analysis, but rather combined the textual and historical work described by *Bruen* into a single step. That "common use" appeared at *Cuomo*'s "First Step" therefore says *nothing* about it being an element of the Amendment's "plain text," and the district court was wrong to draw that conclusion.

This Court has suggested, in post-*Bruen* dicta, that "common use" is something to be considered as part of the "threshold inquiry" into the Second Amendment's text. *See Antonyuk v. James*, 120 F.4th 941, 981 (2d Cir. 2024). But *Antonyuk*'s only support for the proposition that "common use" was textual was the same passage from pages 31–32 of *Bruen* discussed above, which, in fact, show that "common use" is a dispositive historical point, not a preliminary textual one. *See id.*; Alicea, *supra*, at 12–14. And more importantly, as with the *Rahimi* and *Alaniz* decisions the district court cited, *Antonyuk*'s statement was dicta, a one-line statement in a nearly 100-page opinion that was about where arms may

23

be carried, not about what constitutes a protected arm. *Antonyuk,* 120 F.4th at 981. The same passage in *Antonyuk* also purported (again, as dicta), to place the question of "whether the affected individuals are 'ordinary, law-abiding, adult citizens' and thus 'part of the people'" at the plain text level too. *Id.* (quoting *Bruen,* 597 U.S. at 31–32). But when this Court confronted the question of whether someone who has been convicted of a non-violent felony could be disarmed consistent with the Second Amendment, *Zherka v. Bondi,* 140 F.4th 68 (2d Cir. 2025), it did not treat itself as bound by *Antonyuk*'s statement that "law-abiding" is a textual limitation on the right and ultimately treated the question of whether a non-law-abiding individual could have his rights restricted as one for history. *Id.* at 76–77.

There also are contrary signals in *Antonyuk* on this issue. In explaining how *Heller* reached the conclusion that the District of Columbia's ban on handguns was unconstitutional, this Court has explained that *Heller* noted that

> [*h*]*istorically*, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." … "[T]he Second Amendment protects the right to keep and bear 'the sorts of weapons' that are "in common use"—a "limitation [that] is fairly supported by the

24

> *historical tradition* of carrying dangerous and unusual
> weapons."

*Antonyuk*, 120 F.4th at 961 (quoting *Heller*, 554 U.S. at 626–27)
(emphases added). That description is incompatible with the notion that
the *text* of the Second Amendment is limited to arms "in common use,"
and *Antonyuk* does not require this Court to say otherwise.

### 3. Narrowing the scope of "arms" at the outset makes no sense within the context of the Second Amendment.

Finally, the district court criticized Plaintiffs' reading of "arms" to
include *all* weapons, regardless of commonality, as "far too facile,"
claiming that it "would essentially eliminate the step-one analysis
whenever a regulation has the slightest connection to guns." S.A. 13
(citation and quotation marks omitted). This criticism lacks merit. The
district court gives no reason why the textual analysis should be a
significant hurdle in a case involving a ban on a type of weapon. All the
textual question does is determine whether the Second Amendment is
even implicated by the case. It would be extremely odd if courts
complained that the First Amendment was *implicated* "whenever a
regulation has the slightest connection to [speech]," and it should seem

25

just as odd with respect to laws restricting weapons and the Second Amendment.

Indeed, both this Court and the Supreme Court's recent Second Amendment decisions demonstrate that the "plain text" is not supposed to be a significant hurdle in most cases. *Bruen's* textual analysis of "bear" did not even cover two whole pages. *See* 597 U.S. at 32–33. By contrast, its historical analysis (even excluding its explanation of the principles underlying its methodology) ran for over thirty. *Id.* at 38–70. *Rahimi* never even bothered to do a textual analysis at all and jumped right into the historical question. *See* 602 U.S. at 690. And that makes sense in light of the stakes of the different analyses. *Bruen* was clear that the textual analysis only establishes *presumptive* protection. For example, a person who is part of "the people" *presumptively* has Second Amendment rights. That does not mean that every member of "the people" can possess or carry guns in any circumstance. What it *does* mean is that any restriction on their ability to do so must be analyzed for consistency with historical restrictions on the right. In *Zherka*, this Court concluded that a nonviolent felon could be disarmed consistent with the Second Amendment's history, even though it acknowledged that "a decision that

26

Zherka does not belong to 'the people' and therefore does not have Second Amendment rights would be at odds with *Heller* [because] [t]he Court in that case defined 'the people' broadly to include '*all* Americans.' " 140 F.4th at 76 (quoting *Heller*, 554 U.S. at 581) (emphasis in *Zherka*). *Zherka*'s mode of analysis is, in this respect, consistent with *Heller* and with Plaintiffs' position in this case (even if Plaintiffs may disagree with the Court's ultimate conclusion). *Heller* defined "arms" broadly as "weapons of offence, or armour of defence," 554 U.S. at 581 (cleaned up), but that broad definition only establishes "prima facie" protection for "all instruments that constitute bearable arms," *id.* at 582.

The district court's contrary impulse—that there must be some arms that can be excluded at the outset—and its choice to exclude any arm that is sufficiently new and not yet in common use, is entirely antithetical to the logic of the Second Amendment. It creates an absurd situation whereby a State, provided it acts fast enough, could stamp out every new development in the field of arms design by banning even improved and less "dangerous" weapons than currently exist without incurring *any* constitutional scrutiny. It would be jarring if an Amendment that exists to prevent the state from disarming its people

27

and to ensure that the people have modern arms with which to defend themselves would have nothing to say about such actions.

## II. The Ban cannot be historically justified.

For the foregoing reasons, the electronic weapons targeted by the Ban are "arms" within the plain text of the Second Amendment. The burden is therefore on the City to justify the Ban as "consistent with this Nation's historical tradition of firearm regulation," by reference to historical restrictions on the right that are "relevantly similar" to the Ban both in "how" and "why" they restricted the carrying of weapons for self-defense. *Bruen*, 597 U.S. at 29, 34. As *Rahimi* made clear, this means that this Court must determine what historical "principle[] that underpin[s] our regulatory tradition" justified valid historical regulation while also respecting the "principles underlying the Second Amendment." 602 U.S. at 692. Only if a historical principle, common to a well-established tradition of historical regulation, extends to cover the challenged restriction, can the modern, challenged law stand. *See id.*

*Bruen* and *Rahimi* provide significant guidance to this Court in carrying out its historical analysis. First, evidence from the Founding era, when the Second Amendment was ratified, has controlling weight.

28

*See Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 438–43 (3d Cir. 2025) (holding that 1791 is the most probative period); *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history."). *Bruen* was explicit that "not all history is created equal." 597 U.S. at 34; *see also id.* at 36 (Sources originating "75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources." (quoting *Heller*, 554 U.S. at 614)). This is so because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. The people adopted the Second Amendment in 1791, so the public understanding of the right around that time is crucial to understanding any limits on the scope of that right. *Bruen*, 597 U.S. at 37; *see generally* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, Harv. J.L. & Pub. Pol'y Per Curiam (Dec. 7, 2022), https://perma.cc/75MP-MHFS. Consequently, evidence that long pre- or post-dates 1791 is less probative, *Bruen*, 597 U.S. at 35–37, and laws from the 20th-century are categorically too late to matter. *Id*. at 66 n.28.

To be sure, this Court in *Antonyuk* concluded that the understanding of the right in 1868, at the Ratification of the Fourteenth Amendment, could also serve as a "focal point[]" of analysis and is another "relevant consideration" to be weighed in determining the meaning of the Second Amendment, 120 F.4th at 972–74. But this is true only to the extent that evidence of the 1868 understanding *confirms* evidence of the 1791 understanding. *Bruen*'s reasoning underscores that evidence from 1868 cannot overcome evidence (or the lack thereof) from 1791 as to the permissibility of a given restriction on the right. After initially rejecting "medieval English regulations," *Bruen*, 597 U.S. at 40; *accord Rahimi*, 602 U.S. at 694 (rejecting English traditions that failed to make it to "this side of the Atlantic"), *Bruen* turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights, *see* 597 U.S. at 44–45. After finding these sources somewhat probative of the Amendment's *general* original meaning, the Court focused on "the history of the Colonies and early Republic," plus "the first decade after [the Second Amendment's] adoption." *Id.* at 46, 50. And it found that the challenged law had "no historical basis" because no analogue in that relevant historical period supported it. *Id.* at 50. Later

30

evidence was much less important. Only after canvassing the historical evidence from English, colonial, Early Republic, and Reconstruction periods did the Court discuss post-1868 sources and the late-19th century. *Id.* at 60–70. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect 'the origins and continuing significance of the [Second] Amendment.'" *Id.* at 67 (quoting *Heller*, 554 U.S. at 614). Thus, the Court declined to rely on such laws and regulations. *See Bruen*, 597 U.S. at 66–68; *accord Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (holding that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions were not grounded in Founding era practice). *Bruen* thus cautioned lower courts to "guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35.

*Bruen*'s reasoning therefore strongly supports the conclusion that the Founding era is the primary benchmark against which historical evidence from later time periods must be measured, even if the Court

formally left open the question whether 1791 or 1868 is the controlling date for constitutional analysis. *See id.* at 37 (noting that "19th-century evidence [has been] treated as mere confirmation of what the Court thought had already been established" (internal quotation marks omitted)); *accord United States v. Rush*, 130 F.4th 633, 642 (7th Cir. 2025) ("[W]e give considerable weight to the time periods immediately leading up to and during the adoption of the Second Amendment in 1791."); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012); *Lara*, 125 F.4th at 438–43; *Worth*, 108 F.4th at 692. Restrictions on the right to keep and bear arms adopted prior to or during the Reconstruction era may be confirmatory of earlier history but cannot alone establish the historical tradition of regulation required by *Bruen. See Bruen*, 597 U.S. at 36 ("But to the extent later history contradicts what the text says, the text controls."). Only "enduring" and "well-established" restrictions with roots in the Founding are relevant in assessing whether the challenged restrictions comport with the text's "unqualified command." *Bruen*, 597 U.S. at 17, 30–31 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see also Rahimi*, 602 U.S. at 692.

Second, *Bruen* held that forming a historical tradition requires proof of representative, relevantly similar analogues. As *Rahimi* explained, such historical laws must evidence the "principles that underpin our regulatory tradition" and conform to those that "underly[] the Second Amendment." 602 U.S. at 692. Analogues are representative, therefore, if they are broadly applicable and widely accepted. This Court noted in *Antonyuk* that it is possible that it would be inappropriate in some cases to infer from legislative silence that legislators necessarily viewed a type of regulation as inconsistent with the right to bear arms. 120 F.4th at 972. But the *Bruen* inquiry is not about what Founding era legislators thought; it is about whether the government can prove from historical regulations that a modern law is consistent with the principles underlying the Second Amendment. And a small number of state laws that are disconnected, in principle, to earlier or later enactments is not a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding, *Bruen*, 597 U.S. at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" and rejecting

33

regulations applying to only 1% of the population (emphasis omitted)). Put differently, laws existing in only a few jurisdictions—historical "outliers"—should be disregarded. *Id.* at 30 (citation and quotation marks omitted). And while it should go without saying, it follows from these principles that historical *silence* cannot establish a tradition of regulation that limits the scope of the Second Amendment right.

Third, any analogues must be "relevantly similar" based on "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.* This requirement means that Founding era laws arising in different contexts, and for different reasons, will be inapt comparators to a modern law, since they are not motivated by the same underlying principles. *See, e.g., Rahimi*, 602 U.S. at 692 ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.").

34

### A. The Supreme Court has determined that history supports banning only "dangerous and unusual weapons."

In this case, these guiding principles should be of largely academic interest, because as discussed above, the Supreme Court has *already* done the historical work necessary to decide whether an arms ban is consistent with the Second Amendment when it held that the District of Columbia's ban on handguns was unconstitutional in *Heller*. Specifically, *Heller* identified as a *historical* limitation on the scope of the Second Amendment right that arms that are "dangerous and unusual" are unprotected and may be banned. 554 U.S. at 627.

"[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment) (emphases in original). *Heller* itself demonstrates this fact. In addition to using the word "and" when naming the historical tradition, *Heller* notably did not undertake a separate analysis of whether modern handguns were "dangerous." Rather, because handguns are "the most popular weapon chosen by Americans for self-defense in the home," and, therefore, not unusual, it held that "a complete prohibition of their use is invalid" without respect to any

35

separate assessment of their dangerousness. *Heller*, 554 U.S. at 629. And to be sure, the alleged "danger" of handguns was extensively discussed by one dissenting opinion, which argued that handguns should be bannable precisely because they were "particularly dangerous." *See id.* at 711 (Breyer, J., dissenting). But despite the fact that the Court was told handguns were used in an "extraordinary percentage of this country's well-publicized shootings, including the large majority of mass shootings," *Heller* still stopped the analysis upon concluding they were in common use. *Hanson*, 120 F.4th at 272 (Walker, J., dissenting) (quoting Br. of Amici Violence Pol'y Ctr. et al., *Heller*, No. 07-290, 2008 WL 136348, at *24 (U.S. Jan. 11, 2008)).

*Bruen* confirms that the test is conjunctive. In rejecting the government's argument "that handguns" may have been "considered 'dangerous and unusual' during the colonial period" it concluded that, even if true, the point was now irrelevant because "they . . . are unquestionably in common use today." 597 U.S. at 47; *see also Caetano*, 577 U.S. at 418 (Alito, J., concurring in the judgment) ("[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes."). If an arm could be

banned if it is dangerous *or* unusual, the Supreme Court's holdings that arms that are in common use are protected would make no sense—if dangerousness were an independent basis for banning an arm, a finding of common use would be insufficient. Therefore, the Supreme Court's decisions demonstrate that to sustain the Electronic Arms Ban the City must show that stun guns are *both* dangerous *and* unusual. The City can do neither.

## B. Electronic arms are far less "dangerous" than other common and protected bearable arms.

Begin with the question of whether stun guns and tasers are "dangerous." To be sure, all weapons are "dangerous" in some sense; that is what makes them weapons. But just because a weapon is capable of harming someone does not mean that it is "dangerous" for purposes of *Heller*'s "dangerous and unusual" standard. In fleshing out the concept of "dangerousness" in this context, courts have developed several different approaches. Some courts have held that a weapon is "dangerous" if it has "uniquely dangerous propensities." *E.g., Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023), *vacated as moot*, 125 F.4th 1301 (9th Cir. 2025) (en banc) (quotation and citation omitted). Others have held that the question is whether an arm is "especially dangerous" when compared to other,

37

protected, arms. *Bevis v. City of Naperville*, 85 F.4th 1175, 1201 (7th Cir. 2023); *see also Bianchi v. Brown*, 111 F.4th 438, 446 (4th Cir. 2024) (en banc) (discussing the regulation of "excessively dangerous weapons once it becomes clear that they are exacting an inordinate toll on public safety and societal wellbeing"). This Court explained, pre-*Bruen*, that the relevant question is whether the weapon is dangerous "in the hands of law-abiding civilians." *Cuomo*, 804 F.3d at 256. The particular language, or the nuances of these approaches, are irrelevant here, however. Plaintiffs are not aware of *any* court that has espoused the view that an arm that is markedly *less dangerous* than protected arms like handguns is nevertheless dangerous enough to justify a flat ban. That is no surprise; it would strain credulity to hold that non-lethal arms like electronic weapons are "dangerous" and therefore at least potentially unprotected, while their deadly cousin the handgun is not.

Indeed, the entire point of electric arms is to provide a *less dangerous* alternative to firearms. That is why people with "religious or ethical compunctions about killing" and people worried about the unique risks of keeping firearms at home often choose electronic weapons instead of firearms. Volokh, *supra*, at 207. And their choice is understandable. As

38

the data irrefutably show, electronic weapons are substantially less harmful to individuals on whom they are used than firearms.

For example, one peer-reviewed study evaluated electronic weapons use against over 1,000 subjects and reported similar results: over 99.75% of subjects sustained either no injuries whatsoever or only minor injuries, like "superficial puncture wounds from [electronic weapons] probes." William P. Bozeman et al., *Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects*, 53 ANNALS EMERGENCY MED. 480, 484 (2009). To be sure, the Bozeman study identified two individuals who died in police custody after being tased, but "electrical weapon use was not determined to be causal or contributory to death by the medical examiner in either case." *Id.* at 485. Another peer reviewed study examined 100 uses of electronic weapons against minors by law enforcement. Alison R. Gardner et al*., Conducted Electrical Weapon (TASER) Use Against Minors: A Shocking Analysis*, 28 Pediatric Emergency Care 873, 873 (2012). Out of those subjects, who ranged from 13 to 17 years of age, there were *zero* deaths, and not *one single report* of severe or even moderate injury. *Id.* at 874–75.

39

Contrast those figures with statistics about gunshot wounds. One study compared the mortality and morbidity rates of tasered emergency room patients with emergency room patients who had been shot with police handguns. Gary J. Ordog et al., *Electronic Gun (Taser®) Injuries*, 16 ANNALS EMERGENCY MED. 73 (1987). The long-term mortality rate for tasered patients was 1.4%, and in each of the three cases where death resulted, the individual went into cardiac arrest several minutes after being tasered, and each was found to have had high levels of the illicit drug PCP in their system. *Id.* at 75. None of these deaths were attributed to electronic weapons use; all of them were attributed to the PCP. For gunshot wounds, by contrast, the mortality rate was 50%, with those individuals that survived nevertheless suffering from severe long-term consequences including "paralysis, brain damage, and loss of limb." *Id.* at 77. And it is worth noting that this study's reported mortality rate of 1.4% is likely disproportionately high as compared to the mortality rate among tasered people in general, since the study only considered people who either showed up or were brought to the emergency room for treatment. *Id.* at 73. The study therefore missed the segment of the

40

population that was either uninjured or only minorly injured, since such individuals are unlikely to seek treatment.

The simple fact is that "stun gun shocks are almost never fatal," and they seldom result in more than very minor injuries. Volokh, *supra*, at 204. Even Amnesty International, which has been a vocal opponent of electronic weapons use by police, agrees that "overall, the death rate compared to the number of reported Taser field uses is relatively low." AMNESTY INT'L USA, "LESS THAN LETHAL"?: THE USE OF STUN WEAPONS IN US LAW ENFORCEMENT 86 (2008).

Further demonstrating that electronic weapons are not "dangerous," military and law enforcement agencies sometimes tase their *own* personnel during training. *See, e.g.*, Tomora Clark, *One Painful Lesson: MPs Train with Tasers*, U.S. ARMY (Mar. 11, 2014), https://perma.cc/5J6R-8R5K; Joshua Magbanua, *Shocked and in Tears: Taser and Pepper Spray Training*, JOINT BASE LANGLEY-EUSTIS (Jan. 29, 2021), https://perma.cc/RVY6-LRMC; Jack Reinhard, *Local Police Discuss Taser Training*, FOX56 WOLF (Apr. 26, 2021), https://perma.cc/8LSR-8YDN (discussing training for officers of the Pennsylvania State Police and Scranton Police Department). Indeed, one

41

police department recently made headlines by "giv[ing] [the] *public* [a] chance to get tasered for free." *Illinois Cops Give Public Chance to Get Tasered for Free at Training Event*, FOX 32 CHI. (Jan. 30, 2019), https://perma.cc/YF6X-UT9K (emphasis added). YouTube is full of videos of such trainings with thousands or even millions of views. *See, e.g.*, Mike La Putt, *TASER Training NV DPS Police Academy 87* (YouTube, Dec. 15, 2019), http://bit.ly/46diKF7 (showing Nevada DPS trainees being tased). To state the obvious, while some police departments tase officers to "give[ ] them the benefit of knowing how [a] suspect would react potentially to that," Reinhard, *supra*, we are aware of none that *shoot* their officers so that they know what it is like to be shot.

Consistent with this reality, this Court has endorsed the use of tasers by law enforcement in situations where using deadly force may have been unconstitutional. *See Penree ex rel. Penree v. City of Utica*, 694 F. Appx. 30, 33 (2d Cir. 2017) (summary order) ("[Second Circuit] precedents suggest that it is *not* excessive force to deploy tasers, after a warning, against arrestees who are dangerous or resisting arrest."). For instance, in *Crowell v. Kirkpatrick*, this Court concluded that the use of a taser was "objectively reasonable" where protestors "were actively

resisting their arrest" even though they "were arrested for relatively minor crimes … and were not threatening the safety of any other person with their behavior." 400 F. Appx. 592, 594–95 (2d Cir. 2010) (summary order). (Consistent with Fed. R. App. P. 32.1, Plaintiffs recognize that summary order dispositions are not precedential but cite them for their persuasive value.)

Even those who enacted the Ban recognized that the arms they were targeting were less dangerous than many that are publicly available today. For instance, an assemblyman who sponsored the 1990 amendments to the State Ban (to add restrictions on stun guns, in addition to projectile-firing tasers), acknowledged that these weapons are "painful, but not very often too harmful." J.A. 234. He hypothesized that such weapons could only be fatal "[u]nder the right conditions"; for example, where the individual being stunned is wearing a pacemaker or is abusing amphetamines. J.A. 235. (The manufacturers of electronic weapons assert that the assemblyman was wrong about pacemakers— "the level of current delivered is actually quite low, well below the level necessary to interfere with a pacemaker." *The truth about TASER*, AXON (2024), https://perma.cc/CM4E-CNR8.)

43

In banning a weapon that is much less dangerous than many that are in common use, in addition to violating the Second Amendment, the Ban creates remarkably perverse incentives. A New Yorker who desires to have a means to defend herself but is denied the ability to own and carry an electronic arm is likely to seek to do so through another means. At least some, if not most, of those people are likely to opt for the arm that *Heller* called the "quintessential self-defense weapon," the handgun. 554 U.S. at 629. In doing so, they will be pushed by the State into choosing a much more lethal weapon than the one they, like the Plaintiffs in this case, would prefer to carry. *Cf. Caetano*, 577 U.S. at 421 (Alito, J., concurring in the judgment) ("Courts should not be in the business of demanding that citizens use *more* force for self-defense than they are comfortable wielding." (emphasis in original)).

### C. Electronic arms are not unusual but rather "in common use for lawful purposes."

That the electronic arms targeted by the Ban are not "dangerous" is dispositive. They are thus necessarily constitutionally protected. But the Ban can equally easily be found unconstitutional because electronic arms are not "unusual" either. As discussed in detail above, the district court erred by placing the burden on Plaintiffs to show that these arms

are "in common use" when, under Supreme Court precedent, the burden is on the City to show that they are "highly unusual in society at large." *Heller*, 554 U.S. at 627.

The City will not be able to bear the burden in this case, because all the evidence shows that these arms are categorically common. In *Caetano*, Justice Alito concluded that "hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States. … While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country." 577 U.S. at 420 (Alito, J., concurring in the judgment) (cleaned up). Justice Alito, in turn, had relied upon a Michigan Court of Appeals decision that had similarly concluded hundreds of thousands of stun guns were owned by law-abiding civilians even by the mid-1980s. *See People v. Yanna*, 824 N.W.2d 241, 245 & n.5 (Mich. Ct. App. 2012) (citing Volokh*, supra*, at 206 n.28, 212); *see also* Steve Marantz, '*Stun Guns' Gain Popularity: More Than 300,000 Sold to Police and Private Citizens*, BOSTON GLOBE, at 2 (May 22, 1985), *available at* https://perma.cc/3DYT-AG7; *The Pros and Cons of Stun Guns*, THE N.Y. TIMES: CONSUMER'S WORLD, at 52 (Aug. 13, 1988), *available at*

45

https://perma.cc/3LDG-AVYB. Subsequent decisions have shown that *Yanna* and *Caetano*'s figures were very conservative. In *Avitabile*, assessing the same New York state laws that are at issue here, even the State agreed that there were nearly 4.5 million stun guns and at least 300,000 tasers currently "owned by private citizens" across America. 368 F. Supp. 3d at 411. More recently, *O'Neil v. Neronha*, found, based on industry data, that "approximately 6.5 million stun guns have been sold to consumers between 2008 and 2020" alone. 594 F. Supp. 3d 463, 472 (D.R.I. 2022); *see also* Decl. of Michael A. Brave ¶ 12, *O'Neil v. Neronha*, 1:19-cv-612 (June 2, 2021), Doc. 39-4 (stating, based on review of manufacturing data for the Axon corporation, manufacturer of TASER branded electronic weapons, that the corporation had produced approximately 286,780 electronic weapons for the civilian marketplace in the preceding 18 years); *see also* Redacted Decls., *O'Neil v. Neronha*, 1:19-cv-612 (Mar. 8, 2021), Doc. 30-4 (detailing the sale of millions of stun guns in recent years). Indeed, stun guns are not even "unusual" in New York itself. Despite the Ban, they are increasingly chosen by those seeking to defend themselves and willing to risk the "legal gray area" created for consumers and retailers in the wake of the *Avitabile* decision. Dana

Kennedy, *Self-defense Tasers and stun guns surge in popularity across NYC*, N.Y. POST (Feb. 27, 2021), https://perma.cc/XUN8-M63Q (noting that sales of TASER brand arms rose 300% the previous year, while two New York-based retailers reported 500% and 200% increase in sales of electronic arms, respectively); *see also* JORDAN B. COHEN & MATTHEW D. TROUT, CONG. RSCH. SERV., IF12841, STUN GUNS, TASERS, AND OTHER CONDUCTED ENERGY DEVICES: ISSUES FOR CONGRESS 2 (2024) (reporting 300% increase in consumer sales of TASER brand devices in 2020 compared to 2019).

## CONCLUSION

The decision of the district court should be reversed and this Court should remand with instruction to enter judgment for Plaintiffs.

Dated: July 22, 2025

Respectfully submitted,

/s/David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

47

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 9,564 words.

Pursuant to FED. R. APP. P. 32, this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: July 22, 2025       /s/David H. Thompson
                                      David H. Thompson

                                  *Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of July, 2025, I filed the foregoing via the Court's ACMS appellate system, which will electronically notify all counsel requiring notice.


Dated: July 22, 2025                    /s/David H. Thompson
                                        David H. Thompson

                                        *Attorney for Plaintiffs-Appellants*

# 25-861

## United States Court of Appeals

*for the*

## Second Circuit

NUNZIO CALCE, SHAYA GREENFIELD, RAYMOND PEZZOLI, SECOND AMENDMENT FOUNDATION, FIREARMS POLICY COALITION, INC., ALLEN CHAN, AMANDA KENNEDY,

*Plaintiffs-Appellants,*

— v. —

JESSICA TISCH, in her official capacity as Commissioner of the New York City Police Department, CITY OF NEW YORK,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, No. 1:21-cv-08208-ER (Edgardo Ramos, District Judge)

## SPECIAL APPENDIX

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**<u>Page</u>**

Opinion & Order, Doc. 57 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 24, 2025)..................................................SA-1

Clerk's Judgement, Doc. 58 (*Calce v. City of New York*, No. 21-cv-08208 (S.D.N.Y. 2025)) (Mar. 24, 2025)............................................SA-21

U.S. Const. amend. II......................................................................SA-22

N.Y. Penal Law
    § 265.00(15-a), (15-c) ...............................................................SA-23
    § 265.01(1) .................................................................................SA-24

N.Y.C. Admin. Code
    § 10-135 .....................................................................................SA-25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NUNZIO CALCE, ALLEN CHAN,
SHAYA GREENFIELD, AMANDA
KENNEDY, RAYMOND PEZZOLI,
SECOND AMENDMENT
FOUNDATION, *and* FIREARMS
POLICY COALITION, INC.,

                    Plaintiffs,

      *– against –*

THE CITY OF NEW YORK *and* JESSICA
TISCH, *in her official capacity as the
Commissioner of the New York City Police
Department,*

                Defendants.

**<u>OPINION & ORDER</u>**

21 Civ. 8208 (ER)

<u>RAMOS</u>, D.J.:

      Nunzio Calce, Allen Chan, Shaya Greenfield, Amanda Kennedy, Raymond

Pezzoli, the Second Amendment Foundation, and the Firearms Policy Coalition, Inc.

(collectively, "Plaintiffs") bring this § 1983 action against the City of New York (the

"City") and Jessica Tisch,[1] in her official capacity as Commissioner of the New York City

Police Department (the "NYPD Commissioner," and collectively, "Defendants"), for

enforcing a New York State law which prohibits private citizens from possessing stun

guns and tasers, and a New York City law which prohibits private citizens from

possessing and selling stun guns.

---

[1] Plaintiffs originally named Dermot Shea as a defendant in his official capacity as Commissioner of the
New York City Police Department. *See* Doc. 1. Pursuant to Federal Rule of Civil Procedure 25(d), "when
a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending[,]
[t]he officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). Jessica Tisch was
appointed NYPD Commissioner effective November 25, 2024, and she currently serves in that role. *See
Mayor Adams Appoints Jessica Tisch as NYPD Commissioner*, https://www.nyc.gov/office-of-the-
mayor/news/847-24/mayor-adams-appoints-jessica-tisch-nypd-commissioner#/0 (last visited Mar. 23,
2025). Therefore, Tisch is automatically substituted as party to this case.

Before the Court are Plaintiffs' motion for summary judgment and Defendants' cross-motion for summary judgment.  For the following reasons, Plaintiffs' motion for summary judgment is DENIED, and Defendants' cross-motion for summary judgment is GRANTED.

## I.    BACKGROUND

### A.  Factual Background[2]

#### 1.  The Parties

Plaintiffs Calce, Chan, Greenfield, and Pezzoli are New York City residents. Doc. 50 ¶¶ 1–4.  Plaintiff Kennedy lives in Bristol, Connecticut, however her agent and recording studio are located in New York City, so she visits New York "on a regular basis," for both social and work-related reasons.  Doc. 40 at 10–11.

The Second Amendment Foundation ("SAF") and Firearms Policy Coalition, Inc. ("FPC") are nonprofit organizations.  *Id.* at 17, 19.  Each have members in New York State and City, including all the individual plaintiffs.  *Id.* at 18, 20.  SAF, which has over 720,000 supporters nationwide, "promot[es] both the exercise of the right to keep and bear arms, as well as education, research, publishing, and legal action focusing on the constitutional right to privately own and possess firearms."  *Id.* at 18.[3]  Plaintiffs allege that SAF has spent a "significant" amount of time responding to requests from its members and supporters, as well as from the general public, resulting from "New York City's enforcement of the State and City laws prohibiting stun guns and tasers."  *Id.* at 19.

"FPC's mission is to defend and promote . . . the fundamental, individual Second Amendment right to keep and bear arms[,] advance individual liberty, and restore

---

[2] The following facts are taken from the parties' Local Rule 56.1 Statements, and the parties' responses thereto, Docs. 40 (Defendants' Response to Plaintiffs' SOF), 50 (Plaintiffs' Response to Defendants' SOF). The facts recited here are undisputed unless otherwise noted.

[3] "SAF publishes three periodicals (The New Gun Week, Women and Guns, and The Gottlieb-Tartaro Report) and also publishes the academic publication Journal of Firearms and Public Policy.  SAF promotes research and education on the consequences of abridging the right to keep and bear arms and on the historical grounding and importance of the right to keep and bear arms as one of the core civil rights of United States citizens."  Doc. 40 at 18.

freedom." *Id.* at 20.  FPC additionally conducts "legislative and regulatory advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs." *Id.*  Representatives from FPC have "spent time, money and other resources answering questions and providing advice" concerning the "legal status of stun guns and tasers in New York City." *Id.* at 21.

Calce, Chan, Greenfield, Pezzoli, and Kennedy each "would like to purchase, possess and carry a stun gun or a taser in the City of New York." *Id.* at 3, 5, 7, 9, 11. Calce, Chan, Greenfield, and Pezzoli specifically desire a stun gun and taser to protect themselves both at home and in public.  Doc. 50 ¶ 1–4.[4]  None of the individual plaintiffs have ever been convicted of a felony nor confined to a mental institution, and to the best of their knowledge, they are each legally eligible to purchase and possess firearms under New York law and federal law.  Doc. 40 at 4, 6, 8, 10, 13.

However, each of them has refrained from purchasing, possessing, or carrying a stun gun or taser in New York City, out of fear that they will be arrested or otherwise prosecuted by NYPD officers for doing so.  *Id.* at 3, 5, 7, 9, 11.  All of them have an "understanding that NYPD officers will enforce the prohibitions against stun guns and tasers." *Id.* at 4, 6, 8, 9, 13.  On November 16, 2021, when she lived in Brooklyn, Kennedy was charged by the NYPD with possession of a stun gun, in violation of New York City Administrative Code § 10-135.  *Id.* at 12–13.  The charge resulted from an incident in which Kennedy brandished her stun gun to deter a woman who had hit her in the face from further attacking her.  *Id.* at 11–12.  FPC assisted Kennedy in paying for counsel to defend against the charge, *id.* at 21, which was ultimately resolved through an adjournment in contemplation of dismissal, which the Kings County Criminal Court issued on December 6, 2021.  Doc. 50 ¶ 7.

---

[4] Neither of the 56.1 statements discusses a specific purpose behind Kennedy's desire to purchase the weapons.

Defendant City of New York is a municipal corporation incorporated under the laws of the State of New York. *Id.* ¶ 10. The current NYPD Commissioner is Jessica Tisch.

### 2. *Stun Guns and Tasers*

An electronic stun gun is defined as "any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, render unconscious or paralyze a person by passing a high voltage electrical shock to such person." Doc. 50 ¶ 18 (quoting N.Y. Penal Law § 265.00(15-c)). Stun guns "require direct contact between the device and an individual." *Id.* ¶ 19.

An electronic dart gun, commonly referred to as a "taser," is defined as "any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical current to such person by means of a dart or projectile." *Id.* ¶ 20 (quoting N.Y. Penal Law § 265.00(15-a)). Tasers "incapacitate individuals by transmitting pulses of electric current" by "fir[ing] two small darts that are connected to the device with wires." *Id.* ¶ 21–22.

"Improper use of stun guns and tasers can result in serious injury, including death." *Id.* ¶ 28. From 2000 through 2020, "tasers were the third leading cause of death among fatalities resulting from civilian-police encounters." *Id.* ¶ 31. Defendants' expert report cites to a USA Today article which provides that "[s]ince 2010, there have been at least 513 cases in which subjects died soon after police used Tasers on them, according to fatalencounters.org." *Id.* ¶ 30. Moreover, according to Defendants, both stun guns and tasers have been "used by criminals to intimidate and even torture victims." *Id.* ¶ 29.

"Between 1970 and the early 2000s, seven states, including New York, enacted laws banning civilian possession of stun guns and tasers." *Id.* ¶ 24. "Approximately 40 localities within 15 states enacted similar restrictions[.]" *Id.* ¶ 25.

*3. New York State and New York City Provisions*

New York Penal Law § 265.01, adopted in 1974 by the State of New York,[5]

provides that "[a] person is guilty of criminal possession of a weapon in the fourth

degree," a Class A misdemeanor, when:

> (1) He or she possesses any firearm, **electronic dart gun**, **electronic stun gun**, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slingshot, shuriken, or throwing star[.]

N.Y. Penal Law § 265.01 (emphasis added); *see also* Doc. 50 ¶ 14–15.

New York City Administrative Code § 10-135, adopted in 1985 by the City of

New York, "prohibits the possession and sale of electronic stun guns," a Class A

misdemeanor, providing:

> a. As used in this section, "electronic stun gun" shall mean any device designed primarily as a weapon, the purpose of which is to stun, render unconscious or paralyze a person by passing an electronic shock to such person, but shall not include an "electronic dart gun" as such term is defined in § 265.00 of the penal law.
>
> b. It shall be unlawful for any person to sell or offer for sale or to have in his or her possession within the jurisdiction of the city any **electronic stun gun**.

New York City, N.Y., Code § 10-135 (emphasis added); *see also* Doc. 50 ¶ 16–17.[6]

The NYPD Police Student Guide[7] identifies the "electronic dart gun" and

"electronic stun gun" as being among the weapons for which "[n]o intent is required, so

that the mere possession of [them] is a crime." Doc. 40 at 16 (emphasis in original); *see*

*also* Doc. 35-5 at 8.

According to public information that the City provides online, the NYPD arrested

1,307 individuals in 2021, 1,552 in 2022, and 2,229 in 2023, for violating N.Y. Penal

---

[5] Plaintiffs state that the 1974 enactment of N.Y. Penal Law § 265.01 "did not address electronic dart guns or electronic stun guns," although it does now. Doc. 40 ¶ 14.

[6] There is no City regulation of tasers being challenged in the instant case. *See* Doc. 50 at ¶¶ 13–17.

[7] Defendants produced this document in response to Plaintiffs' discovery request for "[a]ll training materials that pertain to or address Stun Guns and/or Tasers, which have been used at any point from January 1, 2017 to present." Doc. 35-5 ¶ 7; *see* Doc. 35-4 at 9.

Law § 265.01(1).  Doc. 40 at 14.  However, Defendants explain that they "do not readily

have at their disposal records illustrating the number of arrests made pursuant to [N.Y.]

Penal Law § 265.01 specifically for the possession or use of stun guns and tasers."  *Id.* at

15.  As for N.Y.C. Admin. Code § 10-135, Defendants explain that NYPD employees

would have to "look up individual arrest reports to determine if an arrestee was charged

with a violation of Administrative Code § 10-135" on the dates Plaintiffs requested, and

in any event, Defendants "do not readily have at their disposal records illustrating the

number of arrests made pursuant to Administrative Code § 10-135 specifically for the

possession or use of stun guns and tasers."[8]  *Id.* at 16.

### 4. Historical Regulations on Non-Firearm Weapons

Between the 1800s and 1900s, many states and jurisdictions enacted laws which

regulated, to various extents, the carry, sale, and/or possession of Bowie knives,

bludgeons, billy clubs, slungshots, sandbags, and/or toy guns—items which Defendants

liken to stun guns and tasers as "non-firearm weapons."  *See* Doc. 50 ¶¶ 32–43.

### B. Procedural History

Plaintiffs filed their initial complaint on October 5, 2021, and an amended

complaint on December 22, 2021.  Docs. 1, 5 (First Amended Complaint, "FAC").

Plaintiffs allege that N.Y. Penal Law § 265.01(1) and N.Y.C. Admin. Code § 10-135 are

unconstitutional, and Defendants therefore deprived them of their right to bear arms

under color of state law, in violation of 42 U.S.C. § 1983, by enforcing those laws.  Doc.

5 ¶¶ 50, i–ii.  Plaintiffs seek (1) a declaratory judgment that § 265.01(1) and § 10-135 are

facially unconstitutional, or alternatively, unconstitutional as applied; (2) a preliminary

and/or permanent injunction restraining Defendants from enforcing § 265.01(1) and § 10-

---

[8] It is unclear why Defendants mention tasers in this response, given that N.Y.C. Admin. Code § 10-135
states it does "not include an 'electronic dart gun' as such term is defined in § 265.00 of the penal law."  *See*
Doc. 50 ¶ 16.

135; (3) attorney's fees and costs; and (4) any other relief the Court deems just and equitable.  *Id.* ¶¶ i–v.  Defendants answered the FAC on April 22, 2022.  Doc. 15.

Following discovery, Plaintiffs moved for summary judgment on March 1, 2024. Doc. 25.  Defendants filed an opposition and cross-motion for summary judgment on April 26, 2024.  Doc. 38.

On June 12, 2024, Plaintiffs filed a notice of constitutional question, pursuant to Federal Rule of Civil Procedure 5.1(a)(2), noting that the FAC and motion for summary judgment "draw into question the constitutionality of the prohibition on 'electronic stun guns' and 'electronic dart guns' set forth in § 265.01(1) of the Penal Law under the Second and Fourteenth Amendments to the United States Constitution."[9]  Doc. 51.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

---

[9] Federal Rule of Civil Procedure 5.1 provides, "[a] party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly:  (1) file a notice of constitutional question stating the question and identifying the paper that raises it, if:  . . . (B) a state statute is questioned and the parties do not include the state, one of its agencies, or one of its officers or employees in an official capacity."  Fed. R. Civ. P. 5.1(1)(B).  In their Memorandum of Law in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, filed on April 26, 2025, Defendants had noted that Plaintiffs "fail[ed] to comport with the requirements" of Rule 5.1.  Doc. 43 at 6 n.2.

judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or speculation. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); *see also Ridinger v. Dow Jones & Co.*, 651 F.3d 309, 317 (2d Cir. 2011).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

The same legal standard applies when analyzing cross-motions for summary judgment.  *See Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (quoting *Aviall, Inc. v. Ryder System, Inc.*, 913 F. Supp. 826, 828 (S.D.N.Y. 1996)).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Board of Education*, 667 F.2d 305, 314 (2d Cir. 1981)).  The Court is not required to grant summary judgment in favor of either moving party. *See id.* (citing *Heublein Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

## III.    DISCUSSION

The question before the Court is whether there is any genuine dispute of material fact as to the constitutionality of N.Y. Penal Law § 265.01 and N.Y.C. Admin. Code § 10-135 under the Second Amendment.

### A.  Applicable Law

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment is not limited to the "right to bear arms in a state militia," but rather includes the "individual right to possess and carry weapons in case of confrontation."  554 U.S. 570, 592, 620 (2008).  In *McDonald v. Chicago*, the Supreme Court held for the first time that the Second Amendment's protections apply fully to the states through the Due Process Clause of the Fourteenth Amendment.  561 U.S. 742 (2010).  In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court recognized *Heller* and *McDonald* as protecting the right of an "ordinary, law-abiding citizen to possess a handgun in the home for self-defense," and it held that individuals also have a "right to carry a handgun for self-defense *outside* the home."  597 U.S. 1, 10 (2022) (emphasis added).

However, the "the right secured by the Second Amendment is not unlimited," and it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller*, 554 U.S. at 626.  The Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."  *Id.* at 625.  Put differently, the Supreme Court has stated it is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"  *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627).  Consistent with that principle, in holding that a ban on the possession of handguns was unconstitutional, the *Heller* Court emphasized "that the American people have considered the handgun to be the quintessential self-defense weapon."  *Id.* at 629.

After *Heller* and *McDonald*, but before *Bruen*, the Second Circuit, "as well as every other regional circuit," applied the following two-step framework for analyzing Second Amended challenges:

> At step one, [courts] asked whether a challenged law burdened conduct that fell within the scope of the Second Amendment based on its text and history. If so, [they] proceeded to step two, assessing whether the challenged law burdened the core of the Second Amendment, defined by *Heller* as self-defense in the home. If the burden was *de minimis*, the law was subject to intermediate scrutiny; if the burden was substantial and affected the core of the right, the law was subject to strict scrutiny.

*Antonyuk v. James*, 120 F.4th 941, 963 (2d Cir. 2024) (internal citations omitted) (collecting pre-*Bruen* cases from every circuit court except the Eighth). In *Bruen*, the Supreme Court rejected Step 2 of that framework and "set out a new 'test rooted in the Second Amendment's text, as informed by history.'" *Id.* at 964 (quoting *Bruen*, 597 U.S. a 19). *Bruen* established a new standard for applying the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 24 (citation omitted). Accordingly, therefore, in analyzing a challenge to a law on Second Amendment grounds, a court has to analyze whether "the Second Amendment's plain text covers an individual's conduct," and if it does, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Antonyuk*, 120 F.4th at 964. As to Step 1—the "plain text" inquiry—the *Bruen* Court reiterated its statement from *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582). "By that same logic," as to Step 2—the examination of "the Nation's historical tradition of firearm regulation"—"the Second Amendment permits more than just those regulations identical to ones that could be

found in 1791." *United States v. Rahimi*, 602 U.S. 680, 689, 691–92 (2024). That is, for the government to "justify its regulation" by showing that it is "'relevantly similar' to laws that our tradition is understood to permit," it need only point to a "historical analogue," not a "historical twin." *Id.* at 691, 701 (quoting *Bruen*, 597 U.S. at 30).

## B. Analysis

"[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). In this context, "in common use at the time" refers to "weapons in use *today*," not at the time of ratification. *Maloney v. Singas*, 106 F. Supp. 3d 300, 310 (E.D.N.Y. 2015).

### 1.  Burden of Proof for "Common Use" Analysis

The parties agree that the two-step Second Amendment test is a burden-shifting framework, whereby after Step 1, the burden shifts to the government to establish that its regulation accords with this Nation's history and tradition. *See Bruen*, 597 U.S. at 24 (emphasis added) (after Step 1, "[t]he government must *then* justify its regulation" at Step 2). However, the parties dispute whether the "common use" analysis takes place during Step 1 or Step 2 of the Second Amendment framework, and therefore, which party carries the burden to prove it.

Plaintiffs assert that "the question of commonality is relevant to the *historical* prong," Step 2, and is thus the government's burden, since the "'historical tradition of prohibiting the carrying of dangerous and unusual weapons' was the Court's whole justification in the first place for interpreting the Second Amendment as protecting arms 'in common use.'" Doc. 49 at 4; Doc. 26 at 10 (quoting *Heller*, 554 U.S. at 627). Plaintiffs explain that Step 1 focuses "solely on the 'plain text' of the Second Amendment," and argue that stun guns and tasers "plainly qualify" as arms, and thus Step 1 is "quickly and conclusively" satisfied. Docs. 26 at 9, 49 at 3, 4. Defendants, on the other hand, argue that the textual analysis at Step 1 itself involves a determination of

whether "the weapon at issue is 'in common use' today" for lawful purposes, as the court must find that stun guns and tasers are within the *scope* of the Second Amendment's protections before turning to the question of whether the government's regulation is nonetheless valid based on the Nation's history and tradition. Therefore, Defendants argue, Plaintiffs' bear the initial burden of showing that stun guns and tasers are in "common use." Doc. 43 at 8.

This Court follows the weight of authority in determining that the "common use" analysis is part of Step 1. *See United States v. Berger*, 715 F. Supp. 3d 676, 681–82 (E.D. Pa. 2024) ("Following Bruen, most federal courts considering Second Amendment challenges address the common-use issue at step one of the analysis.") (collecting cases); *see, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 254–55 (2d Cir. 2015), *cert. denied Shew v. Malloy*, 579 U.S. 917 (2016); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023); *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023), *reversed and remanded on other grounds*, 602 U.S. 680 (2024). *Heller* framed the "common use" analysis as part of the determination of what "sorts of weapons" are protected by the Second Amendment. *Heller*, 554 U.S. at 627; *see also id.* at 625 (emphasis added) (stating it "accords with the historical understanding of the *scope of the right*" to bear arms to say that the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes"); *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring) (emphasis added) (internal citation omitted) ("*Heller* . . . recognized a few categories of traditional exceptions to the right. For example, *Heller* indicated that: . . . the Second Amendment *attaches* only to weapons 'in common use[.]'"). Therefore, "[b]ecause determining which 'arms' the amendment covers is a textual matter," the "common use" analysis is to be conducted at Step 1, in assessing whether the regulated conduct is presumptively protected by the Constitution. *United States v. Lane*, 689 F. Supp. 3d 232, 252 at n.22 (E.D. Va. 2023). Plaintiffs' contrary, narrower interpretation of the textual analysis—that Step 1 is "quickly and conclusively"

satisfied because stun guns and tasers "plainly qualify" as arms, Docs. 49 at 3, 4; 26 at 9—is "far too facile and would essentially eliminate the step-one analysis whenever a regulation has the slightest connection to guns." *Mills v. New York City, New York*, No. 23 Civ. 7460 (JSR), 2024 WL 4979387, at *8, *9 (S.D.N.Y. Dec. 4, 2024) (granting motion to dismiss claim that various New York City firearm licensing regulations violated the Second Amendment, based in part on plaintiffs' failure, at step one of the Second Amendment analysis, to "show that the challenged regulations are foreclosed by the text of the Second Amendment").  Indeed, in *Bruen* itself, *at the outset of its textual analysis*, the Supreme Court established that the handguns at issue were not disputed to be "in common use" for self-defense, and only then turned to Step 2, the assessment of the Nation's historical tradition of firearm regulation.  *See Bruen*, 597 U.S. at 32–34.

While the Second Circuit has not squarely discussed which party bears the burden to establish whether an arm is in "common use," it has, like the Supreme Court in *Bruen*, treated the "common use" assessment as core to the "initial" question, at Step 1, of whether the "challenged legislation impinges upon conduct protected by the Second Amendment."[10]  *Cuomo*, 804 F.3d at 254–55 (considering under the "First Step:  Whether

---

[10] The *Cuomo* court does note that, based on *Heller*'s statement that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," it follows that "the State bears the initial burden of rebutting" the "presumption in favor of Second Amendment protection."  *Cuomo*, 804 F.3d at 257 n.73.  It would seem to follow that this "burden of rebutting" is triggered *after* the "First Step: Whether the Second Amendment Applies," *id.* at 254, given the Second Amendment only "extends" to a given case, *id.*, if the first step is satisfied.  On the other hand, at least one court seems to have interpreted *Cuomo* to mean that the government's burden is triggered *during* Step 1, albeit still in response to a plaintiff's presentation of prima facie evidence that the Second Amendment protects the conduct and weapon at hand.  *See Avitabile v. Beach*, 368 F. Supp. 3d 404, 411, 412, 421 (N.D.N.Y. 2019) (finding stun guns and tasers were in "common use" where plaintiff did his best to "develop[] the 'common use' issue in discovery" through data, the State stipulated to the limited factual record developed by plaintiff, and the State offered "no meaningful contrary evidentiary showing"; and finding N.Y. Penal Law § 265.01 unconstitutional as applied to stun guns and tasers).  Another court, adopting a third approach, seems to have interpreted the "presumption in favor of Second Amendment protection" as attaching *before* Step 1, with the government bearing the "initial burden of rebutting" that presumption by affirmatively "disprov[ing]" either "common use" or "typical possession by law-abiding citizens" at Step 1, that is, without the plaintiff necessarily presenting any evidence first.  *Maloney v. Singas*, 351 F. Supp. 3d 322, 233, 234 (E.D.N.Y. 2018) (concluding that the government needs to affirmatively "show that, at a minimum, [the arms at issue] are not typically possessed by law-abiding citizens for lawful purposes" in order to "exempt

the Second Amendment Applies," that "[t]he Second Amendment protects only 'the sorts of weapons' that are (1) 'in common use' and (2) 'typically possessed by law-abiding citizens for lawful purposes.'").[11]   And, following *Bruen*, courts within the Second Circuit have continued to analyze "common use" at Step 1—and generally as plaintiffs' burden.  *See, e.g.*, *Grant v. Lamont*, No. 22 Civ. 1223 (JBA), 2023 WL 5533522, at *4 (D. Conn. Aug. 28, 2023) ("Under *Heller* and *Bruen*, Plaintiffs 'bear the burden of producing evidence that the specific firearms they seek to use and possess are in common use for self-defense, that the people possessing them are typically law-abiding citizens, and that the purposes for which the firearms are typically possessed are lawful ones.' . . . 'If Plaintiffs establish each of those elements, the burden shifts to Defendants to justify their regulation based on *Bruen*'s requirements for establishing relevant similarity to history and tradition.'"); *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 55 (N.D.N.Y. 2024) ("*Bruen*'s first step . . . requires a textual analysis, determining whether the challenger is part of 'the people' whom the Second Amendment protects, whether the weapon at issue is 'in common use' today for self-defense, and whether the proposed course of conduct

---

the challenged law from Second Amendment coverage").  However, *Maloney*'s statement that "nunchakus constitute a 'bearable arm' and so the rebuttable presumption that nunchakus are protected by the Second Amendment applies," *id.* at 234, is, like Plaintiffs' proposed approach, far too sweeping and "inconsistent with *Bruen* itself."  *See Mills*, 2024 WL 4979387, at *8.  In any event, here, Plaintiffs argue that "common use" is not in Step 1 whatsoever but in Step 2.  The *Cuomo* court is clear that "common use" is assessed at Step 1; therefore, the Court determines it is Plaintiffs' burden to establish it.

[11] Although *Bruen* dispensed with the second step of the analysis applied in *Cuomo*, "means-end scrutiny," the first part of the analysis in *Cuomo* remains consistent with *Bruen*.  *See Bruen*, 597 U.S. at 19 ("Step one of the predominant framework is broadly consistent with *Heller*, . . . [b]ut *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."); *see id.* at 18–19 (internal citations omitted) (explaining that in "means-end scrutiny," courts would "analyze 'how close the law [came] to the core of the Second Amendment right and the severity of the law's burden on that right.'  The Courts of Appeals [would] generally maintain 'that the core Second Amendment right is limited to self-defense *in the home*.'  If a 'core' Second Amendment right [was] burdened [by the challenged law], courts [would] apply 'strict scrutiny' and ask whether the Government [could] prove that the law [was] "narrowly tailored to achieve a compelling governmental interest.  Otherwise, they [would] apply intermediate scrutiny and consider whether the Government [could] show that the regulation [was] 'substantially related to the achievement of an important governmental interest.'"); *see also Frey v. Bruen*, 2022 WL 3996713, at *3 and n.2 (S.D.N.Y. Sept. 1, 2022) (explaining that *Bruen* rejected the *second step* of the previous two-step approach, which involved, in the *first step*, analyzing "whether the challenged legislation impinges upon conduct protected by the Second Amendment, or weapons in common use and typically possessed by law-abiding citizens for lawful purposes," and in the second step, determining the appropriate level of scrutiny).

falls within the Second Amendment."); *Vermont Federation of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 187 (D. Vt. 2024) ("[A]ccording to *Bruen*, a plaintiff must prove that the regulated weapons are in common use in order to qualify for presumptive protection under the Second Amendment. Once a plaintiff has done that, the State may justify its regulation by demonstrating that the regulation 'is consistent with the Nation's historical tradition of firearm regulation.'); *Lane v. Rocah*, No. 22 Civ. 10989 (KMK), 2024 WL 54237, at *8 (S.D.N.Y. Jan. 4, 2024) (emphasis in original) (finding Plaintiffs' proposed conduct was "*arguably* affected with a constitutional interest," because they desired to possess weapons "in common use," and "typically used for self defense and hunting," and deferring to a later stage in the case the assessment of "whether a law prohibiting that conduct turns out to be constitutional").

Other Circuit Courts have come to the same conclusion that whether a weapon is in "common use" is part of the "textual analysis" in Step 1. For example, the Ninth Circuit expressly stated:

> *Bruen* step one involves a threshold inquiry. In alignment with *Heller*, it requires a textual analysis, determining whether the challenger is "part of 'the people' whom the Second Amendment protects," whether the weapon at issue is 'in common use' today for self-defense," and whether the "proposed course of conduct" falls within the Second Amendment.

*Alaniz*, 69 F.4th at 1128.

In *United States v. Rahimi*, the Fifth Circuit similarly stated that the firearms at issue were "in common use" and thus "within the scope" of the Second Amendment, before finding that "*Bruen*'s first step [wa]s met, and the Second Amendment presumptively protect[ed] Rahimi's right to keep the weapons officers discovered in his home." 61 F.4th at 454. The Fifth Circuit then found, at Step 2, that the Government failed to demonstrate that the restriction on the Second Amendment right imposed by 18 U.S.C. § 922(g)(8) "fits within our Nation's historical tradition of firearm regulation," thus concluding that the law was facially unconstitutional. *Id.* at 460–61. The Supreme

Court ultimately reversed the Fifth Circuit's finding that the statute was unconstitutional—holding that the Second Amendment in fact "*permits the disarmament* of individuals who pose a credible threat to the physical safety of others"—however its reversal was premised on its findings that the Fifth Circuit engaged in an overly demanding historical inquiry at Step 2, and incorrectly applied the Court's "precedents governing facial challenges." *Id.* at 693, 701 (emphasis added).[12]  The Court did not, however, criticize the Fifth Circuit's analysis at Step 1, which included its finding that the handguns at issue were in "common use."

Therefore, Plaintiffs bear the burden to prove, at Step 1, that stun guns and tasers are in "common use."

2.  *"Common Use" Analysis*

"[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. Therefore, Plaintiffs must show that stun guns and tasers are in "common use" today, and that they are "typically possessed by law-abiding citizens for lawful purposes." *Cuomo*, 804 F.3d at 255–56.

Whether an arm is in "common use" is "an objective and largely statistical inquiry." *Id.* at 256.  "Since *Heller*, courts in this Circuit have require[d] substantial statistical evidence showing the popularity of a weapon before concluding that it is protected by the Second Amendment." *Jones v. Bermudez*, No. 15 Civ. 8527 (PKC) (BCM), 2019 WL 2493539, at *9 n.7 (S.D.N.Y. Feb. 14, 2019), *report and recommendation adopted sub nom. Jones v. Burmudez*, No. 15 Civ. 8527 (PKC) (BCM), 2019 WL 1416985 (S.D.N.Y. Mar. 29, 2019); *see also Berger*, 715 F. Supp. 3d at 691

---

[12] The Supreme Court explained:  "The Fifth Circuit made two errors.  First, like the dissent, it read *Bruen* to require a 'historical twin' rather than a 'historical analogue.'  Second, it did not correctly apply our precedents governing facial challenges . . . Rather than consider the circumstances in which Section 922(g)(8) was most likely to be constitutional, the panel instead focused on hypothetical scenarios where Section 922(g)(8) might raise constitutional concerns.  That error left the panel slaying a straw man." *Rahimi*, 602 U.S. at 701 (internal citations omitted).

(citation omitted) ("Every post-*Heller* case to grapple with whether a weapon is 'popular' enough to be considered 'in common use' has relied on statistical data of some form."). Courts have applied different statistical methodologies, such as evaluating the "raw" total number of a particular arm in the U.S., considering the "percentage and proportion" of ownership of that specific arm relative to total weapon ownership, and taking into account how many jurisdictions "allow or bar a particular weapon." *Berger*, 715 F. Supp. 3d at 691 (citation omitted). "[T]ypical possession," meanwhile, requires analyzing "both broad patterns of use and the subjective motives of gun owners." *Cuomo*, 804 F.3d at 256. "Looking solely at a weapon's association with crime . . . is insufficient. [The Court] must also consider more broadly whether the weapon is 'dangerous and unusual' in the hands of law-abiding civilians." *Id.* As to this "typical possession" analysis, the Second Circuit has recognized that "reliable empirical evidence of lawful possession for lawful purposes [i]s 'elusive,' beyond ownership statistics." *Id.* at 257.

Here, Plaintiffs have not provided any studies, reports, or data for the Court to conduct a "statistical inquiry" into whether stun guns and tasers are in common use. *Id.* at 256. Plaintiffs do not "even identify the most basic of statistics including, for example, the number of stun guns and/or tasers purchased in the United States for any given year." Doc. 43 at 11. Thus, Plaintiffs provide "no evidence whatsoever to support their claim that stun guns and tasers are in common use in the United States for self-defense, let alone in New York City." *Id.* at 10–11.

Plaintiffs' reliance on "findings and conclusions" from non-binding cases is of no moment. Doc. 49 at 7; *see People v. Yanna*, 297 Mich. App. 137, 144 (Ct. App. 2012) (citation omitted) ("Hundreds of thousands of Tasers and stun guns have been sold to private citizens, with many more in use by law enforcement officers."); *Avitabile*, 368 F. Supp. at 411 ("[B]ased on the limited data available, the parties agree there are at least 300,000 tasers and 4,478,330 stun guns owned by private citizens across the United States."); *O'Neil v. Neronha*, 594 F. Supp. 3d 463, 473 (D.R.I. 2022) ("Defendants agree

that millions of stun guns have been sold nationwide[.]").  Putting aside that the phrases "hundreds of thousands" and "millions" are indefinite, and that the figures in *Avitabile* were based on "limited data," Plaintiffs do not provide a legal basis for the Court to adopt those findings.[13]  Moreover, Plaintiffs do not even attempt to argue how these scant sources could inform whether stun guns and tasers are commonly used for lawful purposes.

Plaintiffs erroneously state that the Second Circuit in *Cuomo* found a pump-action rifle was in "common use," without any "evidence going to the issue."  Doc. 49 at 4.  The *Cuomo* court considered the constitutionality of two laws regulating weapons and large-capacity magazines:  a New York law, and a Connecticut law regulating "183 particular assault weapons," of which just one of the 183 weapons, the pump-action rifle, was a "non-semiautomatic firearm."  *Cuomo*, 804 F.3d at 250 and n.17.  The court initially found, based on various statistics offered by the plaintiff, that the assault weapons and large-capacity magazines being regulated by the laws at issue were "in common use."  *Id.* at 255.  Then, it analyzed whether the weapons were additionally "typically possessed by law-abiding citizens for lawful purposes"; after recognizing the difficulty of that analysis, the court opted to "*assume without deciding*" that the semiautomatic weapons were within the scope of the Second Amendment's protections.  *Id.* at 256, 257 n.73.  However, as to the pump-action rifle only, *i.e.* as to the "single non-semiautomatic firearm" covered by the Connecticut law, the court explicitly *decided*, as opposed to "*assum[ing] without deciding*," that the Second Amendment presumptively applied.  *Id.* at 257 n.73.  The court reasoned that, since the government "focused on semiautomatic weapons," it "failed to

---

[13] Plaintiffs suggest that the Court should rely on those findings by quoting a Ninth Circuit case, *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), *vacated on rehearing en banc*, which provided:  "[T]he historical research required under *Bruen* involves issues of so-called 'legislative facts'—those 'which have relevance to legal reasoning and the lawmaking process,' such as 'the formulation of a legal principle or ruling by a judge or court'—rather than adjudicative facts, which 'are simply the facts of the particular case.'"  Doc. 49 at 7 n.1 (quoting *Teter*, 76 F.4th at 946–47 (internal citation omitted)).  However, the quoted language is not in reference to a "common use" analysis, nor do Plaintiffs provide any explanation as to why it should apply thereto.

make any argument that this pump-action rifle [wa]s dangerous, unusual, or otherwise not within the ambit of Second Amendment protection," such that "the presumption that the Amendment applies" to it "remain[ed] unrebutted." *Id.*; *see Virginia v. Black*, 538 U.S. 343, 369 (2003) (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part) (quoting Black's Law Dictionary 1190 (6th ed. 1990)) (defining "prima facie evidence" as that which, "if unexplained or uncontradicted, is sufficient to sustain a judgment in favor of the issue which it supports"). Therefore, the *Cuomo* court's determination as to pump-action rifles was entirely separate from its "common use" analysis, and it nowhere suggested "common use" can be established without any statistical evidence whatsoever.

Plaintiffs also overstate the Supreme Court's holding in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), arguing that the case "erases any conceivable doubt concerning the weapons at issue." Doc. 49 at 3. In *Caetano*, the Court vacated a Massachusetts court's judgment upholding a ban on the possession of stun guns, but it did so specifically because "the explanation the Massachusetts court offered for upholding the law contradict[ed] th[e] Court's precedent." *Caetano*, 577 U.S. at 412. The Court explained that the Massachusetts court (1) improperly relied on the fact that stun guns "were not in common use at the time of the Second Amendment's enactment," and (2) it improperly concluded stun guns were "unusual" because they are "a thoroughly modern invention"—both in contradiction with the principles established in *Heller*. *Id.* at 411, 412 (quoting *Commonwealth v. Caetano*, 470 Mass. 774, 781 (2015), *judgment vacated sub nom. Caetano v. Massachusetts*, 577 U.S. 411 (2016)).[14] In other words, *Caetano* reiterated that the Second Amendment can extend to arms "that were not in existence at

---

[14] The Court additionally rejected the Massachusetts Court's third explanation for its holding that the Second Amendment did not protect stun guns: that the record did not "suggest that [stun guns] are readily adaptable to use in the military." *Caetano*, 470 Mass. at 781. The Court found this reasoning also contradicted *Heller*, as "*Heller* rejected the proposition 'that only those weapons useful in warfare are protected.'" *Caetano*, 577 U.S. at 412 (quoting *Heller*, 554 U.S. at 624–25).

the time of the founding." *Id.* at 312 (quoting *Heller*, 554 U.S. at 582); *see also Bruen*, 597 U.S. at 28 (same). The *Caetano* Court did not, however, conclusively determine, because it was not required to, that stun guns and tasers are in "common use."[15]

In sum, because Plaintiffs have failed to provide any evidence that stun guns and tasers are in "common use"; they have clearly not "set forth significant, probative evidence on which a reasonable fact-finder could decide in [their] favor." *Senno*, 812 F. Supp. 2d at 467–68. Therefore, no "reasonable jury could return a verdict" that stun guns and tasers are presumptively protected by the Second Amendment at Step 1 of the analysis, and the Court does not proceed to Step 2. *Id.* at 467; *see Cuomo*, 804 F.3d at 254 ("If the challenged restriction does not implicate conduct within the scope of the Second Amendment, our analysis ends and the legislation stands.").

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment is DENIED, and Defendants' cross-motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 25 and 38, and close the case.

It is SO ORDERED.

Dated:    March 24, 2025
          New York, New York

                                        _____
                                        EDGARDO RAMOS, U.S.D.J.

---

[15] The Court notes, however, that in concurrence, Justice Alito, joined by Justice Thomas, states: "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." *Caetano*, 577 U.S. at 420 (Alito, J. concurring). However, a concurrence is not binding precedent. *See Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (noting that a statement "contained in a concurrence" did not "constitute[] binding precedent").

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
NUNZIO CALCE, ALLEN CHAN, SHAYA
GREENFIELD, AMANDA KENNEDY, RAYMOND
PEZZOLI, SECOND AMENDMENT FOUNDATION, *and*
FIREARMS POLICY COALITION, INC.,

       Plaintiff,        21 **CIVIL** 8208 (ER)

   -against-          **<u>JUDGMENT</u>**

THE CITY OF NEW YORK and JESSICA TISCH, *in her*
*official capacity as the Commissioner of the New York City*
*Police Department.*

       Defendants.
------------------------------------------------------------------------X

    It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion & Order dated March 24, 2025, Plaintiffs' motion for summary

judgment is DENIED, and Defendants' cross-motion for summary judgment is GRANTED.

Accordingly, the case is closed.

**Dated:** New York, New York

    March 24, 2025

            **TAMMI M. HELLWIG**
             **Clerk of Court**

     **BY:**         
            **Deputy Clerk**

**U.S. CONST. amend. II**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**N.Y. Penal Law § 265.00(15-a), (15-c)**

**Definitions**

**15-a.** "Electronic dart gun" means any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical shock to such person by means of a dart or projectile.

**15-c.** "Electronic stun gun" means any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, knock out or paralyze a person by passing a high voltage electrical shock to such person.

**N.Y. Penal Law § 265.01(1)**

**Criminal possession of a weapon in the fourth degree**

A person is guilty of criminal possession of a weapon in the fourth degree when:

1) He or she possesses any firearm, electronic dart gun, electronic stun gun, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slingshot, shuriken, or throwing star;

## N.Y.C. Admin. Code § 10-135

## Prohibition on sale and possession of electronic stun guns.

**a.** As used in this section, "electronic stun gun" shall mean any device designed primarily as a weapon, the purpose of which is to stun, render unconscious or paralyze a person by passing an electronic shock to such person, but shall not include an "electronic dart gun" as such term is defined in section 265.00 of the penal law.

**b.** It shall be unlawful for any person to sell or offer for sale or to have in his or her possession within the jurisdiction of the city any electronic stun gun.

**c.** Violation of this section shall be a class A misdemeanor.

**d.** The provisions of this section prohibiting the possession of electronic stun guns shall not apply to police officers as defined in the criminal procedure law, who are operating under regular department procedure or operation guidelines established by their department.

**e.** The provisions of this section shall not apply to manufacturers of electronic stun guns or importers and exporters or merchants of electronic stun guns, when such stun guns are scheduled to travel in the course of international, interstate, or intrastate commerce to a point outside the city. Such bulk shipments shall remain in their original shipping package, unopened, except for inspection and possible subdivision for further movement in interstate or intrastate commerce to a point outside the city.