No. 25-861

# In the
# United States Court of Appeals
# for the Second Circuit

◆

NUNZIO CALCE, SHAYA GREENFIELD, RAYMOND PEZZOLI, SECOND AMENDMENT FOUNDATION, FIREARMS POLICY COALITION, INC., ALLEN CHAN, AMANDA KENNEDY,

*Plaintiffs–Appellants*,

v.

JESSICA TISCH, in her Official Capacity as Commissioner of the New York City Police Department, CITY OF NEW YORK,

*Defendants–Appellees*.

◆

On Appeal from the United States District Court for the Southern District of New York
Case No. 21-cv-8208 (ER)

◆

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS AND REVERSAL**

◆

ERIN M. ERHARDT
  *Counsel of Record*
JOSEPH G.S. GREENLEE
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Rd.
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amicus Curiae* makes the following statement:

The National Rifle Association of America has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF *AMICUS CURIAE*..................................................1

CONSENT TO FILE ............................................................................2

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT .........................................................................................5

    I.  The Second Amendment's plain text covers *all* bearable arms.....................................................................................................5

    II.  The "common use" consideration is part of the historical analysis—not the plain text analysis. .............................................7

    III. Arms fall outside of the Second Amendment's protections only if they are *both* are "dangerous *and* unusual.".......................12

    IV. The government has not shown that stun guns and tasers are either dangerous or unusual....................................................15

CONCLUSION ....................................................................................19

CERTIFICATE OF COMPLIANCE.......................................................21

CERTIFICATE OF SERVICE..............................................................22

ii

## TABLE OF AUTHORITIES

**Cases**

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ...................................................................... passim

*Calce v. City of New York,*
    2025 WL 895414 (S.D.N.Y) ......................................... 6, 10, 17

*Com. v. Caetano,*
    470 Mass. 774 (2015) ................................................................. 13

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................ passim

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ...................................................... 10

*Friedman v. City of Highland Park, Ill.,*
    577 U.S. 1039 (2015) ................................................................. 14

*Miller v. Bonta,*
    699 F. Supp. 3d 956 (S.D. Cal. 2023) ......................................... 15

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ...................................................................... passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ................................... 5, 6, 10, 11

*Ramirez v. Commonwealth,*
    479 Mass. 331 (2018) .................................................................. 17

*United States v. Miller,*
    307 U.S. 174 (1939) ...................................................................... 7

*United States v. Price,*
    111 F.4th 392 (4th Cir. 2024) ..................................................... 3

*United States v. Rahimi,*
    602 U.S. 680 (2024) ......................................................... 3, 15, 16

*Virginia v. Black,*
538 U.S. 343 (2003) ......................................................................6

## Constitutional Provisions

U.S. CONST. amend. II ................................................... passim

## Other Authorities

BLACK'S LAW DICTIONARY (6th ed. 1990) ...................................6

## STATEMENT OF *AMICUS CURIAE*[1]

**The National Rifle Association of America (NRA)** is America's oldest civil rights organization and foremost defender of Second Amendment rights. It was founded in 1871 by Union officers who, based on their Civil War experiences, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has approximately four million members, and its programs reach millions more.

This case concerns *Amicus* because the Second Amendment protects more than just firearms. Moreover, it is essential for the preservation of the right to keep and bear arms that the government be held to its burden of justifying regulations that burden conduct protected by the Second Amendment.

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *Amicus* and its members contributed money intended to fund its preparation or submission.

1

## CONSENT TO FILE

All parties consented to the filing of this brief.

## SUMMARY OF ARGUMENT

"In some cases, the burden makes all the difference." *United States v. Price*, 111 F.4th 392, 415 (4th Cir. 2024) (Quattlebaum, J., concurring). This is one such case. "[W]hen the Government regulates arms-bearing conduct, ... it bears the burden to 'justify its regulation.'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022)).

Here, the district court erred by improperly assigning the burden to the Plaintiffs. The Second Amendment presumptively protects all bearable arms. It is not Plaintiffs' burden to demonstrate that an arm is "in common use" in order for it to earn Second Amendment protection; rather, it is the government's burden to rebut the presumption of protection by showing that an arm is "dangerous and unusual."

The government did not meet its burden. The government urged the district court—successfully but erroneously—to make Plaintiffs show that stun guns and tasers are in common use; the government provided no evidence that stun guns and tasers are unusual. Moreover, the government's evidence of dangerousness lies almost exclusively in examples of criminal misuse of the arms at issue—but criminal misuse

3

says nothing about the use of the subject arms by law-abiding citizens for lawful purposes.

Stun guns and tasers are bearable arms presumptively protected by the Second Amendment. In order to ban their possession, the government must show that stun guns and tasers are both dangerous and unusual. But the government has not shown (nor can it) that stun guns and tasers are either dangerous or unusual, let alone both. Therefore, a total ban on their possession is unconstitutional and the district court's contrary conclusion must be reversed.

# ARGUMENT

## I. The Second Amendment's plain text covers *all* bearable arms.

The Supreme Court set forth "the standard for applying the Second Amendment" in *New York State Rifle & Pistol Association, Inc. v. Bruen*: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. 1, 24 (2022).

The initial inquiry under *Bruen*, therefore, is a plain text analysis. The Court conducted this exact plain text analysis in *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008).

In its analysis, the Court recognized that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. Thus, "[*Heller*] identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015); *see also Virginia v. Black*, 538 U.S. 343, 369

5

(2003) (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part) (defining "prima facie evidence" as "sufficient to establish a given fact" and "if unexplained or uncontradicted ... sufficient to sustain a judgment in favor of the issue which it supports") (quoting BLACK'S LAW DICTIONARY 1190 (6th ed. 1990)).[2]

The government does not dispute—and thus has not rebutted—the fact that stun guns and tasers are bearable arms. This should be the end of the plain text analysis: stun guns are bearable arms that the Second Amendment presumptively protects; therefore the government must justify its regulation through history and tradition.

However, the district court held—at the government's urging—that the initial inquiry was not satisfied. Rather, the district court held that "Plaintiffs' [sic] bear the initial burden of showing that stun guns and tasers are in 'common use'" as part of the plain text inquiry. *Calce v. City of New York*, 2025 WL 895414, at *7 (S.D.N.Y). This was in error: while it may be true that "the right secured by the Second Amendment is not

---

[2] In *Cuomo*, this Court held unconstitutional a ban on a pump-action rifle because the state focused exclusively on semiautomatic weapons and "the presumption that the Amendment applies remain[ed] unrebutted." 804 F.3d at 257 n.73.

unlimited," *Heller*, 554 U.S. at 626, any limitations on bearable arms must be considered in light of this country's historical tradition of firearm regulation, not as part of the plain text analysis. This includes the determination of an arm's commonality. *See Bruen*, 597 U.S. at 28 ("[W]e use history to determine which modern 'arms' are protected by the Second Amendment.").

Stun guns and tasers are bearable arms covered by the Second Amendment's plain text. The government must therefore justify its ban "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

## II. The "common use" consideration is part of the historical analysis—not the plain text analysis.

The Supreme Court has recognized that "the sorts of weapons protected [by the Second Amendment] were those 'in common use at the time.'" *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). In so recognizing, the Court noted that this "limitation is fairly supported by the *historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (emphasis added); *see also Bruen*, 597 U.S. at 47 (explaining that the *Heller* Court was "[d]rawing from this *historical tradition*" of restricting "dangerous and unusual

7

weapons" in holding that the Second Amendment protects arms "'in common use at the time'") (quoting *Heller*, 554 U.S. at 627) (emphasis added)). In other words, the question of whether a particular arm is "dangerous and unusual"—or, by contrast, "in common use"—must be considered in the historical, rather than the plain text, analysis.

Moreover, the *Heller* Court considered the "historical tradition" of restricting dangerous and unusual weapons and protecting common arms in its own historical analysis. After completing the plain text analysis of the Second Amendment, 554 U.S. at 576–600, the Court focused on historical tradition, examining "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," *id*. at 605. Only after reviewing "Postratification Commentary," *id*. at 605–10, "Pre-Civil War Case Law," *id*. at 610–14, "Post-Civil War Legislation," *id*. at 614–16, "Post-Civil War Commentators," *id*. at 616–619, and Supreme Court precedents, *id*. at 619–26, did the Court identify the "historical tradition" of regulating "dangerous and unusual weapons" and determine that arms "in common use at the time" are protected. *Id*. at 627 (quotation omitted).

8

Additionally, the Court identified the traditional "dangerous and unusual" regulation in the same paragraph as other "longstanding" regulations, *id*. at 626–27—simultaneously promising to "expound upon the historical justifications for" those regulations another time, *id*. at 635. Indeed, *Heller* "did not say that dangerous and unusual weapons are not *arms*," but rather "that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition*.'" *Teter v. Lopez*, 76 F.4th 938, 949 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024), and *on reh'g en banc*, 125 F.4th 1301 (9th Cir. 2025) (quoting *Heller,* 554 U.S. at 627) (emphases in *Teter*).

*Bruen*, too, supports this conclusion. While *Bruen* did not involve a "dangerous and unusual" weapon, its framing of the protected conduct under the plain text analysis is illuminating: the *Bruen* Court defined the conduct at issue as "bear[ing] *arms* in public for self-defense." 597 U.S. at 33 (emphasis added) (quotation marks omitted). In determining whether the Second Amendment protected the conduct at issue, the Court repeatedly referred to arms in general, not the specific arm in question. *See id*. at 32–33. Just as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and

bear arms," *id.* at 32, nothing in the Amendment's plain text draws a distinction between types of bearable arms. Because the specific bearable arm is not relevant to the plain text, the characteristics of the specific arm—*i.e.*, whether it is "dangerous and unusual"—cannot be assessed in the plain text analysis.[3]

The district court pointed to *Cuomo*, 804 F.3d at 254–55, to support its claim that "common use" is a plain text consideration and therefore Plaintiffs bear the burden of demonstrating that stun guns and tasers are sufficiently "common." *Calce*, 2025 WL 895414, at *8. But *Cuomo* was clear that "*the State* bears the initial burden of rebutting" the "presumption in favor of Second Amendment protection." 804 F.3d at 257 n.73 (emphasis added) (citing *Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011) ("[I]f *the government can establish* that a challenged firearms law regulates activity falling outside the scope of the Second

---

[3] The district court states that "in *Bruen* itself, *at the outset of its textual analysis*, the Supreme Court established that the handguns at issue were not disputed to be 'in common use' for self-defense, and only then turned to Step 2." *Calce*, 2025 WL 895414, at *7 (citing *Bruen*, 597 U.S. at 32–34 (emphasis in original). But *Bruen*, rather than placing the "common use" question into the plain text analysis, was merely disposing of undisputed issues before beginning its analysis at all. *See Bruen*, 597 U.S. at 31–32.

10

Amendment … then the analysis can stop there….") (emphasis in *Cuomo*)). The *Cuomo* court repeatedly reiterated that the government—not Plaintiffs—bear the burden. *See id*. at 269, 257 n.73, 262 n.112.

*Cuomo* clearly recognized that it is the government's burden to rebut the presumption that the Second Amendment applies to all bearable arms. 804 F.3d at 269 ("[O]ur holding … merely reflects the presumption required by the Supreme Court in *District of Columbia v. Heller* that the Second Amendment extends to all bearable arms, and that *the State* … has failed to rebut that presumption.") (emphasis added). This is true regardless of where *Cuomo* placed the "common use" analysis under the pre-*Bruen* framework. *Id*. at 257 n.73 ("We emphasize that our holding with respect to the Remington 7615—*at both steps of our analysis*—reflects *the State's failure* to present any argument at all regarding this weapon or others like it.") (emphases added). Under the *Bruen* framework, it is still the government's burden to rebut the presumption of Second Amendment protection, not through plain text analysis but through history and tradition. *See Bruen*, 597 U.S. at 24.

It is not Plaintiffs' burden to demonstrate, as a matter of plain text, that stun guns and tasers are sufficiently "common" to earn Second

11

Amendment protection. Stun guns and tasers are bearable arms that are presumptively protected. Thus, it is the government's burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, including the tradition of regulating "dangerous and unusual'—or uncommon—arms.

## III. Arms fall outside of the Second Amendment's protections only if they are *both* are "dangerous *and* unusual."

"[T]he historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'"—as opposed to those weapons that are "in common use"—is the *only* traditional regulation *Heller* identified in its historical analysis of restrictions on particular arms. 554 U.S. at 627.

In *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016), the Court made clear that a weapon must be *both* dangerous *and* unusual to qualify as "dangerous and unusual." In other words, "this is a conjunctive test." *Id.* at 417 (Alito, J., joined by Thomas, J., concurring). Thus, even if a weapon is not "in common use"—*i.e.*, the weapon is "unusual"—in order to be removed from Second Amendment protection it must also be "dangerous."

12

*Caetano* vacated and remanded the Massachusetts Supreme Judicial Court's opinion upholding a stun gun prohibition. *Id.* at 412. The Massachusetts court had upheld the stun gun ban because it found that the prohibition fell within the "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (quoting *Com. v. Caetano*, 470 Mass. 774, 778 (2015)). The Supreme Court rejected this holding, determining that the Massachusetts court's analysis of whether stun guns were "unusual" was flawed. At that point, the Supreme Court declined to consider whether stun guns qualified as exceptionally "dangerous." *Id.* If the "dangerous and unusual" test were not a conjunctive test, the Court would have proceeded to consider whether stun guns are exceptionally dangerous, because that might have justified the Massachusetts court's holding. But the *Caetano* Court did not, because it is indeed a conjunctive test, and the ban failed at the "unusual" analysis.

Justice Alito, joined by Justice Thomas, emphasized this point in a concurring opinion:

> As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are "unusual," it does not need to

13

consider the lower court's conclusion that they are also "dangerous."

*Id.* at 417 (Alito, J., joined by Thomas, J., concurring) (citing *Heller*, 554 U.S. at 636).

Justice Thomas, who authored the *Bruen* opinion, joined by Justice Scalia, who authored the *Heller* opinion, provided additional confirmation that if either the dangerous or unusual element is not satisfied, the arm cannot be banned. Dissenting from a denial of certiorari, the Justices noted that because the banned arms in that case were common, and thus not unusual, they were protected arms—whether the arms were exceptionally dangerous did not matter since they were not unusual:

> *Heller* asks whether the law bans types of firearms commonly used for a lawful purpose.... Roughly five million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons.

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 1042 (2015) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) (citations omitted) (emphasis added).

14

Likewise, an arm cannot be prohibited merely because it is dangerous. Indeed, "[i]f *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." *Caetano*, 577 U.S. at 418 (Alito, J., joined by Thomas, J., concurring); *see also Miller v. Bonta*, 699 F. Supp. 3d 956, 969–70 (S.D. Cal. 2023), *appeal held in abeyance*, No. 23-2979, 2024 WL 1929016 (9th Cir. Jan. 26, 2024) ("The Supreme Court carefully uses the phrase 'dangerous and unusual arms,' while the State, throughout its briefing, refers to 'dangerous [or] unusual arms.' That the State would advocate such a position is disheartening.") (brackets in original).

Stun guns are neither dangerous nor unusual. Therefore, a total ban on their possession is unconstitutional.

## IV. The government has not shown that stun guns and tasers are either dangerous or unusual.

"[W]hen the Government regulates arms-bearing conduct ... it bears the burden to 'justify its regulation.'" *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 24); *see also Bruen*, 597 U.S. at 17, 24, 33–34, 38–39, 60, 70 (making clear that the government bears the burden of justifying the law with historical regulations). The government has not met that burden.

15

Ordinarily, determining whether a law that implicates the Second Amendment's plain text is constitutional requires reviewing the "'historical tradition of firearm regulation' to help delineate the contours of the right," and determining, based on that history, "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 691–92 (quoting *Bruen*, 597 U.S. at 17). This requires analogizing the ban at issue to historical regulations, with particular attention paid to both "how" and "why" those historical regulations burdened the Second Amendment protected right, as a means of deducing an applicable historical principle.

To determine whether a weapon is unusual, "the pertinent Second Amendment inquiry is whether [a particular weapon is] commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano*, 557 U.S. at 420 (Alito, J., concurring). Justice Alito, joined by Justice Thomas, already commented on this issue:

> [H]undreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States…. While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment.

16

*Id.*[4] Nevertheless, the district court downplays the *Caetano* concurrence, concluding that the "*Caetano* Court did not, however, conclusively determine, because it was not required to, that stun guns and tasers are in 'common use.'" *Calce*, 2025 WL 895414, at *11. The district court similarly ignored Plaintiffs' citations to other cases—which note the existence of hundreds of thousands of tasers and millions of stun guns in the hands of private citizens in the United States—because those cases are "non-binding." *Id*. at *10.

Because the district court erroneously placed the burden on Plaintiffs to demonstrate that stun guns and tasers are "common"—and dismissed all evidence in support thereof—the opinion contains no evidence that stun guns and tasers are "unusual." In fact, the government did not present any evidence regarding the unusualness of stun guns and tasers. Df.'s Memo. of Law in Support of Motion, *Calce v. City of New York*, No. 21-cv-8208 (S.D.N.Y.), Doc. No. 43, at 16–19. The government merely argued that Plaintiffs did not establish commonality.

---

[4] "Having received guidance from the Supreme Court in *Caetano*," Massachusetts' Supreme Judicial Court subsequently and necessarily "conclude[d] that stun guns are 'arms' within the protection of the Second Amendment." *Ramirez v. Commonwealth*, 479 Mass. 331, 337 (2018).

17

*Id.* Perhaps the government could have presented its own argument or explanation on commonality (or the lack thereof), but it failed to do so before the district court. Thus, the government did not carry its burden of demonstrating that stun guns and tasers are "unusual."

Because "dangerous and unusual" is a conjunctive test, and because stun guns and tasers are not "unusual," there is no need to determine whether they are "dangerous." *Caetano*, 577 U.S. at 418 (Alito, J., concurring) ("[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes."). Even if dangerousness alone were enough, however, the government did not demonstrate that stun guns and tasers are "dangerous." At the district court, the government primarily discussed the dangers that stun guns and tasers may present in the hands of criminals. Df.'s Memo., at 19–20, 22–23. But the fact that criminals may misuse a weapon is not relevant to the question of whether law-abiding individuals possess them for lawful purposes. The Supreme Court has

18

repeatedly focused on the use of arms by law-abiding citizens, not their popularity among criminals.[5]

As to mere possession of stun guns and tasers, the inquiry ends there. *Heller* already explored the relevant history and found that the only way to ban possession of a bearable arm is by demonstrating that it is "dangerous and unusual" and therefore unprotected by the Second Amendment. 554 U.S. at 627. Because the government did not demonstrate that stun guns and tasers are dangerous and unusual, it has not met its burden and a flat ban on their possession is unconstitutional.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

/s/ *Erin M. Erhardt*
Erin M. Erhardt
 *Counsel of Record*
Joseph G.S. Greenlee
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION

---

[5] For instance, Justice Breyer's dissent in *Heller* argued that "handguns … are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting). But that did nothing to frame the Court's analysis. All that mattered to the Court was that "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Id.* at 629.

19

11250 Waples Mill Rd.
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 3,485 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 25, 2025, I served the foregoing with the Clerk of the Court using the ACMS System, which will send notice of such filing to all registered ACMS users.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*