# 25-861

## United States Court of Appeals for the Second Circuit

NUNZIO CALCE, SHAYA GREENFIELD, RAYMON PEZZOLI,
SECOND AMENDMENT FOUNDATION, FIREARMS POLICY
COALITION, INC., ALLEN CHAN, AMANDA KENNEDY,

*Plaintiffs-Appellants*,

*against*

JESSICA TISCH, in her official capacity as
Commissioner of the New York City Police
Department, CITY OF NEW YORK,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR DEFENDANTS-APPELLEES

RICHARD DEARING
INGRID R. GUSTAFSON
ELINA DRUKER
  *of Counsel*

October 17, 2025

MURIEL GOODE-TRUFANT
*Corporation Counsel
of the City of New York*
Attorney for Appellees
100 Church Street
New York, New York 10007
212-356-2609
edruker@law.nyc.gov

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................i

PRELIMINARY STATEMENT.........................................................1

ISSUES PRESENTED....................................................................3

STATEMENT OF THE CASE..........................................................4

    A. New York State and City laws prohibiting electronic dart
       and stun guns ......................................................................4

    B. The district court's dismissal of plaintiffs' lawsuit ............6

SUMMARY OF ARGUMENT.........................................................8

ARGUMENT..............................................................................12

POINT I .....................................................................................12

    PLAINTIFFS FAILED AT *BRUEN*'S FIRST STEP TO
    SHOW THAT ELECTRONIC DART AND STUN GUNS
    ARE 'ARMS' WITHIN THE MEANING OF THE SECOND
    AMENDMENT ...................................................................12

    A. Plaintiffs bear the burden of demonstrating, at *Bruen*'s
       first step, that the weapons they seek to carry are
       commonly used today for lawful purposes......................12

       1. Under established precedent, plaintiffs bear the
          burden of demonstrating common use at step one. ...12

       2. Plaintiffs' arguments for avoiding their burden are
          incorrect.................................................................16

    B. Plaintiffs failed to meet their burden of demonstrating
       common use. .................................................................23

## TABLE OF CONTENTS (cont'd)

**Page**

1. Plaintiffs failed to supply facts about any of the factors courts use to assess whether a weapon is in common use. .............................................................25

2. Plaintiffs are incorrect to claim that ownership numbers alone are sufficient to meet their burden, and they do not provide such numbers anyway. .........30

3. The Supreme Court's decision in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), also does not satisfy plaintiffs' burden. ...........................................35

POINT II ........................................................................37

    IF THIS COURT DISAGREES, IT SHOULD REMAND FOR THE DISTRICT COURT TO ADDRESS THE REMAINING QUESTIONS NOT REACHED BELOW ..............................37

CONCLUSION ................................................................44

CERTIFICATE OF COMPLIANCE ................................45

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Antonyuk v. James,*
120 F.4th 941 (2d Cir. 2024) .................................................*passim*

*Atterbury v. U.S. Marshals Serv.,*
805 F.3d 398 (2d Cir. 2015) ........................................................ 38

*Avitabile v. Beach,*
368 F. Supp. 3d 404 (N.D.N.Y. 2019) ................................. 5, 33, 34

*Baltas v. Maiga,*
119 F.4th 255 (2d Cir. 2024) ....................................................... 38

*Bevis v. City of Naperville,*
85 F.4th 1175 (7th Cir. 2023) ...................................................... 16

*Bianchi v. Brown,*
111 F.4th 438 (4th Cir. 2024) (en banc) ........................... 27, 28, 32

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) .................................................................*passim*

*Castro v. U.S.,*
540 U.S. 375 (2003) ..................................................................... 24

*Cavanaugh v. Geballe,*
28 F.4th 428 (2d Cir. 2022) ......................................................... 38

*CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP,*
735 F.3d 114 (2d Cir. 2013) ......................................................... 24

*Collymore v. City of N.Y.,*
No. 23-1304, 2025 U.S. App. LEXIS 10977 (2d Cir. May
7, 2025) ....................................................................................... 35

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .................................................................*passim*

*Frey v. City of N.Y.,*
____ F.4th ____, No. 23-365-cv, 2025 U.S. App. LEXIS
24303 (2d Cir. Sep. 19, 2025) ................................................ 13, 41

*Fyock v. City of Sunnyvale,*
779 F.3d 991 (9th Cir. 2015) ....................................................... 32

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Giambalvo v. Suffolk Cnty.*,
____ F.4th ____, No. 23-208, 2025 U.S. App. LEXIS
23638 (2d Cir. Sept. 12, 2025) ...................................................... 41

*Hanson v. Smith*,
120 F.4th 223 (D.C. Cir. 2024) .............................................*passim*

*Havens v. James*,
76 F.4th 103 (2d Cir. 2023) .......................................................... 38

*Hollis v. Lynch*,
827 F.3d 436 (5th Cir. 2016) .......................................... 21, 26, 27

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger
U.S.A., Inc.*,
146 F.3d 66 (2d Cir. 1998) ............................................................ 33

*Juzumas v. Nassau Cnty.*,
33 F.4th 681 (2d Cir. 2022) ............................................................ 8

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ...................................................................... 14

*Lane v. Cacace*,
No. 22-CV-10989 (KMK), 2025 US Dist LEXIS 57913
(S.D.N.Y. Mar. 25, 2025) ...................................................... 23, 24

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ...................................................................... 36

*Maryland v. Wilson*,
519 U.S. 408 (1997) ...................................................................... 36

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ............................................ 27, 28, 29

*Nat'l Org. for Marriage, Inc. v. Walsh*,
714 F.3d 682 (2d Cir. 2013) .......................................................... 38

*Nat'l Ass'n for Gun Rights v. Lamont*,
____ F.4th ____, Nos. 23-1162, 23-1344, 2025 U.S. App.
LEXIS 21570 (2d Cir. Aug. 22, 2025)....................................*passim*

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)...........................................................................*passim*

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*People v. Yanna,*
297 Mich. App. 137 (2012)............................................................ 33

*Pinach v. Bondi,*
147 F.4th 117 (2d Cir. 2025) ........................................................ 17

*Rocky Mt. Gun Owners v. Polis,*
121 F.4th 96 (10th Cir. 2024)........................................................ 14

*Rupp v. Bonta,*
723 F. Supp. 3d 837 (C.D. Cal. 2024) ........................................... 14

*U.S. v. Alaniz,*
69 F.4th 1124 (9th Cir. 2023) ....................................................... 15

*U.S. v. Bridges,*
150 F.4th 517, 2025 U.S. App. LEXIS 19943 (6th Cir.
Aug. 7, 2025).................................................................... 22, 27, 40

*U.S. v. Dabidah,*
No. 24-cr-00514 (ER), 2025 US Dist LEXIS 70686
(S.D.N.Y. Apr. 11, 2025) ............................................................... 28

*U.S. v. Morgan,*
150 F.4th 1339, 2025 U.S. App. LEXIS 22466 (10th Cir.
Sep. 2, 2025) ..........................................................................*passim*

*U.S. v. Price,*
111 F.4th 392 (4th Cir. 2024) (en banc)..................................*passim*

*United States v. Rahimi,*
602 U.S. 680 (2024).................................................................*passim*

*Zherka v. Bondi,*
140 F.4th 68 (2d Cir. 2025) ..................................................... 22, 23

## Other Authorities

Fed. R. Civ. P. 56 ......................................................................... 23, 35

N.Y.C. Admin. Code § 10-135............................................................. 4

Penal Law § 265.00............................................................................. 4

Penal Law § 265.01............................................................................. 4

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Eugene Volokh, *Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life*, 62 Stan. L. Rev. 199, 243 (2009) ....................................................................... 33, 34

U.S. Const, amend. II ........................................................... 15

## PRELIMINARY STATEMENT

The United States District Court for the Southern District of New York (Ramos, J.) correctly applied longstanding summary judgment standards to reject plaintiffs' Second Amendment challenge to the City of New York's enforcement of the prohibition on the possession of stun-guns and tasers. In opposing a motion under Rule 56, plaintiffs were required to submit facts that, if taken in the light most favorable to them, would allow a factfinder to find in their favor on each of the essential elements of their claim on which they will carry the burden at trial. The district court correctly found they'd failed to do so in this case.

This Court should affirm. To ascertain the constitutionality of a law allegedly burdening an individual's exercise of the Second Amendment, courts apply a two-part burden-shifting framework. At step one, plaintiffs have the burden of establishing that the Second Amendment's plain text covers the conduct they intend to engage in. Among other things, that requires showing that the item at issue is an "arm" that is in common use for self-defense today. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022). If plaintiffs fail to meet this burden, the inquiry ends and the burden never shifts to the government to justify its regulation with historical evidence.

Here, plaintiffs did not carry their burden to show a triable question whether stun guns and tasers are "arms" protected by the Second Amendment—defined as weapons commonly used for self-defense today—because they failed to submit any facts at all on this point. Because they thus failed to show that their intended conduct falls within the plain text of the Second Amendment, the district court correctly rejected their claims, without deciding any broader question about how a stun-gun and taser ban would fare under the Second Amendment if a plaintiff were to adduce such evidence.

On appeal, plaintiffs do not dispute that, if the common-use requirement is a step-one inquiry, they bear the burden of submitting a reliable factual foundation to allow the district court to assess whether electronic dart and stun guns are "arms." Their argument is that the requirement is a step-two inquiry, such that the City bears the burden to establish that the challenged regulations are consistent with the principles underlying the nation's regulatory tradition. They are mistaken several times over, as a matter of both precedent and logic.

First, their argument is foreclosed by this Court's recent decision in *National Association for Gun Rights v. Lamont*, ____ F.4th ____, Nos. 23-1162, 23-1344, 2025 U.S. App. LEXIS 21570 (2d Cir. Aug. 22, 2025),

which squarely holds that the common-use requirement is part of the textual inquiry at *Bruen*'s first step.

Second, even setting *Lamont* aside, plaintiffs make key analytical errors. They mistakenly treat the step-one inquiry as a simple matter of applying dictionary definitions, divorced from historical meaning of the text, where the Supreme Court has said otherwise. They also rely on the demonstrably incorrect premise that the common-use inquiry is merely a function of the regulatory tradition of banning "dangerous and unusual" weapons, when the two concepts represent distinct doctrinal strands. In rejecting plaintiffs' contentions, the district court correctly applied binding precedent from the Supreme Court and this Court. The Court should therefore affirm. If this Court disagrees, it should follow its traditional practice and remand to allow the district court to resolve, in the first instance, the parties' remaining arguments.

## ISSUES PRESENTED

1. Did the district court correctly grant summary judgment to the City, where the plaintiffs failed to adduce any evidence that their intended conduct falls within the plain text of the Second Amendment, which is their burden under this Court's precedent?

2. In the event this Court does not affirm, should this Court remand, where the district court had no occasion to consider the parties'

remaining arguments, and the Court's traditional practice counsels against reaching those questions on appeal in the first instance?

## STATEMENT OF THE CASE

### A. New York State and City laws prohibiting electronic dart and stun guns

New York law makes it unlawful to possess an "electronic stun gun," Penal Law § 265.01, which is defined as "any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, knock out or paralyze a person by passing a high voltage electrical shock to such person," *id.* § 265.00(15-c), or an "electronic dart gun," *id.* § 265.01, which has the same definition, except it passes an electrical shock "by means of a dart or projectile," *id.* § 265.00(15-a), rather than through direct contact. In 1985—before the state law was amended to cover stun guns—New York City made it unlawful to sell, offer for sale, or to possess an electronic stun gun. N.Y.C. Admin. Code § 10-135. City law does not prohibit selling or possessing electronic dart guns.

As Professor Robert Spitzer, a historian and political scientist who studies firearms and criminology explained, stun guns date back to the 1930s, and were originally designed for farming and torture, not policing or riot control (Appendix "A" at 293, 296). They were adapted in the

1970s and 1980s with the goal of proving law enforcement a less lethal alternative to firearms, which could be used for riot control or on airplanes (A296-98). They were primarily purchased by law enforcement, and, through the early 2000s, unlawful for civilians to carry in at least 17 states and 130 localities (A297-98). They have broad criminal appeal, and have gained popularity in robberies, because they are less likely to be mistaken by police for a firearm and do not typically result in a sentence enhancement, unlike firearms (A299).

Despite their reputation as being "non-lethal," electronic dart and stun guns are merely less lethal than firearms; they often unexpectedly result in death (A298-300). "[A] stun gun is a deadly weapon if used by an untrained professional, improperly, or against a vulnerable victim" (A299 (cleaned up))[1]. Indeed, between 2000 and 2020, they were the third leading cause of death in civilian-police encounters, even though police are authorized and trained to use them (A298-99).

In 2019, the District Court for the Northern District of New York (Hurd, J.) permanently enjoined the State from enforcing its prohibition on the possession and use of electronic dart and stun guns "by all citizens for all purposes, even for self-defense in one's own home," as

---

[1] This brief uses "cleaned up" to indicate that internal quotation marks, alterations, or citations have been omitted from quotations.

inconsistent with the Second Amendment. *Avitabile v. Beach*, 368 F. Supp. 3d 404, 421 (N.D.N.Y. 2019). The State did not appeal, and that injunction remains in place.

### B. The district court's dismissal of plaintiffs' lawsuit

Five individual plaintiffs allege that they wish to keep and carry electronic dart and stun guns for self-defense in New York City, but have been told by New York City Police Department ("NYPD") officers that doing so would be illegal (A16-18). They, along with two gun-advocacy groups, brought this lawsuit against the City and NYPD's Commissioner challenging both City and State law under the Second Amendment. One of the individual plaintiffs, Amanda Kennedy, who lives in Bristol, Connecticut, alleges that in 2021, when she was living in Brooklyn, she got into a fight with a pedestrian while driving her car (A49). The pedestrian tried to open her car door, but Kennedy brandished her stun gun, "told her to stop[,] and attempted to leave" (*id.*). Kennedy does not say whether she discharged her stun gun or whether brandishing it was effective in ending the alleged attack. The police arrested Kennedy for unlawful possession of a stun gun, and charges against her were eventually dismissed as part of an adjournment in contemplation of dismissal (A49-50). None of the other plaintiffs makes any similar allegations.

6

After the close of discovery (S.D.N.Y. Case No. 21-cv-08208-ER, Dkt. Minute Entry 10/19/2023), the parties cross-moved for summary judgment (*id*. Dkt. Nos. 25, 38). In support of its motion, the City submitted, among other things, the 194-page expert report of Robert Spitzer, dated January 3, 2024, detailing the history of electronic dart and stun guns, and summarizing analogous historical regulations prohibiting weapons such as Bowie knives, billy clubs, and blackjacks, which were associated with "criminals and street gang members" and not commonly used for self-defense (S.D.N.Y. Case No. 21-cv-08208-ER, Dkt. No 42-2, at 22). The Plaintiffs did not submit any evidence about how common stun guns and tasers are today, who owns them, or for what purpose they are used, either in support of its own motion, or in opposition to the City's motion.

The district court granted summary judgment to the City and denied plaintiffs' motion (Special Appendix ("SA") 11-20). The court applied the framework set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and held that the plaintiffs had failed to carry their burden of demonstrating that the ban on electronic dart and stun guns violates the plain text of the Second Amendment by prohibiting a weapon commonly in use for self-defense today (SA16-18). Thus, the court concluded that it need not examine the government's proof that

7

the prohibition is consistent with the Nation's historical tradition of regulating weapons (SA20). It did not conclusively rule on the question whether stun guns or tasers are "Arms."

## SUMMARY OF ARGUMENT

On a de novo review of the district court's resolution of the parties' cross-motions for summary judgment, this Court should affirm. *See Juzumas v. Nassau Cnty.*, 33 F.4th 681, 686 n.6 (2d Cir. 2022). The general rules of party presentation apply in Second Amendment cases, as *Bruen* recognizes. Thus, plaintiffs had the obligation to come forward with evidence on the central issue on which they carry the burden at trial: that the conduct they wish to engage in is protected by the plain text of the Second Amendment. Here, that burden includes establishing that the restricted weapon is an "Arm," which established precedent defines as a weapon that is in common use for lawful purposes, primarily self-defense.

Plaintiffs wrongly contend that the government, and not the plaintiffs, bears the burden of demonstrating that electronic dart and stun guns are "arms" because this question is purportedly evaluated at step two of *Bruen*'s two-part test for determining whether a challenged law comports with the Second Amendment. But this Court recently rejected this argument and decisively held otherwise in *Lamont*, 2025 U.S. App.

8

LEXIS 21570—a decision which this Court cannot and should not depart from. And plaintiffs' arguments to the contrary are in any event incorrect. The Supreme Court has made clear that the step-one inquiry is not merely a matter of applying dictionary definitions, and that the definition of "arms" is not just the product of analogizing to historical laws restricting "dangerous and unusual weapons," thereby refuting plaintiffs' contentions on these two points. Thus, plaintiffs bear the burden here.

To determine if a given weapon is in common use for lawful purposes, primarily self-defense, courts consider not only raw data about the number of such weapons sold, but also many other factors, including how many such weapons, remain operable, who owns them, for what purpose, their typical patterns of use, common sense facts about the weapon's suitability for lawful purposes, and crime statistics. In multiple respects, plaintiffs' showing fell far short. For example, they submitted no proof at all about how many electronic dart and stun guns are owned by civilians versus law enforcement, military, or criminals. Nor did they submit any proof about how they are typically used or how it makes sense to use them. Plaintiffs thus failed to carry their burden by presenting the district court with sufficient facts to enable the court to

conclude that electronic dart and stun guns are in common use today for lawful purposes (and principally self-defense).

This Court should reject plaintiffs' proposal to jettison all of these factors and consider ownership numbers alone. Those numbers alone cannot speak to the full definition of "arms" articulated by the Supreme Court, and considering numbers in isolation leads to absurd results. But even if bare numbers were the sole focus of the inquiry, plaintiffs have failed to offer any evidence of the numbers they cite, instead relying on unsubstantiated or stipulated numbers from other judicial opinions. This failing is independently dispositive.

And plaintiffs cannot cover for their complete failure to adduce any facts by claiming that that the Supreme Court decided that stun guns are "Arms," in *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016). That decision merely held that stun guns are not excluded from the scope of the Second Amendment solely by virtue of the fact that they did not exist at the time of the founding. It did not purport to resolve whether stun guns are in common use for lawful purposes today, as required for a plaintiff to show that they are "arms" falling within the Second Amendment's plain text.

Because it was plaintiffs' burden under settled Second Circuit precedent to adduce evidence raising a fact issue on the "common use"

question and they utterly failed to carry it, the district court correctly ended its analysis and granted the City's motion for summary judgment. The district court did not determine whether electronic dart and stun guns are indeed "arms." Nor did the district court consider the parties' arguments at step two about whether the laws at issue here are consistent with the principles underpinning the national tradition of weapons regulations.

In the alternative, if this Court disagrees with the district court, this Court should follow its usual practice and remand to the district court to reach these remaining questions in the first instance. This practice makes particular sense here considering that, in resolving these outstanding questions, the reviewing court will need to apply newly issued precedent from this Court, sift in the first instance through the extensive historical evidence submitted by the City, and reckon with plaintiffs' multiple methodological errors.

## ARGUMENT

## POINT I

### PLAINTIFFS FAILED AT *BRUEN*'S FIRST STEP TO SHOW THAT ELECTRONIC DART AND STUN GUNS ARE 'ARMS' WITHIN THE MEANING OF THE SECOND AMENDMENT

### A. Plaintiffs bear the burden of demonstrating, at *Bruen*'s first step, that the weapons they seek to carry are commonly used today for lawful purposes.

The district court correctly concluded that plaintiffs bear the initial burden of showing that the weapons that they wish to carry—electronic dart and stun guns—fall within the ambit of the Second Amendment as "Arms" in common use today for lawful purposes. None of plaintiffs' arguments to the contrary has any merit.

### 1. Under established precedent, plaintiffs bear the burden of demonstrating common use at step one.

There is no dispute that when assessing the constitutionality of a law challenged under the Second Amendment, courts apply a two-step text-and-history framework announced in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19-24 (2022), and later clarified in *United States v. Rahimi*, 602 U.S. 680, 690-92 (2024), and *Antonyuk v. James*,

12

120 F.4th 941, 964 (2d Cir. 2024). At the first step, the question is whether the plain text of the Second Amendment covers the conduct that the plaintiff intends to engage in. *Bruen*, 597 U.S. at 17.[2]

Although the Supreme Court did not say so explicitly, this Court, as well as courts across the country, have confirmed that it is the plaintiff who bears the burden of clearing this "initial textual hurdle" at step one. *Frey v. City of N.Y.*, ____ F.4th ____, No. 23-365-cv, 2025 U.S. App. LEXIS 24303, at *10 (2d Cir. Sep. 19, 2025); *Lamont*, 2025 U.S. App. LEXIS 21570, at *21 (plaintiffs must show that the plain text covers their conduct); *see also U.S. v. Morgan*, 150 F.4th 1339, 2025 U.S. App. LEXIS 22466, at *5, 12 (10th Cir. Sep. 2, 2025) (faulting challenger for "inverting the burden he bears at *Bruen* step one"). If the plaintiff establishes that the prohibited conduct falls within the right protected by Second Amendment's plain text, the burden shifts to the government to justify the law by showing that "the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 691. But if a plaintiff does not satisfy the burden at the first step, the court's inquiry ends. *U.S. v. Price*, 111 F.4th 392, 398 (4th Cir. 2024) (en

---

[2] For ease of reference, this brief uses "plaintiff" to refer to the party challenging a law under the Second Amendment, although, in a criminal cases, this burden would fall on the criminal defendant who challenges a law's constitutionality.

banc); *Rocky Mt. Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024).

Plaintiffs implicitly admit that they bear the burden at step one (App. Br. 28). And this makes sense, considering that it is plaintiffs who are invoking the Second Amendment's protection, and considering that, as explained below, determining whether its protection is even implicated is not a simple matter of applying dictionary definitions, but rather governed by an interpretation of the original understanding of the text that is informed by history. Indeed, the Supreme Court adopted the two-step framework in *Bruen* after drawing an analogy between the First and Second Amendments, and in First Amendment jurisprudence, the plaintiff generally bears the initial burden of demonstrating an infringement of free speech or free exercise rights, before the burden shifts to the government to justify the law. *Rupp v. Bonta*, 723 F. Supp. 3d 837, 849 (C.D. Cal. 2024) (discussing, for example, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022)).

At *Bruen*'s first step, a plaintiff must demonstrate that the "textual elements" of the Second Amendment's "operative clause" apply to the conduct being restricted. *See Bruen*, 142 S. Ct. at 2134 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582, 592 (2008) (cleaned up). That clause provides, in pertinent part, that "the right of the people to keep

14

and bear Arms, shall not be infringed." U.S. Const, amend. II. As relevant here, this means that plaintiffs bore the burden of showing that the weapons they intend to carry are "arms" within the meaning of the text.

In *Lamont*, after closely examining Supreme Court precedent, this Court determined that "arms" means "arms that are typically possessed and in common use by law-abiding citizens for lawful purposes (principally individual self-defense)." 2025 U.S. App. LEXIS 21570, at *33.[3] This conclusion comes directly from *Heller*, in which the Supreme Court observed that "arms" means those "instruments that constitute bearable arms, even those that were not in existence at the time of the founding," 554 U.S. at 624, but is limited to those weapons "in common use at the time for lawful purposes like self-defense." *Id*. at 624-25 (cleaned up). This limitation comes from the fact that the Second Amendment codified a preexisting right of militia members to keep "small-arms weapons" "of the kind in common use at the time … in defense of person and home," so that they could be ready if called to muster. *Id*. at 625. Given

---

[3] Courts across the country are in accord. *U.S. v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) ("*Bruen* step one involves a threshold … textual analysis, determining … whether the weapon at issue is in common use today for self-defense") (cleaned up); *Price*, 111 F.4th at 402 (en banc decision, explaining that the "step-one inquiry [asks] whether the weapons regulated by [the challenged law] are in common use for a lawful purpose"); *Hanson v. Smith*, 120 F.4th 223, 232, n.3 (D.C. Cir. 2024) (observing that "the *Bruen* Court determined that handguns are in common use before conducting its historical analysis").

15

the original understanding of the scope of the preexisting right, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.*[4]

### 2. Plaintiffs' arguments for avoiding their burden are incorrect.

On appeal, ignoring settled precedent, plaintiffs argue that whether the regulated weapon is in "common use" should be the assessed at step two (Appellant's Brief ("App. Br.") at 15-20, 22-24). But in *Antonyuk*, this Court held that the "threshold inquiry" into the Second Amendment's text requires courts to consider, among other things, "whether the weapon concerned is 'in common use.'" *Antonyuk*, 120 F.4th at 981. Applying *Antonyuk*, in *Lamont*, this Court recently rejected the very same argument advanced by plaintiffs here, and reiterated that the common-use analysis "fall[s] under the first step of *Bruen*." 2025 U.S. App. LEXIS 21570, at *33. This Court is bound by the

---

[4] This Court has not had the occasion to address whether the plain text protects all weapons in common use for a lawful purpose, or only those in common use for the purpose of self-defense. The Seventh Circuit has observed that "[b]oth Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense"; although there are "other lawful uses for weapons—sporting uses, collection, and competitions come to mind as examples, ... the constitutional protection exists to protect the individual right to self-defense." *Bevis v. City of Naperville*, 85 F.4th 1175, 1192 (7th Cir. 2023). This Court need not resolve this question here because, as explained below, plaintiffs did not adduce *any* facts on any of the key factors courts consider in determining "common use."

decisions of prior panels unless they are either overruled by an en banc panel or by the Supreme Court. *Pinach v. Bondi*, 147 F.4th 117 (2d Cir. 2025). "Accordingly, it is neither appropriate nor possible for a panel of this Court to disregard an opinion of a previous panel." *Id.* (cleaned up).

Even if the question were open for a different resolution at the panel stage, the conclusions of *Antonyuk* and *Lamont* are entirely correct. Although plaintiffs make a tortured argument that the *Bruen* decision, which first announced the two-part test, addressed common use at step two (App. Br. 18-20), the structure of the *Bruen* decision rebuts that contention. In Part III, after "[h]aving made the constitutional standard endorsed in *Heller* more explicit," the *Bruen* Court went on to "apply that standard to New York's proper-cause requirement," in two subsections: A and B. *Bruen*, 597 U.S. at 31-38. In subpart A, the court concluded that "[t]he Second Amendment's plain text ... presumptively guarantees petitioners ... a right to 'bear' arms in public for self-defense," *after* concluding that (1) the petitioners, "two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects," (2) that handguns are "arms" because they are weapons 'in common use today for self-defense," and (3) "their proposed course of conduct—carrying handguns publicly for self-defense" is protected under an appropriate understanding of the "keep and bear"

17

provision. *Id.* at 31-33. In subpart B, the Court then went on to perform its lengthy step two historical analogical inquiry to assess whether the regulation was nonetheless justified. *Id.* at 33-70.

Indeed, plaintiffs' contention that "common use" is a step-two inquiry relies on multiple faulty premises. *First*, they posit a false dichotomy between text and history, as if step one were limited to dictionary definitions to be considered in a vacuum, and step two were the sole part of the analysis to which historical materials are relevant (App. Br. 15-17). But, as *Heller* explained, history is pivotal to understanding the Second Amendment's text; courts must look to the "historical background" to understand the text because "because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *Heller*, 554 U.S. at 592. Thus, contrary to plaintiffs' suggestion (at 15-16), *Heller*'s discussion of "common use" is part of how the Court defined the text, which was not a simple matter of looking at modern dictionary definitions, but a many-page inquiry into what the constitutional text would have meant to its drafters, considering historical sources and precedent to discern the text's original meaning. 554 U.S. at 576-603; *see also id.* at 584 (reviewing "founding-era sources" to discern the text's "natural meaning").

As Justice Kavanaugh has put it, "[t]he first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution—and to interpret that text according to its ordinary meaning *as originally understood*." *Rahimi*, 602 U.S. at 715 (Kavanaugh, J., concurring) (emphasis added); *see also Price*, 111 F.4th at 401 (rejecting "argument that we are barred from considering the historical limitations on the scope of the right at step one of the framework set forth in *Bruen,*" and observing that "we can *only* properly apply step one of the *Bruen* framework by looking to the historical scope of the Second Amendment right."). Justice Kavanaugh went on to say there are some parts of the Constitution that are clear without precedential or historical reference, but the meaning of "broadly worded or vague individual-rights provisions," like the Second Amendment, must be discerned by examining "the laws, practices, and understandings from before and after ratification ... [to] discern the meaning of the constitutional text and the principles embodied in that text." *Rahimi*, 602 U.S. at 715-17 (Kavanaugh, J., concurring).

Plaintiffs' related suggestion that all bearable weapons are "arms" within the dictionary meaning of the Second Amendment is also contrary to precedent (App. Br. 11-13). As noted, *Lamont* explicitly found that the text covers only those weapons that "are typically possessed and

in common use by law-abiding citizens for lawful purposes (principally individual self-defense)." 2025 U.S. App. LEXIS 21570, at *33. And even putting *Lamont* aside, plaintiffs' theory that the Second Amendment protects all weapons ignores that *Heller* repeatedly emphasized that a sawed-off shotgun is "*the type of weapon* … not eligible for Second Amendment protection" and that "the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Heller*, 554 U.S. at 622-23.

*Second*, another false premise underlying plaintiffs' argument is their repeated insistence that the *Heller* court adopted the common-use requirement in response to the regulatory tradition of restricting "dangerous and unusual" weapons, and thus that determining "common use" is a matter of analogical reasoning to those regulations (App. Br. 17-18, citing *Heller*, 554 U.S. at 627). This contention ignores *Heller*'s lengthy precedential discussion of "common use" without reference to laws restricting such weapons. To be sure, the Court later confirmed that its textual understanding "is fairly supported" by historical prohibitions on "dangerous and unusual" weapons, 554 U.S. at 624, an observation repeated in *Bruen*, 597 U.S. at 21, 47, and *Rahimi*, 602 U.S. at 735. But that merely shows the complementary nature of the original understanding of the limitations on scope of the right and contemporaneous

20

prohibitions that were consistent with that understanding. *Price*, 111 F.4th at 399 (noting that the "limitation on the types of weapons protected *was supported by* the historical tradition" (cleaned up, emphasis added)).

The above understanding of *Heller* is further confirmed by *Bruen* and ensuing lower-court decisions. In *Bruen*, the Supreme Court reiterated that "arms" means only those weapons in common use for lawful purposes today, without ever suggesting that it needed to resort to analogical reasoning to compare modern weapons restrictions to historical prohibitions on dangerous and unusual weapons. *Bruen*, 597 U.S. at 24, 31-32. And lower courts are in accord that the Supreme Court identified the common-use requirement as a facet of in its textual discussion in *Heller*, and not as arising out of the related but distinct historical tradition of prohibiting "dangerous and unusual" weapons mentioned later in the opinion. *Price*, 111 F.4th at 399-401; *Hollis v. Lynch*, 827 F.3d 436, 445-46 (5th Cir. 2016).

Plaintiffs' repeated contentions that dangerousness is the touchstone of common use (App. Br. 35-37, 39-44) are foreclosed by *Lamont*. This Court explained that the "common use" inquiry is distinct from the Supreme Court's separate observation that there is a "historical tradition of prohibiting the carrying of dangerous and unusual weapons."

21

*Lamont*, 2025 U.S. App. LEXIS 21570, at *30, 33-34 (cleaned up). This Court emphasized that while the common-use question is resolved at the first step of *Bruen*, it is not yet "clear how and at what point in the analysis we are to consider whether weapons are unusually dangerous." *Id*. For the purpose of this case, the Court need not answer whether dangerousness is considered at step one or two, because the plaintiffs have failed to address the threshold question of whether the weapons they seek to carry are commonly used for lawful purposes. *E.g.*, *Bridges*, 150 F.4th 517 (deciding machine guns are common, but upholding a ban on them at step-two as consistent with historical laws banning dangerous and unusual weapons). Despite plaintiffs' contentions, it is clear that these are two distinct questions.

*Third*, plaintiffs incorrectly contend that this Court has analyzed whether an individual qualifies as "the people" within the text of the plain Second Amendment at step two (App. Br. 23-27), relying on *Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025). In *Zherka*, this Court held that, at step one, non-violent felons are among "the people" protected by the plain text of the Second Amendment. 140 F.4th at 77. "Because the Second Amendment protects Zherka and his proposed conduct," the Court moved on to step two, where it compared the modern law to historical laws and concluded that disarming nonviolent felons is entirely

22

consistent with the nation's historical tradition of firearms regulations. *Id*. at 77-91. Plaintiffs, unlike Zherka, did not make that initial showing. In short, under the settled law of this Circuit which fully adheres to Supreme Court precedent, plaintiffs had the burden of showing, at *Bruen*'s first step, that electronic dart and stun guns are in common use today for lawful purposes, principally self-defense. *Antonyuk*, 120 F.4th at 964, 981; *Lamont*, 2025 U.S. App. LEXIS 21570, at *33; *see also Lane v. Cacace*, No. 22-CV-10989 (KMK), 2025 US Dist LEXIS 57913, at *18 (S.D.N.Y. Mar. 25, 2025) (collecting cases concluding that it is the plaintiff's burden to demonstrate common use at step one).

### B. Plaintiffs failed to meet their burden of demonstrating common use.

As *Bruen* itself makes clear, at the first step of the two-part inquiry, the district court's role was to assess common use, among other things, based on the record the parties created. District courts are "not obligated to sift the historical materials for evidence," but are entitled to rely on the parties' submissions. *Bruen*, 597 U.S. at 60. "[I]n our adversarial system of adjudication, we follow the principle of party presentation," and courts are entitled to decide cases based on the record compiled by the parties. *Id*. at 25 n.6; Fed. R. Civ. P. 56(c)(3).

Thus, the parties must chart their course, compile their factual records, and present their best arguments, so that courts are not left to "divine" the facts—whether they are adjudicative or legislative facts. *Lane*, 2025 US Dist LEXIS 57913, at *11-13 (explaining that even if the common-use inquiry turns largely on legislative, as opposed to adjudicative, facts, the parties' must present those facts to the court in a reliable and useful manner). It is up to the party offering the facts to "provide concrete guidance." *Id.* (quoting *Or. Firearms Fed. v. Kotek*, 682 F. Supp. 3d 874, 886 n.2 (D. Or. 2023)).

It should have come as no surprise to plaintiffs that they would have to submit some reliable factual foundation to press their Second Amendment challenge beyond summary judgment. After all, "[o]ur adversary system is designed around the premise that the parties ... are responsible for advancing the facts and arguments entitling them to relief." *Castro v. U.S.*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part). And it is fundamental that at summary judgment, when a nonmovant carries the burden of proof at trial, they must demonstrate that they can carry that burden to fend off summary judgment. *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013). These rules are no different in Second Amendment cases, which "rel[y] on various evidentiary principles and default rules to resolve

24

uncertainties." *Bruen*, 597 U.S. at 25 n.6 (cleaned up); *Lane*, 2025 US Dist LEXIS 57913, at *11-13.

Here, the district court correctly concluded that plaintiffs utterly failed to supply any basis from which the district court could conclude that electronic dart and stun guns are "arms" because they submitted absolutely nothing on that question. On appeal, they suggest that it was sufficient that they argued that electronic dart and stun guns are commonly owned from a purely numerical standpoint. First, that argument is wrong on the law and fails to capture the full test for "common use" articulated by the Supreme Court. Second, even if that argument were correct, plaintiffs failed to provide any actual evidence about how widely owned electronic dart and stun guns are, relying instead on unsubstantiated and stipulated facts from other cases. Each of these failings is independently dispositive. As a result, the district court correctly denied their motion for summary judgment and properly granted the City's motion.

### 1. Plaintiffs failed to supply facts about any of the factors courts use to assess whether a weapon is in common use.

Plaintiffs utterly failed to carry their burden of demonstrating common use with any specific facts or evidence. Although neither the

Supreme Court nor this Court has articulated a comprehensive test for assessing whether a given weapon is in common use, courts consider a mix of factors including whether a given weapon is largely owned by individuals or law enforcement; whether the weapon is actually used for self-defense or in the commission of crimes; whether, as a matter of common sense, it is suited for lawful purposes; and in how many jurisdictions its possession is unrestricted. *Morgan*, 2025 U.S. App. LEXIS 22466, at *12 (collecting cases and summarizing factors); *Hollis*, 827 F.3d at 449. These factors are drawn directly from the Supreme Court's definition of "arms" as those weapons "that are typically possessed and in common use by law-abiding citizens for lawful purposes (principally individual self-defense)." *Lamont*, 2025 U.S. App. LEXIS 21570, at *33 (citing *Heller*, 554 U.S. at 625, 627). That definition does not focus on a single consideration, but rather on the weapon's typical ownership profile (law-abiding citizens), its typical use (not simply possession), and the lawfulness of that use.

In applying these factors, courts frequently start by looking at "objective and largely statistical" facts, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015), including the total number of a given weapon that were manufactured and sold, how that compares to the number of other types of weapons, and how many jurisdictions

26

regulate them, to "identify potentially relevant data for the common use inquiry," *Hollis*, 827 F.3d at 449 (concluding machine guns are not common under any metric). There is "considerable variety across the circuits as to what the relevant statistic is," *id.*, since sales data fails to account for weapons that are no longer functional, not possessed by individuals, or have been taken outside of the country. *Morgan*, 2025 U.S. App. LEXIS 22466, at *12-13. Civilian ownership statistics are critical, as weapons owned by the military, law enforcement officers, or criminals fall outside the scope of the Second Amendment. *See Cuomo*, 804 F.3d at 256 ("[W]eapons that are most useful in military service … could be banned without implicating the Second Amendment") (cleaned up); *Bianchi*, 111 F.4th at 461; *U.S. v. Bridges*, 150 F.4th 517, 2025 U.S. App. LEXIS 19943, at *17-22 (6th Cir. Aug. 7, 2025) (law-enforcement equipment and unlawfully owned weapons do not count towards establishing a weapon is in common use); *Morgan*, 2025 U.S. App. LEXIS 22466, at *12-14.[5]

To determine whether a given weapon is "typically possessed by law-abiding citizens for lawful purposes," courts "look into both broad

---

[5] Plaintiffs' discussion of how police departments and the military use tasers has no bearing on the common-use inquiry (App. Br. 41-43), except perhaps to highlight that a very large proportion of the electronic dart and stun guns in circulation (and use) are likely owned by local law enforcement officers and the military.

patterns of use and the subjective motives of gun owners." *Cuomo*, 804 F.3d at 256; *see also Lamont*, 2025 U.S. App. LEXIS 21570, at *29.[6] As part of this inquiry, courts consider "common sense" and "whether there are any reasons a law-abiding citizen would want to use a particular weapon for a lawful purpose." *Price*, 111 F.4th at 405 (cleaned up). This question turns on whether due to their character, the weapons in question are "ill-suited and disproportionate to self-defense." *Bianchi*, 111 F.4th at 461 (sustaining ban of AR-15 combat rifles); *Morgan*, 2025 U.S. App. LEXIS 22466, at *14 (noting that "self-defense does not commonly require firing more than 1,000 rounds per minute" (cleaned up)). "A weapon's dangerousness is not the sole *determinative* factor of whether it is in common use for a lawful purpose, but it is a *relevant* factor."

---

[6] In both *Cuomo* and *Lamont*, this Court provided guidance about the common-use requirement, but ultimately assumed without deciding that semiautomatic assault rifles and large-capacity magazines are in common use and upheld the challenged regulations at step two. In *Lamont*, this Court had no occasion to explore further because, given "uncertainty" in the case law about how this analysis should be done, the Court "simply assume[d] without deciding that the desired firearms and magazines are bearable arms within the meaning of the Second Amendment," and went on to resolve the case at *Bruen*'s second step. 2025 U.S. App. LEXIS 21570, at *34. Likewise, in *Cuomo*, this Court concluded that the evidence in the record was inconclusive, so assumed semiautomatic assault rifles and large-capacity magazines are "arms" and moved on to step two of its analysis, under which it upheld the restrictions. 804 F.3d at 257. Although *Cuomo*, applied a means-end approach at step two, which has since been abrogated by *Bruen*, its common-use analysis at step one provides considerable guidance here because it is a straightforward application of *Heller*'s first step—a textual inquiry which the *Bruen* Court expressly approved. *U.S. v. Dabidah*, No. 24-cr-00514 (ER), 2025 US Dist LEXIS 70686, at *9 (S.D.N.Y. Apr. 11, 2025) (collecting cases, explaining that *Bruen* did not disturb *Heller*'s textual analysis).

*Morgan*, 2025 U.S. App. LEXIS 22466 at *15 n.10 (cleaned up). Courts also "look to statistics regarding weapons commonly used in crimes versus weapons commonly chosen by law-abiding citizens for self-defense," *Price*, 111 F.4th at 405, though this Court has cautioned that "evidence of disproportionate criminal use" alone is not enough, because the Supreme Court held that handguns merit constitutional protection notwithstanding their outsized role in criminality and violence. *Cuomo*, 804 F.3d at 256.

In this case, however, his Court does not need to conclusively determine what all of the relevant factors are, or how to weigh them, since plaintiffs haven't satisfied any of them. Indeed, plaintiffs made no effort at all to submit any evidence to the district court, whether as part of the briefing or through a separate affidavit or affirmation. They could have, for instance, submitted data about how many electronic dart or stun guns have been manufactured, how many are in private hands or owned by law enforcement, whether and how often they are used in the commission of crimes or for self-defense, or how they are regulated in jurisdictions across the country. But they submitted nothing in the district court, other than the individual plaintiffs' affirmations that they would like to carry stun guns in the City. They provided no basis on which the

district court could have found they carried their summary judgment burden at step one.

Plaintiffs' single anecdote about one plaintiff once brandishing an illegal stun gun is insufficient (A49). In *Morgan*, the Tenth Circuit emphasized that even if Morgan himself used his machine guns for self-defense, "he provide[d] little or no evidence to show that private individuals commonly use his type of machineguns for self-defense," and that, to the contrary, "evidence suggests they use machineguns primarily for unlawful purposes." 2025 U.S. App. LEXIS 22466, at *14. Plaintiffs' showing was insufficient for the very same reason. That one of the plaintiffs alleges to have once brandished a stun-gun is not proof about whether electronic dart or stun guns are commonly used for lawful purposes, primarily self-defense, rather than for law enforcement, military, or criminal purposes.

### 2. Plaintiffs are incorrect to claim that ownership numbers alone are sufficient to meet their burden, and they do not provide such numbers anyway.

Ignoring all of the relevant case law, plaintiffs invite this Court to instead engage in a simplistic counting exercise, arguing that the only relevant considerations for assessing common use is the number of a given weapon owned nationwide (App. Br. 44-47). But established

precedent precludes that argument, and plaintiffs in any event failed to substantiate any of the numbers they put before the district court.

*First*, the case law confirms that common use does not depend on a pure counting exercise, which plaintiffs themselves criticize elsewhere in their brief (App. Br 27-28). Relying on a purely numerical approach would have absurd results, and *Heller*'s definition of common use contemplates more factors that simple possession.

Indeed, this Court explicitly rejected the type of approach proffered by plaintiffs in *Lamont*, explaining that numbers alone tell an incomplete story. 2025 U.S. App. LEXIS 21570, at *28-30. Rejecting the plaintiffs' argument that semiautomatic assault rifles and large-capacity magazines are "widely popular," and so are in common use, this Court explained that a purely numerical approach to common use "would strain both logic and administrability, as it would hinge the right on ... a trivial counting exercise." *Id*. at *29-30. This Court explained that such an approach would "lead to absurd consequences," where "unusually dangerous arms like the M-16 or the W54 nuclear warhead can gain constitutional protection merely because they become popular before the government can sufficiently regulate them." *Id*. (cleaned up, quoting *Bianchi v. Brown*, 111 F.4th 438, 460-61 (4th Cir. 2024) (en banc)).

Moreover, courts across the country are in accord: raw numbers tell only part of the story, because they do "not tell us how many are in use or for what purpose." *Morgan*, 2025 U.S. App. LEXIS 22466, at *13; *Hanson v. Smith*, 120 F.4th 223, 232-33 (D.C. Cir. 2024) (whether a weapon is in common use is "not to be found solely by looking to the number of a certain weapon in private hands"); *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[M]arketing materials and sales statistics … do[]not necessarily show that large-capacity magazines are in fact commonly possessed by law-abiding citizens for lawful purposes."). "[T]he Supreme Court's choice of the phrase common *use* instead of common *possession*, means more than the number of a certain weapon in private hands." *Morgan*, 2025 U.S. App. LEXIS 22466, at *13; *Bianchi*, 111 F.4th at 460-61 (suggesting that "only instances of 'active employment' of the weapon should count, and perhaps only active employment in self-defense").

*Second*, in any event, even if this purely numerical approach were correct, plaintiffs failed to establish ownership numbers. Plaintiffs did not submit any relevant facts about how many electronic dart or stun guns are in civilian hands today.

Plaintiffs wrongly suggest that the court can pluck background facts about electronic dart and stun guns from other judicial opinions,

such as from Justice Alito's concurrence in *Caetano*, the D.C. Circuit's decision in *Hanson*, 120 F.4th at 232-33, and the district court decision in *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411 (N.D.N.Y. 2019), or from the pleadings in those cases (App. Br. 24-26, 45-46). But while a court may take judicial notice of a document filed in another court, it cannot do so for the "truth of the matters asserted in the other litigation," because "[f]acts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b)." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (cleaned up). And here, none of the facts plaintiffs cite are even "adjudicated facts," but instead unsubstantiated assertions, speculation, stipulations, or concessions, none of which can carry plaintiffs' burden.

Indeed, a close look at Justice Alito's concurrence in *Caetano* illustrates why courts do not simply accept facts in previous court opinions, especially stray dicta from a concurrence. In support of the proposition that there are "hundreds of thousands of Tasers and stun guns," Justice Alito relied on *People v. Yanna*, 297 Mich. App. 137, 144 (2012), which, in turn, relied on a law review article, Eugene Volokh, *Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life*, 62 Stan. L. Rev. 199, 243 (2009)—which Justice Alito also cited. But that article states that "today

33

stun guns are practically viable self-defense weapons, owned by nearly 200,000 civilians," with no supporting citation. The article then goes on to concede that "[m]uch" of what it has to say about stun guns' viability as a self-defense tool, "of course, is speculation. There are no available data about how often stun guns or irritant sprays are used either criminally or defensively." 62 Stan. L. Rev. at 212. Unsupported data and speculative claims made in a law review article, of course, neither satisfy reliability standards nor are sufficient for a factfinder to rely on regarding elements of a constitutional violation.

*Avitabile* also cannot satisfy plaintiffs' burden. There, based on "limited data," the parties stipulated that millions of tasers and stun guns had been manufactured and that the government "concede[d] for purposes of this motion practice that tasers and stun guns are both in 'common use,'" without examining how many were still operable, or whether they were owned by the government, law-enforcement officers, or the military, let alone the other factors courts consider when evaluating common use. 368 F. Supp. 3d at 411. But a fact that is stipulated or conceded in one lawsuit is hardly persuasive in another, especially a case involving entirely different parties.

On appeal, plaintiffs attempt to correct their omission by referencing old newspaper articles from 1986 and 1988, military and police

34

accounts extolling the utility of electronic dart guns, and filings in other cases (App. Br. 39-41). Even if useable facts could be extracted from these sources, a party cannot raise new facts for the first time on appeal. *Collymore v. City of N.Y.*, No. 23-1304, 2025 U.S. App. LEXIS 10977, at *3, n.1 (2d Cir. May 7, 2025). When deciding the motions for summary judgment, the district court was required to "consider only the cited materials" and, because there were no such materials, the court correctly granted summary judgment to the City. Fed. R. Civ. P. 56(c)(3).

### 3. The Supreme Court's decision in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), also does not satisfy plaintiffs' burden.

In lieu of proof, plaintiffs incorrectly suggest that Supreme Court precedent already "establishes" that electronic dart and stun guns are arms in common use (App. Br. 13-14). In *Caetano*, the Court, in a per curiam opinion, reversed a state court decision holding that stun guns are not "arms" within the meaning of the Second Amendment on the ground that stun guns did not exist at the time of the founding and were not used by militia-members. 577 U.S. at 412. In doing so, the Court held that the lower court's reasoning contravened two baseline principles from *Heller*—that the Second Amendment extends to arms "that were not in existence at the time of the founding" and covers weapons

beyond those "useful in warfare." *Id.* (cleaned up). The Court then remanded for the state court to apply that guidance and make the determination about stun guns in the first instance, while specifically refraining from holding that the law at issue contravened the Second Amendment. *Caetano* thus stands for the simple proposition that "the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*." *Id.* at 420 (Alito, J., concurring).

To the extent that language in Justice Alito's concurrence in *Caetano*'s concurrence could be interpreted to suggest that the two concurring justices would have found stun guns protected by the Second Amendment, that part of the concurrence did not garner the support of the majority of the Court, and so is not binding. *Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (noting that a statement in a concurrence is not binding precedent); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 419-420, 426 (2024) (J. Gorsuch, concurring) (unlike an opinion's holding and the reasoning essential, "[d]icta, stray remarks, and digressions" are the "vapours and fumes of law" and warrant less weight).

Plaintiffs likewise misplace their reliance on the D.C. Circuit's decision in *Hanson* (App. Br. 14). *Hanson* addressed a cap on firearm

magazine capacity, not a prohibition on stun guns or tasers. And to the extent that *Hanson* suggested that stun guns are "protected by the Second Amendment" because there are 200,000 in civilian hands, 120 F.4th at 233, relying on *Caetano*, 577 U.S. at 412 (Alito, J., concurring), this is a misreading of *Caetano* for the reasons already explained, and plaintiffs thus offer nothing that could carry their burden at summary judgment.

### POINT II

### IF THIS COURT DISAGREES, IT SHOULD REMAND FOR THE DISTRICT COURT TO ADDRESS THE REMAINING QUESTIONS NOT REACHED BELOW

If this Court disagrees with the district court's conclusion that the plaintiffs failed to carry their threshold burden of submitting sufficient facts which would have allowed the court to evaluate whether electronic dart and stun guns are in common use, this Court should remand so that the district court may address all remaining questions in the first instance.

For starters, because the district court rejected plaintiffs' claims due to their failure to show that the conduct they intended to engage in was protected by the plain text of the Second Amendment, the court had no occasion to consider the above-outlined mix of factors to decide

whether electronic dart and stun guns are, in fact, in common use today for lawful purposes. If the Court concludes that the district court erred in dismissing the case at step one, the district court should have the opportunity to complete the step one analysis. This Court, which is "a court of review, not of first view," *Havens v. James*, 76 F.4th 103, 123 (2d Cir. 2023) (cleaned up), generally does not analyze issues not decided below in the first instance. *See Baltas v. Maiga*, 119 F.4th 255, 269 (2d Cir. 2024) (cleaned up). When this Court reverses or vacates a district court's dismissal on a threshold ground, its practice is generally to remand. *See, e.g., Cavanaugh v. Geballe*, 28 F.4th 428, 435 (2d Cir. 2022); *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 409 (2d Cir. 2015); *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 692 (2d Cir. 2013).

Next, because it never moved to *Bruen*'s second step, the district court did not reach plaintiffs' arguments about whether the prohibition on electronic dart and stun guns can be "historically justified" (App. Br. 28-34). Had it done so, the district would have considered the City's proof to analyze whether "the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 691. And, because plaintiffs are advancing a facial challenge, the court would have asked whether there are any set of circumstances under

which the challenged law could be applied consistent with the Second Amendment. *Rahimi*, 602 U.S. at 708-13 (Gorsuch, J., concurring).

If this Court reverses, it should also give the district court the opportunity, in the first instance, to address the parties' arguments about historical analogues. The City submitted proof of longstanding and broad ranging prohibitions on keeping unusual weapons that are associated with criminality, while permitting weapons that are associated with lawful uses.

Remand would be warranted in this case in particular for several reasons. First, this Court issued its decision in *Lamont*, which considered whether large capacity assault rifles can be prohibited because they are "unusually dangerous," after the district court's opinion in this case. 2025 U.S. App. LEXIS 21570, at *34-59. Remand would enable the district court to address the import of that decision in the first instance.

Second, the City supplied abundant evidence that the prohibition on electronic dart and stun guns in a jurisdiction where firearms licenses are readily available under a shall-issue regime is consistent with the principles underpinning historical weapons restrictions, including via an expert affidavit supported by nearly 100 pages of historical laws (A257-58; 292-484). Those laws demonstrate a historical tradition of prohibiting "[b]owie knives, daggers, dirks, sword canes, brass

39

knuckles," while allowing "commonly owned weapons like rifles, muskets, sabers, bayonets, and larger handguns." *See Bridges*, 2025 U.S. App. LEXIS 19943, at *40-50. As courts have recognized, **"**[w]hat set Bowie knives, dirks, and the like apart was their frequent use in criminal assaults and perceived lack of lawful uses or defense value." *Id*.

The City amply demonstrated that prohibiting electronic dart and stun guns fits comfortably in the well-established historical tradition of prohibiting street weapons which, like electronic tasers and stun guns, were "associated with assault, murder, dueling, robbery, and other criminal activity," and "weren't arms that law-abiding citizens typically owned for traditionally lawful purposes," while allowing rifles and handguns that were typically used for lawful purposes. *Id*. The City's evidence showed that, in addition to law enforcement purposes, electronic dart and stun guns are commonly used by criminals (S.D.N.Y. Case No. 21-cv-08208-ER, Dkt. No 42-2, at 8). They are also extremely dangerous in untrained hands, and, indeed, despite police training, are a leading cause of death in police encounters (A299-300). Civilians underappreciate how deadly they are, particularly if applied to vulnerable individuals such as people with pacemakers, heart conditions, or people who abuse cocaine or amphetamines (A235. 299-300).

Third, Plaintiffs press this Court to adopt a cramped interpreta-tion of what might qualify a weapon as "dangerous and unusual" and grapple with almost none of the City's evidence on appeal. The district court should have the opportunity to sift through and consider the City's evidence in the first instance, with the benefit of full briefing to address the multiple methodological errors that plaintiffs make in their step two argument.

For instance, plaintiffs' argument that the City would be required to supply an analogue from 1791 cannot be reconciled with the Supreme Court's more nuanced consideration of history (App. Br. 28-30). The Su-preme Court emphasized that its cases "were not meant to suggest a law trapped in amber." *Rahimi*, 602 U.S. at 691. As this Court has repeatedly admonished, even the complete absence of distinctly similar historical laws is not necessarily evidence that a modern law is inconsistent with our national tradition of firearms regulation, but could be evidence of a lack of legislative will. *Antonyuk*, 120 F.4th at 963-74; *Frey v. City of N.Y.*, No. 23-365-cv, 2025 U.S. App. LEXIS 24303 (2d Cir. Sep. 19, 2025); *Giambalvo v. Suffolk Cnty*, ___ F.4th ___, No. 23-208, 2025 U.S. App. LEXIS 23638 (2d Cir. Sept. 12, 2025). When a state law is challenged, "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of [the] analysis." *Antonyuk*, 120

41

F.4th at 972-73. Both are "fertile ground, and the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation." *Id.* at 974.

And plaintiffs' focus on whether a given weapon is more or less lethal than a handgun is overly simplistic (App. Br. 37-38). To be sure, courts have observed that some weapons, for instance large capacity assault rifles, can be prohibited because they are "unusually dangerous," as compared to a handgun "because of their characteristics." *Lamont*, 2025 U.S. App. LEXIS 21570, at *30. And these unusually dangerous weapons can be prohibited without inquiring into how common they are because prohibitions on unusually dangerous weapons are presumptively lawful. *Id.* But the inverse does not follow; just because a weapon is less deadly that a handgun does not mean it cannot be regulated. The Supreme Court has been clear that the Second Amendment is not a "regulatory straightjacket." *Bruen*, 597 U.S. at 30. As new weapons are developed, whether electronic dart and stun guns or sonic cannons—the inquiry remains the same: is the conduct prohibited by the plain text of the Second Amendment, and, if so, does the restriction fit within our national tradition of regulation. Plaintiffs suggest that anything less deadly than a firearm cannot be regulated ignores that the Second Amendment "right was not unlimited." *Heller* ̦554 U.S. at 595. "The

42

reach of the Second Amendment is not limited only to those arms that were in existence at the Founding," and, "[b]y that same logic, the Second Amendment permits more than just regulations identical to those existing in 1791." *Rahimi*, 602 U.S. at 680.

In the end, however, these questions need not be reached in this case—and especially not in this appeal. Plaintiffs' failure to adduce any evidence during discovery that could satisfy their burden to persuade a factfinder that stun guns or tasers are "arms" within the meaning of the Second Amendment dooms their case, and their appeal.

## CONCLUSION

This Court should affirm.

Dated:  New York, New York
        October 17, 2025

Respectfully submitted,

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for Appellees

By:  _____
ELINA DRUKER
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
212-356-2609
edruker@law.nyc.gov

RICHARD DEARING
INGRID R. GUSTAFSON
ELINA DRUKER
   *of Counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 9,556 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____
ELINA DRUKER