# 25-861

## United States Court of Appeals

*for the*

## Second Circuit

NUNZIO CALCE, SHAYA GREENFIELD, RAYMOND PEZZOLI, SECOND
AMENDMENT FOUNDATION, FIREARMS POLICY COALITION, INC., ALLEN
CHAN, AMANDA KENNEDY,

*Plaintiffs-Appellants,*

— v. —

JESSICA TISCH, in her official capacity as Commissioner of the New York
City Police Department, CITY OF NEW YORK,

*Defendants-Appellees,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK,
No. 1:21-cv-08208-ER (Edgardo Ramos, District Judge)

## REPLY BRIEF OF PLAIINTIFFS-APPELLANTS

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................ii

INTRODUCTION ............................................................................... 1

ARGUMENT ...................................................................................... 3

I.   The City misunderstands the Supreme Court's "common use" principle and "plain text" inquiry. ............................................... 3

A. "Common use" is not a prerequisite to textual protection, but a historical rule of decision. ...................................................... 3

1. *Bruen* and *Heller* refute the City's expansive view of the "plain text" of the Second Amendment. ............... 3

2. Nothing in this Court's precedents require treating "common use" as part of the "plain text." ................. 11

B. The district court should have held that electronic arms are "in common use" because they are widely lawful and owned in large numbers. ...................................................... 15

1. An arm is "in common use" if it is possessed in substantial numbers and is widely legal. ................. 15

2. Electronic arms are in common use............................ 20

II.   Applying *Lamont* in this case requires holding that electronic arms are protected. ................................................................... 24

CONCLUSION ................................................................................ 31

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) ........................................................ 11

*Avitabile v. Beach,*
    368 F. Supp. 3d 404 (N.D.N.Y. 2019) ........................................... 21

*Bailey v. United States,*
    516 U.S. 137 (1995) ....................................................................... 18

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ...................................................... 1, 17, 24, 31

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................. 1, 6, 7, 8, 10, 18, 19, 23, 24

*Friedman v. City of Highland Park,*
    136 S. Ct. 447 (2015) ................................................................ 16, 17

*Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.,*
    916 F.2d 1174 (7th Cir. 1990) ...................................................... 23

*Langevin v. Chenango Ct., Inc.,*
    447 F.2d 296 (2d Cir. 1971) .......................................................... 23

*McDonald v. Chicago,*
    561 U.S. 742 (2010) ....................................................................... 26

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ........................................................ 23

*National Association for Gun Rights v. Lamont,*
    153 F.4th 213 (2d Cir. 2025) .................. 2, 11, 12, 13, 14, 15, 24, 25

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ................................................................ 1, 4, 5, 9

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) .......................................................... 19

*O'Neil v. Neronha,*
    594 F. Supp. 3d 463 (D.R.I. 2022) ............................................... 21

*Parker v. District of Columbia,*
    478 F.3d 370 (D.C. Cir. 2007) ...................................................... 24

ii

*People v. Webb*,
    131 N.E.3d 93 (Ill. 2019) ................................................................ 21

*People v. Yanna*,
    824 N.W.2d 241 (Mich. Ct. App. 2012) .......................................... 21

*Ramirez v. Commonwealth*,
    479 Mass. 331 (2018) ....................................................................... 21

*Singleton v. Wulff*,
    428 U.S. 106 (1976) ......................................................................... 26

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
    605 U.S. 280 (2025) ......................................................................... 17

*Snope v. Brown*,
    145 S. Ct. 1534 (2025) ............................................................... 17, 19

*Staples v. United States*,
    511 U.S. 600 (1994) ......................................................................... 17

*Teter v. Lopez*,
    125 F.4th 1301 (9th Cir. 2025) ........................................................ 22

*Teter v. Lopez*,
    76 F.4th 938 (9th Cir. 2023) ........................................................... 22

*United States v. Aulet*,
    618 F.2d 182 (2d Cir. 1980) ............................................................ 26

*United States v. Bridges*,
    150 F.4th 517 (6th Cir. 2025) ............................................................ 8

*United States v. Hunt*,
    63 F.4th 1229 (10th Cir. 2023) ........................................................ 23

*United States v. Miller*,
    307 U.S. 174 (1939) ......................................................................... 10

*United States v. Price*,
    111 F.4th 392 (4th Cir. 2024) .......................................................... 13

*United States v. Rahimi*,
    602 U.S. 680 (2024) ................................................................. 5, 7, 8

*United States v. Rubin*,
    609 F.2d 51 (2d Cir. 1979) .............................................................. 13

iii

*United States v. Stevens*,
  559 U.S. 460 (2010) ........................................................ 5

*Zherka v. Bondi*,
  140 F.4th 68 (2d Cir. 2025) ........................................... 11

## Statutes, Rules, and Laws

H.B. 891, 31st Leg. (Haw. 2021) ............................................ 21

WIS. STAT. § 941.295 ........................................................... 21

FED. R. EVID. 201, 1972 Advisory Comm. Note ....................... 22

## Other Authorities

Paris Achen, *Use of Stun Guns to Commit Crimes More Prevalent*, THE
  COLUMBIAN (July 11, 2012), https://perma.cc/U6AX-KG3X .... 27, 28

Consent Order, *N.J. Second Amend. Soc'y v. Porrino*, No. 16-cv-4906
  (D.N.J. Apr. 25, 2017), Doc. 30 ...................................... 21

*Offenses Involving Weapon Use, Offense Category by Type of
  Weapon/Force Involved, 2019*, NIBRS (2019),
  https://perma.cc/5WSY-BJ4N ......................................... 27

Justin Nix, *Making Sense of Unofficial Deadly Force Data*, POLICE
  CHIEF ONLINE (Apr. 21, 2023), https://perma.cc/AMG6-EVGX ..... 29

*Our visualizations*, FATAL ENCOUNTERS (last updated Jan. 3, 2021),
  https://perma.cc/5G2Y-2H3N ......................................... 29

*Stun Guns, TASERs, and Other Conducted Energy Devices: Issues for
  Congress*, CONG. RSCH. SERV. (Dec. 3, 2024),
  https://perma.cc/XEE8-H9CC ......................................... 30

*Vincent Del' Ostia*, FATAL ENCOUNTERS, https://perma.cc/2MWN-
  P88S ........................................................................... 29

## INTRODUCTION

The City's defense of the decision below fundamentally is built on a misunderstanding of where the "common use" principle established by *District of Columbia v. Heller*, 554 U.S. 570 (2008), fits into the Court's clarification and elaboration of *Heller*'s methodology in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). As Plaintiffs have explained at length, the common use test is the result of the Supreme Court's assessment of historical limits on the Second Amendment's protections and therefore has no relevance to the meaning of the plain text. *See* Pls.' Br., Doc. 35.1 at 15–28 (July 23, 2025) ("Pls.' Br."). But the City argues that "common use" is really an *element* of the textual scope of the term "arms," such that Plaintiffs bear a "burden" under *Bruen* to prove, before the Second Amendment is even implicated, that any weapon that New York bans is "in common use today for lawful purposes." Defs.' Br., Doc. 52.1 at 12 (Oct. 20, 2025) ("City Br."). It also exaggerates that misplaced burden by claiming that, to satisfy it, Plaintiffs must not only demonstrate, as Justice Alito found in *Caetano v. Massachusetts*, that stun guns are owned in large numbers and lawful in many states, *see* 577 U.S. 411, 420 (2016) (Alito, J., concurring), but

1

also must present evidence about "how many such weapons[] remain operable, who owns them, for what purpose, their typical patterns of use, common sense facts about the weapon's suitability for lawful purposes, and crime statistics," City Br. 9. And it argues that the district court was right to decide that stun guns and other electronic arms are not "arms" because Plaintiffs failed to offer evidence on each of these points.

The City's' arguments miss the mark. "Common use" is the historical principle used to determine the ultimate constitutionality of a weapons ban, not a component of the "plain text." *See* Pls.' Br. 15–20. In other words, common use is relevant to whether an arm can be banned, not whether an item is an arm in the first place. Nothing in this Court's caselaw, including this Court's recent decision in *National Association for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir. 2025), requires treating common use as a component of the "plain text." A lack of common use therefore is a burden that the City must bear to justify its ban, not something that Plaintiffs must prove to implicate the Second Amendment. Furthermore, regardless of where it fits into the analysis or who holds the burden, an arm is "in common use" if it is owned in large numbers and broadly legal, and electronic arms are owned in the millions

2

and legal in all 50 states today. Finally, whether an arm is "in common use" is a classic example of a "legislative fact" on which the concerns about limitations on what is appropriate for judicial notice or other evidentiary rules, *see* City Br. 32–33, simply do not apply.

There is no reason for this Court to remand for further consideration if it holds, as it should, that the district court erred in concluding stun guns are not "arms." This is unlike a case in which the district court erred on a distinct threshold or jurisdictional question and never reached the merits. The *Bruen* analysis is a unitary merits analysis, and the correct course is to conduct the fulsome analysis and resolve the dispute. That is especially true given a remand would be futile under *Lamont*.

## ARGUMENT

I. **The City misunderstands the Supreme Court's "common use" principle and "plain text" inquiry.**

A. **"Common use" is not a prerequisite to textual protection, but a historical rule of decision.**

1. ***Bruen* and *Heller* refute the City's expansive view of the "plain text" of the Second Amendment.**

The Court repeatedly placed the burden on *the government* to justify its regulation through this historical inquiry. *See, e.g., id.* at 24–

25, 33–34, 58 n.25. The City, eager to avoid that burden, strains to enlarge the initial "burden" on Plaintiffs to state a claim under the Second Amendment, arguing that the threshold "plain text" question "is not a simple matter of applying dictionary definitions, but rather governed by an interpretation of the original understanding of the text that is informed by history." City Br. 14. But to the extent this means anything more than that the *original* semantic meaning of the Second Amendment's terms govern (and thus that Founding-era meaning controls if there has been semantic drift over time), it defies any reasonable reading of *Bruen*. *Bruen* distinguished the meaning of the Second Amendment's "plain" or "bare" text from the analysis of historical regulatory traditions by which litigants might demonstrate that the ultimate right is not as capacious as the text. What the City calls a "false dichotomy between text and history," *Id.* at 18, is a distinction that is mandated by the Supreme Court.

*Bruen* demonstrates that the City's approach is contrary to the structure of the analysis the Supreme Court has mandated. *Bruen* devoted minimal analysis to the plain-text meaning of "bear," the term at issue in that case, *see* 597 U.S. at 32, and dealt with *all* of the evidence

4

of historical limits on the right as part of the historical analysis in which the government indisputably bears the burden, *id.* at 34–70. *United States v. Rahimi* clinches the point, as there the Court engaged in zero plain-text analysis and confirmed that the government's burden kicks in whenever it "regulates arms-bearing conduct." 602 U.S. 680, 691 (2024). This is consonant with how the Supreme Court treats First Amendment questions, to which *Bruen* compared its mode of analysis. "In that context, when the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." 597 U.S. at 24 (cleaned up). One way the Government can do so is by demonstrating that something falls within one of the "narrowly limited classes of speech" such as defamation or obscenity that can be restricted *despite being speech* within the plain text meaning of the First Amendment. *See United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (citations omitted); *Bruen*, 597 U.S. at 24–25 (citing *Stevens* on this point). The government bears the burden of showing "speech" fits into such a category, just as the City bears the burden of showing an "arm" is of a type that could historically be proscribed.

5

The City appears to deny that under *Bruen* and *Heller*, something can be an "arm" within the literal, plain text of the Second Amendment, without necessarily being a *protected* arm, if history discloses some regulatory principle that permits that type of weapon to be restricted in some way. But this misunderstands the import of a weapon being covered by the plain text. Such coverage results in *presumptive* protection; whether citizens ultimately have a constitutionally protected right to possess the weapon must wait for conclusion of the full *Bruen* analysis. Or as *Heller* put it, "the Second Amendment extends, *prima facie*"—on its face—"to all instruments that constitute bearable arms." 554 U.S. at 582. *Heller*'s statements that "a sawed-off shotgun is 'the type of weapon … not eligible for Second Amendment protection' and that 'the Second Amendment right, whatever its nature extends only to certain types of weapons,' " therefore are perfectly consistent with Plaintiff's interpretation. *See* City Br. 20 (quoting *Heller*, 554 U.S. at 622–23) (emphasis omitted). To say that all weapons are "arms"—as *Heller* itself did, *see* 554 U.S. at 581—is not to say that all arms are ultimately protected. It is to say that all arms are *presumptively* protected. If the City believes that a certain arm nevertheless can be banned, it bears the

6

burden of rebutting that presumption and demonstrating such as a matter of historical principle.

The City's argument that "courts must look to the 'historical background' to understand the text … 'because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right,' " fails for similar reasons. City Br. 18 (quoting *Heller*, 554 U.S. at 592). That the right to keep and bear arms is a "pre-existing right" is a reason that there may be historical principles that limit its ultimate protection to something less than the full scope of the plain meaning of its terms—but it has nothing to do with the plain meaning of those terms. The City similarly relies on statements by Justice Kavanaugh in *Rahimi* for this proposition, but those statements refute the City's position. *See* City Br. 19. When Justice Kavanaugh wrote that "the first and most important rule in constitutional interpretation is to heed the text" he made clear that "the text" meant nothing more than "the actual words of the Constitution," entirely in line with Plaintiffs' position here. *Rahimi*, 602 U.S. at 715 (Kavanaugh, J., concurring). And his directive to look to "laws, practices, and understandings from before and after ratification that may help the

7

interpreter discern the meaning of the constitutional text and the principles embodied in that text" as a way to define "exceptions to broadly worded constitutional rights" like the Second Amendment, *id.* at 717 (Kavanaugh, J., concurring), directly supports Plaintiffs' explanation of where historical evidence must fit into the *Bruen* analysis—as establishing *exceptions* to the text, not defining the text itself.

The Sixth Circuit recently drew the correct line between historical and textual analysis in *United States v. Bridges*, 150 F.4th 517 (6th Cir. 2025), in which it confronted the constitutionality of the federal law prohibiting unregistered machinegun possession. *Bridges* upheld the law even though the court correctly concluded that "the Second Amendment's plain text covers Bridges's possession of a machinegun" because a machinegun "is undoubtedly an 'Arm[]' that one can 'keep and bear.' " *Id.* at 524 (citations omitted). The panel found that presumption rebutted— and Bridges' possession of a machinegun ultimately *not* protected—by the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 525 (quoting *Heller*, 554 U.S. at 627). But it did so without collapsing the distinction *Bruen* drew between text and

history, and without shifting the burden to show that a machinegun was *not* a "dangerous and unusual weapon" to Bridges.

Given that the sort of historical analysis which the City tries to incorporate into the "plain text" of the Second Amendment does not belong there, there is no *textual* hook for "common use" and hence, common use *cannot* be considered part of the textual question this Court must answer at the threshold.

The City persists in claiming that both *Heller* and *Bruen* prove otherwise, but it is wrong—as are the lower court opinions cited by the City making similar arguments. *See* City Br. 20–21. As to *Bruen*'s discussion of "common use" at the outset of the opinion, the City merely parrots the district court's errors, *see id.* at 17, to which Plaintiffs have already responded, *see* Pls.' Br. 19–20. In short, in the cited discussion *Bruen* confirms that arms in common use are protected conclusively as a matter of text and history, not just covered presumptively as a matter of plain text. *See* 597 U.S. at 32.

As for *Heller*, the City claims that it contained a "lengthy precedential discussion of 'common use' without reference to laws restricting [dangerous and unusual] weapons." City Br. 20. But a close

9

look at *Heller* demonstrates that common use cannot be severed from historical tradition.

The Court first addressed common use in its discussion of *United States v. Miller*, 307 U.S. 174 (1939). *Heller*, 554 U.S. at 624–25. That discussion took place before the Court formally turned to historical "limitation[s] on the right to keep and carry arms." *Id.* at 627. But the Court made clear that it was getting ahead of itself: "We may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits." *Id.* at 624. After interpreting *Miller* as permitting weapons in common use, the Court concluded that this "accords with the historical understanding of the scope of the right"— pointing to "Part III, *infra.*," *id.* at 625—i.e., the part of the opinion discussing historical limitations on the right, *see id.* at 626–28. And as part of *that* discussion, the Court reasoned that the "common use" test was "fairly supported by the historical tradition of carrying dangerous and unusual weapons." *Id.* at 627 (cleaned up). Thus, these passages make clear that the common use test is the result of the Court's historical analysis, not part of the Second Amendment's plain text.

10

### 2. Nothing in this Court's precedents require treating "common use" as part of the "plain text."

The City argues that *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), "held that the 'threshold inquiry' into the Second Amendment's text requires courts to consider, among other things, 'whether the weapon concerned is 'in common use.' " City Br. 16 (quoting *Antonyuk*, 120 F.4th at 981). It further argues that *Lamont* "reiterated that the common-use analysis 'fall[s] under the first step of *Bruen*.' " *Id.* (quoting *Lamont*, 153 F.4th at 234). Not so.

The cited statement in *Antonyuk* was dicta in a case about where arms may be carried, not what arms are protected. *See* Pls.' Br. 23–24. Indeed, that very same part of *Antonyuk* also suggested that whether an individual was an "ordinary, law-abiding, adult citizen" was part of the *textual* determination of whether that person fits within "the people" as a matter of the Second Amendment's plain text. *Id.* at 23 (citing *Antonyuk*, 120 F.4th at 981). But in a later case in which it had to confront the issue, this Court treated those who were not "law-abiding" as nevertheless among "the people" encompassed by the Amendment's textual scope. *See Zherka v. Bondi*, 140 F.4th 68, 76–77 (2d Cir. 2025); *see also* Pls.' Br. 24. *Antonyuk*'s dicta about the plain-text meaning of

11

"arms" is no more binding than its dicta about the plain-text meaning of "the people."

The City suggests that *Zherka* can be distinguished because the plaintiff in that case made his "initial showing" that he was within the Second Amendment's text. *See* City Br. 22–23. But that is precisely the point. If the City were right, and the list of things to be considered at the "threshold inquiry" really included whether an individual is "law-abiding," it would have been *impossible* for Zherka, who had a felony conviction, to have made that showing. Treating the "arms" issue analogously to the "people" issue in *Zherka* suggests that the statement in *Antonyuk* that "common use" is an element of the textual analysis must be dicta.

The City claims that *Lamont* forecloses this argument. *See, e.g.*, City Br. 8–9. But the opposite is true—*Lamont* makes clear that there is no currently binding answer to where "common use" fits in this Circuit. Indeed, after canvassing disagreement on where in the analysis common use fits, *Lamont* expressly declined to take a position, finding it "not necessary to resolve this appeal." 153 F.4th at 235. And while *Lamont* did, in a parenthetical, describe *Antonyuk*'s discussion of this issue as a

"holding," that parenthetical *itself* was dicta, and use of the word "hold" cannot magically transform dicta into binding precedent. *See United States v. Rubin*, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, J., concurring) ("A judge's power to bind is limited to the issue that is before him; he cannot transmute dictum into decision by waving a wand and uttering the word 'hold.' "). And in any event, read in context, it does not appear that the *Lamont* panel considered itself bound on the point— indeed, there would be no reason for the panel to say it was unnecessary to decide the issue to resolve the appeal if a prior panel had already decided it.

Notably, *Lamont*'s discussion on this point refutes the notion, advanced by the City, that the "lower courts are in accord that the Supreme Court identified the common-use requirement as a facet of … its textual discussion in *Heller*, and not as arising out of the related but distinct historical tradition of prohibiting 'dangerous and unusual' weapons mentioned later in the opinion." City Br. 21 (citing *United States v. Price*, 111 F.4th 392, 399–401 (4th Cir. 2024)). After acknowledging that *Antonyuk* suggests that the Second Circuit "has understood the 'in common use' analysis to fall under the first step of *Bruen*," *Lamont* made

13

clear that it was not confident in that point under Supreme Court precedent, saying:

> [T]he Supreme Court has not made clear how and at what point in the analysis we are to consider whether weapons are unusually dangerous. Nor has the Court clarified how we are to evaluate a weapon's 'common use.' The Court's opinions may reasonably be read to require such considerations at the first step of *Bruen*'s two-step inquiry, cabining the meaning of 'Arms' to those that are not unusually dangerous and that are generally owned and used by ordinary citizens for lawful purposes, principally self-defense. Or the Court's precedents may reasonably be read to require those considerations at *Bruen*'s second step, as part of our analogical comparison of contemporary restrictions to historical analogues.

*Lamont*, 153 F.4th at 234–35. That the Court was unclear whether the "meaning of 'Arms' " was properly "cabin[ed]" to those "that are generally owned and used by ordinary citizens for lawful purposes" or whether "those considerations" came into focus "at *Bruen*'s second step" demonstrates that *where common use fits* in the analysis was one of the issues about which the Court was uncertain, *id.*, a fact that is furthermore confirmed by the cases cited on either side of this issue, with parentheticals about how some of them have incorporated "common use" into the textual definition of an arm, *see id.* at 235 nn.20–21. Because *Lamont* thereafter "prefer[red] not to venture into an area in which such uncertainty abounds and that is not necessary to resolve this appeal" and

14

simply "assume[d] without deciding that the desired firearms and magazines are bearable arms within the meaning of the Second Amendment," *id.* at 235, this question is currently open in the Second Circuit. And for the reasons laid out above and in Plaintiffs' opening brief, this Court should treat "common use" as relevant to *Bruen*'s historical inquiry.

**B. The district court should have held that electronic arms are "in common use" because they are widely lawful and owned in large numbers.**

In addition to placing "common use" in the wrong part of the analysis, the City offers two interrelated reasons why electronic arms are not in "common use." Neither persuades. It advances a faulty notion of what "common use" entails, and it improperly faults Plaintiffs with a "complete failure to adduce any facts" supporting common use. City Br. 10.

**1. An arm is "in common use" if it is possessed in substantial numbers and is widely legal.**

The City argues that this Court should consider "whether a given weapon is largely owned by individuals or law enforcement; whether the weapon is actually used for self-defense or in the commission of crimes; whether, as a matter of common sense, it is suited for lawful purposes;

15

and in how many jurisdictions its possession is unrestricted." *Id*. at 26 (citation omitted). The City contrasts this to "a purely numerical approach" focused only on "the number of a given weapon owned nationwide" to determine whether that arm is "in common use." *Id*. at 30–31.

The City's dichotomy misconstrues the nature of Plaintiffs' argument. While numerosity alone may be *sufficient* to establish common use in some circumstances, numerosity is not the sole criteria by which common use can be evaluated. The ultimate question is whether, based on the actions of the American people, a given weapon is both dangerous and unusual. If millions of law-abiding Americans possess an item, the answer clearly is no. But even if ownership is only in the tens or hundreds of thousands, the answer also is no if the item is generally lawful for ordinary Americans to possess and use. After all, if the American people truly deemed a weapon to be dangerous and unusual, it is unlikely they would sit idly by while thousands upon thousands of their fellow citizens acquired it. This approach accords with how Supreme Court justices have consistently treated common use. In dissent from denial of certiorari in *Friedman v. City of Highland Park*, 136 S. Ct. 447 (2015), for instance,

16

Justice Thomas opined that the Second Amendment protects a right to possess AR-15 platform rifles because "roughly five million Americans" own them for "lawful purposes." *Id.* at 449 (Thomas, J., dissenting). And in concurrence in *Caetano*, Justice Alito concluded that stun guns were in common use, because " '[h]undreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 states." 577 U.S. at 420 (Alito, J., concurring) (citation omitted); *see also, e.g.*, *Snope v. Brown*, 145 S. Ct. 1534, 1534 (mem.) (Kavanaugh, J., statement respecting denial of certiorari). It also accords with how the Supreme Court has distinguished common from unusual arms in other contexts. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025) ("assault weapons" are "widely legal and bought by many ordinary consumers"); *Staples v. United States*, 511 U.S. 600, 611 (1994) (semiautomatic firearms are "commonplace" and "generally available").

The City's attempt to complicate this straightforward analysis with questions about "whether the weapon is actually used in self-defense or in the commission of crimes," and whether it appears "as a matter of common sense" to be useful for lawful purposes, runs directly contrary to

17

precedent. City Br. 26. Begin with the question of whether a weapon is "actually used" for self-defense or whether it is used by criminals. As for "actual use," to the extent the City means more than "simple possession," *id*. at 31, it is wrong because *Heller* and *Bruen* cannot plausibly be read as distinguishing between "use" and "possession" in determining the Second Amendment's application to a particular firearm. In *Heller*, the Supreme Court explained, in the course of articulating the "common use" test, that citizens at the Founding "would bring the sorts of lawful weapons that they *possessed* at home to militia duty." 554 U.S. at 627 (emphasis added). And when the Court first described the test a few pages earlier, it stated that "the Second Amendment does not protect those weapons not typically *possessed* by law-abiding citizens for lawful purposes." *Id*. at 625 (emphasis added). And that makes sense because, with firearms, possession itself *is* a form of use. "Consider the paradoxical statement: 'I *use* a gun to protect my house, but I've never had to *use* it.' " *Bailey v. United States*, 516 U.S. 137, 143 (1995). As this example illustrates, " '[u]se' draws meaning from its context," *id*., and the context of the Second Amendment—which specifically mentions "keep[ing]" and

18

"bear[ing]" arms—makes clear that possessing a firearm for a lawful purpose such as self-defense amounts to using the firearm.

Criminal *misuse*, on the other hand, is entirely irrelevant to the test. Although handguns "are the overwhelmingly favorite weapon of armed criminals," *Heller*, 554 U.S. at 682 (Breyer, J., dissenting), that fact did not impact the majority's analysis in *Heller*, *see New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015), *abrogated by Bruen*, 597 U.S. 1 (2022) ("That evidence of disproportionate criminal use did not prevent the Supreme Court from holding that handguns merited constitutional protection.").

Similarly, whether "common sense" suggests that a given arm has utility for a lawful purpose is beside the point. *Heller* specifically declined to assess what might make handguns good for self-defense, because "whatever the reason," the American people had adjudged them useful for that purpose. 554 U.S. at 629; *see also Snope*, 145 S. Ct. at 1538 (Thomas, J., dissenting from the denial of certiorari) ("[W]e have never relied on our own assessment of how useful an arm is for self-defense before deeming it protected."). To do otherwise would effectively reinstate

19

interest-balancing by inviting judges to opine on what features might, or might not, be useful to have in a firearm.

To be clear, by objecting to considering these issues, Plaintiffs do not suggest that they would not, in this case, add up to constitutional protection for electronic arms if they were given weight in the "common use" analysis. The City has offered effectively no evidence of criminal misuses of stun guns, and common sense readily suggests that these weapons, which are favored for defensive purposes by law-enforcement agencies all around the country, would have defensive utility for law-abiding citizens as well. But a proper analysis under *Bruen* would nevertheless omit these factors from consideration.

### 2. Electronic arms are in common use.

Under the analysis laid out above, electronic arms are "in common use" for lawful purposes. As Plaintiffs explained in their opening brief, the hundreds of thousands of Tasers that Justice Alito pointed to in *Caetano* was a low-end estimate at the time and certainly fails to reflect the increased popularity of these arms today. *See* Pls.' Br. 44–47. And electronic arms are lawful in *all* 50 states today. The State's expert stated that "[f]rom the 1970s through the early 2000s, at least seven states,

including New York State, enacted laws that barred civilian possession of stun guns and tasers." A297. But not *one* of those states currently restricts ownership of them, either because the state repealed its restriction or because a court has held it unconstitutional and the state has ceased enforcement. *See* H.B. 891, 31st Leg. (Haw. 2021) (repealing restriction because the legislature found *Caetano* "has raised questions regarding the constitutionality of bans on electric guns, and may make amendments to Hawaii's law on electric guns advisable"); *Ramirez v. Commonwealth*, 479 Mass. 331, 332 (2018); *People v. Yanna*, 824 N.W.2d 241, 245–46 (Mich. Ct. App. 2012); *Avitabile v. Beach*, 368 F. Supp. 3d 404, 421 (N.D.N.Y. 2019); *O'Neil v. Neronha*, 594 F. Supp. 3d 463, 479 (D.R.I. 2022); Consent Order 3–4, *N.J. Second Amend. Soc'y v. Porrino*, No. 16-cv-4906 (D.N.J. Apr. 25, 2017), Doc. 30 ("Defendants … in light of the [*Caetano*] United States Supreme Court decision … enter into this consent decree and do hereby concede that the aforementioned statute banning electronic arms in New Jersey is unconstitutional."); WIS. STAT. § 941.295 (allowing licensed possession and carriage of electronic weapons); *see also People v. Webb*, 131 N.E.3d 93, 98 (Ill. 2019).

Even so, the City argues that this Court should be required to find stun guns are not "common" because, they claim, Plaintiffs failed to adduce evidence of their commonality below. City Br. 23. If common use properly is considered as part of the historical analysis, that is a meaningless objection, since the burden is not on Plaintiffs to prove common use but on the City to prove that electronic arms are "dangerous and unusual." But even if the burden did fall on Plaintiffs, Plaintiffs did show below, by reference to the litany of other cases holding stun guns are common, *see* Mem. of Law in Supp. of Pls.' Mot. for Summ. J. 12–15, *Calce v. City of New York*, No. 1:21-cv-08208 (Mar. 1, 2024), Doc. 26, that electronic arms are extremely common, and they have bolstered that showing with additional evidence of commonality on appeal, *see* Pls.' Br. 44–47.

The City objects to this, arguing that "judicial notice" of such findings is inappropriate, but whether an arm is "in common use" or not is a legislative fact, not an adjudicative fact, such that the Rules of Evidence, even the rules around judicial notice, simply do not apply. *Teter v. Lopez*, 76 F.4th 938, 946–47 (9th Cir. 2023), *vacated on reh'g en banc*, 125 F.4th 1301 (2025); *see* FED. R. EVID. 201, 1972 Advisory Comm. Note.

22

Such "general facts which help the tribunal decide questions of law," *Langevin v. Chenango Ct., Inc.*, 447 F.2d 296, 300 (2d Cir. 1971) (Friendly, J.) (quotations omitted), are the only kind relevant to the constitutionality of this law, *see Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Legislative facts can be found anywhere, *Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990), and by judges at any level of the proceedings, *United States v. Hunt*, 63 F.4th 1229, 1250 (10th Cir. 2023) ("Insisting on a cramped notion of what is part of the record is particularly inappropriate" in cases involving legislative facts.); *contra* City Br. 35 ("[A] party cannot raise new facts for the first time on appeal."). Thus, when the City suggests the fact that Justice Alito's statement in *Caetano* that there are "hundreds of thousands of Tasers and stun guns," which was based on another court decision and a law review article (which in turn relied on a newspaper article), "illustrates why courts do not simply accept facts in previous court opinions," *see* City Br. 33 (citation omitted), it actually points to the single clearest example that whether an arm is "in common use" is a legislative fact on which this Court's review is unrestricted. And if another example is needed, *Heller*'s conclusion that handguns are "the

23

most preferred firearm in the nation to 'keep' and use for protection of one's home and family," 554 U.S. at 628–29 (quotation marks and citation omitted), was supported not with a citation to record evidence but rather to the D.C. Circuit's decision below, which in turn relied on a social science paper. *See Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007).

## II. Applying *Lamont* in this case requires holding that electronic arms are protected.

The foregoing establishes that electronic arms are in common use and therefore not unusual. That alone should be enough to resolve this case. That electronic arms are not dangerous in a constitutionally material sense is a separate, but equally adequate basis for resolving it. Pls.' Br. 37–43. And to prevail under Supreme Court precedent, the City must prove that electronic arms are both dangerous *and* unusual. *See, e.g.*, *Caetano*, 577 U.S. at 411 (vacating decision for erroneous "unusual" analysis despite lower court also finding stun guns were "dangerous"); *id.* at 417 (Alito, J., concurring) ("As the *per curiam* opinion recognizes, this is a conjunctive test").

Plaintiffs recognize, however, that since filing their opening brief, *Lamont* held that even common arms can be banned if they are

"unusually dangerous." 153 F.4th at 232–34. Plaintiffs, of course, reserve the right to argue that *Lamont* was incorrectly decided in an appropriate forum. But applying *Lamont* in this case demonstrates that electronic arms cannot be banned. The reasons Plaintiffs have offered for why electronic arms like Tasers are not "dangerous" under *Heller* likewise show that they are not "unusually dangerous" under *Lamont*. The City disputes that the Court should even reach the question, but also suggests that electronic arms are, in fact dangerous. This Court should reject both arguments.

Although this Court generally declines to reach issues that were not passed upon by the district court, this case is meaningfully different from those the City cites in its brief in which the Court reversed a district court's decision on some jurisdictional or other threshold ground and declined to go further into the case than the district court did. *See* City Br. 38 (collecting cases). Here, the district court granted summary judgment against Plaintiffs on the merits. Though it did not *complete* its merits analysis, it was nevertheless fully briefed on the appropriate analysis under *Bruen* and decided the case by applying *Bruen*. In other words, the issue passed on below was whether Plaintiffs have a Second

25

Amendment right to keep and bear electronic arms. That same issue is the one presently at issue before this Court, and the Court can and should resolve that issue.

Furthermore, even if the historical analysis required by *Bruen* could be treated as a separate "issue" not passed upon below, "there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt … or where injustice might otherwise result." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (quotation marks and citations omitted); *see also United States v. Aulet*, 618 F.2d 182, 186 (2d Cir. 1980) (quoting *Singleton*, 428 U.S. at 121). This is such a circumstance. If Plaintiffs are correct, this case presents an ongoing deprivation of their fundamental rights, *see McDonald v. Chicago*, 561 U.S. 742, 778 (2010), and further delay causes them an ongoing constitutional harm. Moreover, the proper resolution is beyond any doubt. To Plaintiffs' knowledge, no court since *Caetano* has upheld a ban on electronic arms as the decision below did. And applying *Lamont* to this case is straightforward because electronic arms are not "unusually dangerous." This Court should not delay in vindicating Plaintiffs' rights.

Nothing in the City's brief supports finding that electronic arms are "unusually dangerous" under *Lamont*. For instance, the City complains that "[stun guns] have broad criminal appeal, and have gained popularity in robberies." City Br. 5. But the article the City cites for support of that proposition (indirectly through its expert, Dr. Spitzer), bases that claim on the statement of one Vancouver, Washington police officer, who provides zero empirical support for it. Paris Achen, *Use of Stun Guns to Commit Crimes More Prevalent*, THE COLUMBIAN (July 11, 2012), https://perma.cc/U6AX-KG3X. Comprehensive national surveys of arms used in crime like the FBI Crime Data Explorer or the National Incident-Based Reporting System do not separately count criminal uses of electronic weapons, suggesting that to the extent they are used illegally, their rate of usage does not merit specific mention. *See Offenses Involving Weapon Use, Offense Category by Type of Weapon/Force Involved, 2019*, NIBRS (2019), https://perma.cc/5WSY-BJ4N. Furthermore, even accepting for the sake of argument that such a criminal preference exists, the article suggests that it is, in fact, directly related to the fact that these arms are *less* dangerous, because, "[c]ompared with a gun, a stun gun can

27

reduce the risk of killing someone during a robbery and adding murder to the list of potential charges." Achen, *supra*.

Indeed, the one type of even arguably dangerous use the City identifies with any statistical support is a type that the ban does not affect: use by police officers. *See* City Br. 5. This argument lines up with one of the original (perverse) reasons restricting these arms: because police officers were using stun guns "to torture suspects" and Mayor Koch did not "want to see the current notoriety escalate the use of these things among the public." A249. That was particularly notable because, at the time, these weapons were "gaining popularity among law-enforcement officials and civilians who consider them a benign and effective method of self-defense," *id.*, as well as "among women, as well as men who work in high-risk areas or professions" for the same purposes, *id*.

But even taking the police use of these arms as a relevant metric to consider in assessing their dangerousness under *Lamont*, the fact that electronic arms "were the third leading cause of death in civilian-police encounters" between 2000 and 2020 does not suggest that they are, themselves "dangerous." *Id*. The City's source for that claim, Fatal Encounters, is notable for its broad method of collecting allegedly fatal

encounters between civilians and police. It logs "any time a person dies in the presence of an officer, and is mentioned by local news media … [t]his includes, for example, suspects who commit suicide in the presence of police officers as well as the 19 children who were killed in the Uvalde massacre." Justin Nix, *Making Sense of Unofficial Deadly Force Data*, POLICE CHIEF ONLINE (Apr. 21, 2023), https://perma.cc/AMG6-EVGX. And as the third most common cause of death in the presence of police, at 919 for the whole period covered by the database, "Taser" is dwarfed by the most common, "shot," at 20,822, and "vehicle," at 6,098. *See Our visualizations*, FATAL ENCOUNTERS (last updated Jan. 3, 2021), https://perma.cc/5G2Y-2H3N. Thus, if this data cannot support banning guns (and it clearly cannot), it necessarily cannot support banning electronic arms. Further, within that set of deaths, a cursory review of the cases compiled in the database illustrates that many of them involve the confounding presence of illegal drugs. *See, e.g.*, *Vincent Del' Ostia*, FATAL ENCOUNTERS, https://perma.cc/2MWN-P88S (The first person in the database with "Taser[]" listed as the cause of death, "[h]is death was attributed to both illegal and prescription drugs in his system."). That is unsurprising, given that the City's own expert acknowledged that

29

electronic arms are "an effective tool for law enforcement," and generally "considered to be 'less lethal options' to firearms," except in the case of the "portions of the population that are more susceptible to a serious injury when Tasers are used against them." A283–84; *see also id.* (calling deaths from electronic arms "rare, [though] they do occur"). This aligns with the most credible research into the safety of these arms, which has found that mortality associated with them is generally attributable to the victim having been an illegal drug user or to the use of other types of force alongside electronic arms. *See* Pls.' Br. 40–41; *see also Stun Guns, TASERs, and Other Conducted Energy Devices: Issues for Congress*, CONG. RSCH. SERV. (Dec. 3, 2024), https://perma.cc/XEE8-H9CC ("[S]ome have questioned whether these deaths were actually caused by the use of TASERs, as most of them involved persons with underlying health conditions (such as heart conditions) or who were under the influence of drugs. In some cases, TASERs may have also been used in combination with other types of force ...."). There is no basis to consider them "unusually dangerous" and hence they cannot be banned. Indeed, any holding otherwise is perverse, as citizens deprived of electronic arms may for self-defense may turn to firearms that are *designed* to be deadly. *See*

30

A221–22. "Courts should not be in the business of demanding that citizens use *more* force for self-defense than they are comfortable wielding." *Caetano*, 577 U.S. at 421 (Alito, J., concurring).

## CONCLUSION

The decision of the district court should be reversed, and this Court should remand for entry of judgment for Plaintiffs.

Dated: November 7, 2025

Respectfully submitted,

/s/David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of L.R. 32(a)(4)(B) because this brief contains 6,415 words.

Pursuant to FED. R. APP. P. 32, this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: November 7, 2025

*/s/David H. Thompson*
David H. Thompson

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of November, 2025, I filed the foregoing via the Court's ACMS appellate system, which will electronically notify all counsel requiring notice.

Dated: November 7, 2025

/s/*David H. Thompson*
David H. Thompson

*Attorneys for Plaintiffs-Appellants*

33